# Unreported Cases

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 124149 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Pharmastem Therapeutics, Inc. v. Viacell, Inc.D.Del.,2003.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PHARMASTEM THERAPEUTICS, INC., Plaintiff,
v.
VIACELL INC., Cryo-Cell International, Inc., Corcell, Inc., Stemcyte, Inc., CBR Systems, Inc. f/k/a Cord Blood Registry, Inc., Birthcells Technology, Inc., Nustem Technologies, Inc., and Bio-Cell, Inc., Defendants.
**No. 02-148 GMS.**

Jan. 13, 2003.

*ORDER*

SLEET, J.
*1 After considering the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that the court construes the disputed claims of the patents-in-suit as follows:

U.S. Patent Nos. 5,004,681 and 5,192,553:
1. "hematopoietic stem cells"
"hematopoietic stem cells" is construed to mean "cells capable of effecting repopulation of blood and other hematopoeietic organs."
2. "cryopreservative"
"cryopreservative" is construed to mean "an agent capable of preserving at very low temperatures."
3. "cryopreservation," "cryopreserving," and "cryopreserved"
"cryopreservation," "cryopreserving," and "cryopreserved" are construed to mean "preserving at very low temperatures that may also include an additional agent capable of preserving the cells, blood components, or compositions."
4. "therapeutic composition"
"therapeutic composition" is construed to mean "a composition that is useful for the treatment or prevention of diseases or disorders."
5. "[stem cells] in an amount sufficient"
"[stem cells] in an amount sufficient" is construed to mean "in a quantity as much as is needed." [FN1]

FN1. Consistent with the court's oral ruling during the Markman hearing on January 10, 2003, the court will not address the defendants' indefiniteness argument at this stage of the proceedings. While the court recognizes that a determination of indefiniteness is necessarily intertwined to some degree with claim construction, it is clear that the court must first attempt to determine what a claim means before it can determine whether the claim is invalid for indefiniteness. *See ASM America, Inc. v. Genus, Inc.,* 2002 WL 1892200, *15 (N.D.Cal. Aug. 15, 2002) (recognizing that claim construction must proceed before an indefiniteness challenge); *see also Intervet America, Inc. v. Kee-Vet Labs.,* 887 F.2d 1050, 1053 (Fed.Cir.1989). The court's position at this time does not, however, represent an actual adjudication on the defendants' indefiniteness defense. At present, the court is merely holding that the claim is sufficiently definite to survive claim construction.
Finally, the court wishes to note that the defendants bear the burden of proving invalidity by clear and convincing evidence. *See North American Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1579 (Fed.Cir.1993). The defendants have not, however, filed a motion seeking to invalidate the patents on indefiniteness grounds. Rather, they simply assert their arguments in their opposition claim construction brief. Such an approach is clearly an attempt at an end-run around the court's scheduling order regarding the filing of dispositive motions, and will not be sanctioned.

6. "derived"
"derived" is a commonly understood word and requires no additional construction.
7. "can proliferate within the host"
"can proliferate within the host" is construed to mean "capable of increasing in quantity."

D.Del.,2003.
Pharmastem Therapeutics, Inc. v. Viacell, Inc.
Not Reported in F.Supp.2d, 2003 WL 124149

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2
Not Reported in F.Supp.2d, 2003 WL 124149 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

(D.Del.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2004 WL 3333208</u> (Trial Motion, Memorandum and Affidavit) Reply of Stembanc, Inc. in Support of Motion to Dismiss Cbr Systems, Inc.'S First, Second, Third, Fourth, Fifth, and Sixth Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6) (Dec. 15, 2004) Original Image of this Document (PDF)
• <u>2004 WL 3333205</u> (Trial Motion, Memorandum and Affidavit) CBR Systems, Inc.'s Opposition to Pharmastem Therapeutics, Inc.'s Motion to Dismiss CBR Systems, Inc.'s First, Second, Third, Fourth, Fifth, Sixth and Seventh Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(6) (Nov. 19, 2004) Original Image of this Document (PDF)
• <u>2004 WL 3333201</u> (Trial Motion, Memorandum and Affidavit) Pharmastem Therapeutics, Inc.'s Motion to Dismiss Defendant CBR's First, Second, Third, Fourth, Fifth, Sixth and Seventh Counterclaims (Sep. 13, 2004) Original Image of this Document (PDF)
• <u>2004 WL 3333200</u> (Trial Pleading) Complaint for Patent Infringement (Jul. 28, 2004) Original Image of this Document (PDF)
• <u>2003 WL 23310808</u> (Verdict and Settlement Summary) (Oct. 29, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 1

**H**
Briefs and Other Related Documents
Ampex Corp. v. Eastman Kodak Co.D.Del.,2006.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
AMPEX CORPORATION, Plaintiff,
v.
EASTMAN KODAK COMPANY, Altek Corporation, and Chinon Industries, Inc., Defendants.
**No. CIVA 04-1373 KAJ.**

Oct. 26, 2006.

**Background:** In patent infringement action, parties sought construction of disputed claim language of patent directed to a system that stored for later display a reduced size version of a video image.

**Holdings:** The District Court, Jordan, J., held that:

(1) term "video image" included still images, regardless of whether they were originally generated from a stream of images giving the appearance of motion, and "video still store" meant a system capable of storing still video images;

(2) apparatus claims of patent directed to a system that stored for later display a reduced size version of a video image did not require that the operations and steps be performed in a specific order; and

(3) patent claims reciting a size reducer that transferred and received data only from the random access memory did not require the size reducer to communicate only with the random access memory.

Claims construed.

**[1] Patents 291 ☞314(5)**

291 Patents
  291XII Infringement
    291XII(C) Suits in Equity
      291k314 Hearing
        291k314(5) k. Questions of Law or Fact.
Most Cited Cases
Patent claims are construed as a matter of law.

**[2] Patents 291 ☞157(1)**

291 Patents
  291IX Construction and Operation of Letters Patent
    291IX(A) In General
      291k157 General Rules of Construction
        291k157(1) k. In General. Most Cited Cases
During patent claim construction, the sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.

**[3] Patents 291 ☞101(2)**

291 Patents
  291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(2) k. Construction in General.
Most Cited Cases
Term "video image," as used in claims of patent directed to a system that stored for later display a reduced size version of a video image, included still images, regardless of whether they were originally generated from a stream of images giving the appearance of motion, and "video still store" meant a system capable of storing still video images.

**[4] Patents 291 ☞101(2)**

291 Patents
  291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(2) k. Construction in General.
Most Cited Cases
Terms "video data," "video pixel data," "data set," and "image data set," as used in claims of patent directed to a system that stored for later display a reduced size version of a video image, meant numerical information representing the luminance, red chrominance, and blue chrominance components of each pixel in a video image; there was no indication in the specification or claims that the terms were intended to have different meanings.

**[5] Patents 291 ☞101(2)**

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k. Construction in General.
Most Cited Cases
Term "directly," as used in claims of patent directed to a system that stored for later display a reduced size version of a video image, meant the transfer of data without intervening processing; in light of the prosecution history as a whole, it would be inappropriate to limit the meaning of the term "directly" based on the embodiment depicted in a single block diagram.

**[6] Patents 291 ☞101(2)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k. Construction in General.
Most Cited Cases
With respect to patent claims reciting an apparatus comprising, among other elements, a random access memory means having an input port and an output port, phrase "an input and an output port" meant an input port and a separate output port; since no language was necessary to specify that the random access memory in another claim, which described an apparatus with a "random access memory means" but made no reference to any input or output ports, had input and output capability, the additional language in claims at issue served to specify one of the available input/output structures, namely separate input and output ports.

**[7] Patents 291 ☞165(5)**

291 Patents
   291IX Construction and Operation of Letters Patent
      291IX(B) Limitation of Claims
         291k165 Operation and Effect of Claims in General
            291k165(5) k. Construction of Particular Claims as Affected by Other Claims. Most Cited Cases
Two independent patent claims are presumed to have different scope when different words or phrases are used in those claims.

**[8] Patents 291 ☞101(2)**

291 Patents
   291IV Applications and Proceedings Thereon

      291k101 Claims
         291k101(2) k. Construction in General.
Most Cited Cases
Term "external source," as used in patent claim reciting "[a] video still store system comprising: an external source an image store a memory a size reducer means and means responsive to said memory for displaying the output image," meant a source located outside of and physically separate from the image store, memory, size reducer means, and means for displaying the output image.

**[9] Patents 291 ☞165(3)**

291 Patents
   291IX Construction and Operation of Letters Patent
      291IX(B) Limitation of Claims
         291k165 Operation and Effect of Claims in General
            291k165(3) k. Construction of Language of Claims in General. Most Cited Cases
A proposed patent claim construction must be rooted in the language of the claims.

**[10] Patents 291 ☞101(2)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k. Construction in General.
Most Cited Cases
Term "responsive to," as used in patent claims reciting a size reducing means that was "responsive to said random access memory," meant performs its function automatically under the control of.

**[11] Patents 291 ☞101(2)**

291 Patents
   291IV Applications and Proceedings Thereon
      291k101 Claims
         291k101(2) k. Construction in General.
Most Cited Cases
Phrase "selectively generating," as used in patent claims directed to a system that stored for later display a reduced size version of a video image, meant to choose whether to generate, and "selective transfer" meant to choose whether to transfer.

**[12] Patents 291 ☞101(3)**

291 Patents
   291IV Applications and Proceedings Thereon

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 3

291k101 Claims
291k101(3) k. Limitations in General. Most Cited Cases

**Patents 291 ☜101(11)**

291 Patents
291IV Applications and Proceedings Thereon
291k101 Claims
291k101(11) k. Process or Method Claims. Most Cited Cases
Apparatus claims of patent directed to a system that stored for later display a reduced size version of a video image did not require that the operations and steps be performed in a specific order since there was no language in the apparatus claims that could be construed to require a specific order of operation; however, method claims would be construed to require the generation of a reduced size copy prior to storage of a full size image in the memory since there was no step for storing only the full size image in the bulk memory.

**[13] Patents 291 ☜165(4)**

291 Patents
291IX Construction and Operation of Letters Patent
291IX(B) Limitation of Claims
291k165 Operation and Effect of Claims in General
291k165(4) k. Reading Limitations or Elements Into Claims, or Disregarding Limitations or Elements. Most Cited Cases
A feature that has no support in the patent claim language will not be read into the claims.

**[14] Patents 291 ☜101(11)**

291 Patents
291IV Applications and Proceedings Thereon
291k101 Claims
291k101(11) k. Process or Method Claims. Most Cited Cases
In patent cases, generally steps of a method claim are not construed to require an order, unless they actually recite an order.

**[15] Patents 291 ☜101(11)**

291 Patents
291IV Applications and Proceedings Thereon
291k101 Claims
291k101(11) k. Process or Method Claims.

Most Cited Cases
In construing patent claims, when a subsequent step references something which indicates that a prior step had been performed, the steps of the method claim must be performed in the order written.

**[16] Patents 291 ☜101(2)**

291 Patents
291IV Applications and Proceedings Thereon
291k101 Claims
291k101(2) k. Construction in General.
Most Cited Cases
Term "corresponding," as used in patent directed to a system that stored for later display a reduced size version of a video image meant that a relationship was maintained between each full size image and the reduced size image generated from that full size image.

**[17] Patents 291 ☜101(2)**

291 Patents
291IV Applications and Proceedings Thereon
291k101 Claims
291k101(2) k. Construction in General.
Most Cited Cases
Patent claims reciting a size reducer that transferred and received data only from the random access memory did not require the size reducer to communicate only with the random access memory.

**Patents 291 ☜328(2)**

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases

**Patents 291 ☜328(2)**

291 Patents
291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
291k328 Patents Enumerated
291k328(2) k. Original Utility. Most Cited Cases
4,205,780, 5,440,343. Cited.

4,821,121. Construed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 4

Jack B. Blumenfeld, Esq., Julie Heaney, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Of Counsel: Jesse J. Jenner, Esq., Sasha G. Rao, Esq., Ropes & Gray LLP, New York, NY, Norman H. Beamer, Esq., Gabrielle E. Higgins, Esq., Ropes & Gray LLP, Palo Alto, CA, James E. Hopenfeld, Esq., Ropes & Gray LLP, Washington, DC, Counsel for Plaintiff.
Paul M. Lukoff, Esq., David E. Brand, Esq., Prickett, Jones & Elliott, P.A., Wilmington, Of Counsel: William F. Lee, Esq., Donald R. Steinberg, Esq., Michael J. Summersgill, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, Boston, MA, S. Calvin Walden, Esq., Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY, Counsel for Defendants.

MEMORANDUM OPINION

JORDAN, District J.

## I. INTRODUCTION

*1 This is a patent infringement case. Before me are the parties' requests that, pursuant to *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), I construe the disputed claim language [FN1] of U.S. Patent No. 4,821,121 (issued April 11, 1989) (the " '121 patent"). Plaintiff Ampex Corporation ("Ampex") and Defendants Eastman Kodak Company ("Kodak"), Altek Corporation ("Altek"), and Chinon Industries, Inc. ("Chinon") (collectively "Defendants") have fully briefed their positions and argued them before me. Jurisdiction is proper under 28 U.S.C. § § 1331 and 1338.

## II. BACKGROUND

### A. Procedural Background

Ampex is the owner, by assignment, of the '121 patent. ('121 patent.) It filed its initial complaint for patent infringement on October 21, 2004 (Docket Item ["D.I."] 1), and amended the complaint on October 29, 2004 (D.I.12) and September 8, 2005 (D.I. 38, the "Second Amended Complaint"). Ampex accuses Defendants of infringing claims 7, 8, and 10-15 of the '121 patent (D.I. 300 at 1), and of willfully infringing those claims (D.I. 38 at ¶ 16). In their answer to the Second Amended Complaint (D.I.42), Kodak and Chinon deny infringement and assert a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement of

the '121 patent. (*Id.* at ¶ ¶ 11, 25.) In a separate answer (D.I.41), Altek denies infringement and asserts a counterclaim seeking the same relief. (*Id.* at ¶ ¶ 11, 26.)

### B. The Disclosed Technology

The '121 patent is directed to a system that stores for later display a reduced size version of a video image. ('121 patent at 1:15-21, 1:27-30.) More specifically, the '121 patent discloses "[a]n electronic still store system ... [that] rapidly generates and outputs for display ... a still image frame comprising a plurality of selectively positioned, reduce [sic] size images." (*Id.* at 1:64-67.) Earlier still store systems could display multiple reduced images at one time, but the process required reading the full size images from the memory, reducing their size, and then inserting them into the display. (*Id.* at 1:34-38.) In other words, a reduced image was created each time it was needed, and the process of creating it resulted in a delay of several seconds before it was displayed. (*Id.* at 1:38-40.) In contrast, the claimed system generates a reduced size version once and then stores it for later use. (*Id.* at 2:1-5.) Therefore, the claimed system needs less time than earlier systems did to produce a multi-image display of the reduced versions, because the full size images have already been reduced. (*Id.* at 2:37-43.)

Eight of the claims in the '121 patent are involved in this case. (D.I. 300 at 1.) Independent claims 7, 8, 10, 12, and 14 relate to an apparatus for storing video images, and independent claims 11, 13, and 15 are directed to a method for storing video images. ('121 patent at cols. 6-10.) As an example, claim 7 recites the following still store system:

*2 An apparatus for storing video pixel data representing video images of a first resolution and, for each each [sic] of the images at said first resolution, a corresponding video image at a second resolution, comprising:

random access memory means for storing video pixel data representing one of a succession of full size images at said first resolution and a corresponding reduced size version thereof at said second resolution;

bulk memory means for receiving said video pixel data from said random access memory means and for storing said succession of full size images and the corresponding reduced size versions thereof, and for outputting upon a user's command, either a selected one of the successive full size images or selected ones of the corresponding reduced size versions

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

thereof for direct transfer to, and storage back in, said random access memory means; and

means responsive to said random access memory means for selectively generating one of said corresponding reduced size versions from the respective full size image in said random access memory means, and for transferring the video pixel data representing [sic] and the corresponding reduced size version back to the contents of said random access memory means.

(*Id.* at 6:23-48.)

### III. APPLICABLE LAW

[1] Patent claims are construed as a matter of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed.Cir.1998) (en banc). "[T]he words of a claim 'are generally given their ordinary and customary meaning." ' *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996)). That ordinary meaning "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313.

To determine the ordinary meaning, the court should review "the same resources as would" the person of ordinary skill in the art. *Multiform Dessicants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998). Those resources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art ." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed.Cir.2004).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Both "the context in which a term is used in the asserted claim" and the "[o]ther claims of the patent in question" are useful for understanding the ordinary meaning. *Id.*

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." ' *Id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582). In short, the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. Thus, "[t]he construction that stays true to the claim language and most

naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed.Cir.1998).

*3 On occasion, "the specification may reveal a special definition given to a claim term ... that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed.Cir.2002)). The specification may also "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor ... [, which] is regarded as dispositive." *Id.* (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed.Cir.2001)).

The court "should also consider the patent's prosecution history ." *Markman*, 52 F.3d at 980. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips*, 415 F.3d at 1317 (citing *Lemelson v. Gen. Mills, Inc.* ., 968 F.2d 1202, 1206 (Fed.Cir.1992)).

The court may also rely on extrinsic evidence, which is "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. In particular, "dictionaries, and especially technical dictionaries, ... have been properly recognized as among the many tools that can assist the court in determining the meaning of particular terminology." *Phillips*, 415 F.3d at 1318 (citing *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed.Cir.2002)). However, extrinsic evidence is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language." ' *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed.Cir.2004)).

[2] During claim construction, "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Phillips*, 415 F.3d at 1324.

### IV. CLAIM CONSTRUCTION

A. "video image"; "video still store"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 6

### 1. The Parties' Proposed Constructions

The parties' dispute over these claim terms focuses on whether the modifier "video" means that a still "video image" must be one extracted from a larger series of images portraying movement. Ampex argues that the term "video" should be construed based on the context in which it appears in the claims, and not independently. (D.I. 305 at 1.) Accordingly, Ampex asserts that "video image" should be construed to mean "an electronic signal representation of visual information displayable in visual form on a monitor or other display device." (*Id.* at 3.) Based on this construction, a still image can be considered a "video image" even if it has no relation to a motion image. (*Id.*) In support of its proposed claim construction, Ampex relies on the specification of the '121 patent and extrinsic evidence in the form of dictionaries, other patents, and expert testimony. (D.I. 300 at 15-17.)

*4 Defendants, on the other hand, assert that the term "video" should be construed, by itself, to mean "a series of related electronic images created for rapid display to allow the appearance of movement." (D.I. 305 at 1.) Defendants would then have this construction of "video" applied to the terms "video image," "video data," "video pixel data," and "video still store." (D.I. 299 at 5.) For example, Defendants argue that "video image" means an "electronic signal representation of visual information that is one of a series of related electronic images created for rapid display to allow the appearance of movement." (D.I. 305 at 3.) This proposed construction does not limit the term "video image" to motion videos. (D.I. 348 at 4.) But, according to Defendants' construction, the term "video" does limit the source of a still image. (*Id.*) In other words, a still video image is a single frame captured from a stream of video. (*Id.* at 5.) Defendants base their construction on the language of the specification, as well as extrinsic evidence regarding the use of the term "video" during the 1980s, which is when the application for the '121 patent was filed. (D.I. 299 at 6-8.) Defendants also contend that Ampex's proposed claim construction would render "video" meaningless because it would allow any electronic image to be considered a "video image." (*Id.* at 8-9.)

### 2. The Court's Construction

[3] The specification of the '121 patent intermingles its use of the terms "image" and "video image" (*compare* '121 patent at 1:15-17 *with id.* at 1:27-30), which may be the source of some confusion as to the meaning of these terms. However, when considered in its entirety, the specification does not use the term "video image" to mean only those still images that have been extracted from a stream of images. The specification states that "[t]he video input circuit ... may be another electronic still store system, a TV camera, or some other source of video data from which one or more frames of a video image may be captured." (*Id.* at 2:65-3:1 .) According to this statement, the claimed still store system may receive a "video image" from another system that stores still images. There is no requirement that the still image obtained from the "other" system must be one that was originally captured from a motion image. It can be any electronic image provided by the "other" still store system. Therefore, the term "video image" includes still images, regardless of whether they were originally generated from a stream of images giving the appearance of motion.

To the extent one might say the intrinsic evidence leaves the meaning of "video image" ambiguous, the extrinsic evidence, particularly in the form of other patents, supports Ampex's proposed claim construction because the term "video image" was often used to refer to any electronic image. One of Kodak's own patents, U.S. Patent No. 5,440,343 (the " '343 patent"),[FN2] states that "[t]he invention provides an electronic imaging system that records both motion and still video images." ('343 patent at 2:3-4 (cited by Ampex at D.I. 347, Ex. 43).) With respect to the still video images, the specification of Kodak's patent further explains that, in still mode, "a high resolution still image is captured and recorded by the recording unit ... each time the record switch ... is depressed." (*Id.* at 3:27-31.) Thus, Kodak used the term "video image" for a still image that was captured firsthand by the electronic imaging system, and not by extraction from a related motion image. European Patent No. 0051305, which is referenced by the '121 patent, also uses the term "video" to describe electronic images. ('121 patent, References Cited.) Specifically, this patent uses the term "video signal" to refer to 2-dimensional picture information that was acquired using a scanner. (European Patent No. 0051305 at 5:23-29 (cited by Ampex at D.I. 308, Ex. 3).) Similarly, U.S. Patent No. 4,205,780 discloses a system that "includes a video camera ... mounted on the document scanner and positioned to capture the video image of each document." (U.S. Patent No. 4,205,780 at 5:55-58 (cited by Ampex at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

D.I. 307, Ex. 10).) In both of these patents, "video" refers to an image that is obtained by scanning a document, and not from a motion image. This review of other patents, albeit brief, demonstrates that others of skill in the art likely understood "video image" to include any still image in electronic form.

**\*5** Defendants' argument that Ampex's proposed construction essentially reads "video" out of the claims is not persuasive. The term "image," alone, is not limited to electronic representations of visual information. Rather, as Ampex contends, "image" is broader because it includes the depiction of visual information in other formats, such as transmission through a lens or reflection from a mirror (D.I. 346 at 10), or images captured in non-electronic form, such as a photograph or painting.[FN3] Thus, Ampex's proposed construction does not render "video" superfluous. Accordingly, I will construe the term "video image" to mean "an electronic signal representation of visual information displayable in visual form on a monitor or other display device." I will also construe "video still store" to mean "a system capable of storing still video images."

B. "video data"; "video pixel data"; "data set"; "image data set"; "the video data"; "the video pixel data"; "said video pixel data"; "the data sets"; "said image data sets"

1. The Parties' Proposed Constructions

The parties' dispute respecting these terms centers on the meaning of the term "data" when it is used in the context of a video still store system. The parties also disagree about the relationship between the first reference to "data" in each claim and subsequent references to "said data" or "the data." Ampex asserts that "data" should be construed to mean "information, in any form, representing a video image." (D.I. 305 at 7-8.) Ampex then argues that "said/the data" means "data representing the same image as the antecedent data." (*Id.* at 9.) In other words, the later referenced "data" need not be exactly the same as the initial "data," as long as it represents the same image. (D.I. 300 at 20-21.) Ampex claims support for its proposed claim construction in the preferred embodiments of the invention and the specification of the '121 patent. (*Id.* at 21-22.) Ampex also relies on extrinsic evidence, including dictionary definitions, expert testimony, and the claim construction arguments made by Kodak during licensing discussions with other companies. (D.I.

307, Exs. 16, 17; D.I. 346 at 13-14.)

Defendants assert that "data" simply means "numerical information." (D.I. 305 at 7.) In line with this proposed construction, Defendants argue that "said/the data" can only mean "the data that is first referenced in the claims." (*Id.* at 9.) Thus, Defendants contend that any subsequent use of the term "data" in the form "said/the data" refers to the same numerical information as the initial use of the term. (D.I. 299 at 10, 13.) The basis for Defendants' asserted claim construction is the claim language, specification, and prosecution history of the '121 patent, as well as extrinsic evidence in the form of dictionaries and expert testimony. (*Id.* at 9-13.)

While the parties' arguments focus almost exclusively on the meaning of "data," none of the claims in the '121 patent use the term "data" by itself. Rather, claims 7, 8, 11, and 14 use the term "video pixel data" ('121 patent at 6:23-48, 6:49-7:20, 7:65-8:14, 8:65-10:7), claim 10 uses the term "video data" (*id.* at 7:31-64), claim 12 uses the term "image data sets" (*id.* at 8:15-47), and claims 13 and 15 use the term "data sets" (*id.* at 8:48-64, 10:8-33). Although these terms were not discussed at length in the briefs, both parties have submitted proposed constructions for them. Therefore, I will consider the arguments made regarding the term "data" when construing the terms that are actually present in the claims.

2. The Court's Construction

**\*6** [4] The ordinary meaning of "data," in the context of a digital system, is "numerical information." *See The American Heritage Dictionary* (New College ed.1982) (defining "data" as "numerical information in a form suitable for processing by computer") (cited by Defendants at D.I. 301 at A-009). Ampex's expert, Dr. Ligler, agreed that "data" refers to numerical information. When asked about the meaning of "video pixel data" in claim 7, Dr. Ligler stated that "[d]ata is represented using 1s and 0s which is mathematical data." (D.I. 301 at A-632, 280:3-14.) Dr. Ligler went on to say that, when in stored form, "data" cannot be anything other than numbers. (*Id.* at A-633-634, 288:21-289:6.) Although Ampex submits dictionaries that define "data" broadly to mean "information" (D.I.307, Exs.16, 17), Ampex does not overcome the evidence, both intrinsic and from its own expert, showing that "data" is limited to numerical information when used in the context of a digital still store system.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

The specification of the '121 patent further explains what is meant by "data, and more particularly the claim terms "video data," "video pixel data," "data set," and "image data set," in the context of the claimed still store system. In order for a video image to be stored in a digital still store system, such as the one claimed in the '121 patent, the image must be in digital format. ('121 patent at 3:16-19.) According to the specification, in "digital sampled data form ... each pixel of video data is represented by three eight bit data bytes defining respectively luminance, red chrominance, and blue chrominance components." (Id . at 3:19-24.) Thus, once converted to digital form, every pixel in an image has three components, each of which has a particular numeric value. (Id. at 3:29-34.) These component values are then represented as a series of binary bits, with each bit being a one or a zero, and the resulting data being stored in the still store system. (See id.) Therefore, the specification confirms that, in a digital system, "data" refers to numerical information and "video data" refers to the numerical information that represents the pixel components of a video image.

There is no indication in the specification or claims that the terms "video data," "video pixel data," "data set," and "image data set" were intended to have different meanings. On the contrary, they appear to be used synonymously. For example, even after the specification explains that a digital video image is composed of pixel components (id. at 3:19-24 ("each pixel of video data" has three components)), the specification continues to use the term "video data," and not "video pixel data," to refer to information representing a digital image (id. at 3:47-48 ("video data representing a frame of a video image")). Also, the claims appear to use the terms "video data" and "video pixel data" interchangeably. Claim 8 recites a "random access memory means ... for storing the *video pixel data* presented at the input port" and a "bulk storage memory ... for presenting selected groups of *video data* at said input port for storage by said random access memory means." (Id. at 6:53-55, 6:60-63 (emphasis added).) Thus, claim 8 uses "video data" and "video pixel data" to refer to the same data. Finally, the claims also use the terms "data set" and "image data set" to refer to information representing an image in the digital still store system. (Id. at 8:15-18 ("full size image data sets representative of corresponding full size images"); id. at 8:48-51 ("A method of storing video pixel data for access and display comprising: providing data sets for a plurality of full size images").) Since images stored in digital format are composed of pixel components, the terms "data set" and "image data set" must be referring to

the same numerical information as the terms "video data" and "video pixel data." Since these four "data" terms are used synonymously in the specification and claims, I will give them the same construction. I will construe "video data," "video pixel data," "data set," and "image data set" to mean "numerical information representing the luminance, red chrominance, and blue chrominance components of each pixel in a video image."

*7 In each of the asserted claims, the term "said" or "the" is used in conjunction with a reference to "video data," "video pixel data," "data set," or "image data set." (Id. at cols. 6-10.) The parties appear to agree that the first use of one of these "data" terms in each claim provides an antecedent basis for later references in the form "said data" or "the data." (D.I. 299 at 11; D.I. 346 at 12.) Since each "data" term refers to the numerical information representing the components of each pixel in an image, "said/the data" logically refers to the set of numerical information necessary to recreate those pixels. Ampex actually appears to acknowledge that conclusion when it argues that "said/the data" means that the data must create the same image as that born of the antecedent data. (D.I. 300 at 20.) The specification clearly teaches that, in digital form, an image is represented by the values of the three components of each pixel. ('121 patent at 3:19-24.) Therefore, in order for digital data to represent the *same* image, it must represent the *same* luminance, red chrominance, and blue chrominance values for each pixel of that image. To the extent that the data necessary to achieve the same luminance and chrominance values must be the same bits originally referenced, the claims require that sameness. To the extent any difference in bits can occur and still achieve the same pixel values, and to that extent only, a variation in the bits is contemplated by the claims.

Ampex argues that construing "said/the data" to require the same numerical information would read a preferred embodiment of the invention out of the claims. (D.I. 300 at 21-22.) According to Ampex, the specification sets forth an embodiment of the invention in which a significant amount of processing takes place between the video input and the image store. (Id. at 21.) Ampex contends that Defendants' claim construction is improper because, in this preferred embodiment, the image store cannot contain the same numerical information that was originally supplied by the video input. (Id.) Of the asserted apparatus claims, only claim 12 is relevant to this argument because it is the only one that provides for a video input.[FN4] Claim 12 recites "[a] video still

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

store system comprising: an external source for supplying a plurality of full size image data sets representative of corresponding full size images; an image store for storing said full size image data sets ..." ('121 patent at 8:15-24.) Therefore, the critical issue is whether the external source performs the processing before it supplies the data or some other circuitry performs the processing between the external source and the image store.

Ampex points to two types of processing that are discussed in the specification. First, the specification discloses that "the video input ... will include appropriate video signal decoding means to process video data received from sources that provide the data in an encoded form." (Id. at 3:8-11.) The only element of claim 12 that can be considered a video input circuit is the "external source." (Id. at 8:15-47.) Thus, according to the specification, it appears that the external source itself will perform the decoding process. Contrary to Ampex's assertion, this processing will not occur between the external source and the image store.

*8 Second, the specification states that "[a]n input analog-to-digital (A-D) converter ... is coupled to receive an input video signal provided by the video input circuit ..., which typically includes video signal processing circuitry that prepares the signal for conversion by the A-D converter ..." (Id. at 3:12-14.) Claim 12 states that the "external source" supplies "a plurality of full size image data sets." (Id. at 8:16-18.) As previously discussed, the term "image data set" means numerical information representing the pixel components of a video image. However, the pixel components of a video image only exist after the image has been converted to digital format. (Id. at 3:19-24.) Therefore, in claim 12, the analog-to-digital conversion must be performed before the external source can supply "image data sets" to the digital still store system. As a result, this processing cannot occur between the external source and the image store.

Since neither form of processing described in the specification takes place between the video input and the image store, construing the term "said/the data" to mean the same numerical information encompassed by the first reference to "data" does not read a preferred embodiment out of the claims. Moreover, the focus is not on the exact order of the ones and zeros; it is on the sameness of the image created. As construed above, references to "said/the data" require numerical information representing the same component values for each pixel in the image. Thus,

any processing that may occur within the digital still store system, to the extent that it changes binary bit values but still maintains the same pixel values, will not remove the system from the scope of the claims. Again, however, the claims will not cover a system that, in the course of processing the data, changes the values of the luminance and chrominance components.

Finally, Ampex contends that the construction of "said/the data" affects a preferred embodiment of the invention in which the permanent memory component is a magnetic disk store. (D.I. 300 at 22 .) Specifically, Ampex relies on expert testimony that "the data actually recorded on the magnetic disk storage system would not be mathematically identical to the data for the video image as stored in the framestore, because ... [it] would be encoded using formats more appropriate for more permanent storage." (D.I. 309 at 8, ¶ 37.) Specifically, the encoding methods used for magnetic disk drives "would significantly change the actual bits recorded on the magnetic disk drive from their original form." (Id. at 8-9, ¶ 40.) Defendants admit that storage on a magnetic disk drive would change the ones and zeros, but they contend that the values of the pixel components would remain the same. (D.I. 348 at 10.) Accordingly, a magnetic disk drive that changes binary bit values without affecting pixel values will not fall outside the scope of the claims.

*9 In sum, I construe "the video data," "the video pixel data," "said video pixel data," "the data sets," and "said image data sets" to mean "numerical information representing the same luminance, red chrominance, and blue chrominance components of each pixel in a video image."

C. "direct"; "directly"

1. The Parties' Proposed Constructions

The parties disagree on the meaning of the terms "direct" and directly," which are used in claims 7, 8, and 10 to describe the transfer of data. ('121 patent at 6:36-40, 6:64-7:5, 7:16-20, 7:59-60.) Ampex asserts that "direct" should be construed to mean that the "transfer path is not circuitous or roundabout, and the transferred data is not significantly processed after it has left the providing or sending structure and before it has reached the receiving structure." (D.I. 305 at 27.) Ampex relies on the prosecution history of the '121 patent, dictionary definitions, and expert

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

testimony. (D.I. 300 at 29-30.) Defendants contend that "direct" means "the transfer of data without intervening circuitry." (D.I. 305 at 27.) In support of their proposed claimed construction, Defendants cite to the prosecution history and the drawing in the '121 patent. (D.I. 299 at 14.)

### 2. The Court's Construction

[5] Both parties rely heavily on the same portion of the prosecution history as the basis for their proposed claim constructions. The relevant part of the prosecution history is the amendment that added the term "directly" to several of the claims. (D.I. 301 at A-202-204.) Defendants emphasize that, in the course of explaining this amendment, the applicant stated that one of the amended claims recites a "bulk memory means which stores both size images and which transfers either size of the images directly back to the random access memory means, with no other circuit therebetween." (*Id.* at A-212-213.) It is from this isolated statement that Defendants draw their proposed claim construction. (D.I. 299 at 14.) However, when this statement is viewed in the context of the entire discussion of the amendment, it does not support Defendants' proposed construction.

In the amendment cited by Defendants, the term "directly" was added to the claims in order to overcome a rejection based on U.S. Patent No. 4,302,776 to Taylor et al. ("Taylor"). (D.I. 301 at A-171, A-199, A-212-213.) Accordingly, the applicant pointed out the relevant features of Taylor and explained how the amendment distinguished the invention from that reference. (*Id.* at A-212-213.) In particular, the applicant stated that Taylor "must pass a frame of video data through his size changer ... prior to supplying his frame store" and that the "use of a size changer between the two stores is an integral feature of his system." (*Id .* at A-212.) The applicant claimed that adding "directly" to the claims distinguished the invention because Taylor "fails to teach ... the direct transfer of images between the disc storage and random access memory." (*Id.* at A-213.) Thus, the term "directly" was intended to mean that data can be transferred between the bulk memory and the random access memory without passing through a size reducer.

*10 In light of the prosecution history as a whole, it would be inappropriate to construe the term "directly" in the way proposed by Defendants. Furthermore, although the drawing in the '121 patent does not show any circuitry between the two memory

components (*see* '121 patent), I will not limit the meaning of the term "directly" based on the embodiment depicted in a single block diagram. *See, e.g., Beckson Marine, Inc. v. NFM, Inc.,* 292 F.3d 718, 724 (Fed.Cir.2002) (holding that, in light of other language in the written description, the figures depicting a single preferred embodiment will not be construed as limiting the claim terms). The statements made by the applicant during prosecution indicate that "directly" was intended to mean the transfer of data without intervening size reduction or, by logical extension, other similar processing. (D.I. 346 at 17.) Therefore, I will construe the term "directly" to mean "the transfer of data without intervening processing."

### D. "an input port and an output port"

### 1. The Parties' Proposed Constructions

The parties' dispute whether the claim language "an input port and an output port" requires separate input and output ports, or just a single port capable of performing both input and output functions. In contrast with its argument regarding "video image," Ampex argues that "input port" and "output port" should be construed separately, rather than in the context of the phrase used in the claims. (D.I. 300 at 34.) Ampex proposes that "port" should be construed to mean "an interface between a communications channel and a unit of computer hardware." (D.I. 305 at 42.) In accordance with this construction, Ampex asserts that "input port" means "a port for inputting data into the claimed random access memory," and "output port" means "a port for outputting data from the claimed random access memory." (*Id.*) Ampex bases its construction on a technical dictionary definition of "port" and the ordinary meaning of "input" and "output." (D.I. 300 at 34.) Ampex also argues that a RAM with separate input and output ports had a specialized name at the time the '121 patent was filed, and that there is no intrinsic evidence to support reading that narrower term into the claims. (*Id.*)

Defendants assert that "an input port and an output port" should be construed as one phrase meaning a random access memory with "an input port and a separate output port." (D.I. 305 at 42.) Defendants' proposal relies on the language of the claim and the one drawing included in the specification of the '121 patent. (D.I. 299 at 16.) Defendants also set forth a claim differentiation argument in support of their

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 11

claim construction. (*Id.* at 16-17.)

### 2. The Court's Construction

[6] Although the specification does not state that the random access memory has any particular input or output structure, the language in claims 8 and 14 imposes a limitation. Claims 8 and 14 disclose an apparatus that includes a "random access memory means having an input port and an output port." ('121 patent at 6:53-54, 9:1-2.) These claims recite an input port *and* an output port, which suggests that the input port is "structurally distinct" from the output port. *Cf. Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.,* 93 F.3d 766, 769-70 (Fed.Cir.1996) (holding that claim language requiring " 'openings ... adjacent *each of* said side walls and ends walls' ... suggests that the openings adjacent to the side walls are structurally distinct from the openings adjacent to the end walls" (original emphasis)). Thus, the plain language of the claims favors Defendants' proposed construction.

**\*11** [7] Defendants' position that the language in claims 8 and 14 requires separate input and output ports is also supported by the lack of any similar language in claim 7. The doctrine of claim differentiation is often cited for "the presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.,* 438 F.3d 1374, 1380 (Fed.Cir.2006). But, there is also "a presumption that two independent claims have different scope when different words or phrases are used in those claims." *Seachange Int'l, Inc. v. C-Cor Inc.,* 413 F.3d 1361, 1369 (Fed.Cir.2005). It must be noted that the doctrine is " 'not a rigid rule," ' and it has been applied cautiously so that parties cannot " 'broaden claims beyond their correct scope." ' *Curtiss-Wright,* 438 F.3d at 1381 (quoting *Laitram Corp. v. Rexnord, Inc.,* 939 F.2d 1533, 1538 (Fed.Cir.1991); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.,* 287 F.3d 1108, 1115 (Fed.Cir.2002)). This concern arises primarily when a party argues that one independent claim must be broader than another because of differences in the claim language. *See, e.g., Seachange,* 413 F.3d at 1369 (holding that the difference in claim language creates a presumption that one independent claim does not require the limitation present in another independent claim). However, in this case, Defendants argue that an independent claim must be narrower than another because it contains language that is not present in the other independent claim. Therefore, the usual concern with applying claim

differentiation is not present in this case, and, as a result, the differences between the claims may serve as a "useful guide in understanding the meaning of particular claim terms." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed.Cir.2005).

As previously discussed, claims 8 and 14 of the '121 patent recite an apparatus comprising, among other elements, a "random access memory means having an input port and an output port." ('121 patent at 6:53-54, 9:1-2.) Claim 7 also describes an apparatus with a "random access memory means," but makes no reference to any input or output ports. (*Id.* at 6:27-31.) The parties appear to agree that a random access memory must have input and output capability. (D.I. 299 at 16; D.I. 300 at 34-35.) Furthermore, both parties submit that, at the time the patent was filed, a random access memory could have a single port with both input and output capability, or a separate input and output port. (D.I. 346 at 20; D.I. 348 at 29.) Therefore, according to the parties, no language was necessary to specify that the random access memory in claim 7 had input and output capability. This supports Defendants' proposition that the additional language in claims 8 and 14 serves to specify one of the available input/output structures, namely separate input and output ports.

Ampex argues that this is not the proper construction because a random access memory with separate input and output ports was called a "dual-ported RAM," and that this specialized term did not appear in any of the intrinsic evidence. (D.I. 300 at 34-35; D.I. 346 at 20.) While that is true, the language that does appear in claims 7, 8, and 14 favors Defendants' proposed claim construction. Therefore, I will construe the phrase "an input and an output port" to mean "an input port and a separate output port."

### E. "external source"

#### 1. The Parties' Proposed Constructions

**\*12** Claim 12 is the only asserted claim that contains the term "external source." ('121 patent at 8:16-18.) The parties' dispute whether the source must be external to the entire video still store system or just certain components of the system. Ampex argues that the language and structure of the claim demonstrate that "external source" means "a source of video images outside of the image store ." (D.I. 300 at 35; D.I. 305 at 43.) In contrast, Defendants assert that "external source" should be construed to mean "a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

source located outside of and at a separate physical location from the physical location of the other components of the video still store system." (D.I. 305 at 43-44.) Defendants rely on the ordinary meaning of the term, the structure of the claim, and the specification. (D.I. 299 at 17-18.)

## 2. The Court's Construction

[8] The structure of claim 12 is especially instructive with regard to the meaning of "external source." Claim 12 recites "[a] video still store system comprising: an external source ... an image store ... a memory ... a size reducer means ... and means responsive to said memory for displaying the output image." ('121 patent at 8:15-47.) Only one component of the video still store system is identified as being "external." Therefore, a logical reading of the claim is that the "external source" means something physically separate from the other components set forth in the claim, namely the image store, memory, size reducer means, and means for displaying the output image. Ampex argues that because the claim states "said memory being responsive to either the external source or the image store," the "external source" need only be outside of the image store. (D.I. 300 at 35.) However, the claim language cited by Ampex merely demonstrates that the memory is responsive to two components of the video still store system. Nothing in this language limits the meaning of "external" or contradicts the logical reading of claim 12.

The specification of the '121 patent supports construing "external source" to mean a source that is physically separate from the other claimed components of the video still store system. Claim 12 states that the "external source" supplies "a plurality of full size image data sets." ('121 patent at 8:16-18.) According to the specification, the source of video images "may be another electronic still store system, a TV camera, or some other source of video data ..." (Id. at 2:65-68.) In all of these examples, the image source would be located outside of the other components of the claimed video still store system.

Ampex contends that "external source" actually means that the source provides images that had been obtained from outside of the video still store system. (D.I. 346 at 21-22.) This argument contradicts not only the specification, but also the plain language of claim 12, in which "external" modifies "source," not "images ." ('121 patent at 8:16-18.) In rejecting Ampex's argument, I do not disagree that the source

can provide images that were captured from outside of the still store system. However, both the claim language and the specification indicate that the "source" itself is physically separate from the other claimed components of the video still store system. Therefore, I will construe the term "external source" to mean "a source located outside of and physically separate from the image store, memory, size reducer means, and means for displaying the output image."

## F. Automatic Operation

*13 Ampex requests that all of the claims be construed to require "automatic generation and storage of reduced size images each time a full size image is stored." (D.I. 300 at 22 (emphasis omitted).) Ampex also asserts that claims 7, 10, 12, 13, and 15 should be construed to disclose a system that will automatically output, transfer, access, or retrieve a plurality of reduced size images. (Id. at 22.)

Significantly, the term "automatic" does not appear in any of the claims or the specification. Ampex argues that this limitation should be read into the claims, but, for the most part, fails to identify any specific claim language to support its effort. Ampex states that the "logic" of the claims supports its proposed construction. (Id. at 23.) In particular, Ampex relies on the following claim language: "random access means for storing" and " bulk memory means for receiving" in claim 7, "control means for causing" in claims 8 and 14, and "first store for receiving" and "second store for receiving and storing" in claim 10. (Id.) Ampex believes that this language demonstrates that each component of the claimed still store system performs its function without input from the user. (Id.) However, the language cited by Ampex simply identifies the components of the still store system and their intended functions. Nothing in this language can be construed to mean that those functions will be performed "automatically" by the claimed system.

Ampex contends that its proposed construction is grounded in the specification and prosecution history of the '121 patent. Ampex specifically points to a portion of the specification which states that the multi-image display "is facilitated by generating a quarter sized copy of each newly received image frame and storing both together." (Id. at 24; '121 patent, Abstract.) Ampex also argues that because the specification describes the '121 patent as an improvement over the related prior art, it must at least contain the basic features of that prior art. (D.I.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                    Page 13
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

300 at 24.) According to Ampex, since earlier still store systems generated reduced size images automatically, the system claimed in the '121 patent must also operate automatically. (*Id.*) Finally, Ampex refers to a section of the prosecution history in which the examiner stated that an "apparent novelty" of the claimed invention is that "the 'frame' of video, containing both resolution copies, is non-selectively produced for all images that are stored." (D.I. 301 at A-056.)

[9] Notwithstanding the intrinsic evidence presented by Ampex, a proposed claim construction must be rooted in the language of the claims. *Bayer AG. v. Biovail Corp., 279 F.3d 1340, 1348 (Fed.Cir.2002).* "While a court may look to the specification and prosecution history to interpret what a patentee meant by a word or phrase in a claim, extraneous limitations cannot be read into the claims from the specification or prosecution history." *Id.* Ampex argues that the intrinsic evidence discussed above demonstrates that *all* of the claims in the '121 patent require the automatic generation and storage of reduced size images. (D.I. 300 at 22.) Yet, Ampex does not show how the evidence can be used to construe any specific terms in the claims. Thus, Ampex is essentially asking that a feature be read into the claims; a task that the court is not permitted to undertake. The Federal Circuit has consistently held that "interpreting what is meant by a word in a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.' " *Intervet Am., Inc., v. Kee-Vat Labs., Inc., 887 F.2d 1050, 1053 (Fed.Cir.1989)*(quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed.Cir.1988)).* It would seem obviously more improper to add a limitation that appears no where in the specification.

*14 With that said, Ampex does ask the court to construe specific language in some of the claims which is closely related to the idea of automatic operation. In particular, Ampex asserts that the phrase "responsive to" in claims 7, 8, 12, and 14 is indicative of automatic operation. (D.I. 300 at 25.) Ampex also points to the term "selectively generating" in claim 7 and the term "selective transfer" in claim 14. (*Id.* at 31-32.) Therefore, those terms are construed below.

1. "responsive to"

a. The Parties' Proposed Constructions

Ampex asserts that "responsive to," in the context of the claim language, means that "the claimed operations are performed automatically under processor control, without the operator orchestrating each step." (D.I. 305 at 29-30.) To support its proposed construction, Ampex relies primarily on the prosecution history of the '121 patent. (D.I. 300 at 25; D.I. 346 at 31-33.) On the other hand, Defendants' contend that "responsive to" means "to be coupled to the random access memory so as to be able to receive data from the random access memory." (D.I. 305 at 28.) Defendants base their construction on the plain language of the claims and the specification. (D.I. 299 at 31-32.)

b. The Court's Construction

[10] During prosecution of the '121 patent, the applicant made an amendment that is directly related to the meaning of the term "responsive to." Specifically, the examiner rejected several claims based on a publication by Hugh Boyd, Quantel ("Boyd"). (D.I. 301 at A-091, A-108.) In order to overcome the rejection, the phrase "in response to" was added to two of the claims. (*Id.* at A-104-105.) The applicant argued that these two claims were amended to reflect that the size reducer produced reduced size images "in response to" the writing of full size image data into the frame store. (*Id.* at A-108.) Most significantly, the applicant then distinguished the Boyd reference on the basis that Boyd did not teach the "responsive use of the size reducer" because "[t]o perform such an operation with the Boyd system an operator would have to orchestrate each step." (*Id.*) Thus, the phrase "in response to" was used to indicate that size reduction was performed automatically upon the writing of data into the frame store, without any command from the operator.

As Defendants point out, the two claims that were amended to include the phrase "in response to" were rejected by the examiner and later cancelled by the applicant. (*Id.* at A-121.) What Defendants fail to acknowledge is that the examiner determined that those two claims would be allowable if rewritten to overcome an indefiniteness rejection under 35 U.S.C. § 112. (*Id.* at A-112, A-114.) Therefore, amending the claims to recite the responsive use of the size reducer was the key to overcoming the prior art rejection. As a result, when new claims were added to the application (*id.* at A-156), the applicant distinguished the Boyd reference on the same basis

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

(*id. at A-163-164*). Specifically, the applicant explained that "[t]his system obviously has a major advantage over the Boyd, Quantel system ... because the Boyd, Quantel reference does not store a reduced size image automatically with the full size counterpart each time a full size image in the frame buffer is to be stored on disk." (*Id.*)

**\*15** Defendants also contend that the claims in the '121 patent are significantly different than the language that Ampex cited to in the prosecution history. (D.I. 299 at 34.) It is true that claims 7, 8, and 14 recite a size reducing means that is "responsive to said random access memory" ('121 patent at 6:41-42, 6:64-64, 9:12-13), rather than the original language, which stated that the size reducer operated in response to the writing of full size image data into the frame store. However, the amendment which added the phrase "responsive to" (D.I. 301 at A-181) makes clear that this language was meant to describe the same distinguishing feature of the invention. In that amendment, the applicant explained that the "size reducer ... is responsive to the frame store to supply a reduced size image at such time as only a full size image is stored in the frame store." (*Id. at A-192.*)

Based on the prosecution history, I will construe the phrase "responsive to" to mean "performs its function automatically under the control of." Accordingly, in claim 7, the phrase "means responsive to said random access memory means" will be construed to mean that "the means performs its function automatically under the control of said random access memory means." Similarly, in claims 8 and 14, the phrase "size reducing means responsive to said random access memory means" will be construed to mean that "the size reducing means performs its function automatically under the control of said random access memory means." Finally, in claim 12, "said memory being responsive to either the external source or the image store" will be construed to mean that "said memory performs its function automatically under the control of either the external source or the image store." My construction is strictly limited to the "responsive to" language. I do not find that all of the claims require the automatic generation and storage of reduced size images each time a full size image is stored. Further, I do not find that every component in the system performs its functions automatically.

2. "selectively generating"; "selective transfer"

a. The Parties' Proposed Constructions

Ampex asserts that "selective" means "characterized by selection," and "select" means "chosen in preference to another or others." (D.I. 305 at 14.) Ampex requests that "selectively generating" be construed to mean that "without the operator orchestrating each step, the claimed means automatically determines whether to generate a reduced size version and generates it in those cases." (*Id. at 31.*) Similarly, Ampex argues that "selective transfer" should be construed to mean that "without the operator orchestrating each step, the claimed means automatically determines whether to generate a reduced size version and generates it in those cases, and transfers the reduced size image so generated to random access memory." (*Id.*) In support of its position that the selection is made "automatically" by the claimed system, Ampex relies on the prosecution history of the '121 patent, as well as expert testimony. (D.I. 300 at 32.)

**\*16** Defendants claim that "selective" and "selectively" mean "the ability to chose (i.e., select)." (D.I. 305 at 14.) Accordingly, Defendants ask that "selectively generating" be construed to mean that "there is the ability to choose (i.e., select) whether to generate reduced size images," and that "selective transfer" be construed to mean that "there is the ability to choose (i.e., select) whether to transfer the reduced size images from the size reducer through random access memory to bulk memory." (*Id.*) The basis for Defendants proposed claim construction is the ordinary meaning of the term "select," the plain language of the claims, and specification. (D.I. 299 at 19-21.) Defendants disagree with Ampex's argument that the claimed system "automatically" makes the selection. (*Id. at 21-22.*)

b. The Court's Construction

[11] The parties appear to agree that the ordinary meaning of the terms "selective" and "selectively" involves choice. (*Id. at 19;* D.I. 300 at 32.) The parties also seem to be in agreement that "selectively generating" means "to choose whether to generate" and "selective transfer" means "to choose whether to transfer." (D.I. 299 at 19; D.I. 300 at 32.) The only dispute is as to whether the system or the user performs the selection. Ampex admits that the terms "selective" and "selectively" do not mean that the selection is performed "automatically" by the system. (D.I. 346 at 23.) And, Ampex points to no other language in the claims that can be construed to mean

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

"automatically." Rather, Ampex argues that the purpose of the invention requires that "automatically" be read into the claims. (D.I. 300 at 32; D.I. 346 at 24.) Ampex also provides a statement from the prosecution history, which it claims confirms that the system itself performs the selection.<sup>FN8</sup> (D.I. 300 at 32.) But, Ampex does not show how these general explanations of the invention relate to any of the specific language in the claims. As discussed above, the specification and prosecution history cannot be used to read limitations into the claims that have no support in the claim language. See *Bayer AG., 279 F.3d at 1348.* Therefore, I will construe "selectively generating" to mean "to choose whether to generate," and "selective transfer" to mean "to choose whether to transfer."

G. Order of Operations and Steps

1. The Parties' Proposed Constructions

The parties dispute whether the claims require that the operations and steps be performed in a specific order. Ampex asserts that, in all of the claims, the reduced size image must be generated prior to storage of the full and reduced size images. (D.I. 300 at 22.) Ampex argues that the structure of the claims, the specification, and the prosecution history support its proposed claim limitation. (*Id.* at 23-25.) Defendants contend that none of the claims require a specific order because there is no basis in the actual claim language. (D.I. 348 at 15.) Defendants also argue that Ampex's reliance on the specification and prosecution history is misplaced. (*Id.* at 15-16.)

2. The Court's Construction

*17 [12] Ampex asserts that both the apparatus and method claims require that the reduced size image be generated before the images are stored. (D.I. 300 at 22.) With respect to claims 7, 8, 10, 12, and 14, which are the apparatus claims at issue, neither the language nor the structure of these claims demonstrates that the reduced size image must be generated prior to storage of the images. Ampex does not cite any language in these claims as explicitly stating an order of operation. Rather, Ampex argues that because the claims recite a bulk memory for storing both the full and reduced size images, the reduced size image must be generated before either is stored in the memory. (*Id.* at 23.) However, simply because the bulk memory may be used to store both

size images does not mean that it cannot store a full size image without a reduced size version. This is illustrated by the fact that some of the apparatus claims also recite a random access memory for storing the full and reduced size images. ('121 patent at 6:27-31, 8:25-32) Ampex admits that full size images are stored in the random access memory before creation of the reduced size version. (D.I. 300 at 4.) Thus, Ampex's argument is not persuasive.

[13] Ampex also submits that the purpose of the invention and the preferred embodiment its proposed construction. (*Id.* at 23-25.) Ampex cites to a section of the prosecution history in which the examiner stated that an "apparent novelty" of the claimed invention is that "size reduction and production of the 'frame' of video data is performed by the interaction between the size reducer and the frame store prior to storage in the image store." (D.I. 301 at A-056.) As discussed above, descriptions of the invention in the specification and prosecution history may be helpful in construing the claim language. *Bayer AG., 279 F.3d at 1348.* However, a feature that has no support in the claim language will not be read into the claims. *Id.* Since there is no language in the apparatus claims that can be construed to require a specific order of operation, I will not read one into claims 7, 8, 10, 12, and 14.

[14] In contrast, the methods set forth in claims 11, 13, and 15 do contain language that requires the steps to be performed in a specific order. The general rule is that the steps of a method claim are not construed to require an order, unless they actually recite an order. *Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed.Cir.2003).* Ampex does not argue that there is any language in the claims which explicitly sets forth an order. However, even if a method claim does not recite an order, there is a two-part test for determining if the steps must nonetheless be performed in the order in which they are written. *Id.* First, the court should determine whether the claim language, "as a matter of logic or grammar," requires that the steps be performed in the order written. *Id.* Second, the court can look to the rest of the specification to determine whether it explicitly or implicitly requires such a construction. *Id.* at 1370.

*18 [15] The logic of claims 11, 13, and 15 requires that the reduced size image be generated before the images are stored in the bulk memory. For example, claim 11 reads as follows:
A method of storing video pixel data comprising:
receiving and storing in selected storage locations in a random access memory, full video pixel data

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

comprising a full size image;

generating from the full video pixel data, reduced video pixel data representing a reproduction thereof in the form of a reduced size image at a lower resolution;

storing the reduced video pixel data representing the reduced size image in additional storage locations in said random access memory along with the full video pixel data;

storing both the full size image and the reduced size image in bulk storage memory; and

selectively transferring either the full size image or the reduced size image from said bulk storage memory into said random access memory for further processing.

('121 patent at 7:65-8:14.) The step dealing with storage in the bulk memory states that both the full and reduced size image are stored in the bulk memory. There is no step for storing only the full size image in the bulk memory. Therefore, logically, the step which generates the reduced size image must be performed before both images can be stored in the bulk memory. When a subsequent step references something which indicates that a prior step had been performed, the steps of the method claim must be performed in the order written. *Mantech Envtl. Corp. v. Hudson Envtl. Servs., Inc.,* 152 F.3d 1368, 1375-76 (Fed.Cir.1998). In every method claim at issue, the storage step requires that both the full and reduced size image be stored. ('121 patent at 7:65-8:14, 8:48-64, 10:8-33.) Therefore, I will construe claims 11, 13, and 15 to require the generation of a reduced size copy prior to storage of a full size image in the memory.

## H. "corresponding"

### 1. The Parties' Proposed Constructions

Ampex asserts that "corresponding" should be construed to mean "having a working relationship." (D.I. 305 at 11.) Of the claims asserted by Ampex in this case, claim 7 recites a "corresponding reduced size version," claim 12 recites a "corresponding one of said reduced size image data sets," and claims 13 and 15 recite a "corresponding plurality of reduced size reproduction images." [FN6] ('121 patent at 6:29-30, 8:26-27, 8:53-54, 10:15-16.) Ampex states that, in the context of these claims, "corresponding" requires that "a relationship be maintained between each full size image and the reduced size image generated from that full size image ." (D.I. 305 at 11-

12.) Ampex bases its proposed construction on a dictionary definition, the specification, the purpose of the invention, the prior art cited in the '121 patent, and expert testimony. (D.I. 300 at 26-28.) Defendants, however, argue that a "corresponding" reduced size image is "one that relates to a full sized image in that it is a smaller (lower resolution) version of the full sized image." (D.I. 305 at 11.) To support their position, Defendants rely on the language of the claims and the specification. (D.I. 299 at 28-29.)

### 2. The Court's Construction

*19 [16] Although Defendants argue otherwise, the specification of the '121 patent does establish that a "relationship" is maintained between each full size image and the reduced size image generated from that full size image. The specification explains that the full and reduced size images are stored together. ('121 patent, Abstract.) More specifically, when a "frame of video data is transferred from [the] frame store ... to [the] disk store ... for more permanent storage, both the full resolution and the quarter resolution copy are transferred." (*Id.* at 4:16-19.) In order for the still store system to transfer a full size image and its reduced size copy between memory components, the two images must have a relationship that can be detected by the system. Otherwise, it would be impossible for the system to determine which two images were being transferred.

Ampex argues that the browse function of the still store system supports the existence of a working relationship. (D.I. 300 at 26.) According to Ampex, the browse function permits a user to select one of the reduced size images in a multi-image display, and the still store system will retrieve its full size version. (*Id.*) Although not described in much detail, the specification does support this capability. The specification states that the still store system allows "an editor ... to view and compare several images at the same time for the purpose of selecting those images which will be used in a television broadcast." ('121 patent at 1:27-34.) This statement can be understood to mean that an editor can view several reduced size images at once and then "select" which full size versions to use in the broadcast. This ability to retrieve a full size image based on its reduced size copy clearly requires that a relationship be maintained between the two versions of each image.

There is another feature of the still store system disclosed in the specification which supports Ampex's proposed construction. The specification

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

states that "[w]hen video data received from [the] disk store ... does not contain a corresponding quarter spatial resolution copy, [the] size reducer ... may be employed to generate a quarter spatial resolution copy for subsequent transfer to either [the] frame store ... or [the] disk store ..." (*Id.* at 4:7-12.) Unless a relationship exists between the full and reduced size versions of an image, the still store system would not be able to determine whether a full size image already has a reduced size copy. While Ampex admits that this feature is optional and is not recited in any of the claims at issue (D.I. 300 at 28, n. 12), the still store system must be able to support this function. Therefore, based on the portions the specification discussed, I will construe "corresponding" to mean that "a relationship is maintained between each full size image and the reduced size image generated from that full size image."

### I. Size Reducer Transfers and Receives Data Only From RAM

#### 1. The Parties' Proposed Constructions

**\*20** Ampex asserts that claims 7, 8, and 10 recite a size reducer that transfers and receives data only from the random access memory. (D.I. 300 at 31.) In support of its proposed construction, Ampex relies on the plain language of the claims and the prosecution history. (D.I. 346 at 37-39.) Defendants argue that there is no intrinsic evidence to support Ampex's proposed claim construction. (D.I. 299 at 37.) Further, Defendants contend that the specification and prosecution history actually contradict Ampex's position. (*Id.*)

#### 2. The Court's Construction

[17] There is nothing in the language of claims 7, 8, and 10 that requires the size reducer to communicate only with the random access memory. For example, the language that Ampex cites to in claim 7 is as follows:

means responsive to said random access memory means for selectively generating one of said corresponding reduced size versions from the respective full size image in said random access memory means, and for transferring the video pixel data representing [sic] and the corresponding reduced size version back to the contents of said random access memory means.

('121 patent at 6:41-48.) This claim language demonstrates that the size reducer receives video pixel data from the random access memory, creates a reduced version of the image, and then transfers the video pixel data back to the random access memory. However, it does not state that the size reducer communicates only with the random access memory. Nothing in this language precludes the size reducer from transferring to or receiving data from other components in the still store system. Since Ampex can point to no specific claim language [FN7] that supports its proposed construction, I will not read a limitation into the claims.

### V. CONCLUSION

Accordingly, for the foregoing reasons, the disputed claim terms will be construed as follows:

| Claim Term | The Court's Construction |
|---|---|
| "video image" | "an electronic signal representation of visual information displayable in visual form on a monitor or other display |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Page 18

| | device." |
|---|---|
| "video still store" | "a system capable of storing still video images." |
| "video data"; "video pixel data"; "data set"; "image data set" | "numerical information representing the luminance, red chrominance, and blue chrominance components of each pixel in a video image." |
| "the video data"; "the video pixel data"; "said video pixel data"; "the data sets"; "said image data sets" | "numerical information representing the same luminance, red chrominance, and blue chrominance components of each pixel in a video image." |
| "direct"; "directly" | "the transfer of data without intervening processing." |
| "an input port and an output port" | "an input port and a separate output port." |
| "external source" | "a source located outside of and physically separate from the |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 19

| | image store, memory, size reducer means, and means for displaying the output image." |
| --- | --- |
| "responsive to" | "performs its function automatically under the control of." |
| "selectively generating" | "to choose whether to generate." |
| "selective transfer" | "to choose whether to transfer." |
| order of steps (claims 11, 13, and 15) | Claims 11, 13, and 15 require the generation of a reduced size copy prior to storage of a full size image in the memory. The other claims at issue do not require an order of operation. |
| "corresponding" | "a relationship is maintained between each full size image and the reduced size image generated from that full size image." |
| size | Claims 7, |

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

| | |
|---|---|
| reducer transfers and receives data only from RAM | 8, and 10 do not require that the size reducer transfer and receive data only from RAM. |

**\*21** An appropriate order will follow.

ORDER

For the reasons set forth in the Memorandum Opinion issued today, IT IS HEREBY ORDERED that the following disputed claim terms of U.S Patent No. 4,821,121 (issued April 11, 1989) are construed as follows:

| Claim Term | The Court's Construction |
|---|---|
| "video image" | "an electronic signal representation of visual information displayable in visual form on a monitor or other display device." |
| "video still store" | "a system capable of storing still video images." |
| "video data"; "video pixel data"; "data set"; "image data set" | "numerical information representing the luminance, red chrominance, and blue chrominance components of each pixel in a video image." |
| "the video data"; "the | "numerical information |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

Page 21

| | |
|---|---|
| video pixel data"; "said video pixel data"; "the data sets"; "said image data sets" | representing the same luminance, red chrominance, and blue chrominance components of each pixel in a video image." |
| "direct"; "directly" | "the transfer of data without intervening processing." |
| "an input port and an output port" | "an input port and a separate output port." |
| "external source" | "a source located outside of and physically separate from the image store, memory, size reducer means, and means for displaying the output image." |
| "responsive to" | "performs its function automatically under the control of." |
| "selectively generating" | "to choose whether to generate." |
| "selective transfer" | "to choose whether to transfer." |
| order of steps | Claims 11, 13, and 15 |

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
(Cite as: --- F.Supp.2d ----)

| | |
|---|---|
| (claims 11, 13, and 15) | require the generation of a reduced size copy prior to storage of a full size image in the memory. The other claims at issue do not require an order of operation. |
| "corresponding" | "a relationship is maintained between each full size image and the reduced size image generated from that full size image." |
| size reducer transfers and receives data only from RAM (claims 7, 8, and 10) | Claims 7, 8, and 10 do not require that the size reducer transfer and receive data only from RAM. |

FN1. By my count, the parties have asked me to construe 99 terms. (D .I. 305 at 1-53.) While a general interest in the terms of the patent is understandable, I cannot, consistent with my judicial responsibilities, answer questions that may be of no more than academic interest. Therefore, I have endeavored to construe only those terms that, based on the papers submitted, appear to be dispositive of issues brought to my attention.

It should also be noted that, in their claim construction brief, Defendants asked the court to find that claims 8, 12, and 14 were invalid for indefiniteness. (D.I. 299 at 40.) The validity of a claim is not an issue of claim construction, but should have been addressed in a motion for summary judgment. I will not convert Defendants' claim construction argument into a motion for summary judgment.

FN2. Kodak's '343 patent was applied for on February 28, 1994. ('343 patent (cited by Ampex at D.I. 347, Ex. 43).)

FN3. This is not to say that a non-electronic image, like a photograph, cannot become a

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

"video image." It would become a "video image" if it were digitized and electronically stored.

FN4. The other apparatus claims asserted by Ampex do not recite a video input ('121 patent at cols. 6-10.), and therefore, they are irrelevant to Ampex's argument that significant processing takes place between the video input and the image store.

FN5. "Applicant's invention ... as described and claimed, provides image reduction via his size reducer (26) coupled only to the frame store (22), *and which receives the full size image only from the frame store whenever there is no reduced size image,* and which then returns the reduced size image directly back to the frame store for storage thereof simultaneously with the corresponding full size image." (D.I. 300 at 32 (emphasis added by Ampex))."

FN6. Claim 10 also includes the term "corresponding," but does not use it to describe the relationship between a full size image and its reduced size version. ('121 patent at 7:36-41.)

FN7. Ampex's reliance on a submission made during the prosecution history is again misplaced, since the prosecution history can clarify claim language but cannot create limitations that are not in the claim itself. *See supra* at 26.

D.Del.,2006.
Ampex Corp. v. Eastman Kodak Co.
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 3068978 (Trial Motion, Memorandum and Affidavit) Plaintiff Ampex Corporation's Oppositions to Defendant Kodak's Motions In Limine Nos. 1-4 Non Confidential Version (Oct. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 2944629 (Trial Motion, Memorandum and Affidavit) Ampex Corporation's Reply Brief in Support of its Motion for Partial Summary Judgment That U.S. Patent No. 4,821,121 Is Not Invalid for Obviousness (Jun. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 2944634 (Trial Motion, Memorandum and Affidavit) Ampex's Reply Brief in Support of Its Motion for Summary Judgment That the Quantel PaintBox is Not Prior Art Under 35 U.S.C. | 102(a) and (b) (Jun. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 2944627 (Trial Motion, Memorandum and Affidavit) Ampex Corporation's Opposition to Motion to

Exclude the Testimony of Carol Scott Under Rule 702 (Jun. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 2944628 (Trial Motion, Memorandum and Affidavit) Ampex's Opposition to Defendants' Motion for Summary Judgment of Inequitable Conduct (Jun. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 1813962 (Trial Motion, Memorandum and Affidavit) Ampex's Reply Brief in Support of its Motion to Compel (May 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1813961 (Trial Pleading) Ampex Corporation's Opening Claim Construction Brief (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 2944636 () Declaration of James Storer in Support of Defendants' Opening Claim Construction Brief (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 2944635 () Declaration of Alan Cavallerano (May 22, 2006) Original Image of this Document (PDF)
• 2006 WL 1813960 (Trial Motion, Memorandum and Affidavit) Ampex's Opening Brief in Support of its Motion to Compel Disclosure of Withheld Communications and for Production of A Privilege Log (May 18, 2006) Original Image of this Document (PDF)
• 2006 WL 2093984 () Videotaped Deposition of Richard L. Donaldson (May 12, 2006) Original Image of this Document (PDF)
• 2006 WL 2093985 () (Partial Testimony) (May 3, 2006) Original Image of this Document (PDF)
• 2006 WL 1199897 (Trial Motion, Memorandum and Affidavit) Defendant's Redactted Reply Brief in Further Support of their Motion to Disqualify Eric Anderson as an Expert Witness (Mar. 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1199896 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Further Support of their Motion to Bifurcate and Motion for Protective Order (Mar. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 1199895 (Trial Motion, Memorandum and Affidavit) Defendants' Redacted Opening Brief in Support of its Motion to Disqualify Eric Anderson as an Expert Witness (Mar. 13, 2006) Original Image of this Document (PDF)
• 2006 WL 809152 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of their Motion for Bifurcation and Protective Order (Feb. 22, 2006) Original Image of this Document (PDF)
• 2005 WL 3666894 (Trial Motion, Memorandum and Affidavit) Protective Order for Confidentiality (Nov. 1, 2005) Original Image of this Document (PDF)
• 2005 WL 3666892 (Trial Pleading) Ampex's Reply to Altek Corporation's Counterclaims (Oct. 12, 2005) Original Image of this Document (PDF)
• 2005 WL 3666893 (Trial Pleading) Ampex's Reply to Eastman Kodak Company and Chinon Industries Inc.'s Counterclaims (Oct. 12, 2005) Original Image of this

--- F.Supp.2d ----
--- F.Supp.2d ----, 2006 WL 3042144 (D.Del.)
**(Cite as: --- F.Supp.2d ----)**

Page 24

Document (PDF)
• 2005 WL 2868003 (Trial Pleading) Altek Corporation'S Answer to Second Amended Complaint for Patent Infringement (Sep. 22, 2005) Original Image of this Document (PDF)
• 2005 WL 2868006 (Trial Pleading) Eastman Kodak Company and Chinon Industries Inc. (N/K/A Kodak Digital Product Center Japan, Ltd)'s Answer to Second Amended Complaint for Patent Infringement (Sep. 22, 2005) Original Image of this Document (PDF)
• 1:04cv01373 (Docket) (Oct. 21, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Briefs and Other Related Documents

ISCO Intern., Inc. v. Conductus, Inc.D.Del.,2003.Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ISCO INTERNATIONAL, INC., Plaintiff
v.
CONDUCTUS, INC., and Superconductor
Technologies, Inc., Defendants.
**No. C.A. 01-487 GMS.**

Feb. 10, 2003.

*MEMORANDUM AND ORDER*
SLEET, J.

## I. INTRODUCTION

*1 The plaintiff, ISCO International, Inc. ("ISCO"), filed the above-captioned suit against Conductus, Inc. ("Conductus") and Superconductor Technologies, Inc. ("STI") (collectively "the defendants") on July 17, 2001. In its complaint, ISCO alleges that Conductus and STI are infringing U.S. Patent No. 6,263,215 ("the '215 patent"). Presently before the court is STI's Motion for Summary Judgment of Invalidity of the '215 patent (D.I.212). For the reasons that follow, the court will deny the motion.

## II. STANDARD OF REVIEW

Summary judgment is appropriate in patent suits as in other civil actions. *Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 244 (3d. Cir.1968). The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 392 (3d Cir.1998). Thus, summary judgment is appropriate only if the moving party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *Boyle,* 139 F.3d at 392. A fact is material if it might affect the outcome of the suit. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)).

An issue is genuine if a reasonable jury could possibly find in favor of the non-moving party with regard to that issue. *Id.* In deciding the motion, the court must construe all facts and inferences in the light most favorable to the non-moving party. *Id.; see also Assaf v. Fields,* 178 F.3d 170, 173-74 (3d Cir.1999).

When a party challenges a patent's validity, the court begins with the statutory presumption of validity. 35 U.S.C. § 282 ("A patent shall be presumed valid."). Accordingly, "[t]he burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." *Id.* Invalidity must be shown by clear and convincing evidence. *Robotic Vision Sys., Inc. v. View Eng'g, Inc.,* 189 F.3d 1370, 1377 (Fed.Cir.1999). This evidentiary standard is relevant in the context of a motion for summary judgment because "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson,* 477 U.S. at 254. As the Court elaborated,
[W]here the ... 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant. Thus, where the factual dispute concerns [a material issue] ... the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the [movant] has shown [that material issue] by clear and convincing evidence or that the [movant] has not.

*2 *Id.* at 255-56. Thus, STI must show that there is no genuine issue as to any material fact that is necessary for a finding, by clear and convincing evidence, of invalidity. If STI makes such a showing, ISCO may withstand summary judgment by adducing "specific facts" sufficient to create a genuine issue of material fact as to an essential element of STI's defense of invalidity. Fed. R. Civ. P. 56(e); *see also Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers Locan Union 42 v. Absolute Envtl. Serv., Inc., et al.,* 814 F.Supp. 392, 401-02 (D.Del.1993) (explaining summary judgment standard and burdens).

With these standards in mind, the court will describe

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the facts that led to the motion presently before the court.

### III. BACKGROUND

The invention of the '215 patent is a "receiver front end" for receiving telecommunications signals. A receiver front end is a system including filters that transmit certain signals and attenuate others, and amplifiers, which strengthen the desired signals. Telecommunications systems divide geographic areas into "cells," each of which is supported by a base station. Each base station has preassigned radio frequency (RF) carriers for the communication channels. Wireless signals from mobile telephones arrive at these base stations, which monitor and process the incoming signals. For various reasons including safety concerns and conservation of battery power, mobile telephones transmit signals at limited power. Therefore, the signals arriving at the base stations tend to be weak, causing the cell to become "reverse link limited." Most of the known solutions to this problem are unappealing or impractical. At the same time, additional demand by mobile telephone users requires more and more frequency channels and base stations. Thus, there was a need for base station front end receivers with increased sensitivity to incoming signals (by limiting losses and noise generated in the base station receiver) and selectivity (to allow more channels to be accommodated). The invention at hand purports to meet these needs.

As the patent specification provides, the receiver front end itself includes:
(1) a plurality of filtering means for spectrally filtering a plurality of RF signals to form a plurality of filtered RF signals; (2) a plurality of amplifying means, in communication with the plurality of filtering means, for amplifying the plurality of filtered RF signals; and (3) cooling means for cryogenically cooling the filtering means and the amplifying means.... At least one of the plurality of filtering means and plurality of amplifying means comprises a superconducting material.... Switching means can be used to bypass the RF signal around the receiver front end in the event of malfunction of [the] receiver front end. Monitoring means for monitoring remotely the operation of the various components of the receiver front end can be used to activate the switching means.

*3 (B 372, '215 col. 2, lns. 49-65, B 374, '215 col. 5, ln. 65 to col. 6, ln. 3). The invention is discussed in more detail below in the context of STI's various

challenges to the patent.

### IV. DISCUSSION

ISCO alleges that the defendants are infringing Claims 10, 12 through 17, and 19 of the patent-in-suit. Of these, only claim 10 is an independent claim. STI first asserts that claim 10 is not entitled to the filing date of provisional application no. 60/002065 ("the '065 application") because that application does not satisfy the written description requirement. In addition, STI alleges that the '215 patent is invalid for lack of enablement, anticipation by prior art, obviousness, and indefiniteness. The court will address each of these issues in turn.

#### A. Provisional Application '065

STI argues that the patent-in-suit is not entitled to the effective filing date of the provisional '065 application. Per 35 U.S.C. § 120,[FN1] a patent application is entitled to the effective filing date of an earlier-filed application if the earlier-filed application meets the written description requirement of 35 U.S.C. § 112. In re Huston, 308 F.3d 1267, *20-21 (Fed.Cir.2002) (quoting Lockwood v. Am. Airlines Inc., 107 F.3d 1565, 1571 (Fed.Cir.1997)). To satisfy the written description requirement, the patent specification must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same...." 35 U.S.C. § 112. The policy of the requirement "is to prevent overreaching and post hoc claims that were not part of the original invention." Purdue Pharma, L.P. v. F.H. Faulding & Co., 48 F.Supp.2d 420, 427 (D.Del.1999), aff'd, 230 F.3d 1320 (Fed.Cir.2000). Accordingly, if claims in the later-filed application were sufficiently described in the earlier-filed application, the later application is entitled to the filing date of its parent application.

> FN1. The statute reads, in relevant part:
> An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States ... which is filed by an inventor or inventors named in the previously filed application shall have the same effect, as to such invention, as though filed on the date

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

of the prior application....
35 U.S.C. § 120.

STI contends the '215 application is not entitled to the earlier filing date of the '065 application because the '065 application fails to provide a written description of a "switched bypass circuit around the receiver front end," a required element of claim 10 of the '215 patent. The '065 application describes only a single switch within the cold space, STI argues, and not a switched bypass circuit around the receiver front end, *i.e.,* a bypass circuit located outside of the cold space. Therefore, the '065 application fails to provide a written description of the invention as later claimed in the '215 application.

ISCO responds that the '065 application describes a switched bypass circuit relative to its function of bypassing the cryoelectronic receiver front end circuitry, with no restriction on the bypass circuit's location. For example, the '065 application states: "[T]he invention can include a switching device to permit the RF signal received by the antenna to bypass the cryoelectronic receiver circuitry module(s) in the cryoelectronic receiver front end and thereby avoid loss of the antenna structure(s) connected to the module(s) .... " '065 provisional at 9, lns 6-12. In another part, the provisional application notes that the bypass circuit "can" pass through the cold space. '065 provisional at 15, lns. 12-16. Other language in original claim 16 of the '065 application also describes the switched bypass circuit in generic terms that do not require a particular location relative to the cold space. *See, e.g.,* '065 provisional at 23. The provisional application therefore encompasses a bypass switch that can be located in either the cold or warm space, ISCO maintains, and a person skilled in the relevant art would understand this. Therefore, the '065 specification supports claim 10 of the '215 application, and the later application is entitled do the filing date of the '065 provisional application.

*4 Based on the information before it at this juncture, the court finds a genuine issue of material fact as to whether the '065 application contains a description of the invention as later claimed in claim 10 of the '215 application. More specifically, there is a genuine issue of material fact as to what a person skilled in the art would understand each application to encompass. This is particularly significant given the highly technical nature of the particular art at issue in this case. Therefore, the court is unable to grant STI's motion for summary judgment on this issue.

**B. Lack of Enablement**

STI next moves for summary judgment on the grounds that the '215 patent does not meet the enablement requirements of 35 U.S.C. § 112. As stated earlier, Section 112 requires that patent specifications include a written description of the invention "in such full, clear, concise, and exact terms" that a person skilled in the relevant art can make and use the invention. 35 U.S.C. § 112. Further, courts have concluded that to meet the enablement requirement, "the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.' " *In re Wright,* 999 F .2d 1557, 1561 (Fed.Cir.1993) (quoting *In re Vaeck,* 947 F.2d 488, 495 (Fed.Cir.1991)). That enablement may require some experimentation is acceptable; the amount of necessary experimentation simply must not be undue. *PPG Indus. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1564 (Fed.Cir.1994) ("[T]he question of undue experimentation is a matter of degree."). Factors to consider in this determination include:
(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*In re Wands,* 858 F.2d 731, 737 (Fed.Cir.1988). Although the question of undue experimentation entails many factual considerations, enablement is a question of law. *Id.* at 735, 737.

STI asserts that the '215 patent specifications do not adequately enable a cryogenically cooled receiver front end. The defendant provides evidence that Superconducting Core Technologies ("SCT"), the original assignee of the patent-in-suit and ISCO's predecessor in interest, experienced difficulties in developing a cryogenically cooled amplifier as described in the specifications. STI maintains that the patent also fails to disclose enabling information regarding how to make or use a planar filter, although it offers no specific support for this contention. Indeed, in its briefing, STI has offered no support for its claim of lack of enablement other than SCT's difficulties in producing the cryogenically cooled amplifier. The court is unpersuaded that this evidence alone precludes any genuine issue as to any material fact that is necessary for a finding of undue experimentation. There is no evidence as to the state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

of the prior art; the relative skill of those in the art; or the predictability or unpredictability of the art. Although the *Wands* factors are "illustrative, not mandatory," *Amgen, Inc. v. Chugai Pharm. Co., 927 F.2d 1200, 1213 (Fed.Cir.1991)*, the court finds that some of this information is necessary for a determination of undue experimentation. For example, ISCO maintains that the work done by SCT was routine engineering and not unduly extensive experimentation. Even the movant recognizes that "[w]hile complex experimentation is not *per se* undue, this is only true up to the norm of the experimentation in the art." Reply Brief at 19. A question of fact remains, then, as to the level of experimentation typically experienced in the relevant art. *See, e.g., Wands, 858 F.2d at 737* ("[T]he fact that experimentation may be complex ... does not necessarily make it undue, if the art typically engages in such experimentation."). STI has not carried its burden of showing that no genuine issue exists as to any material fact necessary for a finding of lack of enablement.

## C. Anticipation by Prior Art

*5 Next, STI moves for summary judgment on the ground that the invention is anticipated by prior art. A patent is not valid if the associated invention was "described in a printed publication ... more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b). Each and every element of the claim must be shown, expressly or inherently, in a single publication. *In re Schreiber, 128 F.3d 1473, 1477 (Fed.Cir.1997)*. To invalidate a patent, the reference also must enable someone skilled in the art to make the claimed invention. *PPG Indus., 75 F.3d at 1566*. "Anticipation is a question of fact." *Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed.Cir.1991)*.

STI asserts that two publications anticipate various claims of the claimed invention. The court will address each publication in turn.

### 1. The Robertson Article

The defendant STI argues that an article [FN2] ("the Robertson article") published by Mark A. Robertson, an engineer, contains all of the elements of claim 10 and several of the dependent claims. The Robertson article describes a military surveillance system for installation in an airplane. This system processes mircowave frequency signals in the frequency range

of 8 to 40 gigahertz. The claims of the patent-in-suit describe a "receiver front end for receiving wireless signals on a plurality of channels." [FN3] "Wireless" was construed to mean "cellular telecommunications transmitted from a source to a receiver without use of a wire." [FN4] Cellular telecommunications are transmitted via frequencies in the range of 850 to 1900 megahertz. The Robertson article, therefore, does not expressly disclose a receiver front end for receiving wireless signals. Of course, the publication may inherently disclose such a receiver. Indeed, the court may consider extrinsic evidence to understand "what the reference meant to persons of ordinary skill in the field of invention." *Scripps Clinic & Research Found., 927 F.2d at 1576*. STI, however, has presented no evidence as to whether someone skilled in the art would perceive the disclosure of a system for receiving microwave frequency signals as an inherent disclosure of a system that receives cellular telecommunications frequencies.

> FN2. *Two Applications of HTS Technology on an Airborne Platform,* produced by Advanced Research Projects Agency, SPIE Proceedings 2156 (Jan.1994).

> FN3. By the court's order of October 30, 2002, the preamble to claim 10 was found to be a claim limitation.

> FN4. *See* the court's order of October 30, 2002 as to claim construction.

Because there exists a dispute as to at least one genuine issue of material fact necessary for a finding of anticipation by a publication, the court need not continue in this analysis as to claim 10. Furthermore, because claims 13-17 and 19 are dependent on claim 10, the court can not find, on summary judgment, that those claims are anticipated by the Robertson article. STI's motion for summary judgment is denied as to the Robertson article.

### 2. The ARPA Report

STI argues that a second publication [FN5] ("the ARPA Report") anticipates claims 10, 13-17, and 19 of the patent-in-suit. The ARPA Report was first presented on February 7, 1995, less than one year prior to the filing date of the '065 provisional application. [FN6] STI believes the '215 patent application is not entitled to the filing date of the provisional application because, as discussed above, the first application fails to meet

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

the written description requirement of 35 U.S.C. § 112. The court has found a genuine issue of material fact as to whether the patent meets the written description requirement. Because STI's anticipation argument rests, in turn, on a finding as to the written description requirement, the court cannot grant summary judgment regarding anticipation by the ARPA Report.

> FN5. *HTSC Dual Use Applications Survey-Progress Report: HTS Filter Applications / Cellular Telephone Base Station Equipment,* produced by Advanced Research Projects Agency (ARPA) (Feb.1995).

> FN6. The '065 application was filed on August 5, 1995.

### D. Obviousness

*6 STI moves for summary judgment on the basis that every asserted claim of the patent-in-suit is obvious. Section 103 renders invalid any patent whose "subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art." 35 U.S.C. § 103. To support a finding of obviousness, there must be a showing of a suggestion or motivation to modify the teachings of a prior art reference. *TIBIA Neuroscience, Inc. v. Cadus Pharm. Corp.,* 225 F.3d 1349, 1356 (Fed.Cir.2000). This motivation may arise from the prior art, the knowledge of someone of ordinary skill in the art, or the nature of the problem to be solved. *Id.*

As the movant recognizes, a determination of obviousness necessarily rests on underlying factual issues, including the scope and content of the prior art, the level of ordinary skill in the art, and the differences between the prior art and the claimed invention. Opening Brief at 26; *see Monarch Knitting Mac. Corp. v. Sulzer Morat GmbH,* 139 F.3d 877, 81 (Fed.Cir.1998). STI has offered no evidence as to any of these issues,[FN7] beyond what can be gleaned from the references it argues anticipated the invention or render the invention obvious. Although the prior art references selected by STI may help create a selective understanding of the state of the prior art, it is not sufficient in this case to convince the court that there are no genuine issues of material fact that would permit a reasonable jury to find for ISCO regarding obviousness.[FN8] This is particularly true because "the level of skill in the art is a prism or lens through which a judge [or] jury ... views the prior art and the

claimed invention. This reference point prevents these factfinders from using their own insight or, worse yet, hindsight, to gauge obviousness." *Okajima v. Bourdeau,* 261 F.3d 1350, 1355. STI's motion for summary judgment regarding obviousness is denied.

> FN7. Indeed, it affirmatively "takes no position with regard to the proper level of education, training, etc. of the person of ordinary skill (POS) to whom the '215 patent is addressed." Opening Brief at 17. Later, STI argues that for the purposes of this motion the level of skill in the art is undisputed, or at least cast in the alternative. Either (1) the skilled artisan is skilled enough such that the patent is enabled, but anticipated and obvious; or (2) the artisan is so unskilled that the patent is not anticipated and obvious, but is not enabled. Reply Brief at 17. Such a position does not adequately shed light on the state of the art.

> FN8. STI cites *Okajima v. Bourdeau,* 261 F.3d 1350 (Fed.Cir.2001), for the proposition that specific findings regarding the level of skill in the art are not necessary if the prior art itself reflects an appropriate level of skill. Accordingly, the movant argues that it need not produce evidence as to the level of skill in the art for purposes of its summary judgment motion. That may well be true in certain cases. However, *Okajima* may be distinguished from the instant case. In *Okajima,* the court reviewed a decision of the Board of Patent Appeals and Interferences ("Board") of the U.S. Patent and Trademark Office which held certain claims to be unpatentable for obviousness. The Federal Circuit held that "the absence of specific findings on the level of skill in the art was not *reversible error* 'where the prior art itself reflects an appropriate level and a need for testimony is not shown." ' (citation omitted) (emphasis added). *Id.* at 1355. The question of whether an absence of evidence as to the level of skill in the art rises to reversible error upon appellate review of the Board's finding of obviousness is different than whether, as here, a court may deny summary judgment in the absence of such evidence. A need for testimony has been shown in the instant case. This is particularly true given the very

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 6
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

technical nature of the art at issue. Furthermore, a court must make findings regarding not only the level of ordinary skill in the art, but also as to the scope and content of the prior art, the differences between the prior art and the claimed invention, and certain secondary considerations including commercial success, long-felt but unresolved need, failure of others, copying, and unexpected results, before invalidating a patent for obviousness. _Ruiz v. A.B. Chance Co., 234 F.3d 654, 663_ (citing cases). Because there is no evidence, or conflicting evidence, as to certain of these issues, summary judgment as to obviousness is inappropriate.

### E. Indefiniteness

Finally, STI argues that the patent-in-suit is invalid for indefiniteness. Section 112 of the patent statute requires that patent claims "particularly point[ ] out and distinctly claim[ ] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, paragraph 2. In determining whether a claim is sufficiently definite, courts analyze whether 'one skilled in the art would understand the bounds of the claim when read in light of the specification.' _Allen Eng'g Corp. v. Bartell Indus., 299 F.3d 1336, 1348 (Fed.Cir.2002)_ (quoting _Personalized Media Communs., L.L.C. v. ITC, 161 F.3d 696, 705 (Fed.Cir.1998)_).

Claim 10 of the '215 patent encompasses "a receiver front end ... comprising ... a switched bypass circuit." The same claim also requires "a switched bypass circuit around the receiver front end." STI asserts that the claim is indefinite because these passages require a bypass circuit that is simultaneously inside and outside the receiver front end. ISCO, however, argues that the term "around" connotes the function, and not the location, of the bypass circuit. As one section of the patent specification explains, "[s]witching means can be used to bypass the RF signal around the receiver front end in the event of malfunction of receiver front end ." '215 col. 5, lns. 65-67.

*7 STI presents no evidence as to how one skilled in the art would understand claim 10 in light of the specification. Absent such evidence, and viewing all inferences in the light most favorable to the non-movant, the court can not conclude that there is no genuine issue of material fact as to the indefiniteness of the claim. It is plausible, based on other passages from claim 10, that the claim could be understood to

refer to the function of the bypass circuit and not the literal location of it. Indeed, the patent specification includes a diagram "of a cryoelectronic receiver front end with a bypass circuit." In light of such language, it is reasonable that one skilled in the art might understand the bounds of the claim. However, absent any evidence as to what someone skilled in the art would understand the claim, the court makes no finding as to the definiteness of the claim, other than to deny STI's motion for summary judgment on this ground.

### V. CONCLUSION

Based on the evidence before it, the court concludes that there remain genuine issues of material fact with regard to each of the issues presented.

For the foregoing reasons, IT IS HEREBY ORDERED that:
1. STI's motion for summary judgment of invalidity of U.S. Patent No. 6,263,215 (D.I.212) is DENIED.

D.Del.,2003.
ISCO Intern., Inc. v. Conductus, Inc.
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24290850 () (Partial Testimony) (Apr. 1, 2003) Original Image of this Document (PDF)
• 2003 WL 24290855 () (Transcript) (Mar. 31, 2003) Original Image of this Document (PDF)
• 2003 WL 24290851 () (Partial Testimony) (Mar. 28, 2003) Original Image of this Document (PDF)
• 2003 WL 24290849 () (Partial Testimony) (Mar. 27, 2003) Original Image of this Document (PDF)
• 2003 WL 24290852 () (Partial Testimony) (Mar. 25, 2003) Original Image of this Document (PDF)
• 2003 WL 24290848 () (Partial Testimony) (Mar. 21, 2003) Original Image of this Document (PDF)
• 2003 WL 24282960 () Videotaped Deposition of Raymond W. Nettleton, taken by Defendants, pursuant to notice, held at the offices of Morgan & Finnegan, LLP, 345 Park Avenue, New York, New York, before Jeffrey Benz, a Registered Professional Reporter and Notary Public with in and for the State of New York. (Jan. 23, 2003) Original Image of this Document (PDF)
• 2002 WL 32991957 () Videotaped deposition of H. Vincent Poor. (Dec. 18, 2002) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 279561 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

• 1:01CV00487 (Docket) (Jul. 17, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.