

Potter
Anderson
& Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

Philip A. Rovner
Partner
provner@potteranderson.com
302-984-6140  Direct Phone
302-658-1192  Fax

February 1, 2007
Public Version February 8, 2007

**BY E-FILE**        **PUBLIC VERSION**

The Honorable Gregory M. Sleet
United States District Court  for the District of Delaware
U.S. Courthouse
844 North King Street
Wilmington, DE  19801

Re:    Talecris Biotherapeutics, Inc. v. Baxter International Inc. and Baxter
       Healthcare Corporation, D. Del., C.A. No. 05-349-GMS

Dear Judge Sleet:

    Baxter International Inc. and Baxter Healthcare Corporation (together "Baxter") seek
permission to move for summary judgment that: (1) Baxter does not infringe any asserted claim
of the patent; and (2) all claims of U.S. Patent No. 6,686,191 ("the '191 patent") are invalid
under 35 U.S.C. Section 112 (written description and/or indefiniteness).  Baxter's proposed
motion would be dispositive of all claims in this case.  The motion would rely on undisputed
facts and the expert reports submitted by plaintiffs themselves.[1]

    Plaintiffs Talecris Biotherapeutics, Inc. and Bayer Healthcare LLC (together, "Plaintiffs")
assert that Baxter infringes Claims 1, 7-12 and 15-20 of the '191 patent.  Claim 1 is the only
independent claim.  The '191 patent is directed to methods of treating a solution of antibodies,
which methods require a solvent/detergent treatment step ("step (a)"), that "increases"
anticomplement activity ("ACA"), and an incubation step ("step (b)"), which reduces the
"increased" ACA "to an acceptable level."  The Court has issued a claim construction ruling (*see*
Exhibit 2, attached).  Many of the terms at issue were construed to have their "plain and ordinary
meaning."

---

[1] At the December 14, 2006 Claim Construction hearing, the Court as well as Plaintiffs' counsel
noted that Baxter would likely file a motion regarding indefiniteness, inadequate written
description and/or lack of enablement. *See*, Exhibit 1, attached (Transcript, pp. 39 and 52-53).

The Honorable Gregory M. Sleet
February 8, 2007
Page 2

<u>**Non-Infringement Of Asserted Claims**</u>

Even resolving all inferences in their favor, Plaintiffs cannot prove that: (1) Baxter's solvent/detergent treatment step "increases" ACA; (2) Baxter's incubation step reduces the "increased [ACA] of the solution"; or (3) Baxter's incubation step reduces ACA "to an acceptable level."

Plaintiffs took samples from three manufacturing "lots" of Baxter's Gammagard Liquid product (the "Sampled Lots") at various points along the manufacturing process.[2] Plaintiffs tested these samples using two different assays: (1) a "hemolytic" assay (purportedly based on Baxter's ACA assay, but with numerous differences) (*see* Exhibit 3); and (2) a "C1q" assay that is inappropriate to use with immunoglobulins, does not measure ACA directly and corresponds to neither Baxter's ACA assay nor the assay used in the '191 patent (*see* Exhibit 4). Accepting, only for purposes of summary judgment, that Plaintiffs' ACA testing of Baxter's Gammagard Liquid product was properly conducted and yielded reliable results (which Baxter disputes), that data still does not prove infringement.

<u>Baxter's Solvent/Detergent Treatment Does Not "Increase" ACA</u>:  Claim 1 requires that the solvent/detergent treatment step result in an "increase" in ACA. For the samples taken from Baxter's process, this would require an increase in ACA between Samples 2 and 5. But Plaintiff's evidence shows there is no difference (within the variation of its hemolytic assay) between Samples 2 and 5. *See* Exhibit 3; *see also* Exhibit 5 (data from Baxter's hemolytic assay). Accordingly, no increase after solvent/detergent treatment is shown by the three lots tested using a hemolytic assay. Plaintiffs' C1q assay reports data from only one lot and shows Sample 5 has a higher value than that of Sample 2. *See* Exhibit 4. As this data for *one* lot conflicts with the data for three lots obtained with the hemolytic assay, Plaintiffs cannot meet their burden by a preponderance of the evidence of proving an "increase" in ACA.

<u>Baxter's Incubation Step Does Not Reduce "Increased ACA Of The Solution"</u>:  Claim 1 requires that "the increased anticomplement activity of the solution" is reduced during the incubation step. This claim term requires that the "increased ACA" caused by the solvent/detergent treatment remain high prior to incubation. Plaintiffs' test results prove the opposite. Plaintiffs' hemolytic assay results show that the ACA of the solution that is to be incubated (Sample 9) is already lower than the ACA of any prior sample, including the starting material. Accordingly, no "increased ACA" remains to be reduced. Plaintiffs' C1q assay results confirm this, as the level of Sample 9 is effectively the same that of as Samples 1 and 2 (*i.e.*, no increase). Thus, even if the solvent/detergent treatment step increased ACA, the increase has already been

---

[2] Samples 1 and 2 were taken during steps that prepare the starting material ("Precipitate G"); Sample 3 was taken during the solvent/detergent treatment process; Sample 5 was taken after a cation exchange step that removes solvent/detergent, but before a pH and conductivity adjustment; Sample 6 was taken in the same holding tank as sample 5, but after pH and conductivity adjustment; Sample 8 was taken after anion exchange chromatography, nanofiltration, ultrafiltration, concentration and formulation steps; Sample 9 was taken in the final container (pre-incubation); and Sample 10 was taken in the final container (post-incubation).

The Honorable Gregory M. Sleet
February 8, 2007
Page 3

eliminated before the incubation step begins. Consequently, the incubation step does not reduce the "increased ACA of the solution." Plaintiffs' experts completely ignore this aspect of the claim, and so fail to even express a complete opinion on infringement.

Baxter's Incubation Step Does Not Reduce ACA "To" An "Acceptable Level": The plain language of Claim 1 requires reduction of ACA "to" an "acceptable level." Plaintiffs cannot show Baxter's ACA was "unacceptable" prior to incubation. Indeed, Plaintiffs' hemolytic data does not show a reduction at all (whether acceptable or unacceptable). And, to the extent Plaintiffs' C1q data shows a reduction, it does not show that the ACA level prior to incubation was "unacceptable." Plaintiffs, thus, cannot meet their burden of proof. Notably, Plaintiffs' experts are silent on this point and so fail to express a complete opinion on infringement.

## Invalidity of Asserted Claims By Lack Of Written Description

The "written description" requirement under Paragraph 1 of Section 112 requires the patentee to adequately describe his invention such that the skilled artisan recognizes the inventor has invented that which he claims. *See, e.g., Amgen*, 314 F.3d at 1330. An "[a]dequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation." *Vas-Cath Inc. v. Mahurkar*, 935 F.3d 1555, 1561 (Fed. Cir. 1991) (citations omitted). Claim 1 lacks sufficient written description with respect to the terms "increased level of anticomplement activity" and "the increased level of anticomplement activity of the solution."

"Increased Level Of Anticomplement Activity"/"The Increased Level Of Anticomplement Activity Of The Solution": The '191 patent claims require an "increase" in ACA after solvent/detergent treatment. The claim language, then, requires a comparison of ACA levels "before and after" solvent/detergent treatment. The '191 patent specification, however, does not identify any ACA levels solutions before solvent/detergent treatment, against which to determine if there is an "increase" after solvent/detergent treatment. The only occasion in which the '191 patent provides a measure against which to determine whether ACA has "increased" is in Table 1, where a "control" is identified. But, rather than show a "before" value, the "control" shows a "without solvent/detergent" value, resulting in a "with and without" comparison. The '191 patent does not adequately describe an "increased level" when it does not provide any data showing a "before and after" solvent/detergent treatment comparison. The single "with and without" "control" does not adequately describe an "increase."

Additionally, the '191 patent does not disclose the standard deviation or variation for any ACA values reported, so does not actually disclose an "increase" for any sample (including for Table 1) since any difference in values may not be greater than the error associated with the measurement of those numbers. For example, given an assay variation of 15% (typical for ACA assays), there would be no actual difference between sample A2 in Table 7 (31 $CH_{50}$ units/mL) and the "control" in Table 1 (25 $CH_{50}$ units/mL), even if they could be compared. Accordingly, the '191 patent specification does not adequately describe of an "increase."

The Honorable Gregory M. Sleet
February 8, 2007
Page 4

## Invalidity of Asserted Claims By Indefiniteness

Paragraph 2 of 35 U.S.C. Section 112 requires the patentee to set forth his claims with sufficient precision that a potential competitor can ascertain whether it infringes the claims and how to avoid infringement. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003). "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx. v. Advantage Dental Prods.*, 309 F.3d 774, 779-80 (Fed. Cir. 2002).

Claims are indefinite when they are "insolubly ambiguous"; that is, when "the claims, the written description, and the prosecution history fail to give us, as the interpreter of the claim term, any guidance as to what one of ordinary skill in the art would interpret the claim to require." *Honeywell International Inc. v. Intn'l Trade Commission*, 341 F.3d 1332, 1340 (Fed. Cir. 2003) (holding that because different methods of measuring "MPE" yielded different results, the method chosen was critical in determining infringement, but since the claim did not specify a particular method of measurement it was "insolubly ambiguous"). Claim 1 of the '191 patent is invalid at least because the terms "acceptable level suitable for intravenous administration," "increased level of anticomplement activity," "then incubating the solution of step a)" and "increased ACA of the solution" and are insolubly ambiguous.

"Acceptable Level Suitable For Intravenous Administration": The claim term "acceptable level suitable for intravenous administration" is vague and indefinite because: (1) there was, and is, no single level of "acceptability" for ACA; (2) an assay (test) must be validated for a particular product for the ACA value obtained with that test to make sense; (3) ACA values obtained using different assays cannot be compared; and (4) ACA values cannot be correlated to adverse events in humans.

It is undisputed that in 1995, when the patent application was filed, there was no single level of "acceptability" for ACA. Different patents, papers, government agencies, and the like identified different examples of "acceptable" ACA based on different assays used to measure ACA. If a person were to measure the ACA in a sample, she would find the ACA level might be "acceptable" under some industry guidelines and "unacceptable" under others. For Claim 1 to have any meaning, this claim term would have to be defined by limits obtained by the particular assay used in the '191 patent. Without such definition, Claim 1 does not provide a means by which to determine ACA "acceptability."

Moreover, Plaintiffs admit that ACA levels obtained using one assay cannot be correlated to ACA levels obtained using other assays. Thus, even if ACA was determined using one assay, if it was a different assay than that used in the patent, one could not ascertain whether that ACA level was "acceptable". A skilled artisan in 1995 also would have known that ACA values cannot necessarily be correlated to adverse events in humans. Indeed, Plaintiffs' expert, Dr. Gelfand, confirmed that adverse events could be caused by many things, only one of which is ACA, and he did not identify any adverse events that could be definitively connected to ACA. Likewise, Dr. Rousell (a former Bayer Corporation employee) confirmed that adverse events

The Honorable Gregory M. Sleet
February 8, 2007
Page 5

cannot be correlated to high ACA. Whether a product causes an adverse event in a patient or not, then, cannot provide a measure of "acceptability."

For at least the reasons set forth above, a person of ordinary skill in the art would be utterly unable to ascertain the meaning of "acceptable" as used in '191 patent. Indeed, as they admitted in their deposition testimony, neither the named inventor nor his patent attorney knew what "acceptable" meant while prosecuting the '191 patent. Accordingly, this term is insolubly ambiguous and, therefore, indefinite.

"Increased Level"/"Reduced To An Acceptable Level Suitable For Intravenous Administration": The terms "increased" and "reduced" both contemplate relative levels, which require comparison of a later level of ACA to an earlier level. The Court construed "increased level of ACA" and "increased ACA of the solution" to have their plain and ordinary meaning. Assuming Plaintiffs are correct that the patent does not require an "increase" in ACA to an unacceptable level, the subsequent claim term "reduced to an acceptable level" has no meaning since the ACA level before incubation could already be "acceptable." It would be nonsensical to reduce ACA from an "acceptable" level to an "acceptable" level, yet that is what the claim says. Thus, these claim terms are insolubly ambiguous and, therefore, indefinite.

"Then Incubating The Solution Of Step A)" and "Increased ACA Of The Solution": The Court construed the term "then incubating the solution of step a)" to mean that "... additional steps may be performed prior to said incubating." But additional steps performed between steps (a) and (b) yield different "solutions," with different ACA levels, due to the specifics of each process step (e.g., different pH, different buffers, different dilutions, etc.). Thus, there could be many "solutions" "originating from step a)," each of which would likely have a different ACA level than that of the "solution of step (a)." But Claim 1 requires that the "increased" ACA level of "the solution of step a)" must remain in the solution to be incubated, since it is "the increased ACA of the solution" that must be reduced during step (b). Because the additional processing steps allowed by the claim would result in a different "solution" with a different ACA level being incubated; it would no longer be "the increased ACA of the solution" as required by step (b). Since Claim 1, as construed, could result in many "solutions" having different ACA levels than that resulting from step (a), these claim terms are insolubly ambiguous and, therefore, indefinite.

For all of these reasons, Baxter therefore respectfully requests the Court's leave to file a motion for summary judgment of noninfringement and invalidity concerning the '191 patent.

Respectfully,

/s/ Philip A. Rovner

Philip A. Rovner
provner@potteranderson.com

PAR/mes/776896
cc: Jeffrey B. Bove (by E-mail and hand delivery)
    Bradford J. Badke (by E-mail and Federal Express)

# Exhibit 1

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        -   -   -

4   TALECRIS BIOTHERAPEUTICS,     :      Civil Action
    INC.,                         :
5                                 :
             Plaintiff,           :
6                                 :
        v.                        :
7                                 :
    BAXTER INTERNATIONAL INC.     :
8   and BAXTER HEALTHCARE         :
    CORPORATION,                  :
9                                 :
             Defendants.          :      No. 05-349-GMS
10                                
                              -   -   -
11
    BAXTER HEALTHCARE            :
12  CORPORATION,                 :
                                 :
13           Counterclaimant,    :
                                 :
14      v.                       :
                                 :
15  TALECRIS BIOTHERAPEUTICS,    :
    INC. and BAYER HEALTHCARE    :
16  LLC,                         :
                                 :
17           Counterdefendants.: 

18                        -   -   -

19                   Wilmington, Delaware
                   Thursday, December, 2006
20                      10:00 a.m.

21                        -   -   -

22  BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

23

24

25

2

1    APPEARANCES:

2            JEFFREY B. BOVE, ESQ.,
         MARY W. BOURKE, ESQ.,
3        MARK E. FREEMAN, ESQ., and
         JACLYN M. MASON, ESQ.
4        Connolly Bove Lodge & Hutz LLP
                      -and-
5        BRADFORD J. BADKE, ESQ.
         Ropes & Gray LLP
6        (New York, N.Y.)

7                        Counsel for Plaintiff and
                         Counterdefendants

8
         PHILIP A. ROVNER, ESQ.
9        Potter Anderson & Corroon LLP
                      -and-
10       SUSAN M. SPAETH, ESQ.,
         JAMES G. GILLILAND, JR., and
11       ANNE M. ROGASKI, ESQ.
         Townsend and Townsend & Crew
12       (Palo Alto, CA)

13                       Counsel for Defendants and
                         Counterclaimant

14

15                       -   -   -

16

17

18

19

20

21

22

23

24

25

1    (indicating).

2              The S/D process results in ISG preparations with

3    acceptable viral inactivation but with unacceptably high

4    levels of ACA.  That's from their brief.  And then, using a

5    final incubation step would surprisingly lower ACA to an

6    acceptable level suitable for IV administration.

7              We believe that the claims, the specification,

8    the file wrapper, as well as their own statements, make it

9    clear that Baxter's claim construction should be adopted by

10   the Court because it is proper.

11             The second term I would like to talk about is

12   acceptable level suitable for IV administration.

13             Acceptable doesn't sound like a very complicated

14   word.  But when you are talking about ACA, everything is

15   complicated, unfortunately.  It is very complex, because it

16   is not simply measuring the -- ACA is not like measuring the

17   length from the podium to the jury box.  Everything we think

18   about ACA is more complicated.  We understand from Your

19   Honor's order that you don't wish us to talk about our

20   general position on indefiniteness, so we will skip that.

21             THE COURT:  Not at this time.

22             MS. SPAETH:  We will go to our alternate

23   construction that we provided to the Court.

24             We believe that for acceptable levels suitable

25   for IV administration to be understood by a person of

1    biochemist or an immunologist, someone in this general

2    field, with either a Bachelor's degree or a Master's degree,

3    and we list several things, like chemistry, biology,

4    biochemistry, immunology or related field.  Those general

5    types of fields.  And several years of experience in one or

6    more of the following.  The purification of blood proteins,

7    how you go from blood plasma to the intermediates, or viral

8    inactivation or removing viruses when everybody knows that

9    is important and that was of utmost importance, as you might

10   appreciate, in the eighties and nineties.

11           They would have had in 1995 some exposure or

12   experience with solvent/detergent treatment and low pH

13   incubation, if they met the virus removal part of the prong,

14   and/or ACA anticomplement system, including how to measure

15   and lower ACA, or the equivalent.

16           So the general field, we do not believe it has

17   to be a Ph.D.  We do not believe it has to be the world's

18   leading expert on any particular one of these.  But somebody

19   who is generally working in the field.

20           THE COURT:  It doesn't have to be one of

21   exceptional skill, but ordinary skill.

22           MS. SPAETH:  Correct.

23           THE COURT:  Let me ask you this:  You point out,

24   I think it's Column 5, the patent discloses certain

25   specifics in the assay.  I guess my question is, absent that

1    disclosure, could plaintiff have enabled independent Claim

2    1?

3            MS. SPAETH:  We believe it would not have passed

4    the written description test, Your Honor, because it was

5    found to be indefinite until they pointed to this section of

6    their specification.

7            So without the numeric values, they failed the

8    written description.  Without the assay identification.

9    They would fail the written description and the enablement

10   prong, yes.

11           THE COURT:  One of the concerns that I have

12   about a number of Baxter's arguments is, it would seem to me

13   that it might place the Court in a position, I am not sure,

14   of limiting the claims by the preferred embodiment or the

15   disclosures in the specification.  Do you want to address

16   that?

17           MS. SPAETH:  Sure, Your Honor.  I know that it

18   is a concern of plaintiffs that we suggest that claims must

19   be limited, for instance, to cholate and pH 7 rather than

20   including tween or any other detergent or pH 5.8.

21           First, on the cholate, while they say they have

22   this tween example in Table 1, if you read the full

23   specification, it becomes clear that Table 1 is only talking

24   about raising ACA with an S/D step.  It doesn't talk about

25   the second half, which it is needed for their claim, which

# Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| TALECRIS BIOTHERAPEUTICS, INC., | ) |
| Plaintiff | ) |
| v. | ) C.A. No. 05-349 GMS |
| BAXTER INTERNATIONAL INC., et al., | ) |
| Defendants | ) |
|  | ) |
| BAXTER HEALTHCARE CORP., | ) |
| Counterclaimant | ) |
| v. | ) |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | ) |
| Counterdefendants | ) |

## ORDER CONSTRUING THE TERMS OF U.S. PATENT NO. 6,686,191

After having considered the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of U.S. Patent No. 6,686,191 (the "'191 patent"):

1.  The term "any virus activity" is construed to have its plain and ordinary meaning.[1]

2.  The term "under conditions ... resulting in an increased level of anticomplement activity" is construed to have its plain and ordinary meaning.[2]

3.  The term "under conditions sufficient to substantially reduce any virus activity and resulting in an increased level of anticomplement activity" is construed to have its plain and ordinary meaning.[3]

4.  The term "increased level of anticomplement activity" is construed to have its plain and ordinary meaning[4].

5.  The term "increased anticomplement activity of the solution" is construed to have its plain and ordinary meaning.[5]

---

[1] "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

[2] The Defendants' alternative construction invites the court to import a limitation from the preferred embodiment into the claims, which is contrary to Federal Circuit precedent. *See Comarck Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("'[w]hile . . . claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims.'"). Further, "when a claim term is expressed in general descriptive words, we will not ordinarily limit the term to a numerical range that may appear in the written description or in other claims." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

[3] See footnote 2.

[4] The Defendants' construction invites the court to import a limitation from the preferred embodiment into the claims. See footnotes 1 and 2. Further, "nor may [the court], in the broader situation, add a narrowing modifier before an otherwise general term that stands unmodified in a claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

[5] See footnote 4.

6.    The term "then incubating the solution of step a)" is construed to mean "incubating a solution originating from step a) under conditions of controlled time, pH, temperature, and ionic strength, wherein additional steps may be performed prior to said incubating."[6]

7.    The term "about 60 $CH_{50}$ units/mL" is construed to mean "about 60 $CH_{50}$ units/mL, wherein one unit of ACA activity (one $CH_{50}$ unit) is defined as the amount of protein capable of activating 50% of the complement in an optimally titered complement and red blood cell hemolysin system."[7]

8.    The term "about 45 $CH_{50}$ units/mL" is construed to mean "about 45 $CH_{50}$ units/mL, wherein one unit of ACA activity (one $CH_{50}$ unit) is defined as the amount of protein capable of activating 50% of the complement in an optimally titered complement and red blood cell hemolysin system."[8]

---

[6] The specification contemplates removal of solvent and detergent molecules after incubation in step a). '191 patent, 4:43-45. The specification provides that "[v]ery low levels of TNBP and cholate in the final container can be achieved by a combination of filtration, diafiltration and hydrohobic chromatography." '191 patent, 4:49-51. The specification describes, in 4:66 - 5:41, various steps to achieve tonic adjustment and to lower the amount of solvent and detergent molecules. Thereafter, the specification states "[t]he so-treated solution [4:66 - 5:41] is incubated ... in order to provide a lowering of ACA levels." '191 patent, 5:43-44. Therefore, to construe the claim terms as the Defendants propose would be contrary to the specification. See Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003) ("A fundamental rule of claim construction is that terms in a patent document are construed with the meaning with which they are presented in the patent document. Thus claims must be construed so as to be consistent with the specification, of which they are a part.") (citations omitted).

[7] See the '191 patent, 5:64 - 6:1.

[8] See footnote 7.

9.  The term "anticomplement activity" is construed to mean "the measure of the ability of antibodies to bind complement."[9]

10. The term "acceptable level suitable for intravenous administration" is construed to have its plain and ordinary meaning.[10]

11. The term "ionic strength" is construed to mean "the summation: $I=1/2\sum(c_i z^2)$ where $c_i$ is the concentration of each type of ion (in moles 1-1) and z is its charge."[11]

Dated: December 28, 2006

/s/ Gregory M. Sleet
UNITED STATES DISTRICT JUDGE

---

[9] See footnote 2.

[10] See footnote 2.

[11] The parties agree on the construction of "ionic strength." See Joint Claims Construction Statement (D.I. 159).

4

# Exhibit 3

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# Exhibit 4

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# Exhibit 5

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY