## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No. 05-349-GMS |
| v. | ) ) | JURY TRIAL DEMANDED |
| BAXTER INTERNATIONAL INC. and BAXTER HEALTHCARE CORPORATION, | ) ) ) | **PUBLIC VERISON** |
| Defendants. | ) ) ) | |
| _____ | ) | |
| BAXTER HEALTHCARE CORPORATION, | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | ) ) ) | |
| Counterdefendants. | ) ) | |

## DECLARATION OF ANNE M. ROGASKI IN SUPPORT OF DEFENDANT BAXTER INTERNATIONAL INC. AND DEFENDANT/COUNTERCLAIMANT BAXTER HEALTHCARE CORPORATION'S MOTIONS *IN LIMINE*

OF COUNSEL:

James G. Gilliland, Jr.
Susan M. Spaeth
Anne M. Rogaski
TOWNSEND and TOWNSEND and
CREW LLP
379 Lytton Avenue
Palo Alto, CA 94301
(650) 326-2400

Dated: April 23, 2007
Public Version: April 28, 2007

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
E-mail: provner@potteranderson.com

*Attorneys for Defendant Baxter International Inc. and Defendant/Counterclaimant Baxter Healthcare Corporation*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | Civil Action No.: 05-349-GMS |
| Plaintiffs, | Jury Trial Demanded |
| v. | |
| BAXTER INTERNATIONAL INC. and BAXTER HEALTHCARE CORPORATION, | |
| Defendants. | **PUBLIC VERSION** |
| BAXTER HEALTHCARE CORPORATION, | |
| Counterclaimant, | |
| v. | |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | |
| Counterdefendants. | |

**DECLARATION OF ANNE M. ROGASKI IN SUPPORT OF DEFENDANT BAXTER INTERNATIONAL INC. AND DEFENDANT/COUNTERCLAIMANT BAXTER HEALTHCARE CORPORATION'S MOTIONS *IN LIMINE***

I, Anne M. Rogaski, declare:

1.    I am a partner at the law firm of Townsend and Townsend and Crew LLP and one of the counsel of record for Defendant Baxter International Inc. and Defendant/Counterclaimant Baxter Healthcare Corporation (collectively "Baxter"). I make this declaration of my personal knowledge.

2.    I informed Plaintiffs on September 1, 2006, in accordance with the Court's scheduling order, that Baxter does not intend to rely upon opinion of counsel as a defense to Plaintiffs' allegations of willful infringement. Attached hereto as Exhibit 1 is a true

and correct copy of my letter to Plaintiffs' counsel on September 1, 2006.

      3.     A true and correct copy of *IMX, Inc. v. Lendingtree LLC*, 2006 WL 38918 (D. Del. Jan. 6, 2006) is attached hereto as Exhibit 2.

      4.     True and correct copies of pages 61-62 of the highly confidential deposition transcript from the February 28, 2007 deposition of Thomas J. Kindt, Ph.D. are attached hereto as Exhibit 3.

      5.     True and correct copies of pages 158-160 of the highly confidential deposition transcript from the March 1, 2007 deposition of Thomas J. Kindt, Ph.D. are attached hereto as Exhibit 4.

      6.     True and correct copies of pages 78-81, 84, 86-87 and 91 of the highly confidential deposition transcript from the February 22, 2007 of Terrence Snape, Ph.D. are attached hereto as Exhibit 5.

      7.     A true and correct copy of *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2006 WL 2724879 (D. Del. Sep. 20, 2006) is attached hereto as Exhibit 6.

      8.     A true and correct copy of the highly confidential Expert Report of Jeffrey V. Ravetch, M.D., Ph.D. Pursuant to Federal Rule of Civil Procedure 26(a) dated January 10, 2007 is attached hereto as Exhibit 7.

      9.     A true and correct copy of the patent-in-suit, U.S. Patent No. 6,686,191 B1, is attached hereto as Exhibit 8.

      10.    A true and correct copy of the highly confidential Rebuttal Expert Report of Christopher J. Bokhart dated January 31, 2007 is attached hereto as Exhibit 9.

      11.    True and correct copies of pages 219 and 222-223 of the highly

confidential deposition transcript from the March 3, 2007 of Jeffrey Ravetch, M.D., Ph.D. are attached hereto as Exhibit 10.

12.     A true and correct copy of the highly confidential Expert Report of Thomas J. Kindt Concerning U.S. Patent No. 6,686,191 dated January 10, 2007 is attached hereto as Exhibit 11.

13.     A true and correct copy of the highly confidential Expert Report of Christopher J. Bokhart dated January 10, 2007 is attached hereto as Exhibit 12.

14.     True and correct copies of pages 27, 32-40, 91, 145-146 and 149-151 of the highly confidential deposition transcript from the February 21, 2007 of Christopher J. Bokhart are attached hereto as Exhibit 13.

15.     A true and correct copy of *Simon Property Group, L.P. v. mySimon, Inc.*, 2001 U.S. Dist. LEXIS 852 (S.D. Ind. Jan. 24, 2001) is attached hereto as Exhibit 14.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 23 day of April, 2007 at Palo Alto, California.

_____
Anne M. Rogaski

Public Version: April 28, 2007

3

# EXHIBIT 1

TOWNSEND
*and*
TOWNSEND
*and*
CREW
LLP

San Francisco, California
Tel 415 576-0200

Walnut Creek, California
Tel 925 472-5000

San Diego, California
Tel 858 350-6100

Denver, Colorado
Tel 303 571-4000

Seattle, Washington
Tel 206 467-9600

**Palo Alto**

379 Lytton Avenue
Palo Alto
California 94301
Tel 650 326-2400
Fax 650 326-2422

September 1, 2006

*VIA EMAIL*

Jeffrey B. Bove, Esq.
Mary W. Bourke, Esq.
Mark E. Freeman, Esq.
Jaclyn M. Mason, Esq.
Donna C. Hallowell, Paralegal
Connolly Bove Lodge & Hutz LLP
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207

      Re:   *Talecris Biotherapeutics, Inc. and Bayer Healthcare LLC v. Baxter International*
            *Inc. and Baxter Healthcare Corporation* and related counterclaim
            U.S. District Court, District of Delaware, Case No. 05-349-GMS
            Our Reference 018652-004000

Counsel:

      Pursuant to Paragraph 3 of the Proposed Scheduling Order, Defendant Baxter
International Inc. and Defendant/Counterclaimant Baxter Healthcare Corporation (collectively,
"Baxter") hereby inform Plaintiffs that Baxter does not intend to rely upon advice of counsel as a
defense to Plaintiffs' allegations of willful infringement in this matter.

               Very truly yours,

               TOWNSEND AND TOWNSEND AND CREW LLP

               Annie M. Rogaski

AMR:lp
60860479 v1

cc:    Philip A. Rovner, Potter Anderson & Corroon LLP (via email and Federal Express)
      Bradford J. Badke, Ropes & Gray LLP (via email and Federal Express)

# EXHIBIT 2



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 38918 (D.Del.)
**(Cite as: 2006 WL 38918 (D.Del.))**

Page 1

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
IMX, INC., Plaintiff,
v.
LENDINGTREE, LLC, Defendant.
**No. Civ. 03-1067-SLR.**

Jan. 6, 2006.

David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiff.

Jack B. Blumenfeld, Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendant.

MEMORANDUM ORDER

ROBINSON, J.

*1 At Wilmington this 6th day of January, 2006, having considered the issues raised by defendant at the December 19, 2005 pretrial conference;

IT IS ORDERED that plaintiff is precluded from seeking to draw an adverse inference or suggesting any adverse evidentiary presumption with respect to the nature of an opinion of counsel on infringement due to defendant's failure to obtain such an opinion, for the reasons that follow:

1. At the December 19, 2005 pretrial conference, defendant raised the following matter for consideration by the court: "Whether [plaintiff] may make any arguments or seek to draw inferences relating to the fact that the opinion of counsel obtained by defendant addressed the issue of invalidity of the patent-in-suit, but not the issue of infringement."

2. The holding of the Federal Circuit in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corporation, et al.,* 383 F.3d 1337 (Fed.Cir.2004) (en banc), provides a clear answer to the question of whether inferences can be drawn as a result of the absence of an opinion from counsel. The Federal Circuit noted, "We now hold that no adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel. Precedent to the contrary is overruled." *Knorr-Bremse,* 383 F.3d at 1341. Pursuant to this holding, plaintiff may not seek to draw the inference that, since the opinion by counsel obtained by defendant failed to discuss infringement, an opinion by counsel on infringement would have been unfavorable if obtained by defendant.

3. As the court in *Knorr-Bremse* further explained, "Although there continues to be an affirmative duty of due care to avoid infringement of the known patent rights of others, the failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or evidentiary presumption that such an opinion would have been unfavorable." *Id.* at 1345 (internal citations omitted). Thus, plaintiff should be precluded from seeking to draw an adverse inference or suggesting any adverse evidentiary presumption as to the nature of an opinion on infringement.

4. As for the propriety of an argument relating to the fact that the opinion of counsel obtained by defendant addressed the issue of invalidity but not infringement, such evidence may be considered by the trier of fact when assessing willful infringement. Unchanged by *Knorr-Bremse* is the standard that a determination of willfulness is made as a result of consideration of the totality of the circumstances. *Id.* at 1342-43. Several factors may be considered in the totality of the circumstances analysis used to evaluate willfulness, but no factor deserves per se treatment; each factor must be given the weight warranted by its strength in a particular case. [FN1] *Rolls-Royce, Ltd. v. GTE Valeron Corp.,* 800 F.2d 1101, 1110 (Fed.Cir.1986); *Knorr-Bremse,* 383 F.3d at 1347. As a result of the holding in *Knorr-Bremse,* however, an adjustment is made to the factors used in the evaluation of the totality of the circumstances. *Knorr-Bremse,* 383 F.3d at 1346 (vacating a judgment of willful infringement and remanding the case, noting that "[b]ecause elimination of the adverse inference as drawn by the district court is a material change in the totality of circumstances, a fresh weighing of the evidence is required to determine whether the defendants committed willful infringement."). In other words, while an evaluation of the factors in the totality of the circumstances must still be conducted to make a determination on the issue of willful infringement, such an evaluation must be made in the absence of the evidentiary contribution or presumptive weight of an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 38918 (D.Del.)
(Cite as: 2006 WL 38918 (D.Del.))

Page 2

adverse inference that any opinion of counsel was or would have been unfavorable. *Id.* at 1341. The fact that no opinion of counsel on the issue of infringement was acquired by defendant may be considered by the trier of fact in its willful infringement analysis, but no inference may be drawn to suggest that such an opinion, had it been acquired, would have been unfavorable to defendant.

> FN1. The Federal Circuit has identified several factors that may be considered in determining whether infringement is willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827 (Fed.Cir.1992).

Not Reported in F.Supp.2d, 2006 WL 38918 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 6



Slip Copy                                                                                                      Page 1
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

H

Briefs and Other Related Documents
Power Intgrations, Inc. v. Fairchild Semiconductor
Intern., Inc.D.Del.,2006.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
POWER INTEGRATIONS, INC., a Delaware
corporation, Plaintiff,
v.
FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware corporation,
and Fairchild Semiconductor Corporation, a Delaware
corporation, Defendants.
**No. CIVA 04-1371 JJF.**

Sept. 20, 2006.

Frank E. Scherkenback, of Fish & Richardson P.C.,
Boston, Massachusetts, Howard G. Pollack, David J.
Miclean, and Michael R. Headley, of Fish &
Richardson P.C., Redwood City, California, William J.
Marsden, Jr., and Sean P. Hayes, of Fish &
Richardson, P.C., Wilmington, Delaware, for
Plaintiff.
G. Hopkins Guy, III, Vickie L. Freeman, Bas de Blank,
and Brian H. VanderZanden, of Orrick, Herrington &
Sutcliffe LLP, Menlo Park, California, Steven J.
Balick, John G. Day, and Tiffany Geyer Lydon, of
Ashby & Geddes, Wilmington, Delaware, for
Defendant.

*MEMORANDUM OPINION*
FARNAN, J.
**\*1** Pending before the Court are several motions filed
by Plaintiff and Defendants. The Court will address
each of the Motions in turn.

I. Defendants' Motion For Protective Order Regarding
Deposition Of Michael C. Keeley, Rebuttal Expert
Report On Damages And Continuation Of Damages
Trial (D.I.309)

By their Motion, Defendants request a protective order
(1) quashing Power Integration's notice of deposition
of Michael C. Keeley, (2) setting reasonable dates for
the submission of Dr. Keeley's rebuttal damages
expert report and deposition, and (3) continuing the
damages portion of the trial currently set for October 2,
2006. Defendants contend that Plaintiff has not

provided any discovery of its restated financial reports
and that a revised damages report by Mr. Troxel
contains new theories which Plaintiff should not be
permitted to assert at this late date.

By e-mail to the Court dated August 21, 2006, the
parties informed the Court that they reached an
agreement concerning the deposition of Mr. Keeley.
However, Defendants continue to press their motion to
the extent that it seeks a continuation of the damages
trial, particularly in light of the fact that Defendants
still have not received Plaintiff's restated financial
reports. Defendants also maintain that Mr. Troxel's
second supplemental expert report on damages should
be stricken.

The Court has addressed the continuation of the
damages trial in this case in the context of a previous
motion filed by Defendants and will not revisit that
decision here. As for Plaintiff's financial reports, the
Court addressed that subject at the Pretrial Conference
and will also discuss it in the context of a pending
motion in limine. Mr. Troxel's second supplemental
expert report is the subject of a separate motion filed
by Defendants, and therefore, will not be addressed by
the Court in the context of this motion. Accordingly,
the Court will deny as moot the Motion For Protective
Order as it applies to Mr. Keeley's deposition and the
deadlines for rebuttal expert reports, and deny the
Motion For Protective Order in all remaining aspects.

II. MOTIONS IN LIMINE

A. *Defendants' Motions In Limine (D.I.356-1)*

1. Motion In Limine To Exclude Plaintiff's Claim For
Damages Based On Defendants' Non-infringing
Foreign Sales And Manufacture Of Products That
Never Entered the U.S.

The Court has previously denied Defendants' Motion
For Partial Summary Judgment Of Non-Infringement
(Foreign Sales) and concludes that the instant motion
more closely resembles a second summary judgment
motion on that issue than a motion in limine.
Accordingly, the Court will deny Defendants' Motion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

Page 2

2. Motion In Limine To Exclude Plaintiff's Claim For
   Evidence And Damages Based On Third Party
   Alleged U.S. Importation Of Accused Products

As with the previous Motion, the Court concludes that
Defendant's second Motion In Limine is akin to a
summary judgment motion. In this case, the jury will
decide how many infringing sales and offers for sale
took place in the United States based on the evidence
submitted by the parties.[FN1] Accordingly, the Court
will deny Defendants' motion.

> FN1. For both their first and second motions
> in limine, Defendants rely on a statement
> made by the Court in the context of
> addressing a motion in limine pertaining to
> the report of Mr. Lum. (D.I.334). The Court's
> statement was confined to the context of that
> dispute and was based solely on the excerpts
> of depositions provided by Defendants in
> connection with that motion. Thus, the Court
> did not intend for its statements to be
> construed as a commentary on the evidence
> as a whole or on the broader issue of alleged
> foreign sales and third party importation
> presented here.

3. Motion In Limine To Preclude Plaintiff From
   Relying On Decertified Financial Reports

**\*2** The Court has reviewed the parties' arguments with
respect to this issue and concludes that Defendants
have not demonstrated sufficient reason to preclude
Plaintiff's from relying on the existing financial
figures. To the extent that the existing figures may be
changed at a later date, the Court can address the issue
post-trial. Accordingly, the Court will deny
Defendants' motion.

4. Motion In Limine To Exclude Evidence Of Alleged
   "Price Erosion"

The Court has reviewed the parties' arguments with
respect to this issue and concludes that Defendants can
address any deficiencies in Mr. Troxel's report
through cross-examination. The Court is not
persuaded that Plaintiff improperly concealed
evidence from Mr. Troxel and disagrees with
Defendants' assertion that products introduced by
Plaintiff into the market prior to October 20, 2004,
cannot provide a basis for damages, when the
calculations relevant to those products are attributable
to post October 20, 2004 sales. Accordingly, the Court

will deny Defendants' Motion.

5. Motion In Limine To Exclude All Evidence Of
   Damages Or Notice Prior To October 20, 2004

The Court has already addressed this issue in previous
decisions and finds that further discussion of this issue
is unwarranted. The Court will not expand its previous
orders to embrace all pre-suit evidence and will not
create a blanket presumption against the admission of
such pre-suit evidence by requiring proffers that the
evidence relates to infringement rather than damages.
To the extent that Defendants have a concern about a
particular piece of evidence, their concerns can be
address at trial or during a side-bar conference.
Accordingly, Defendants' motion will be denied.

6. Motion In Limine To Exclude Sales Reports And
   Other Documents As Unreliable

The Court has considered the parties' arguments
concerning this issue and concludes that the reliability
or unreliability of the documents identified by
Defendants is a question reserved for the jury. As for
Defendants' hearsay objections, the Court notes that
Plaintiff contends that the documents fall within a
number of exceptions to the hearsay rule. To the
extent that Defendants maintain these objections and
contend that these hearsay exceptions do not apply,
the Court will consider such objections in the context
of the trial so that the Court can fully evaluate the
foundational evidence relevant to the exhibits.
Accordingly, the Court will deny Defendants' motion.

7. Motion In Limine To Exclude Legal Opinions On
   Infringement

The Court has reviewed the parties' arguments with
respect to this issue and concludes that Defendants are
not entitled to relief. Although claim construction is a
question of law, the ultimate question of infringement
is a question of fact reserved for the jury. *Envirotech
Corp. v. Al George, Inc.,* 730 F.2d 753, 758
(Fed.Cir.1984). Thus, technical experts are permitted
to give their opinions on the question of infringement.
*See Snellman v. Ricoh Co.,* 862 F.2d 282, 287
(Fed.Cir.1988), *cert. denied,* 491 U.S. 910 (1989).
Accordingly, the Court will deny Defendants' Motion.

8. Motion In Limine To Exclude Evidence That
   Defendants Copied Plaintiff's Circuits Or Datasheets

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*3 The Court has reviewed the parties' arguments regarding this issue and concludes that the issue of copying presents questions for the jury. As for Defendants concerns regarding jury confusion, the Court concludes that such concerns are slight and likely to be fully ameliorated once the Court instructs the jury as to the applicable law. Accordingly, the Court concludes that Defendants will not be unduly prejudiced by this evidence, and therefore, the Court will deny Defendants' Motion.

### 9. Motion In Limine To Exclude Claims And Evidence Regarding Defendants' FSD210HD Product

Defendants contend that Plaintiff failed to identify the FSD210HD product as an accused device in any of its damages reports prior to August 8, 2006, and in any of its interrogatory responses. Defendants also contend that they identified this device during discovery, even though it was not accused, to be sure that Plaintiff was aware of the device. Defendants also point out that there are no technical reports concerning infringement for this device, and therefore, if Plaintiff is permitted to pursue the device, Defendants contend that discovery will need to be reopened.

Plaintiff contends that Defendants concealed that this device was manufactured in the United States until May 2006. Plaintiff points out that it identified the FSD210 family of products, and the fact that it did not specifically designate the particular sales suffix is a "semantic" difference. According to Plaintiff there is no relevant difference between the FSD210HD and the other members of the FSD210 family, and Defendants' documents demonstrate that the FSD210HD is a version of the FSD210H product identified by Plaintiff. In addition, Plaintiff contends that Defendants, themselves, referred to the FSD210 as an accused device.

The Court concludes that Plaintiff has sufficiently identified the FSD210HD as an accused product in this litigation in light of their identification of the FSD210 family of products. The FSD210 family of products has been the subject of technical expert reports, and therefore, the Court is persuaded that additional discovery related to the FSD210HD product is not required. Further, Defendants have not demonstrated that there is a significant difference between the FSD210HD device and the other devices in that family, including the FSD210H which was identified by Plaintiff. Accordingly, the Court will deny Defendants' Motion.

### 10. Motion In Limine To Exclude Claims Or Evidence Based On An Alleged "Offer For Sale" Because The Theory Was Not Included In Plaintiff's Damages Report

Defendants contend that Plaintiff's damages expert did not calculate damages based on an offer to sale, and therefore, this evidence is outside the scope of the expert reports. Defendants also contend that offers to sell that culminated in sales outside the United States should be excluded.

Plaintiff contends that lost profit damages are based on lost sales, and therefore, its damages expert was not required to calculate damages separately for offers for sale. However, Plaintiff contends that its damages expert did consider offers for sale in the context of his price erosion calculations. Plaintiff also contends that evidence of offers to sell infringing products in the United States is evidence that actual sales of infringing products occurred in the United States and evidence of Defendants' intent to induce others to imports and use these products in the United States.

*4 The Court has considered the parties' arguments and concludes that the alleged offers to sale were considered by Dr. Troxel in the context of his price erosion analysis and that the alleged offers for sale are relevant to the issues in this case. Accordingly, the Court will deny Defendants' Motion.

### 11. Motion In Limine To Exclude Doctrine Of Equivalents' Arguments With Regard To The '075, '876 And '366 Patent And Limit The Argument With Regard To The '851 Patent

Plaintiff has not asserted the doctrine of equivalents with respect to the '075 patent, and therefore, the Court concludes that the motion is moot to the extent that it pertains to that patent. As for the remaining patents, the Court finds Defendants' motion to be more akin to a motion for summary judgment than a motion in limine, and the question of the sufficiency of the evidence on the doctrine of equivalents can be taken up after the jury's verdict, if necessary. Accordingly, the Court will deny Defendants' Motion to the extent that it has not already been mooted.

### 12. Motion In Limine To Exclude Evidence Concerning Power Integrations' Earlier Litigation Success Against System General or Motorola

Slip Copy                                                                              Page 4
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

The parties apparently agree that evidence regarding Plaintiff's successes in the Motorola and System General lawsuits is irrelevant to this action, and therefore, the Court will grant Defendants' Motion. As for Plaintiff's argument that they should be able to raise this issue if Defendants "open the door" to the subject, the Court concludes that such an arguments depends entirely on the evidence produced at trial and its context. Accordingly, the Court will address any such issues on a case-by-case basis during the trial.

### 13. Motion In **Limine** To Preclude Plaintiff's From Introducing Evidence Of Defendants' Prior **Claim Construction** Positions, Or Evidence Of Who "Won" Or "Lost"

Defendants contend that any reference to their prior claim construction positions or to who "won" or "lost" the claim construction debate are prejudicial to Defendants and confusing to the jury. In response, Plaintiff contends that this evidence is relevant to willfulness. Specifically, Plaintiff contends that Defendants obtained 13 opinions of counsel and their positions have changed several times, including changes based on incorrect claim construction. Plaintiff contends that they are entitled to question the competence of Defendants' opinions and Defendants' reasonable reliance on those opinions.

While the Court agrees that reference to who "won" or "lost" the claim construction debate may not be appropriate to suggest that the Court favors one parties' position over another, the Court concludes that evidence of Defendants' shifting claim constructions is relevant to the reasonableness and competence of the opinions of counsel relied upon by Defendants as a defense to willful infringement. Accordingly, the Court will permit Plaintiff to explore this issue in that limited context, and therefore, Defendants' Motion will be denied.

### 14. Motion In Limine To Preclude Any Evidence Or Assertion That Opinion Counsel Must Have Construed All Terms To The Claims As Part Of A Proper Analysis

**\*5** Plaintiff agrees with Defendants that there is no requirement that opinion counsel construe each and every term of a patent for the opinion of counsel to be valid. However, the Court agrees with Plaintiff that the question of whether counsel should have construed a particular claim term in rendering his

non-infringement opinion is relevant to the jury's assessment of whether Defendants' reasonably relied on that opinion. Accordingly, the Court will deny Defendants' Motion.

### 15. Motion In Limine To Preclude Irrelevant And Prejudicial Documents Regarding Power Integrations And its Products

Defendants contend that Plaintiff should be precluded from introducing evidence related to awards that Plaintiff has received for its products and evidence from an e-mail sent by one of Defendants employees' which states that Plaintiff's "system ideas" were "epoch making." Defendants contend that this evidence does not have a nexus to the technology or inventions of the asserted claims, and that Plaintiff has not provided any testimony linking these accolades to the patents-in-suit. Defendants further contend that this evidence is more appropriately reserved for the invalidity trial as evidence of secondary indicia of non-obviousness.

Plaintiff contends that the e-mail from Defendants' employee is relevant evidence of Defendants' intent to copy. Plaintiff also contends that the article discussing the awards Plaintiff has received discusses the features of certain of Plaintiff's products which embody the patented technologies in this case.

The Court has reviewed the documents cited by Defendants and concludes that they are relevant to the patented technology and provide useful background information regarding Power Integrations and the marketplace for power supplies. Further, as Plaintiff points out, the Court will instruct the jury as to the appropriate law, so as to prevent the misuse of the documents by the jury, and therefore, the Court is not persuaded that Defendants will suffer undue prejudice if the Court does not exclude the above-referenced documents from evidence. Accordingly, the Court will deny Defendants' Motion.

### 16. Motion In Limine To Exclude Technical Expert Testimony From Michael Shields On Inherency

Defendants contend that the Court should exclude the testimony of Mr. Shields on the issue of inherency. Specifically, Defendants contend that this testimony exceeds the scope of Mr. Shield's expert report and is beyond his area of expertise. Defendants also contend that Mr. Shields indicated at his deposition that he would not be discussing the subject of inherency.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

In response, Plaintiff contends that Defendants have mischaracterized the testimony of Mr. Shields. According to Plaintiff, Mr. Shields indicated that he did not agree with Defendants' definition of inherency, but did not testify that he would not opine on inherency. Plaintiff also contends that Defendants will have ample opportunity to cross-examine and rebut Mr. Shields' testimony. [FN2]

> FN2. Plaintiff raises an additional issue which they contend is related to Defendants' Motion. Specifically, Plaintiff contends that Defendants "may" argue that Mr. Shields should not be allowed to provide testimony regarding documents that came to light after Mr. Shields provided his rebuttal report and deposition. Plaintiff requests that the Court clarify that its expert, Mr. Shields, will be permitted to respond to the testimony of Defendants' expert, Mr. Gwozdz, whose testimony the Court declined to preclude in the context of a previous motion in limine raised by Plaintiff. Because this issue was raised in Plaintiff's response to Defendants' Motions In Limine, the Court does not have Defendants' position with respect to this issue. Also, it appears to the Court that Plaintiffs are anticipating this argument to be raised by Defendants, but it is unclear to the Court whether Defendants are, in fact, pressing this argument. Accordingly, the Court will address this issue during the trial, if it becomes necessary.

*6 Plaintiff does not address the content of Mr. Shields report in its response to Defendants' Motion In Limine. The Court has reviewed the report and notes that it does not expressly address the concept of inherency. As the Court stated previously, opinions not disclosed by an expert in his report will not be permitted at trial. Accordingly, the Court will exclude the testimony of Mr. Shields as it relates to the concept of inherency, unless Plaintiff can designate the portion of Mr. Shields' report which it contends addresses this topic, and therefore, Defendants' Motion will be granted at this juncture.

### 17. Motion In Limine To Exclude E-Mails Between GE And Fairchild

Defendants contend that e-mails between themselves and GE should be excluded from evidence, because they are irrelevant. Specifically, Defendants contend that the e-mails were not relied upon by Plaintiff's damages expert and were dated prior to October 20, 2004. Defendants also contend that the e-mails have not been authenticated and are inadmissible hearsay.

Plaintiff contends that the e-mails are not relevant to their damages case, but to show Defendants' intent to induce others to import infringing products into the United States. As for authentication, Plaintiff contends that the documents are Defendants' documents, and therefore, Defendants should be required to authenticate them. Plaintiff also contends that these documents are admissible as admissions of a party-opponent and business records.

The Court has reviewed the parties' arguments and the proffered evidence and concludes that the documents referred to by Defendants have only marginal, if any, relevance to the issues in this case. Accordingly, the Court will grant Defendants' Motion and exclude the e-mail evidence referred to by Defendants.

### 18. Motion In Limine To Exclude Dr. Eklund's Testimony Concerning Conception Or Reduction To Practice Unless Plaintiff Provides And Lays The Foundation Of Independent Evidence Corroborating The Dates

The Court has reviewed the parties' arguments regarding this issue and notes that a related summary judgment motion was denied. The Court further finds that questions concerning conception, reduction to practice and corroboration are factual in nature, and therefore, reserved for the jury. Accordingly, the Court will deny Defendants' Motion.

### 19. Motion In Limine To Exclude Argument Or Evidence Challenging The Publication Dates Of Prior Art References Listed By Defendants

In an effort to facilitate the resolution of the parties' dispute concerning the publication dates of the prior art references, the Court will limit Defendants to 7 prior art references (a number equaling the number of claims asserted in this litigation). Once the references are selected, the parties shall confer to determine whether they can stipulate to the publication dates. Accordingly, Defendants' Motion will be denied at this juncture.

### B. *Plaintiff's Motions In Limine (D.I.343-1)*

Slip Copy
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

1. Motion In Limine To Preclude Defendants From Referencing Or Introducing Evidence Related To Plaintiff's Restatement Of Earnings, Including Reference to SEC or DOJ Investigations, Civil Suits Against Plaintiff, and Personnel Changes

*7 The Court has reviewed the parties' positions with respect to this issue and agrees with Plaintiff that the evidence sought to be precluded is irrelevant to this case. As the Court has stated previously, this case is not a securities action. Accordingly, the Court will grant Plaintiff's Motion.

2. Motion In Limine To Preclude Defendants From Arguing That The FSD210HD Devices Were Not Manufactured In The United States

Because the Court will permit Plaintiff to pursue the FSD210HD as an accused device, the Court will also permit Defendants the opportunity to argue that these devices were not manufactured in the United States, if they have evidence to support that argument. Accordingly, the Court will deny Plaintiff's Motion.

3. Motion In Limine To Preclude Testimony From Gu-Yeon Wei, Defendants' expert on copying

Plaintiff contends that Dr. Wei did not speak to those who developed the accused parts and only looked at the circuits and schematics in formulating his opinion on copying. Thus, Plaintiff contends that Dr. Wei's testimony regarding copying is based on speculation. In the Court's view, any deficiencies in the Dr. Wei's opinions, including the measures he took in formulating those opinions, can be addressed by Plaintiff through cross-examination. Accordingly, the Court will deny Plaintiff's Motion.

4. Motion In Limine To Preclude Mr. Conrad, Defendants' "reliance" witness, from testifying regarding communications with Defendants' in-house counsel (Steven Schott) regarding infringement or the validity of the patents-in-suit

Plaintiff contends that during his first deposition, Mr. Conrad indicated that he relied only on certain opinion letters of counsel in connection with Fairchild's defense to the charge of willful infringement; however, Mr. Conrad reversed course during a second deposition and referred to conversations he had with

Mr. Schott. Plaintiff points out that Mr. Schott was initially listed by Defendants as a trial witness, but that when Plaintiff sought to compel his testimony, Defendants took him off the witness list prompting Plaintiff to withdraw its motion to compel. Plaintiff contends that, to the extent Mr. Conrad refers to conversations he had with Mr. Schott, Defendants are trying to introduce Mr. Schott's testimony through the "back-door" while simultaneously having shielded Mr. Schott from discovery.

Defendants contend that Plaintiff had ample opportunity to explore the state of mind of Mr. Conrad during his two day deposition. Defendants contend that Plaintiff's decision not to depose Mr. Schott is not a basis to limit Mr. Conrad's testimony.

The Court agrees with Defendants that Plaintiff made a tactical decision to forgo the deposition of Mr. Schott, and Defendants should not be penalized by that decision. Accordingly, the Court will deny Plaintiff's Motion.

III. Defendants' Motion To Strike Plaintiff's Second Supplemental Report On Damages (D.I.314)

Defendants request the Court to strike the second supplemental expert report of Plaintiff's damages expert, Mr. Troxel, which was served on August 8, 2006. Defendants contend that the report is (1) untimely, (2) accuses a new device, the FSD210HD, that was not previously raised by Plaintiff, (3) contains damages calculations based on conditions occurring before October 20, 2004, (4) adjusts the future lost profits damages sought from 2009 until 2010, (5) improperly contains damages calculations based on worldwide sales, (6) improperly refers to the favorable decision Power Integrations obtained in the ITC investigation of System General, and (7) contains unfair updated references to the testimony and reports of Mr. Slayton and Mr. Lum. In addition, Defendants contend that they have not been able to finish deposing Mr. Troxel and that the damages trial should be continued, because Plaintiff's have not yet produced their restated financial reports.

*8 Plaintiff contends that the FSD210HD is a particular version of a product that has been named as an accused product and within a family of products already identified as accused products. Plaintiff contends that the alternative calculations regarding conditions prior to October 20, 2004, are in Mr. Troxel's report, in case the Court grants reconsideration of its ruling on the markings issue as it

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

relates to damages. Plaintiff also contends that Mr. Troxel has always included a future price erosion analysis for a period of four years from the trial date, and therefore, the extension until 2010 reflects the current trial date. Plaintiff further contends that the other changes to the expert report are appropriate and consistent with their duty to provide updated reports in response to newly discovered information.

The Court has reviewed the revisions to Mr. Troxel's report and concludes that the report should be redacted to comport with the Court's rulings in this case regarding the testimony of Mr. Lum and the calculation of damages prior to October 20, 2004. The Court also concludes that the findings of the ITC are irrelevant to this litigation, and thus, those portions of Mr. Troxel's report dealing with the ITC findings should also be redacted. However, the Court will permit damages to be recoverable until 2010, since that is consistent with the period of damages sought by Plaintiff throughout this case and has only changed as a result of the extended trial date. In addition, the Court will allow the report to stand as it pertains to the issue of world-wide sales numbers and the FSD210HD product, which the Court has concluded was properly asserted by Plaintiff as an accused product. Accordingly, Defendants' Motion will be granted-in-part and denied-in-part. Plaintiff's Second Supplemental Expert Report On Damages will be redacted consistently with the Court's rulings in this case.

CONCLUSION

For the reasons discussed, the Court has made the above rulings with respect to the pending Motions.

An appropriate Order reflecting the Court's rulings will be entered.

*ORDER*

At Wilmington, this *20* day of September 2006, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that:

1. Defendants' Motion For Protective Order Regarding Deposition Of Michael C. Keeley, Rebuttal Expert Report On Damages And Continuation Of Damages Trial (D.I.309) is *DENIED AS MOOT* to the extent it applies to Mr. Keeley's deposition and *DENIED* in all

other respects.

2. Defendants' Motion In Limine (D.I.356-1) To Exclude Plaintiff's Claim For Damages Based On Defendants' Non-infringing Foreign Sales And Manufacture Of Products That Never Entered the U.S. is *DENIED*.

3. Defendants' Motion In Limine To Exclude Plaintiff's Claim For Evidence And Damages Based On Third Party Alleged U.S. Importation Of Accused Products (D.I.356-2) is *DENIED*.

4. Defendants' Motion In Limine To Preclude Plaintiff From Relying On Decertified Financial Reports (D.I.356-3) is *DENIED*.

*9 5. Defendants' Motion In Limine To Exclude Evidence Of Alleged "Price Erosion" (D.I.356-4) is *DENIED*.

6. Defendants' Motion In Limine To Exclude All Evidence Of Damages Or Notice Prior To October 20, 2004 (D.I.356-5) is *DENIED* .

7. Defendants' Motion In Limine To Exclude Sales Reports And Other Documents As Unreliable (D.I.356-6) is *DENIED*.

8. Defendants' Motion In Limine To Exclude Legal Opinions On Infringement (D.I.356-7) is *DENIED*.

9. Defendants' Motion In Limine To Exclude Evidence That Defendants Copied Plaintiff's Circuits Or Datasheets (D.I.356-8) is *DENIED*.

10. Defendants' Motion In Limine To Exclude Claims And Evidence Regarding Defendants' FSD210HD Product (D.I.356-9) is *DENIED*.

11. Defendants' Motion In Limine To Exclude Claims Or Evidence Based On An Alleged "Offer For Sale" Because The Theory Was Not Included In Plaintiff's Damages Report (D.I.356-10) is *DENIED*.

12. Defendants' Motion In Limine To Exclude Doctrine Of Equivalents' Arguments With Regard To The '075, '876 And '366 Patent And Limit The Argument With Regard To The '851 Patent (D.I.356-11) is *DENIED AS MOOT* as it pertains to the '075 patent, and *DENIED* in all other respects.

13. Defendants' Motion In Limine To Exclude Evidence Concerning Power Integrations' Earlier Litigation Success Against System General or

Slip Copy                                                                                    Page 8
Slip Copy, 2006 WL 2724879 (D.Del.)
**(Cite as: Slip Copy)**

Motorola (D.I.356-12) is *GRANTED.*

14. Defendants' Motion In **Limine** To Preclude Plaintiff's From Introducing Evidence Of Defendants' Prior **Claim Construction** Positions, Or Evidence Of Who "Won" Or "Lost" (D.I.356-13) is *DENIED.*

15. Defendants' Motion In Limine To Preclude Any Evidence Or Assertion That Opinion Counsel Must Have Construed All Terms To The Claims As Part Of A Proper Analysis (D.I.356-14) is *DENIED.*

16. Defendants' Motion In Limine To Preclude Irrelevant And Prejudicial Documents Regarding Power Integrations And its Products (D.I.356-15) is *DENIED.*

17. Defendants' Motion In Limine To Exclude Technical Expert Testimony From Michael Shields On Inherency (D.I.356-16) is *GRANTED.*

18. Defendants' Motion In Limine To Exclude E-Mails Between GE And Fairchild (D.I.356-17) is *GRANTED.*

19. Defendants' Motion In Limine To Exclude Dr. Eklund's Testimony Concerning Conception Or Reduction To Practice Unless Plaintiff Provides And Lays The Foundation Of Independent Evidence Corroborating The Dates (D.I.356-18) is *DENIED.*

20. Defendants' Motion In Limine To Exclude Argument Or Evidence Challenging The Publication Dates Of Prior Art References Listed By Defendants (D.I.356-19) is *DENIED.*

21. Plaintiff's Motion In Limine To Preclude Defendants From Referencing Or Introducing Evidence Related To Plaintiff's Restatement Of Earnings, Including Reference to SEC or DOJ Investigations, Civil Suits Against Plaintiff, and Personnel Changes (D.I.343-1) is *GRANTED.*

22. Plaintiff's Motion In Limine To Preclude Defendants From Arguing That The FSD210HD Devices Were Not Manufactured In The United States (D.I.343-2) is *DENIED.*

**\*10** 23. Plaintiff's Motion In Limine To Preclude Testimony From Gu-Yeon Wei, Defendants' expert on copying (D.I.343-3) is *DENIED.*

24. Plaintiff's Motion In Limine To Preclude Mr. Conrad, Defendants' "reliance" witness, from testifying regarding communications with Defendants'

in-house counsel (Steven Schott) regarding infringement or the validity of the patents-in-suit (D.I.343-4) is *DENIED.*

25. Defendants' Motion To Strike Plaintiff's Second Supplemental Report On Damages (D.I.314) is *GRANTED-IN-PART* and *DENIED-IN-PART.* Plaintiff's Second Supplemental Report On Damages will be redacted to comport with the Court's rulings in this case.

D.Del.,2006.
Power Integrations, Inc. v. Fairchild Semiconductor Intern., Inc.
Slip Copy, 2006 WL 2724879 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 3223651 (Verdict, Agreement and Settlement) Special Verdict Form (Oct. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 3227273 (Verdict, Agreement and Settlement) Defendants' Special Verdict Form (on Infringement and Damages) (Sep. 1, 2006)
• 2006 WL 3227274 (Verdict, Agreement and Settlement) Defendants' Special Verdict Form (on Invalidity) (Sep. 1, 2006)
• 2006 WL 3227272 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Compel Discovery and to Continue Damages Trial Date (Aug. 3, 2006)
• 2006 WL 3227271 (Trial Motion, Memorandum and Affidavit) Fairchild's Answering Brief in Opposition to Power Integrations' Motion for Reconsideration of the Court's June 2, 2006 Order (Jul. 6, 2006)
• 2006 WL 1813959 (Trial Motion, Memorandum and Affidavit) Intersil Corporation's Opening Brief in Support of its Motion to Quash Subpoena and for Protective Order (May 26, 2006) Original Image of this Document (PDF)
• 2006 WL 3227269 (Trial Motion, Memorandum and Affidavit) Consolidated Reply in Support of Defendants' Motions for Summary Judgment (Apr. 19, 2006)
• 2006 WL 3227270 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendants Motion for Summary Judgment of Limitation on Damages Under 35 U.S.C. 287 (Failure to Mark) (Apr. 19, 2006)
• 2006 WL 1199891 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Summary Judgment of Unenforceability and Invalidity of U.S. Patent Nos. 6,107,851 and 6,229,366 (Mar. 24, 2006) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2724879 (D.Del.)
(Cite as: Slip Copy)

• 2006 WL 1199892 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Partial Summary Judgment of Non-Infringement (Foreign Sales) (Mar. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 1199893 (Trial Motion, Memorandum and Affidavit) Opening Brief Insupport of Defendants' Motion for Summary Judgment of Invalidity of Claim 1 of the '876 Patent (Mar. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 1199894 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Partial Summary Judgment of Limitation on Damages under 35 U.S.C. |287 (Failure to Mark) (Mar. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 1199888 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Summary Judgment of Invalidity of Claims 1 and 5 of U.S. Patent No. 4,811,075 (Mar. 23, 2006) Original Image of this Document (PDF)

• 2006 WL 1199889 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Summary Judgment of Non-Infringement of U.S. Patent No. 4,811,075 (Mar. 23, 2006) Original Image of this Document (PDF)

• 2006 WL 1199890 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendants' Motion for Summary Judgment of Noninfringement of Claims 17-19 of U.S. Patent No. 6,249,876 (Mar. 23, 2006) Original Image of this Document (PDF)

• 2006 WL 3226493 () Declaration of Dr. Peter Gwozdz in Support of Defendants' Motion for Summary Judgment Regarding Invalidity of Claims 1 and 5 of U.S. Patent No. 4,811,075 (Mar. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 1199887 (Trial Pleading) Plaintiff Power Integrations, Inc.'s Answer to Defendants' First Amended Counterclaims (Mar. 15, 2006) Original Image of this Document (PDF)

• 2006 WL 3227268 (Trial Pleading) Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation's First Amended Answer and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement and Demand for Jury Trial (Feb. 23, 2006)

• 2006 WL 809151 (Trial Pleading) Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation's First Amended Answer and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringement and Demand for Jury Trial (Feb. 23, 2006) Original Image of this Document (PDF)

• 2006 WL 809150 (Trial Motion, Memorandum and Affidavit) Paul Horowitz's Response and Objections to Subpoena (Feb. 3, 2006) Original Image of this Document (PDF)

• 2006 WL 809149 (Trial Pleading) Plaintiff's Answer to Defendants' Motion to Compel the Continued Depositions of Leif Lund and Balu Balakrishnan (Feb. 2, 2006) Original Image of this Document (PDF)

• 2005 WL 4883954 (Trial Pleading) Power Integrations' Opening Claim Construction Brief (Dec. 28, 2005)

• 2005 WL 3666891 (Trial Motion, Memorandum and Affidavit) Plaintiff's Consolidated Opposition to Defendants' Expedited Motion to Amend the Schdule and Motion to Shorten Time (Oct. 28, 2005) Original Image of this Document (PDF)

• 2005 WL 4883959 (Trial Motion, Memorandum and Affidavit) Defendants'd Answering Brief in Opposition to Plaintiff's Motion for Clarification or Reconsideration (Sep. 7, 2005)

• 2005 WL 4883958 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opening Brief in Support of Its Motion for Clarification or, in the Alternative, Reconsideration of the Court's August 9, 2005 Order (Aug. 23, 2005)

• 2005 WL 4883957 (Trial Motion, Memorandum and Affidavit) Plaintiff's Opposition to Defendants' First Motion to Compel (Aug. 12, 2005)

• 2005 WL 4883956 (Trial Pleading) Answer (Aug. 1, 2005)

• 2005 WL 4883955 (Trial Pleading) Defendants Fairchild Semiconductor International, Inc.'s and Fairchild Semiconductor Corporation's Answer and Counterclaims to Plaintiff's First Amended Complaint for Patent Infringementand Demand for Jury Trial (Jul. 11, 2005)

• 2004 WL 3606399 (Trial Pleading) First Amended Complaint for Patent Infringement (Oct. 20, 2004) Original Image of this Document (PDF)

• 2004 WL 5027299 (Trial Pleading) First Amended Complaint for Patent Infringement (Oct. 20, 2004)

• 1:04cv01371 (Docket) (Oct. 20, 2004)

• 2004 WL 5027296 (Verdict, Agreement and Settlement) DEfendants' Proposed Special Verdict Form (2004)

• 2004 WL 5027297 (Verdict, Agreement and Settlement) Power Integrations' ŸProposed¨ Special Verdict and Interrogatories to the Jury - Validity (2004)

• 2004 WL 5027303 (Verdict, Agreement and Settlement) Special Verdict form (2004)

• 2004 WL 5027306 (Verdict, Agreement and Settlement) Power Integrations' ŸProposed¨ Special Verdict and Interrogatories to the Jury (2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 8

US006686191B1

(12) **United States Patent**
Alonso

(10) Patent No.: **US 6,686,191 B1**
(45) Date of Patent: **Feb. 3, 2004**

(54) **PREPARATION OF VIRALLY INACTIVATED INTRAVENOUSLY INJECTABLE IMMUNE SERUM GLOBULIN**

(75) Inventor: **William R. Alonso**, Cary, NC (US)

(73) Assignee: **Bayer HealthCare LLC**, Tarrytown, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1772 days.

(21) Appl. No.: **08/532,211**

(22) Filed: **Sep. 22, 1995**

(51) Int. Cl.$^7$ ..................... C12N 7/04; A61K 39/395; A61K 39/40; A61K 39/42

(52) U.S. Cl. ................ 435/236; 424/176.1; 424/177.1; 424/130.1

(58) Field of Search ........................... 530/390.1, 390.5, 530/386, 387.1; 424/176.1, 177.1, 130.1; 435/236

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,396,608 A * 8/1983 Tenold
4,540,573 A * 9/1985 Neurath et al.
4,762,714 A * 8/1988 Mitra et al.

OTHER PUBLICATIONS

Joy Yang, Y.H. et al. "Antibody Fc functional activity of intravenous immunoglobulin preparations treated with solvent–detergent for virus inactivation" Vox Sang, vol. 67, pp. 337–344, May 17, 1994).*

* cited by examiner

*Primary Examiner*—Yvonne Eyler
(74) *Attorney, Agent, or Firm*—Connolly Bove Lodge & Hutz LLP

(57) **ABSTRACT**

Method of reducing the anticomplement activity (ACA) resulting from viral inactivation treatment of a solution of antibodies, the method comprising contacting the solution with a trialkylphosphate, such as tri-n-butyl phosphate, and a detergent, such as sodium cholate, under conditions sufficient to reduce substantially the virus activity, and then incubating the solution under controlled conditions of time, pH, temperature, and ionic strength such that the anticomplement activity is reduced to an acceptable level. In a preferred embodiment, the ACA is reduced to less than 60 $CH_{50}$ units/mL, the incubation is for at least about ten days at a pH from 3.5 to 5.0, the temperature is maintained within a range of 2 to 50° C., and the ionic strength of the solution is less than about 0.001 M.

**24 Claims, 1 Drawing Sheet**

EXHIBIT

16

8-1-06

PENGAD 800-631-6989

PAGE 143

DSPhv



US 6,686,191 B1

**1**

PREPARATION OF VIRALLY INACTIVATED
INTRAVENOUSLY INJECTABLE IMMUNE
SERUM GLOBULIN

BACKGROUND OF THE INVENTION

1. Field

This invention generally deals with an intravenously
injectable immunoglobulin product, and more specifically
deals with an intravenously injectable immune serum globu-
lin (IGIV) which has been subjected to a virus inactivation
step and which has a low level of anticomplement activity.

2. Background

Early pharmaceutical preparations of immune serum
globulins could not be administered intravenously due to an
unacceptably high incidence of adverse reactions. These
adverse reactions were associated with a decrease in serum
complement levels, apparently caused by complement bind-
ing to the administered gamma globulin. (1) The ability of
gamma globulin to bind complement, or its anticomplement
activity (ACA), is greatly increased as a result of denatur-
ation brought about during the fractionation procedure.
Several approaches have been taken to address the problem
of rendering ISG safe for intravenous administration. (See
(2) and references therein). Tenold reported a method of
preparing an immune serum globulin (ISG) with low ACA
which could be administered by intravenous injection. (2,
incorporated herein by reference). The Tenold '608 process
requires formulating the ISG at low ionic strength
(preferably less than about 0.001) and at low pH (3.5–5.0).

Other methods of preparing intravenously injectable
immune serum globulin (IGIV) have been reported, includ-
ing stabilizing with carbohydrates such as maltose (3). A
process including incubation of ISG at pH 4.0 at 37° C. (4)
results in a product with low ACA which may be adminis-
tered by intravenous injection; however, upon storage the
product regains its high ACA. IGIV has also been prepared
by covalent modification of the ISG, for example by pro-
teolysis (5) or by reduction of disulfide linkages followed by
reaction with a blocking agent (1,6).

Antibody preparations, since they are isolated blood
products, have an inherent hazard of transmitting virally-
mediated diseases. Inactivation of viruses is an important
step in producing safe and effective blood products. U.S. Pat.
No. 4,540,573 to Neurath et al., which is incorporated herein
by reference, describes a viral inactivation process using a
trialkyl phosphate and detergent process (hereinafter, the
solvent/detergent process, or SD process). (7) That solvent/
detergent method has gained acceptance as being efficacious
in the inactivation of lipid-enveloped viruses with limited
adverse effects on biological activity' or blood product
profile. (8, 15; See also 12 for a discussion of various viral
inactivation processes).

Current antibody preparations on the market generally
have been regarded as safe with respect to viral contamina-
tion. (9) This is thought to be due to features of the
fractionation processes used to isolate these blood products.
However, it would be desirable to further ensure the safety
of the antibody preparations by including a distinct viral
inactivation step in the production process. Successful
reduction of viral activity in an IGIV solution was reported
using several different methods of viral inactivation for a
variety of viruses. (16, 17) A process for preparation of
immunoglobulins substantially free of retrovirus has been
reported involving incubation of ISG under controlled con-
ditions of time, temperature, and pH. The process entails

**2**

isolating ISG via a cold ethanol plasma fractionation process
and then storage of the ISG at one of two storage conditions:
(a) at pH$\leq$4.25 at a temperature of 27° C. for at least three
days, or (b) at pH$\leq$6.8 at a temperature of 45° C. for at least
six hours. (10).

We have found that using the SD process to treat ISG
preparations, especially those subsequently formulated
according to the Tenold '608 patent, results in a product with
an acceptable viral inactivation but with unacceptably high
levels of ACA. Elevated ACA levels were always detected
at the sterile bulk stage (i.e., after compounding as 5% or
10% IGIV and filtration with 0.2 μm sterile filters) of all
tri-n-butyl phosphate (TNBP)/detergent treated IGIV prepa-
rations regardless of process scale. Preparations of ISG with
high ACA levels are not suitable for intravenous injection
and instead must be administered via other routes, e.g.
intramuscular (IM) injection. However, IGIV preparations
are more desirable since they are immediately available in
the bloodstream and are not subject to loss associated with
IM injection. It is thus desirable to have an IGIV product
which is both low in ACA and has been subjected to a viral
inactivation step.

SUMMARY OF THE INVENTION

The invention is a method for producing an intravenously
injectable immune serum globulin (IGIV) preparation with
low anticomplement activity which has been chemically
treated to render it substantially free of lipid-enveloped
viruses. The method comprises a solvent/detergent viral
inactivation step followed by an incubation step. We have
discovered that the incubation step is necessary to achieve
an acceptable level of ACA low enough to allow the ISG to
be administered by intravenous injection. The incubation
step should be conducted under controlled time, pH,
temperature, and ionic strength. Preferably, the pH should be
maintained between about 3.5 and about 5.0, the tempera-
ture should be within a range of about 2 to about 50° C., and
the ionic strength should be less than about 0.001M. In a
preferred embodiment the ACA of the ISG preparation
decreases gradually over a period of at least about ten days
when the ISG is maintained at a pH of about 4.25 at low
ionic strength (less than about 0.001M) and the viral inac-
tivation step (in a model system) results in a substantial
reduction (i.e. at least 4 logs) in the titer of lipid enveloped
viruses.

BRIEF DESCRIPTION OF THE FIGURE

FIG. 1 shows a comparison of the typical average
observed ACA levels of 5% IGIV solutions treated accord-
ing to the SD process and with or without the follow-up
incubation of the present invention.

SPECIFIC EMBODIMENTS

Materials and Methods

The starting material for the process of this invention is
unmodified human immune serum globulin. In the specifi-
cation and claims the term "immune serum globulin" is used
to define the substance also referred to in the literature
variously as gamma globulin, IgG and immunoglobulin G.
It consists predominantly and preferably of at least about 85
percent of the IS species of gamma globulin, which has a
molecular weight of about 160,000. Any remainder is pref-
erably 9S species, with a molecular weight of about 300,000.
Both standard immune and hyperimmune serum globulins,
e.g., tetanus, rabies and hepatitis immune serum globulins,

US 6,686,191 B1

3

can be employed, the solvent/detergent treated product being immune and hyperimmune ISG, respectively. Thus, a suitable starting material for the process of this invention is Cohn's Fraction II or Fraction III filtrate. (See Refs. 13, 14.)

Fraction II, by ultracentrifugation studies, is predominantly (about 85 percent) the 7S (sedimentation constant of 7) species of gamma globulin with an average molecular weight of 160,000. The remaining protein is essentially 9S material with a M.W. of about 300,000. Wet Fraction II paste (approximately 30 percent solids) is commonly lyophilized to obtain dry ISG powder which is then dissolved and prepared for intramuscular injection as a 16.5 percent sterile solution. Either the wet Fraction II paste or the dry ISG powder is a suitable starting material for the process of this invention.

Gamma globulin by any process which has essentially the same composition of protein components as found in the Cohn Fraction II or Fraction III filtrate can be used as starting material in the present process. Both standard immune serum globulin and hyperimmune serum globulin can be employed as starting materials. As is well known, the latter is produced from plasma or serum obtained from selected donors who have much higher titers for a specific antibody than is normally found in the average population. These donors have either been recently immunized with a particular vaccine or else they have recently recovered from an infection or disease. These high titer sera or plasmas are pooled and subjected to the usual Cohn fractionation procedures up to the point of isolating Fraction II.

Furthermore, because the amount of antibody required to achieve a desired immunological response is substantially less when administered intravenously, it will be apparent the intravenous dose will be substantially less than the intramuscular dose which will produce the same serum antibody titer. Thus, the dose of intramuscular ISG and hyperimmune serum globulin must be higher than that required to achieve the same serum antibody titer when globulin of the same antibody activity is administered intravenously.

The starting wet paste or lyophilized powder is dissolved in a volume of water or other physiologically-acceptable carrier to provide a protein solution of a concentration of about 0.5–20% preferably about 5 to 10 percent. If Fraction III filtrate is employed, the aqueous solution must be concentrated by conventional techniques to the desired protein concentration. Any protein concentration may be used in this method; however, the above range is preferred from a practical standpoint.

After the protein has been dissolved or concentrated, the solution is adjusted to a pH of about 3.5 to 5.0 preferably about 3.8 to 4.2, by addition of a physiologically-acceptable acid such as hydrochloric acid. In general, the pH is adjusted to a point whereat the monomeric material in the protein solution is maintained at a maximum. However, the pH must not be so low as to result in gelation. The temperature should not be harmful to the ISG material. Good results are obtained within the temperature range of about 0–20° C. It is not necessary to hold the so-adjusted material for any period of time prior to the next step; however, the material may be held, if desired, without detrimental effects.

The protein solution at the appropriate pH (preferably 3.8–4.2) may be diafiltered with at least 4 volume exchanges of water to reduce the alcohol concentration from approximately 17% (Filtrate III) to about 2% alcohol. The efficacy of solvent/detergent as a viral inactivation method is much better at or above ambient temperatures; however, high

4

concentrations of alcohol at these temperatures will denature the IgG molecules. Thus, this inactivation must be performed in low alcohol concentration.

Next, the protein concentration of the so-treated material is adjusted to the level desired for incubation with TNBP/detergent, generally less than 10% protein for maximum viral inactivation. This adjustment is accomplished by conventional techniques not detrimental to ISG, e.g., ultrafiltration, reverse osmosis, sublimation, evaporation, etc. Prior to addition of TNBP/detergent, the pH may be adjusted within a wide range, depending on the detergent to be used. With Tween 80, the pH may be as low as 3.5, where the IgG starts becoming unstable. With cholate, the pH is adjusted to within the range of 5.0–6.4, preferably about 5.6, prior to addition of TNBP/detergent. Satisfactory cholate solubility during incubation was achieved by adjusting the immunoglobulin solutions to a pH of 5.5 or higher prior to addition of TNBP and sodium cholate. Adjusting the IgG solution to pH values lower than 5.5 is not suitable because the solubility of sodium cholate is highly dependent on pH (cholic acid pK=6.4), with poor solubility at pH 5.5 or lower. Furthermore, maximum viral inactivation during incubation with TNBP/cholate was observed at pH values less than 6.0 in experiments which employed model viruses spiked into IgG solutions. The inactivation of HIV-1 and BVDV (bovine viral diarrhea virus, which is employed as a model for hepatitis C) was accelerated at pH 5.8, with inactivation to the detection limit occurring in 1–2 hours, whereas inactivation to the detection limit required a minimum of 6 hours when pH 7 conditions were used.

Next, the TNBP/detergent is added to the protein solution (preferably less than 8% [w/w], pH 5.8) mixed thoroughly, and then incubated above ambient temperatures, for example 30° C., with continuous agitation or mixing. Target TNBP/cholate levels for optimal viral inactivation during the incubation step should be >3 mg/mL TNBP and >2 mg/mL cholate as defined by Edwards et al. (8) Moreover, for effective viral inactivation, it is important that the solution is essentially free of particulates in order to facilitate thorough mixing of solvent/detergent and IgG solution. After incubation with TNBP/cholate under these conditions, greater than 5.2 $\log_{10}$ reduction of HIV-1 and greater than 4.0 $\log_{10}$ reduction of BVDV were detected.

After completing the incubation which provides the viral inactivation, the solvent and detergent molecules must be removed in order to achieve a final product with low levels of residual TNBP and cholate which would be suitable for intravenous administration. Generally, procedures to remove detergent are also effective in removing TNBP, and vice versa. Very low levels of TNBP and cholate in the final container can be achieved by a combination of filtration, diafiltration and hydrophobic chromatography. After completing the incubation, the majority of cholate (and TNBP) can be removed from the protein solution by filtration, providing the solution had been previously adjusted to a lower pH value such as 4.0, because sodium cholate is sparingly soluble in aqueous solutions at such pH values. Moreover, all processing steps which follow the solvent/detergent incubation are performed at lower pH values (i.e., 4.0) because IgG molecules are more stable at pH values between 3.5–5.0, in low ionic strength solutions. (2) Thus, after incubation with TNBP/cholate, the protein solution is adjusted to approximately pH 4.0 and incubated at 0–8° C. in order to promote cholate precipitation. Next, filtration is employed to remove the precipitated cholate from the IgG solution.

The so-treated solution is diafiltered with at least four volume exchanges of water to reduce the ionic strength and

US 6,686,191 B1

5

to remove additional TNBP and cholate. After or during the above treatment, the pH is measured and maintained within the range of about 3.5–5.0. The protein concentration of the so-treated material is adjusted to 10–30%, usually 13% (w/v) e.g., by employing conventional techniques not detrimental to ISG, e.g., ultrafiltration, reverse osmosis, sublimation, evaporation, etc. Again the pH of the preparation is maintained within the range of about 3.5–5.0, preferably about 3.8–4.2.

In the present invention, hydrophobic chromatography is employed to remove the TNBP and cholate not eliminated by the filtration and diafiltration steps, and thus provide a final product with low levels of residual TNBP and cholate which is suitable for intravenous administration. Hydrophobic chromatography is a method for TNBP removal from protein solutions that has fewer drawbacks and limitations than other available methods such as oil extraction, ion exchange or affinity chromatography. In part, this is because the protein of interest (IgG) remains in solution throughout the TNBP removal process. Polystyrene-based resins (typically PLRP-S from Polymer Laboratories, Amherst, Mass.) were used to remove the solvent/detergent from solution, as we have found the polystyrene-based resins to be superior to other resins, such as silica-based C-18 resins.

Next, the ISG preparation is adjusted to 5% or 10% protein, and treated to render it tonic, i.e., to render it compatible with physiological conditions, or render it physiologically acceptable upon injection. In a preferred embodiment, the tonicity is adjusted to about 230 to about 490 mosmol/kg solvent. More preferably, the tonicity range is from about 250 to about 350 mosmol/kg solvent, and most preferably the tonicity range is from about 260 to about 325 mosmol/kg solvent. The 5% formulation (5% IGIV) is made tonic by the addition of 10% maltose. The 10% formulation contains 0.2 M glycine in order to achieve an isotonic preparation without large quantities of sugar. The product with either formulation (Gamimune®N 5% or Gamimune®N 10%) experiences shifts in molecular distribution (antibody aggregation) when the ionic strength of the low pH solution is increased. Therefore, sodium chloride, which is often used to achieve tonicity, should not be used.

The so-treated solution is incubated at pH 4.25 under low ionic strength conditions (NLT 21 days at 20–27° C. preferred) in order to provide a lowering of ACA levels. The ionic strength is determined according to Perrin (18), and in a preferred embodiment the ionic strength should be less than about 0.001M. Elevated ACA levels were always detected at this stage of all TNBP/cholate treated IGIV preparations (regardless of process scale); however, ACA levels are gradually lowered by incubation at pH 4.25 under low ionic strength conditions (Tables 3, 5–7). While there is no strict rule for determining when the ACA level is low enough to be an acceptable level suitable for intravenous administration, IGIV preparations should have ACA levels as low as possible.

The Figure depicts the typical average reduction of ACA observed in 5% IGIV solutions following SD treatment. For a 5% ISG formulation the acceptable level suitable for intravenous administration preferably would be less than about 45 $CH_{50}$ units/mL, and more preferably less than about 30 $CH_{50}$ units/mL. For a 10% ISG formulation, the acceptable level suitable for intravenous administration preferably would be less than about 60 $CH_{50}$ units/mL, and more preferably less than about 45 $CH_{50}$ units/mL. As used herein, one unit of ACA activity (one $CH_{50}$ unit) is defined as the amount of protein capable of activating 50% of the complement in an optimally titered complement and red

6

blood cell/hemolysis system. The assay measures the amount of complement that is bound by the mixture of standardized amounts of complement and protein. See refs. 19–20 for a discussion of the assay. Briefly, red blood cells that have been sensitized by preincubation with red blood cell antibodies are added to these complement/protein mixture. In the presence of free complement (not already bound by the protein) these sensitized cells will lyse, releasing hemoglobin which can be quantitated as a measure of the degree of lysis. In parallel, sensitized red blood cells are also added to a buffer control-complement mixture, whose degree of lysis is defined as 100%. The difference between the actual amount of complement needed to give 100% lysis and the amount of complement remaining unbound in the presence of protein equals the amount of complement actually bound by the protein, or anticomplement activity.

Results

Anticomplement Activity of ISG Resulting From Viral Inactivation Process

To establish the effect of the SD viral inactivation process on solutions containing ISG which are formulated according to the Tenold '608 patent, the experiments depicted in Table 1 were performed. The starting material (SM) was Cohn process filtrate III which had been ultrafiltered to about 5% protein and then diafiltered with four volumes of water.

In the control experiment, incubation (–)/SD (–) the SM was not subjected to any incubation or solvent/detergent treatment. In the incubation (+)/SD (–) experiment, the pH of the SM was adjusted to 7.0, the solution was incubated at 30° C. for ten hours, and then the pH was reduced to 4.0. In the incubation (+)/SD, TNBP & Tween 80 (+) experiment, the pH of the SM was adjusted to 7.0, 3 mg/mL TNBP and 2 mg/mL Tween 80 were added to the solution, the solution was incubated at 30° C. for ten hours, and then the pH was reduced to 4.0. In the incubation (+)/SD, TNBP & cholate (+) experiment, the pH of the SM was adjusted to 7.0, 3 mg/mL TNBP and 2 mg/mL cholate were added to the solution, the solution was incubated at 30° C. for ten hours, and then the pH was reduced to 4.0. The solutions in each experiment were then diafiltered with four volumes CWFI (cold water for injection) and concentrated by ultrafiltration. After addition of dry maltose to about 10% w/v, the 5% IGIV solution (pH 4.25) was filtered through a 0.2 μm filter.

TABLE 1

Anticomplement activity in 5% IGIV produced by variations of the Solvent/Detergent IGIV Process

| | ACA ($CH_{50}$/mL.) |
|---|---|
| Control (no solvent/detergent treatment, no 30° C. incubation) | 25 |
| Incubate at 30° C. for 10 hr (no solvent/detergent) | 22 |
| Incubate at 30° C. for 10 hr NLT 3 mg/mL TNBP NLT 2 mg/mL Tween 80 | 68 |
| Incubate at 30° C. for 10 hr NLT 3 mg/mL TNBP NLT 2 mg/mL cholate | >100 |

*These samples were assayed for ACA after final compounding according to the Tenold '608 patent, but they were not incubated at pH 4.25 and 22° C. prior to analysis.

The results listed in Table 1 show that levels of ACA increased in IgG samples after incubation with TNBP/cholate or TNBP/Tween 80. ACA levels were not elevated in IgG samples that were incubated for 10 hr at 30° C. in the

US 6,686,191 B1

7

absence of solvent/detergent. These results suggest that ACA levels of IGIV samples were not elevated by either processing manipulations or incubation for 10 hr at 30° C. in the absence of solvent/detergent.

TABLE 2

| Anticomplement activity in 5% IGIV spiked with TNBP/Na cholate | |
|---|---|
| | ACA (CH$_{50}$/mL) |
| 5% IGIV, no TNBP/cholate | 12 |
| 5% IGIV with 100 μg/mL | 13 |
| TNBP, 100 μg/mL Na cholate | |

Furthermore, spiking experiments (with TNBP and Na cholate, Table 2) have demonstrated that the elevated anticomplement activity levels were not artifacts caused by carrying out the anticomplement assay in the presence of trace levels of TNBP/Na cholate. Thus, using the prior art SD process for viral inactivation of a solution containing ISG, subsequently formulated according to the Tenold '608 patent, yields a product which has high ACA and is unsuitable for intravenous administration. In a similar experiment, SD treated samples which were not incubated (Table 3, Initial Testing) had ACA levels greater than 100 units.

TABLE 3

| Reduction in Anticomplement activity of samples previously treated with TNBP/cholate | | |
|---|---|---|
| | | ACA (CH$_{50}$/mL) |
| Sample | Initial Testing (no incubation) | After incubation 6 wk. @ 5° C. 3 wk. @ 22° C. |
| RB21872-16 | >100 | 33 |
| RB21872-17 | >100 | 34 |
| RB21872-18 | >100 | 36 |
| RB21872-20 | >100 | 27 |

However, when duplicate SD treated samples were incubated for extended periods of time (6 weeks at 5° C. and 3 weeks at 22° C.), the level of ACA was markedly reduced (Table 3, after incubation). This led to further investigation of this surprising observation.

Aggregate Content of ISG Exposed to TNBP/cholate

The samples of the previous experiment (Table 3, Initial Testing) were analyzed by size exclusion (gel permeation) HPLC immediately after compounding to determine the extent of aggregation of the JGIV at the initial time point. HPLC analysis shows nearly complete monomer content in the samples. (Table 4).

TABLE 4

| HPLC analysis of non-incubated 5% IGIV samples (Table 3 Initial) | | | | |
|---|---|---|---|---|
| Sample | Aggregate (%) | Dimer (%) | Monomer (%) | Fragment (%) |
| RB21872-16, initial | 0.140 | 0.00 | 99.86 | 0.00 |
| RB21872-17, initial | 0.146 | 0.00 | 99.85 | 0.00 |
| RB21872-18, initial | 0.124 | 0.00 | 99.88 | 0.00 |
| RB21872-20, initial | 0.172 | 0.00 | 99.83 | 0.00 |

Previously, high IgG aggregate levels were shown to correlate with high anticomplement activity. However, results from analysis of the samples show the level of ACA

8

in the samples to be greater than 100 units. (Table 3, 'Initial Testing') The HPLC analysis shows that the high ACA following the TNBP/cholate treatment was not due to the presence of aggregated IgG molecules.

Varied Conditions of Time and Temperature

The SM was the same as in the previous experiment, and experimental conditions were similar with the following changes. The solutions were treated with TNBP/cholate at pH 7.0 and then were compounded to 5% IGIV, 10% maltose, pH 4.25, as above. The ACA was assayed immediately after final compounding, after a first incubation for nine days at 5° C., and after a second incubation for 21 days at either 22° C. or 5° C. The results are presented in Table 5.

TABLE 5

| ACA of TNBP/cholate treated IGIV samples | |
|---|---|
| Sample Point | ACA (CH$_{50}$/mL) |
| Intermediate Samples | |
| Initial sterile bulk | >100 |
| Incubated 9 d. @ 5° C. | >100 |
| Final Incubation | |
| 21 d. @ 22° C. | 49 |
| 21 d. @ 5° C. | 71 |

In the initial sterile bulk sample, which was treated with TNBP/cholate at pH 7.0, the level of ACA was again greater than 100 units for the initial time point, confirming the observations noted in Table 3. Upon incubation at 5° C. for nine days, the ACA remained greater than 100 units. The final incubation step at either 5° C. or 22° C. shows that the reduction in ACA is dependent on temperature, with faster reduction in ACA observed at higher temperatures.

Effect of pH During Solvent/detergent Treatment on ACA

ACA levels were evaluated after incubation with TNBP/cholate at pH 5.8 because better viricidal activity was observed at pH values less than 6.0. Generally, the non-incubated sterile bulk samples of material incubated at pH 5.8 had lower ACA levels than the pH 7.0 samples, but the trend of lowering ACA upon incubation was repeated in the pH 5.8 samples. In fact, the ACA levels continue to decrease beyond the 21 day incubation in samples that initially had elevated ACA levels after incubation with TNBP/cholate at pH 5.8 (Table 6). As was previously noted for the samples incubated at pH 7.0, the lowering of ACA was not due to decreasing levels of aggregated IgG molecules because the material treated at pH 5.8 was essentially monomeric IgG prior to 22° C. incubation (HPLC analysis, sample A4, Table 8).

TABLE 6

| Sample A4 - ACA upon extended incubation | |
|---|---|
| Incubation at 22° C. (days) | CH$_{50}$/mL |
| 0 | 122 |
| 10 | 73 |
| 19 | 55 |
| 25 | 56 |
| 28 | 45 |
| 30 | 40 |
| 34 | 39 |
| 41 | 33 |

US 6,686,191 B1

9      10

### TABLE 6-continued

Sample A4 - ACA upon extended incubation

| Incubation at 22° C. (days) | CH$_{50}$/mL |
|---|---|
| 48 | 30 |
| 55 | 29 |

Similar results were achieved with samples formulated to 10% IGIV, 0.2 M glycine in the sterile bulk stage. Upon incubation at low ionic strength at pH 4.25 for 10 and 21 days, the levels of ACA were seen to decline in both 5% IGIV samples and 10% IGIV samples. (Table 7) The decrease in ACA can thus be observed over a range of ISG concentrations and over a range of pH values for the solvent/detergent treatment. (Tables 3, 5, 7) HPLC analysis (Table 8) of the sterile bulk samples presented in Table 7 confirmed that the elevated ACA levels were not due to aggregation of ISG molecules.

### TABLE 7

ACA of samples treated with TNBP/cholate at pH 5.8

| Sample | Sterile bulk (day zero) (CH$_{50}$/mL) | 10 days incubation at 20–27° C. (CH$_{50}$/mL) | 21 days incubation at 20–27° C. (CH$_{50}$/mL) |
|---|---|---|---|
| A1 (5% IGIV) | 43 | ND | 10 |
| A2 (5% IGIV) | 31 | 14 | 15 |
| A3 (5% IGIV) | 44 | 15 | 12 |
| A4 (5% IGIV) | 122 | 73 | 55 |
| B1 (10% IGIV) | >100 | 48 | 46 |
| B2 (10% IGIV) | 49 | 36 | 30 |
| B3 (10% IGIV) | 53 | ND | 37 |

Taken together, the above results suggest that ISG products which have been subjected to a solvent/detergent viral inactivation process resulting in an undesirable ACA increase can be made suitable for IV administration by incorporating an additional incubation step under the conditions described here to reduce the ACA to an acceptable level.

### TABLE 8

HPLC Analysis of sterile bulk samples treated with TNBP/cholate at pH 5.8

| Sample | Aggregate (%) | Dimer (%) | Monomer (%) | Fragment (%) |
|---|---|---|---|---|
| A2 | 0.140 | 0.00 | 99.86 | 0.00 |
| A3 | 0.146 | 0.00 | 99.85 | 0.00 |
| A4 | 0.124 | 0.00 | 99.88 | 0.00 |

### CONCLUSION

The ACA increase resulting from the solvent/detergent treatment of the IGIV (antibody) solution appears to be an unavoidable secondary effect of TNBP/detergent treatment to inactivate viruses in the solution. I have discovered that by incubating the solution of IGIV at low pH (4.25) and low ionic strength (0.001M) for a relatively long period of time (at least about 10 days), the ACA gradually decreases over the period of incubation.

The prior art discloses a method of producing IGIV (the Tenold '608 patent) using low pH and low ionic strength.

The Tenold '608 method omits the viral inactivation step, and thus avoids the problem of increased ACA, but the possibility of viral activity remains. Unlike Tenold, incubation is an essential aspect of the present invention for reducing the ACA.

The Neurath et al. '573 patent teaches the solvent/detergent viral inactivation step. However, Neurath '573 does not mention controlling the pH and also does not mention any consequences of the process relating to ACA. Elevated ACA levels were detected at the sterile bulk stage of TNBP/cholate treated IGIV preparations. However, ACA levels decreased upon incubation for at least about 10 days at pH 4.25, low ionic strength, and not less than about 20° C. (See Tables 5–7) The prior art describes several approaches to lowering ACA levels of purified IgG preparations, including removal of IgG aggregates. (11) IgG aggregates have been shown to activate the complement system in vivo. (1) In the present invention, however, lowering of IgG ACA was not due to decreasing levels of IgG aggregates because these TNBP/cholate treated IGIV preparations contained low levels of aggregated IgG (as measured by HPLC, Tables 4, 8) prior to incubation under such conditions.

It would be desirable to produce substantially virus-free IGIV, but following the prior art results in a product with an unacceptable level of ACA. Note that Tenold '608 states that the product is substantially free of ACA, but use of the SD process in conjunction with Tenold '608 does result in high levels of ACA: experimental results reported here show that treating ISG solutions with the SD process and then formulation according to the Tenold '608 patent leads to a product with high ACA. (See Tables 1, 3, 5–7) The surprising finding reported here is that a follow-up (terminal) incubation step lowers the ACA of the solvent/detergent treated solution. The typical average observed ACA levels of 5% IGIV solutions treated according to the SD process and with or without the follow-up incubation are compared in the Figure. The present invention thus includes a previously unobserved method of reducing the ACA by incubating under controlled conditions of pH, temperature, and ionic strength for a period of time, thus allowing the product to be administered by intravenous injection.

Mitra '714 does not suggest the use of a S/D process but, instead, reports that a relatively brief incubation of an ISG product under similar conditions results in a substantially virus free preparation. (10) However, employing incubation under such conditions to provide a lowering of anticomplement activity is a novel application of these incubation conditions which were previously employed in the IGIV process for inactivation of enveloped viruses.

The newly developed IGIV process reported here, which includes an additional internationally accepted viral inactivation procedure (treatment with TNBP/cholate), generates IgG preparations which have low ACA levels and are suitable for IV administration. The major advantage is that an IGIV product with improved safety can be obtained by a two-step process that includes a TNBP/cholate treatment for viral inactivation and incubation under conditions that afford low ACA levels that are suitable for IV administration.

The above disclosure is intended to illustrate the invention, and it is thought variations will occur to those skilled in the art. Accordingly, it is intended that the scope of the invention should be limited only by the claims below.

### REFERENCES

1 Barandun, S. et al., Vox Sang. 7: 157–174 (1962).
2 Tenold, R. A., U.S. Pat. No. 4,396,608 (Aug. 2, 1983).

11

12

3 Fernandes, P. M. et al., U.S. Pat. No. 4,186,192 (Jan. 29, 1980).

4 Malgras, J. et al., Rev. Franc. Trans. 13: 173 (1970).

5 Sgouris, J. T., Vox Sang. 13: 71 (1967).

6 Pappenhagen, A. R. et al., U.S. Pat. No. 3,903,262 (Sep. 2, 1975).

7 Neurath, A. R. and Horowitz, B., U.S. Pat. No. 4,540,573 (Sep. 10, 1985).

8 Edwards, C. A. et al., Vox Sang. 52: 53–59 (1987).

9 Louie, R. E. et al., Biologicals 22: 13–19 (1994).

10 Mitra, G. and Mozen, M., U.S. Pat. No. 4,762,714 (Aug. 9, 1988).

11 Polson, A. and Ruiz-Bravo, C., Vox Sang. 23: 107–118 (1972).

12 Seng, R. L. and Lundblad, J. L., U.S. Pat. No. 4,939,176 (Jul. 3, 1990)

13 Cohn et al., J. Am. Chem. Soc. 68: 459 (1946).

14 Oncley et al., J. Am. Chem. Soc. 71: 541 (1949).

15 Kameyama, S. et al., U.S. Pat. No. 5,151,499 (Sep. 29, 1992).

16 Uemura, Y. et al., Vox Sang. 67: 246–254 (1994).

17 Yang, Y. H. J. et al., Vox Sang. 67: 337–344 (1994).

18 Perrin, D. D. and Dempsy, B., Buffers for pH and Metal Ion Control (Chapman and Hall, London, 1974), pp. 6–7.

19 Palmer, D. F. and Whaley, S. D., Complement Fixation Test, in Manual of Clinical Laboratory Immunology (Ed. N. R. Rose, et al., American Society for Microbiology, Washington, D.C., 1986) pp. 57–66.

20 Mayer, M. M., Quantitative C'Fixation Analysis, Complement and Complement Fixation, in Experimental Immunochemistry (Ed. E. A. Kabat and M. M. Meyer, Thomas, Springfield, Ill., 1961), pp. 214–216, 227–228.

What is claimed is:

1. A method of treating a solution of antibodies which may have virus activity, the method comprising

a) contacting the solution with a trialkylphosphate and a detergent under conditions sufficient to substantially reduce any virus activity and resulting in an increased level of anticomplement activity; and

b) then incubating the solution of step a) under conditions of controlled time, pH, temperature, and ionic strength, such that the increased anticomplement activity of the solution is reduced to an acceptable level suitable for intravenous administration.

2. The method of claim 1, wherein the anticomplement activity is reduced to less than about 60 $CH_{50}$ units/mL.

3. The method of claim 1, wherein the solution comprises about 5% wt./wt. antibody and the anticomplement activity is less than about 45 $CH_{50}$ units/mL.

4. The method of claim 3, wherein the solution comprises about 5% wt./wt. antibody and the anticomplement activity is less than about 30 $CH_{50}$ units/mL.

5. The method of claim 1, wherein the solution comprises about 10% wt./wt. antibody and the anticomplement activity is less than about 60 $CH_{50}$ units/mL.

6. The method of claim 5, wherein the solution comprises about 10% wt./wt. antibody and the anticomplement activity is less than about 45 $CH_{50}$ units/mL.

7. The method of claim 1, wherein the incubation is for at least about ten days.

8. The method of claim 1, wherein the pH is maintained within a range of about 3.5 to about 5.0.

9. The method of claim 1, wherein the temperature is maintained within a range of 2° C. to 50° C.

10. The method of claim 1, wherein the ionic strength is less than about 0.001 M.

11. The method of claim 1, wherein at least about 99% of the antibodies are monomeric.

12. The method of claim 1, comprising the further step of adjusting the tonicity of the solution to a physiologic value under such conditions that the ionic strength is not appreciably altered.

13. The method of claim 12, wherein the tonicity of the solution is adjusted by adding a carbohydrate to the solution.

14. The method of claim 13, wherein the carbohydrate used is maltose.

15. The method of claim 12, wherein the tonicity of the solution is adjusted to a range of about 230 to about 490 mosmol/kg solvent.

16. The method of claim 15, wherein the tonicity of the solution is adjusted to a range of about 274 to about 309 mosmol/kg solvent.

17. The method of claim 12, wherein the tonicity of the solution is adjusted by adding an amino acid to the solution.

18. The method of claim 17, wherein the amino acid used is glycine.

19. The method of claim 1, wherein the trialkylphosphate is tri-n-butyl phosphate and the detergent is selected from polysorbate 80 and sodium cholate.

20. The method of claim 1, wherein the solution has a pH between about 3.5 and about 6.0 during step a).

21. An intravenously injectable immune serum globulin preparation produced by the method of claim 1 and substantially free of lipid enveloped viruses, wherein the preparation has an ionic strength less than about 0.001 M, a pH between about 3.5 and about 5.0, an antibody concentration of about 5% wt./wt., and a maltose concentration of about 10% wt./wt.

22. The preparation of claim 21, wherein the pH is about 4.25.

23. An intravenously injectable immune serum globulin preparation produced by the method of claim 1 and substantially free of lipid enveloped viruses, wherein the preparation has an ionic strength less than about 0.001, a pH between about 3.5 and about 5.0, an antibody concentration of about 10% wt./wt., and a glycine concentration of about 0.2 M.

24. The preparation of claim 23, wherein the pH is about 4.25.

* * * * *

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 13

# THIS EXHIBIT HAS BEEN

# REDACTED IN ITS ENTIRETY

# EXHIBIT 14

4 of 9 DOCUMENTS



Analysis
As of: Apr 20, 2007

**Simon Property Group, L.P., a Delaware limited partnership, Plaintiff, v. mySimon,
Inc., a California corporation, Defendant.**

**CAUSE NO. IP 99-1195-C H/G**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
INDIANA, INDIANAPOLIS DIVISION**

*2001 U.S. Dist. LEXIS 852*

**January 24, 2001, Decided**

**SUBSEQUENT HISTORY:** Appeal dismissed by
Simon Prop. Group, L.P. v. my*Simon, Inc., 282 F.3d 986,
2002 U.S. App. LEXIS 3875* (7th Cir. Ind., 2002)
Motion granted by Simon Prop. Group, L.P. v. my*Simon,
Inc., 2003 U.S. Dist. LEXIS 5438* (S.D. Ind., Mar. 26,
2003)

**PRIOR HISTORY:** Simon Prop. Group, L.P. v. my*Si-
mon, Inc., 2000 U.S. Dist. LEXIS 12227* (S.D. Ind., Aug. 4,
2000)

**DISPOSITION:** **[*1]** Defendant mySimon's motion
seeks judgment as a matter of law and/or a new trial,
Plaintiff SPG's motion seeks equitable relief, including
the entry of a permanent injunction against defendant's
use of the "Simon" mark, equitable relief on several state
law claims for trademark dilution, and an award of at-
torneys' fees and costs against mySimon granted in part
and denied in part.

**COUNSEL:** For SIMON PROPERTY GROUP, L.P.,
plaintiff: DANIEL L BOOTS, BINGHAM SUMMERS
WELSH & SPILMAN, INDIANAPOLIS, IN.

For SIMON PROPERTY GROUP, L.P., plaintiff:
RONALD A SANDLER, JONES DAY REAVIS &
POGUE, CHICAGO, IL.

For SIMON PROPERTY GROUP, L.P., plaintiff:
TERRENCE M MURPHY, JONES DAY REAVIS &
POGUE, DALLAS, TX.

For MYSIMON, INC., defendant: JOEL TRAGESSER,
LOCKE REYNOLDS LLP, INDIANAPOLIS, IN.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United
States District Court, Southern District of Indiana.

**OPINION BY:** DAVID F. HAMILTON

**OPINION:**

ENTRY ON PARTIES' POST-VERDICT
MOTIONS

Plaintiff Simon Property Group, L.P. ("SPG") owns
and operates retail shopping malls all over the United
States. SPG brought this trademark action against defen-
dant mySimon, Inc., which operates a comparative shop-
ping information service on the World **[*2]** Wide Web. A
jury found that mySimon's name, Internet address, and a
cartoon character named "Simon" violated SPG's rights
under Section 43(a) of the Lanham Act, *15 U.S.C. §
1125*(a), and Indiana unfair competition laws. The jury
also rejected mySimon's laches defense to the federal
claim and assessed compensatory damages totaling $ 16.8
million. Under SPG's Indiana unfair competition claim,
the jury assessed punitive damages of an additional $ 10
million.

The jury's verdict did not resolve all claims and issues
of relief. Both parties filed post-verdict motions and ex-
tensive briefs. Defendant mySimon's motion seeks
judgment as a matter of law and/or a new trial. Plaintiff
SPG's motion seeks equitable relief, including the entry of
a permanent injunction against defendant's use of the
"Simon" mark, equitable relief on several state law claims

for trademark dilution, and an award of attorneys' fees and costs against mySimon. Those motions are now ripe for decision.

As explained below, the court grants in part and denies in part each side's motion. The effect of the court's ruling is to leave standing the verdict of liability for trademark infringement and unfair [*3] competition, to award permanent injunctive relief to plaintiff, but to vacate all but $ 50,000 of the damages awards, subject to a new trial on the issue of "corrective advertising" damages unless SPG accepts a remittitur of corrective advertising damages to a nominal sum. In addition, SPG's motion for attorneys' fees and expenses is denied. SPG's petition for costs is denied without prejudice, and SPG may submit an amended bill of costs. When final judgment is entered (the timing will depend on SPG's decision on the remittitur), the court will stay the injunctive relief pending appeal, subject to mySimon continuing to pay royalties into an escrow account. n1

> n1 To protect SPG's interests pending a decision on these motions and appeal, the court ordered mySimon to deposit in an escrow account with the court 2 percent of its gross revenues since the time of the verdict. SPG's expert witness on damages testified that 2 percent of gross revenues would be a reasonable royalty for mySimon's use of the marks in question.

[*4]

*Background*

Plaintiff Simon Property Group has long used the name "Simon" in connection with its mall development, mall management, and retail shopping services. In October 1998, defendant mySimon, Inc. launched an Internet-based comparison shopping service for use by retail consumers at no cost. MySimon uses the name "Simon" as part of the company's corporate name, as part of the company's Internet domain name (www.mysimon.com), and as the name of a cartoon character that appears prominently in its advertising and its web site. There is no business relationship of any kind between plaintiff SPG and defendant mySimon.

SPG filed this lawsuit in August 1999 claiming that mySimon's uses of the name "Simon" infringed SPG's right to use the "Simon" mark in connection with retail shopping. SPG asserted that mySimon's name, its web site address, and the "Simon" character are so similar to SPG's own trademark, and that mySimon's business is so closely related to SPG's business, that mySimon is likely to confuse consumers by making them think incorrectly that mySimon's services are offered by or affiliated with SPG. SPG sought an injunction and an award of money damages under federal trademark [*5] law and several states' laws. After filing the lawsuit, SPG sought a temporary restraining order to block mySimon's planned advertising campaign for the 1999 holiday season. The court denied SPG's motion after a two-day hearing on October 20-21, 1999. SPG then withdrew its motion for preliminary injunction and filed an amended complaint. On August 4, 2000, the court granted in part mySimon's motion for summary judgment. SPG's principal claims survived for trial.

The case was tried before a jury in August 2000, reserving certain equitable claims and remedy issues for later decision by the court. On the federal trademark claim, the jury found that SPG had proven (1) that it had established a protected trademark in the name "Simon" as of October 1998, and (2) that mySimon's uses of the "Simon" name were likely to cause confusion among a significant number of reasonably prudent consumers in the relevant market. The jury also rejected mySimon's laches defense to the federal claim and assessed damages.

The jury's damages award on SPG's federal trademark claim had two components. First, the jury awarded $ 11.5 million in damages based on defendant's supposed "profits" attributable to use [*6] of the infringing trademarks -- one of two alternative damages models presented by SPG. (MySimon has yet to earn a dime of profit since its launch in 1998.) The jury's award of profits accounted for mySimon's use of the infringing marks through the end of trial and also assumed (as instructed) that mySimon would continue to use the marks into the indefinite future. Second, the jury determined that mySimon's use of the infringing trademarks caused injury to Simon Property Group compensable by an award of $ 5.3 million for "corrective advertising."

MySimon has now renewed its motion, originally made at the close of plaintiff's case, for judgment as a matter of law under *Fed. R. Civ. P. 50* on the issue of secondary meaning, which is the first element of SPG's Lanham Act claim. MySimon asserts that no reasonable jury could find that SPG had established secondary meaning for the "Simon" mark among consumers as of October 1998, when mySimon began public use of the name mySimon, the Internet address www.mysimon.com, and the "Simon" character in connection with its Internet business. In the alternative, mySimon also seeks a new trial under *Fed. R. Civ. P. 59* on both elements of SPG's Lanham [*7] Act claim, the laches defense, and the jury's damages award. SPG's motion asks the court to issue equitable relief, primarily in the form of an injunction prohibiting mySimon from using the "Simon" mark, as well as to award fees and costs against mySimon.

SPG's claim for unfair competition under Indiana law was also tried to the jury. The court instructed the jury that

SPG could prevail on the unfair competition claim only if it proved by a preponderance of the evidence each element of its federal claim plus two additional elements: (1) direct competition between SPG and mySimon, and (2) intent on the part of mySimon to pass off its Internet-based comparison shopping services as services offered by Simon Property Group. The jury determined that SPG proved these additional elements, which opened the door for a possible award of punitive damages. The jury awarded $ 10 million in punitive damages. MySimon's motion seeks judgment as a matter of law or, in the alternative, a new trial on the Indiana unfair competition claim and on the jury's award of punitive damages.

SPG's remaining state law claims for trademark dilution were brought under the laws of Florida, Texas, and Georgia. These [*8] claims were tried to the court because only injunctive relief is available under these state laws. SPG seeks equitable relief on these state law claims.

*Standards*

Judgment as a matter of law may be entered only where "there is no legally sufficient evidentiary basis for a reasonable jury" to find for the non-moving party on the issue. *Fed. R. Civ. P. 50*. In addressing mySimon's motion for judgment as a matter of law, the court reviews the evidence in a light most favorable to SPG, granting SPG every reasonable inference that the jury might have drawn in its favor. See *Kossman v. Northeast Illinois Regional Commuter R.R. Corp., 211 F.3d 1031, 1036 (7th Cir. 2000)*. The court will set aside the jury's verdict and enter judgment as a matter of law only when the evidence is such that, without resolving conflicts in the testimony or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable jurors could have reached. *Lane v. Hardee's Food Systems, Inc., 184 F.3d 705, 706-07 (7th Cir. 1999); Klunk v. County of St. Joseph, 170 F.3d 772, 775 (7th Cir. 1999); Emmel v. Coca-Cola Bottling Co., 95 F.3d 627, 629-30 (7th Cir. 1996).* [*9]

In deciding mySimon's motion for a new trial under *Fed. R. Civ. P. 59*, the court must determine whether the jury's verdict was against the weight of the evidence, the damages were excessive, or if for other reasons the trial was unfair. *Westchester Fire Ins. Co. v. General Star Indemnity Co., 183 F.3d 578, 582 (7th Cir. 1999)*. The burden on the moving party seeking to establish the need for a new trial based on the weight of the evidence is substantial. A district court may grant a new trial because the verdict was against the weight of the evidence "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the court's] conscience." *Latino v. Kaizer, 58 F.3d 310, 315 (7th Cir. 1995)* (finding abuse of discretion in district court's deci-

sion to grant a new trial based on weight of evidence; trial judge improperly usurped the jury's role in deciding the most reasonable inferences to be drawn from the evidence); accord, *Cefalu v. Village of Elk Grove, 211 F.3d 416, 424 (7th Cir. 2000)* ("Only when a verdict is contrary to the manifest [*10] weight of the evidence should a motion for a new trial challenging the jury's assessment of the facts carry the day.").

*Discussion*

I. *Post-Verdict Motions on SPG's Federal Trademark Claim*

A. *Secondary Meaning*

To establish that it had a protected trademark for purposes of this case, SPG was required to show that it had established "secondary meaning" in the word "Simon." A trademark has secondary meaning when, "in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 211, 120 S. Ct. 1339, 1343, 146 L. Ed. 2d 182 (2000)*, quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 851 n.11, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982)*. n2

n2 Trademark law distinguishes between different types of words and marks in terms of their ability to enable consumers to rely on them to identify and distinguish one company's goods or services from those of its competitors. "Trademarks that are fanciful (*i.e.*, made up, like 'Kodak' or 'Exxon'), or arbitrary (*e.g.*, 'Black & White' scotch), or suggestive (*e.g.*, 'Business Week,' 'Coppertone') are favored" and are automatically entitled to trademark protection because they are inherently distinctive. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 609 (7th Cir. 1986)*. Descriptive marks (*i.e.*, terms used to describe the ingredients, qualities, or characteristics of an article of trade or a service) generally are not protected as trademarks because they are often a poor means of distinguishing one source of services from another. See, *e.g., Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc., 149 F.3d 722, 727-28 (7th Cir. 1998)* (finding that the term "platinum" as used in connection with mortgage services is a descriptive mark; term describes the quality of plaintiff's services and directly suggests that it provides a superior service). A descriptive mark, however, may receive trademark protection if it acquires secondary meaning. *Id.* Personal names used as trademarks, like descriptive terms, are not inherently distinctive and are protected only upon a showing of

secondary meaning. See *Pirone v. MacMillan, Inc., 894 F.2d 579, 583 (2d Cir. 1990); Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1231 (3d Cir. 1978);* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 13.2 (4th ed. 2000).

**[*11]**

Defendant mySimon has renewed its earlier motion for judgment as a matter of law on the issue of secondary meaning. As explained below, the court finds that, at least in the absence of more precisely defined quantitative standards for proof of secondary meaning, the evidence provided a legally sufficient basis for a reasonable jury to find the existence of secondary meaning among consumers.

The court instructed the jury that it should find in favor of SPG on the "secondary meaning" element if, as of October 1998, "a substantial number of average consumers in the relevant market actually associated the word 'Simon' with a single source for mall development, mall management, and/or retail shopping services." Jury Inst. No. 17. The jury was further instructed to consider the following factors in reaching a decision on the secondary meaning element:

(1) direct consumer testimony;

(2) consumer surveys and research;

(3) the amount and manner of Simon Property Group's advertising of the "Simon" trademark;

(4) Simon Property Group's sales volume;

(5) the length and manner of use of the "Simon" trademark by Simon Property Group;

(6) evidence of intentional **[*12]** copying by the defendant; and

(7) evidence of actual confusion among consumers.

Jury Inst. No. 18; see also *Spraying Systems Co. v. Delavan, Inc., 975 F.2d 387, 393 (7th Cir. 1992)* (listing factors); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1086-87 (7th Cir. 1988)* (finding letters and phone calls directed to plaintiff about defendant's products relevant evidence of secondary

meaning). The factors are often classified as to whether they measure direct or circumstantial evidence of secondary meaning. See, *e.g., Echo Travel, Inc. v. Travel Associates, Inc., 870 F.2d 1264, 1267 (7th Cir. 1989).* Although the absence of direct evidence can weigh against a plaintiff, no single factor necessarily controls the analysis. See *Platinum Home Mortgage, 149 F.3d at 728.* The determination of secondary meaning is treated as a question of fact. *Id.*

1. *Direct Evidence of Secondary Meaning*

Direct evidence of secondary meaning comes in two forms: direct consumer testimony and survey evidence. SPG did not present a consumer survey to the jury that was intended to show that its **[*13]** mark had acquired secondary meaning among consumers as of October 1998. Thus, to the extent that SPG relies on direct evidence, it relies on anecdotal witness testimony.

Several witnesses testified that the "Simon" name was well known and that they associated the name "Simon" with SPG as a mall developer and/or mall management company. See, *e.g.,* Trial Exs. 6009, 6013, 6015, 6017, 6023, 6024, 6028. Virtually all of SPG's "consumer" testimony came from witnesses who work for SPG as bankers, investment bankers, lawyers, or advertising agents, or who have a similar special interest in SPG and the real estate or retail shopping industries. Accordingly, argues mySimon, these witnesses are not representative of the "average" consumer and SPG cannot prevail on this factor.

SPG seeks to support the jury's ability to rely on its "consumer" testimony by noting that all of its witnesses are also "shoppers" and "consumers" despite their professional ties to SPG. SPG argues that evidence from witnesses with special sensitivities to SPG's business endeavors raises only a question of weight to be resolved by the jury.

SPG also argues that the testimony from persons with a special interest **[*14]** in SPG or its real estate development business is relevant because it shows that the purchasing public may associate the "Simon" mark with a single provider of services other than those services SPG provides directly to retail consumers. The court agrees that such evidence is marginally relevant to SPG's case against mySimon. SPG, however, goes one step further and argues:

> So long as there is secondary meaning among any purchasing group, the SIMON mark is entitled to protection and is infringed by mySimon's use of the mark in that market as well as in related product markets. . . . In other words, Simon must

establish that its mark has secondary meaning among the retail community, the investment community *or* shoppers.

Pl. Response Br. at 20 (emphasis in original).

This argument is not supported by existing law. If SPG were correct, it could prevail in this case by establishing (1) secondary meaning for its mark among an isolated group of industry specialists or investment bankers, and (2) a "likelihood of confusion" among average shoppers and retail consumers. Under that scenario, SPG would not need any evidence that the average retail consumer had ever heard [*15] of Simon Property Group or that the average consumer had ever thought that the word "Simon" was connected with anything related to retail shopping. If a jury found a "likelihood of confusion" under those circumstances, the finding would have to be set aside. At some point, the connection between the "purchasing group" among whom a plaintiff establishes secondary meaning and an allegedly "related market" becomes too tenuous to support the possibility of confusion.

Contrary to SPG's argument, the Seventh Circuit's decision in *Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277 (7th Cir. 1998),* does not show that a plaintiff can rely on evidence of secondary meaning among "any purchasing group" as direct evidence in support of a trademark infringement claim. In *Thomas & Betts,* the plaintiff sold its products primarily through independent distributors. In response to the defendant's motion for summary judgment on the secondary meaning issue, the plaintiff submitted declarations from four distributors and two consultants in an attempt to show that its product's trade dress had achieved secondary meaning. The distributors testified that they could identify products [*16] as plaintiff's products based on their distinctive oval shape. See *138 F.3d at 294.*

The Seventh Circuit found that the dealers' testimony was relevant evidence of secondary meaning even though it was not testimony from ultimate consumers. *Id.* With apparent approval, the Seventh Circuit noted the district court's citation to *Sassafras Enterprises, Inc. v. Roshco, Inc., 915 F. Supp. 1, 7 (N.D. Ill. 1996),* for the principle that, "when the relevant buyer class consists of dealers and ultimate consumers, the state of mind of dealers is important." *138 F.3d at 294.* Significantly, the paragraph of the *Sassafras Enterprises* decision that is cited in *Thomas & Betts,* which is actually a quotation from Professor McCarthy's treatise, begins by noting that, where the relevant buyer class consists of ultimate consumers, the state of mind of wholesale or retail distributors is often rejected as irrelevant. See *915 F. Supp. at 7.*

The conclusion in *Thomas & Betts* that testimony from customers at various levels of the supply chain can be "relevant" evidence of secondary meaning in a few trademark cases falls well short of SPG's [*17] assertion that, in this case, it could rest on evidence that the "Simon" name is well known in certain business and investment circles. The relevant buyer class in this case is ultimate consumers, not investment bankers, lawyers, and advertising agents who specialize in serving retail shopping malls and their owners.

SPG's theory of infringement and damages depends upon a likelihood of confusion among ultimate retail consumers -- the shoppers who are customers or potential customers of SPG or mySimon. A survey sample drawn exclusively from a universe of industry experts would not be representative of, or reveal anything significant about, the state of mind of average consumers. Anecdotal testimony drawn from that same, non-representative group is similarly unenlightening as direct evidence of what average consumers think when they encounter the name "Simon."

Nevertheless, SPG's testimony from various witnesses indicating that the "Simon" name is well known in the retail trade or real estate investment industry remains relevant because it is possible to infer from it that at least some "average consumers" were familiar with SPG's "Simon" mark and associated the name with SPG's ventures [*18] as a mall development company or mall management company. However, SPG's evidence is not the type of testimony from an average consumer that would be directly relevant to SPG's claim to secondary meaning in this case.

The jury was instructed to consider whether the witnesses who testified to familiarity with the "Simon" mark were representative of average consumers. Jury Inst. No. 22; see also Jury Inst. No. 17 ("The average consumer is not someone who is totally uninformed, nor is the average consumer someone who is particularly sensitive to, or more aware of, particular information for one reason or another."). Because SPG's witnesses were so unrepresentative, their testimony as to secondary meaning was so slight as to amount to almost nothing. The jury could not have reasonably considered SPG's "consumer" testimony to be direct consumer testimony such that this factor would favor SPG. The court agrees with mySimon that SPG failed to present any significant direct evidence of secondary meaning.

### 2. *MySimon's Direct Evidence Against Secondary Meaning*

In the face of SPG's failure to present any substantial direct evidence of secondary meaning, mySimon came forward with what it [*19] characterizes as substantial direct evidence against secondary meaning. MySimon's

evidence on the point relates primarily to an extensive "branding" campaign launched by SPG during 1999, months after mySimon had launched its business in October 1998. As part of the branding campaign, SPG began to feature the "Simon" mark more prominently in its malls and advertising in an attempt to increase consumer awareness of SPG's role as a leader in shopping center management. This branding campaign was the first substantial effort to establish national brand identification and loyalty for a particular set of malls (as opposed to particular retail stores and products). See Trial. Tr. IV at 613 (Corsaro).

MySimon argued at trial that SPG's own documents and studies show that consumer awareness of the "Simon" mark was essentially nonexistent prior to the 1999 branding campaign. Statements related to the branding campaign in SPG annual reports and in materials prepared by SPG's advertising agency indicate an almost complete lack of consumer awareness of the "Simon" mark prior to the campaign. SPG's 1998 annual report stated:

> There is much work to be done as research shows that shoppers [*20] do not have the proper awareness of the added value that a Simon-managed shopping center can deliver. Our aim is to make shoppers cognizant of this added value and aware of who is delivering it to them.

Trial Ex. 18 at 19. SPG's 1999 annual report included the initial results of the branding campaign: "In 1997, benchmark research indicated that only 3% of the shoppers surveyed knew Simon. In 2000 [*i.e.*, after the 1999 branding campaign], more than half of all mall shoppers surveyed recognized the Simon name and nearly 2/3 of Simon mall shoppers recognized and understood the Simon brand." Trial Ex. 9400 at 4. SPG's advertising agency prepared material that described the Simon branding campaign as an effort to create a "new category for malls and mall management." Trial Ex. 2501 at 2. The promotional material stated: "Our recognition just prior to the campaign was almost nonexistent," and: "By 1999, we had spent forty years building a strong profile within the retail real estate industry, yet the more than 100 million shoppers who paid us over 2 billion visits last year simply didn't know who operated their shopping centers." Trial Ex. 2501 at 2, 11. n3

> n3 As a point of comparison, the Seventh Circuit has found that a secondary meaning survey showing 50 percent recognition "is regarded as clearly sufficient to establish secondary meaning,

[but] a figure in the thirties can only be considered marginal." *Spraying Systems Co. v. Delavan, Inc., 975 F.2d at 394.* Even though results in the 30 percent range would not establish secondary meaning as a matter of law, such evidence "is still probative of the issue of secondary meaning, and the factfinder should weigh that fact with all of the other evidence to determine if secondary meaning exists." *Thomas & Betts, 138 F.3d at 295.*

**[*21]**

Based on this evidence, mySimon contends that no matter how well-known the "Simon" mark may have been at the time of trial, SPG did not have a protected trademark in the name "Simon" for purposes of this case in October 1998 when mySimon launched its business. The intervening branding campaign, mySimon argues, not only shows that consumer awareness was very low before 1999, but also taints the evidence of any later actual confusion that SPG relies upon to support its claim that its mark had secondary meaning in October 1998.

SPG acknowledges that it began to feature the "Simon" mark more prominently in its advertising and in its malls in March 1999 in an attempt to increase consumer awareness of SPG's role as a leader in shopping center management. However, SPG argued at trial that the estimates of pre-campaign consumer awareness appearing in the 1999 annual report and in the promotional materials prepared by its advertising agency were not reliable indicators of secondary meaning. In support of this argument, SPG relied on a former SPG official involved in the branding campaign who testified that the 3 percent figure was a rough figure derived from small focus groups conducted during [*22] 1997 in six or eight markets, not from a national survey designed to achieve a statistically significant result. Trial Tr. IV at 606-08, 617-20 (Corsaro). A witness from the advertising agency who worked on the benchmark studies agreed in her testimony that the low levels of initial awareness reported in the promotional materials could be characterized as "puffing" -- an overstatement by her agency to emphasize the success of the campaign. Trial Tr. IV at 566-67 (Brundage). Ms. Brundage also testified that those same benchmark studies showed consumer awareness of the "Simon" mark as high as 30 to 40 percent in particular markets. Trial Tr. IV at 560-61.

To reach a decision favorable to SPG, the jury had to discount the weight of the statements in the SPG annual reports and the SPG promotional material. It would be impossible to conclude both that the "Simon" mark had achieved secondary meaning by October 1998 and that consumer awareness of the "Simon" mark was almost nonexistent before the branding campaign began. Given the evidence presented at trial, a reasonable juror could

have discounted mySimon's evidence on secondary meaning and found that, in October 1998, a substantial number [*23] of average consumers associated the "Simon" mark with a single source for mall development, mall management, and/or retail shopping services. The jury could have reasonably (1) accepted the testimony that the focus groups were not properly designed to test for the particular association that indicates secondary meaning; (2) accepted the testimony that the focus groups did not yield reliable results for these purposes; and (3) inferred from SPG's circumstantial evidence that some number far in excess of 3 percent of consumers came to associate the "Simon" mark with SPG's services by October 1998. n4

> n4 MySimon is also correct that a reasonable jury might have concluded that the evidence against secondary meaning was highly relevant. SPG itself relied upon the 3 percent figure in its annual report to its shareholders. Even though the figure was not the result of careful survey construction and scientific sampling, the fact that it was generated from a process wholly unrelated to the litigation could be seen as a reason to give it substantial weight. Reasonable jurors might also decide, in light of their own reason and experience, that consumers simply did not recognize or care who managed their favorite malls before SPG's 1999 branding campaign. Further, if the 3 percent figure from 1997 were accepted as an accurate reflection of consumer awareness in October 1998, SPG's circumstantial evidence of secondary meaning would appear far less compelling. Nonetheless, it was the jury's role to choose among possible interpretations of the evidence. The court must assume that all reasonable inferences were drawn in favor of SPG.

[*24]

### 3. SPG's Circumstantial Evidence of Secondary Meaning

By rebutting mySimon's evidence against secondary meaning, SPG obviously managed at best only to neutralize the direct evidence factor for secondary meaning. As explained above, SPG's own direct evidence of secondary meaning was so slight as to amount to almost nothing. However, under the law of this circuit and others, a plaintiff is not required to submit direct evidence of secondary meaning in order to prevail on a claim that it had established a protected trademark. See *Platinum Home Mortgage, 149 F.3d at 728* ("While not fatal to its request, the absence of that evidence weighs against Platinum Mortgage."); *Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 126 (4th Cir. 1990)* (holding on summary judgment that plaintiff had established secondary mean-

ing; available evidence was almost entirely circumstantial). As a result, it is necessary to assess SPG's evidence on the remaining "circumstantial" factors. The remaining factors are (1) the amount and manner of SPG's advertising of the "Simon" trademark; (2) SPG's sales volume; (3) the length and manner of SPG's use of the "Simon" trademark; [*25] (4) evidence of intentional copying by the defendant; and (5) evidence of actual confusion among consumers.

The evidence presented on SPG's advertising, sales, and length and manner of use of the "Simon" mark would have allowed a reasonable jury to decide that each of these factors favored SPG. Simon Property Group has been in business under various names -- all of which included the name "Simon" in some manner -- for about 40 years. As early as 1993, SPG advertised its shopping malls over radio and television using tag lines such as "a Simon managed property" to conclude the advertisements. Trial Tr. I at 63-64; Trial Ex. 629. Beginning in 1994, SPG began selling mall gift certificates branded with the "Simon" trademark directly to consumers. Trial Tr. I at 54-55. In 1998, SPG sold over 3.4 million of these gift certificates.

The jury could also have reasonably found that a substantial number of the 100 million people who visit SPG shopping centers each year were exposed to the "Simon" trademark through displays, door signs, and security vehicles bearing the "Simon" mark prior to October 1998. In addition, after the merger of SPG's predecessor with the DeBartolo Group in 1995, SPG [*26] offered a shopping "rewards" program called "Mallperks" in which consumers accumulated points by spending money at SPG's shopping centers. Consumer exposure to the "Simon" trademark could have occurred through any of these media. The jury was entitled to infer that, through such exposure, a substantial number of consumers came to associate the "Simon" mark with a single source for mall development, mall management, and/or retail shopping services.

MySimon argues that SPG's circumstantial evidence of secondary meaning on these factors is insubstantial. For example, mySimon argues that SPG's advertising prior to October 1998 barely focused on the "Simon" mark at all, that the gift certificate program is very small in relation to the total number of visitors to SPG properties, and that the Mallperks program does not have an explicit association with the "Simon" mark. These arguments, however, address the effectiveness of SPG's promotional efforts -- a conclusion to be drawn from the evidence by the trier of fact. The evidence presented at trial was sufficient to allow the jury to find that SPG's marketing and use of the "Simon" mark were intended to create brand recognition and consumer [*27] loyalty, and

that these efforts supported SPG's claim of secondary meaning.

Evidence of intentional copying of the mark also can be circumstantial evidence of secondary meaning. *Echo Travel, 870 F.2d at 1267.* The relevant inference, which is by no means mandatory, is that the defendant copied the plaintiff's mark for the purpose of trading off an established association in the minds of consumers between the mark and a particular source for products or services. Because the jury found in favor of SPG on its claims for unfair competition and punitive damages, it is clear that the jury determined that mySimon's founders intended, at least in part, to copy the "Simon" mark to take advantage of SPG's use of the similar mark.

There is legally sufficient evidence in the record to support an inference of intentional copying. Most of the evidence of intentional copying concerns actions by mySimon founder Michael Yang. After choosing the name "mySimon," Yang sought to purchase the Internet domain name "www.simon.com" from SPG, which owns that domain name and had used it as the address of the company's web site since 1997. Yang also sent an e-mail message to SPG raising the [*28] possibility that mySimon might represent an investment opportunity for SPG, and stating that he believed there was "a lot of synergy" between SPG's business and the mySimon comparison shopping concept. Trial Ex. 2002. In his e-mail, Michael Yang described mySimon as a "temporary name" for his company. *Id.*

Former SPG official Andy Halliday testified that, after these initial contacts with Michael Yang, he specifically told Yang not to use the mySimon name, Trial Tr. II at 131, though Halliday did not confirm that critical point in any writing or electronic message to Yang. Nevertheless, Yang stuck with the mySimon name, launched the www.mysimon.com web site, and used the "Simon" cartoon character to represent the company. n5

n5 SPG also presented an excerpt from Michael Yang's personal journal suggesting that he considered naming the company "Yaho." Trial Ex. 247. Because "Yaho" is substantially similar to the name "Yahoo!" -- a successful Internet search engine and content provider -- SPG argued at trial that this evidence showed that Yang was contemplating different attempts to trade off the name of a successful company.

[*29]

SPG argues that a reasonable person could conclude that Yang intended to trade off SPG's success in the "brick and mortar" retail world. The court agrees that the evidence is legally sufficient to permit that inference. Under this view of the evidence, Yang was aware not only of SPG's substantial presence in the retail mall business, but also of SPG's opposition to his use of the "Simon" mark by the time the company's name became "permanent" and the company was launched. Yang also recognized a strong "synergy" between the two businesses and chose to move forward with the name mySimon in what the jury apparently found was an attempt to capitalize on that "synergy" by attracting consumers to the mySimon web site who already associated the "Simon" mark with retail shopping. In essence, the name "mySimon" could be seen as a way of expressing the idea that mySimon's web site is a personalized, at-home version of the "Simon" mall with which consumers were already familiar. n6

n6 The evidence concerning the origin of the mySimon name could also support a completely benign inference that Michael Yang had no intent to copy the "Simon" name from SPG. Under this view, mySimon's founders independently developed the company name, and it was simply a coincidence that SPG -- a mall retailing giant -- happened to own the domain name Yang had hoped to reserve for the new company. After a brief and unproductive discussion about the potential for partnering and an investment by SPG -- spurred on at least in part by an expression of interest on the part of SPG -- the two companies went their separate ways, while mySimon did little to promote any association consumers might make between the two companies. Even if the court might see mySimon's version of events as the more reasonable explanation, the questions raised by mySimon's post-verdict motion are narrower: whether a reasonable jury could have reached the conclusion urged by SPG, and whether that conclusion is so contrary to the weight of the evidence that the court should order a new trial on the issue.

[*30]

Evidence of actual confusion on the part of consumers, although particularly important to the issue of likelihood of confusion, can also be relevant to the issue of secondary meaning. See, *e.g., International Kennel Club, 846 F.2d at 1086* (finding that letters and telephone calls from confused consumers supported an inference of secondary meaning). A consumer would not assume that mySimon was associated with or sponsored by SPG unless the consumer already associated the "Simon" mark with SPG and its business. Therefore, to the extent that consumers have been actually confused by mySimon's name, the mySimon web site, or the "Simon" character, such evidence also supports an inference of secondary meaning.

2001 U.S. Dist. LEXIS 852, *

SPG presented some evidence of actual confusion. One consumer sent an e-mail to SPG stating that SPG engaged in misleading advertising. The e-mail suggests that the consumer saw mySimon's television advertisement, went to SPG's web site, and then became disappointed when he did not find the functionality promised by the advertisement. Trial Ex. 3000. There are a number of similar examples of consumers who sent e-mail messages to SPG's web administrator asking how [*31] they could use SPG's web site for comparison shopping. See, e.g., Trial Exs. 3004, 3005, 3009, 3017. Other e-mails received by SPG were from on-line shoppers who were trying to track down orders, who had complaints about orders, or who wanted to know where they could get the best price on a product. See, e.g., Trial Exs. 3001, 3010, 3024, 3035, 3048.

SPG also presented evidence indicating that mySimon received e-mails from confused consumers. One consumer sent an e-mail to mySimon wanting to know whether mySimon gift certificates would be redeemable at her local mall. Trial Ex. 3153. A shopping center customer sent an e-mail to mySimon complaining about the parking ticket she received when parked outside a department store, presumably at a Simon mall. Trial Ex. 3159.

SPG's collection of misdirected and confused consumer e-mails is not unambiguous evidence of actual consumer confusion. For example, many of the e-mails may indicate confusion between SPG's and mySimon's web site addresses rather than confusion between the two companies as possibly related sources of retail shopping services. Similarly, some of the e-mails received by SPG do not explicitly indicate that the consumers [*32] were attempting to contact mySimon, although the context of the messages could support such an inference. Also, since both parties operate on essentially a national scale, the few scores of e-mail messages arguably indicating relevant confusion might be dismissed as occasional confusion resulting from carelessness or indifference among consumers using less than ordinary care. See, e.g., Platinum Home Mortgage, 149 F.3d at 729 ("de minimus evidence of actual confusion does not necessarily establish a likelihood of consumer confusion"), citing Universal Money Centers, Inc. v. American Tel. & Tel. Co., 22 F.3d 1527, 1535 (10th Cir. 1994) (affirming summary judgment for defendant despite some evidence of actual confusion; isolated instances of confusion were de minimis evidence). Cf. Forum Corp. of North America v. Forum, Ltd., 903 F.2d 434, 442 (7th Cir. 1990) (finding that trial court improperly attributed instance of consumer confusion to carelessness; court could not conclude that isolated instances of confusion represented a statistically insignificant percentage, since the actual percentage was unknown). MySimon also argues [*33] that SPG's evidence of actual confusion is not probative of the "Simon" mark's secondary meaning in October 1998 because SPG's huge and successful branding campaign in 1999 substantially affected consumer awareness of the mark.

Despite these potential weaknesses in SPG's evidence on actual confusion, the evidence could reasonably be interpreted to suggest at least some degree of genuine consumer confusion between the two companies. Thus, viewing the evidence in the light most favorable to SPG, the court assumes that the jury determined that SPG's evidence of actual confusion supported an inference of secondary meaning. Cf. Platinum Home Mortgage, 149 F.3d at 729 (implying that evidence of actual confusion can be relevant but not controlling in determining secondary meaning; finding that the evidence "fails to show that consumers identify 'platinum' as the designator of a specific source. . . . notwithstanding the evidence of actual confusion").

4. Balancing the Factors that Determine Secondary Meaning

Deciding secondary meaning required the trier of fact to balance all the direct and circumstantial evidence presented in the case. In the absence of brighter lines [*34] in the law of secondary meaning, this multi-factor balancing makes it difficult to conclude that the evidence allows for one and only one conclusion. The jury in this case unquestionably had to draw a number of inferences in favor of SPG to find that secondary meaning existed in October 1998. The evidence on intentional copying, actual confusion, and several of the other circumstantial factors was far from one-sided in favor of SPG. There was no substantial direct evidence of secondary meaning, and SPG actually had to overcome its own internal studies showing low consumer awareness close to the relevant time period. Nonetheless, assuming that all reasonable inferences were drawn in favor of SPG, the evidence was sufficient to support the jury's verdict on this issue. The court denies mySimon's motion for judgment as a matter of law on the issue of secondary meaning.

MySimon's motion for a new trial on the issue of secondary meaning is, of course, decided under a standard that allows the court some discretion and more latitude. A motion for a new trial can succeed if the jury's verdict was contrary to the manifest weight of the evidence or if the trial was unfair to mySimon. MySimon [*35] has not argued that anything about the trial was unfair to it. MySimon had a full opportunity to present its evidence and its arguments to the trier of fact. The court believes that the jury was properly instructed on the issue of secondary meaning. Having heard all the evidence, the jury was left to determine the facts and apply the law as stated in the court's instructions, without sharp lines or quantitative standards.

The court also heard all of the evidence and, as the law recognizes, it stands in a unique position to assess mySimon's motion for a new trial based on the weight of the evidence. See *Cefalu v. Village of Elk Grove, 211 F.3d 416, 424 (7th Cir. 2000)*. In this case, the jury's verdict on the element of secondary meaning could be viewed as contrary to the manifest weight of the evidence only if the court were to deprive the jurors of their power to draw reasonable inferences from the evidence on each factor in the balancing test. Although the absence of direct evidence weighs against plaintiff's attempt to establish secondary meaning, the absence of such evidence is not necessarily fatal. See *Platinum Home Mortgage, 149 F.3d at 728.* **[*36]** The jury could have reasonably found that the evidence on defendant's intent, the evidence on actual confusion, and the evidence on other circumstantial factors favored SPG and overcame the lack of direct evidence. As a result, mySimon's motion for a new trial on the issue of secondary meaning is denied.

### B. *Likelihood of Confusion*

Once SPG proved secondary meaning for the "Simon" name, it could show trademark infringement by proving that mySimon's use of the name mySimon, the web site address www.mysimon.com, and/or the "Simon" cartoon character was likely to cause confusion among consumers. The jury determined that SPG met its burden on this issue. MySimon seeks a new trial on the ground that the jury's conclusion was contrary to the manifest weight of the evidence.

The court instructed the jury that mySimon's use of the "Simon" mark is likely to cause confusion if it is likely to cause a significant number of reasonably prudent consumers in the relevant market to believe that mySimon and its services are related to or sponsored by SPG. Jury Inst. No. 26. Like the test for secondary meaning, the test for likelihood of confusion is a multi-factor balancing test without bright **[*37]** lines or clear quantitative standards. Pursuant to Seventh Circuit decisions, the court instructed the jury to consider the following factors:

(1) The degree of similarity between the plaintiff's trademarks and the defendant's trademarks in appearance, sound, and suggestion;

(2) The similarity of the products or services for which the two companies' marks are used;

(3) The area and manner of concurrent use, including the distribution and marketing channels used for plaintiff's and defendant's products and services;

(4) The degree of care likely to be exercised by consumers;

(5) The strength of the trademark "Simon" as used by Simon Property Group;

(6) Evidence of actual confusion; and

(7) The intent of mySimon in adopting the name of the company, its Internet domain name, and its animated "Simon" character.

Jury Inst. No. 27; see also *Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc., 128 F.3d 1111, 1115 (7th Cir. 1997)*. None of these factors considered alone is dispositive of the matter, and the proper weight to be given to each factor varies from case to case. *Id.* Nonetheless, the similarity of the marks, **[*38]** evidence of actual confusion, and the intent of the defendant are often the most important indicators. *Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1044, 2000 U.S. App. LEXIS 33581, 2000 WL 1868325,* at *2 (7th Cir. 2000); *Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 461-62 (7th Cir. 2000).* n7

> n7 The Second Circuit has treated the final decision based on all the factors as a question of law that is reviewed *de novo* on appeal. See *Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997)*. The Seventh Circuit has not adopted that approach, but has instead treated the ultimate balancing of the factors as a question for the trier of fact. See, *e.g., Forum Corp. of North America v. Forum, Ltd., 903 F.2d at 438* ("We have considered the arguments in favor of treating the ultimate finding of confusion or no confusion as legal and rejected them.").

The jury easily could have found that the marks at issue in **[*39]** this case are substantially similar in appearance, sound, and suggestion. The word "Simon" is the salient feature of each company's marks, especially as presented to retail consumers. Further, the public is not likely to encounter the marks in a side-by-side comparison, making minor stylistic differences less important.

The similarity of the products and services presents an interesting issue here, involving the so-called "convergence" between Internet and brick-and-mortar businesses -- a phenomenon that changed substantially even between the TRO hearing in October 1999 and the trial in August 2000. SPG and mySimon arguably compete with each other, at least in the sense that some consumers who

Case 1:05-cv-00349-GMS    Document 267    Filed 04/27/2007    Page 58 of 73

Page 11
2001 U.S. Dist. LEXIS 852, *

use mySimon's comparison shopping service to make purchases on the Internet might otherwise have gone to their local shopping mall to buy merchandise. The evidence at trial also showed that SPG is exploring several Internet and "e-commerce" ventures, and that SPG's web site -- now using the domain name www.shopsimon.com rather than www.simon.com -- has become increasingly consumer oriented. At the same time, it is clear that the business models of the two companies and the identities that the [*40] companies seek to foster among consumers remain distinct. SPG and mySimon offer consumers different services and very different shopping experiences.

A trademark protects the owner against competing use not only upon the products or services to which she has applied it but also upon such other articles as might naturally or reasonably be supposed to come from her. See *Helene Curtis Industries, Inc. v. Church & Dwight Co., 560 F.2d 1325, 1331 (7th Cir. 1977);* see also *Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 958* (discussing scope of senior user's trademark rights for use of its marks on products "closely related" to its own). Cases applying the doctrine of "natural expansion" typically involve questions of expanding a company's product line. See, *e.g., Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d at 463* (because drugs and herbal supplements perform somewhat similar functions and because the market in herbal supplements was an area of natural expansion for a pharmaceutical company, the similarity between plaintiff's drug and defendant's herbal supplement supported a likelihood of confusion).

Whether Internet-based [*41] comparison shopping is an area of "natural expansion" for SPG or a business that is directly competitive with SPG is a disputed question of degree. The evidence in this case raised a material question as to how similar and/or competitive mySimon's and SPG's services were -- especially at the time that mySimon entered the market in October 1998. n8

n8 SPG's view of the competition issue is perhaps best captured by a mySimon print advertisement showing a stressed shopper who obviously was not having a positive shopping experience at a brick-and-mortar mall. Trial Ex. 612. The advertisement's text touts the benefits of on-line comparison shopping and bemoans the difficulties of shopping at the mall. SPG understandably views the advertisement as a direct attack on the whole concept of its shopping malls.

A juror might reasonably have concluded that consumers were not likely to be confused by two companies whose business strategies are so different as to be virtually at war with one another, despite the similar names. On the other hand, both SPG and mySimon are intimately connected with retail shopping. With mySimon's advertisement in mind, the average consumer might draw a connection between the mySimon comparison shopping tool and the brick-and-mortar SPG malls -- viewing the services as related in the sense that both seek to provide the best possible shopping experience for the consumer. The average consumer may not fully consider the fact that it would be strange for a mall management company to provide tools that encourage and make it easy for people to stay away from the mall, and that make it easy for a consumer to compare prices among SPG's customers (its retail tenants) and other retailers.

[*42]

The jury's view on this question is clear. Direct competition was an element of SPG's unfair competition claim under Indiana law, and the jury found in favor of SPG on that claim. The court cannot disregard the jury's apparent finding that mySimon and SPG offer retail shopping services that are in direct competition with one another. At least in an abstract sense, both companies aggregate retailers and the retailers' products for the convenience of the consumer. Their services could reasonably be viewed as alternative and competing means (the shopping experience) to reach the same end (browsing for or purchasing products and services). Given the jury's finding of direct competition, the similarity of the companies' services favors SPG on the likelihood of confusion.

A reasonable jury could also conclude that the area and manner of concurrent use of the "Simon" marks favor SPG. Both companies advertise directly to retail consumers through similar marketing channels on essentially a national basis. Both companies' advertisements seek to tie the "Simon" name to a positive shopping experience. See, *e.g.,* Trial Exs. 812, 814, 816 (examples of magazine advertisements from mySimon's [*43] "Simon Knows" advertising campaign targeting shoppers looking for particular items or gifts by using large banners such as "Simon Knows Sports," "Simon Knows Music," or "Simon Knows Moms"). The prominence of the "Simon" mark in each company's advertising -- particularly after SPG's 1999 branding campaign -- and the strong association between the mark and shopping that both companies seek to create through their advertising might lead to consumer confusion.

Neither party presented substantial evidence on consumers' degree of care. As a result, this factor cannot be found to favor (or detract from) SPG's claim that consumers are likely to be confused by mySimon's use of the "Simon" mark.

If a plaintiff's mark is particularly strong, it is more likely that consumers will be confused by a substantially similar mark. "Simon" is a common first name and last name in this country. Used as a trademark, the name "Simon" does not have inherent distinctiveness. The strength of the mark therefore must be measured largely in terms of the strength of its secondary meaning, *i.e.*, the tendency of consumers to associate the mark with a single source for goods or services. *Sands, Taylor & Wood, 978 F.2d at 959.* **[*44]** SPG presented evidence on secondary meaning that was legally sufficient to support a jury verdict in its favor, but the evidence was not particularly strong, especially as of October 1998 when mySimon launched its business. In particular, SPG presented no substantial direct evidence of secondary meaning. A reasonable jury could have found that the "Simon" mark met only the minimum threshold of distinctiveness necessary to establish protection in a personal name. In any event, this factor becomes less important if, as the jury might reasonably have found in this case, the two parties' marks and services are substantially similar. See *id.* ("Whether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related.").

The evidence on mySimon's intent and actual confusion was discussed above in connection with secondary meaning. A reasonable jury could draw inferences from the evidence favorable to SPG and conclude that these two factors favored SPG. If anything, SPG's evidence of actual confusion (primarily a collection of misdirected e-mails and less probative testimony from a confused college student) is somewhat stronger under **[*45]** the test for "likelihood of confusion" as compared to the test for "secondary meaning." When determining the value of the actual confusion evidence to evaluate secondary meaning, the jury had to consider whether SPG's intervening branding campaign detracted from the weight of the evidence. However, once the jury determined that the mark had secondary meaning and moved on to consider the likelihood of confusion, the effect of the branding campaign became less important. n9

n9 SPG argues that testimony from its real estate investment bankers, lawyers, contractors, and advertising agents is also evidence of actual confusion. Pl. Response Br. at 30 n.104. This evidence contributes little to determining *relevant* actual confusion. See *Platinum Home Mortgage, 149 F.3d at 729* ("evidence of actual confusion must refer to the confusion of reasonable and prudent consumers, and not confusion among sophisticated members of the mortgage service industry").

Through an expert in consumer research, mySimon **[*46]** presented survey evidence tending to show virtually no threat of actual confusion between the two companies. Two of the four surveys involved showing consumers in shopping malls either a mySimon advertisement or a picture of the home page of the mySimon web site. (The malls where the surveys were conducted were not SPG malls.) The survey respondents were then asked which company they thought put out the advertisement or web page. They were also asked what other products or services are put out by the same company and whether they believed that the company whose ad or web page they thought they were looking at was related to any other company. Both of the mall surveys were conducted during June 2000 -- after the SPG branding campaign. Trial Tr. V at 722-25. Another survey format involved asking Internet users similar questions about the mySimon web site. Trial Tr. V at 769-70.

The defense expert (whose name, coincidentally, is Dr. Itamar Simonson) testified that the average result across the four surveys showed a "completely negligible" likelihood of confusion with under 2 percent of respondents indicating relevant confusion. Trial Tr. V at 774. The highest percentage of confusion **[*47]** -- 6 percent raw, 5 percent adjusted -- was found in the mall survey asking about the mySimon advertisement. Trial Tr. V at 758. Defendant's expert testified that he would consider any number less than 15 percent as indicating the effect of guessing. Trial Tr. V at 759.

SPG did not present a survey of its own to the jury. n10 Instead, SPG relied on its evidence of actual confusion and responded to defendant's survey evidence by attacking the validity of the methodology. Although the court did not attribute great weight to those attacks on Dr. Simonson's surveys, if the jury rejected defendant's surveys as methodologically unsound and inconsistent with the anecdotal evidence presented by SPG, the jury reasonably could have found that the actual confusion factor favored SPG.

n10 The court ruled before trial that SPG's proposed survey methods would not produce sufficiently probative evidence to be admissible. See *Simon Property Group, L.P. v. my Simon, Inc., 104 F. Supp. 2d 1033 (S.D. Ind. 2000).* SPG did not pursue the matter further by actually completing and offering such a survey into evidence.

**[*48]**

Taking all the factors together, the jury's verdict in favor of SPG on the trademark infringement claim was not so contrary to the weight of the evidence that the verdict should be set aside. As explained above, a rea-

sonable jury could have determined that the evidence favored SPG on each of three factors that some cases have identified as particularly important indicators of confusion -- the similarity of the marks, evidence of actual confusion, and the intent of the defendant. Even though SPG's trademark was not shown to be a particularly strong personal trademark as of October 1998, the jury found that it had reached a threshold of distinctiveness giving it some protection under federal trademark law, and it was not so weak that it would necessarily outweigh other factors in this case. The final balancing of factors on the likelihood of confusion was properly submitted to the jury as the trier of fact. The court denies mySimon's motion for a new trial on the likelihood of confusion.

### C. Laches as a Defense to Damages

During the trial, mySimon argued that laches was an issue for both the jury and the court to decide. Trial Tr. III at 419-20. MySimon argued that laches [*49] should be submitted to the jury as a defense to damages under the Lanham Act, but that the court should revisit the issue as a defense to any potential injunctive relief. Id. Pursuant to Seventh Circuit case law indicating that juries have addressed laches in Lanham Act cases, see, e.g., Roulo v. Russ Berrie & Co., Inc., 886 F.2d 931, 942 (7th Cir. 1989) (upholding jury verdict against defendant on laches where verdict was not against the weight of the evidence), and in response to mySimon's request, the court instructed the jury on laches as a potential defense to damages in this case. Jury Inst. No. 35. The instruction was not given to seek a merely advisory verdict on the issue. The jury rejected the defense.

MySimon's post-verdict motion seeks judgment under Rule 52(c) (applying to findings by the court) and a new trial under Rule 59 on the issue of laches. Having previously argued in favor of a jury decision on its equitable defense, mySimon cannot now ask the court for judgment on the issue under Rule 52 simply because it disagrees with the jury's verdict. However, the court does not read mySimon's motion under Rule 52 as a request for the court to decide [*50] the issue anew. Instead, mySimon's motion is actually consistent with its earlier contention that both the jury and the court may address the laches defense. See, e.g., Hot Wax, Inc. v. S/S Car Care, 1999 U.S. Dist. LEXIS 16444, No. 97 C 6879, 1999 WL 966094, at *5, *7 (N.D. Ill. Oct. 14, 1999) (addressing laches as a defense to injunctive relief under a Lanham Act false advertising claim after jury had rendered verdict on laches as a defense to damages; parties had consented to submitting issue to the jury as to damages). Accordingly, mySimon's challenge to the jury's verdict on laches as a defense to damages will be reviewed under the Rule 59 standard. To the extent the issue of laches remains open as a defense to injunctive relief, the court addresses

mySimon's Rule 52 motion in the section of this entry discussing SPG's request for a permanent injunction.

To prove laches, mySimon had to show by a preponderance of the evidence that SPG unreasonably delayed in taking action with respect to its claim for trademark infringement and that SPG's unreasonable delay caused harmful prejudice to mySimon. See Roulo v. Russ Berrie & Co., Inc., 886 F.2d at 942. The jury's verdict that [*51] mySimon failed to prove at least one of these elements is not against the manifest weight of the evidence.

MySimon argues that SPG's delay in this case should be measured from the time SPG became aware of Michael Yang's proposed use of the name mySimon until the time SPG took documented action to stop mySimon's use of the "Simon" name and mark. The evidence introduced at trial permits only the conclusion that SPG knew about mySimon's proposed use of the "Simon" trademark in connection with comparison shopping over the Internet several months before mySimon's October 1998 launch. SPG viewed mySimon as a threat from the time of SPG's earliest contacts with Michael Yang in April 1998. Andy Halliday, co-president of SPG's Simon Brand Ventures, sent an e-mail to SPG senior executives and legal counsel on April 13, 1998, stating that SPG "should vigorously defend against the use of Simon for any online shopping service. We should mark, register, or whatever is necessary to preserve the name Simon for all electronic shopping services." Trial Ex. 2004. During the trial, Halliday testified that he personally told Yang at some point during the initial discussions between the two companies not [*52] to use the Simon name, although Halliday never bothered to document that seemingly important demand. See Trial Tr. II at 130-32, 136-38. Other testimony indicated that as early as mid-1998 high-level SPG officials were aware of and concerned with mySimon's use of the "Simon" name in connection with its proposed Internet business. See, e.g., Trial Tr. IV at 636, 645-46.

Despite SPG's direct contact with Michael Yang as early as April 1998 and its substantial concern over the fact that Yang was considering the name mySimon for his Internet business, there is no evidence that SPG officials took any further action (beyond Halliday's alleged oral demand to Yang) to stop mySimon's use of the "Simon" name and mark until July 1999, when SPG sent mySimon a cease-and-desist letter. Trial Tr. II at 205. As noted, mySimon's public launch occurred in October 1998. Between October 1998 and July 1999, defendant introduced its web site to the public, committed millions of dollars to advertising, and garnered substantial press recognition under the name mySimon.

The Seventh Circuit has stated that a "two year delay in filing an action following knowledge of the infringement has rarely been held [*53] sufficient to constitute

laches." *Roulo v. Russ Berrie & Co., Inc., 886 F.2d at 942*, citing *Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 933 (7th Cir. 1984)*. Measured according to mySimon's time line, SPG delayed in taking action from mid-1998 until July 1999 -- a period of just over one year. Although mySimon concedes that SPG's period of delay is shorter than the delay commonly found to support a laches defense, it argues that the determination is fact-driven and that the conclusion in this case should be different because (1) SPG officials had early knowledge of mySimon's proposed Internet start-up, (2) SPG executives had an immediate and extremely negative reaction to *any* use of the "Simon" name by Michael Yang's company, and (3) the period of delay spans the national launch of defendant's Internet company. Def. Br. at 24-25; Def. Reply Br. at 20-21. At bottom, mySimon's argument is that if SPG knew that if it waited to act until nine months after a nation-wide launch of Michael Yang's company, mySimon would already be at the point of no return for changing its name.

In light of the Seventh Circuit's statement in *Roulo* that a delay **[*54]** of two years is rarely "sufficient" to support a finding of laches, it would be difficult to treat the delay of six months from the Yang-Halliday contact in April 1998 to the mySimon launch in October 1998 as unreasonable as a matter of law. Regardless of whether the unique circumstances of this case might have supported a finding of unreasonable delay, the jury's conclusion that mySimon failed to prove its defense could clearly be supported by a finding that SPG's delay, or at least its delay after October 1998, caused no prejudice to mySimon. Joshua Goldman, mySimon's president and chief executive officer, testified that he doubted that mySimon would have stopped using the mark if SPG had complained in January 1999 instead of June 1999. Trial Tr. II at 206-07. Goldman also testified that mySimon "probably" would not have stopped using the mark even if SPG had sent its cease-and-desist letter as early as November 1998, just one month after the public launch. *Id.* Thus, although SPG waited to act until after mySimon had sunk considerable resources into the "Simon" marks, a conclusion that mySimon would not have done things any differently even if SPG had acted as early as November **[*55]** 1998 was not against the manifest weight of the evidence.

### D. *SPG's Request for Injunctive Relief*

SPG's post-verdict motion asks the court to enter a permanent injunction requiring mySimon to change its name and to cease using all of its "Simon" marks. SPG also seeks the forfeiture and transfer of ownership rights in the Internet domain name "www.mysimon.com" from defendant mySimon, Inc. As a concession to the challenges mySimon would face in changing its name, SPG initially proposed a six-month transition period during which the "www.mysimon.com" domain name would link to mySimon's new domain name. n11 MySimon does not agree that injunctive relief is warranted in this case, and it also objects to the specific terms of SPG's proposed equitable relief.

n11 On January 19, 2001, SPG filed a motion to amend its request for additional relief. In the motion, SPG characterized the defendant's post-verdict advertising as a media "blitz" that amounts to a "conscious decision to expand their infringing use" of the "Simon" marks. As a result of mySimon's advertising, SPG alleges, consumer confusion has increased and any transition period before an injunction takes effect should be limited to thirty days rather than six months. As proof of the alleged additional confusion, SPG submitted a number of additional e-mails from consumers that were sent to the SPG web site administrator. The e-mails are similar in character to those submitted at trial as evidence of actual confusion. The court finds that mySimon's post-verdict advertising does not materially change the equities applicable to SPG's request for injunctive relief.

- - - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - - -

**[*56]**

Professor McCarthy has written that it is "difficult to imagine an unfair competition case where damages are adequate to remedy the problem of defendant's continued acts." 5 McCarthy § 30:2. Therefore, "an injunction is the standard remedy in unfair competition cases." *Id.* The need for injunctive relief stems from the presumed inadequacy of legal remedies and a need for the trademark owner to reassert control over the mark. See *Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982)*. In addition, the public interest generally favors injunctive relief as a means to avoid confusion in the marketplace. See *International Kennel Club, 846 F.2d at 1091-92 & n.8.*

In this case, the jury found that mySimon intended to trade off the value of SPG's "Simon" mark and also found a likelihood of consumer confusion. These findings are not merely advisory upon the court when it comes to addressing SPG's motion for equitable relief. See *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 844 (7th Cir. 1978)* ("Any actual issues necessarily and actually decided by the jury are foreclosed under settled **[*57]** principles of collateral estoppel from subsequent reconsideration by the district court."); see

generally *Dairy Queen, Inc. v. Wood, 369 U.S. 469, 470, 479, 8 L. Ed. 2d 44, 82 S. Ct. 894 (1962)* (parties retain right to jury trial on legal issues even where legal issues are arguably "incidental" to equitable issues); *Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 508, 510-11, 3 L. Ed. 2d 988, 79 S. Ct. 948 (1959)* (legal issues must ordinarily be tried to jury before judge determines equitable issues); *Cabinet Vision v. Cabnetware, 129 F.3d 595, 600-01 (Fed. Cir. 1997)* (jury finding on counterclaim constrained court's determination of inequitable conduct defense in patent case).

Given the jury's verdict and its resolution of relevant factual issues in favor of SPG, it would be an abuse of discretion not to award injunctive relief in this case. Tempered by reasonable transition measures, a permanent injunction will allow SPG to reassert control over the "Simon" mark and will also prevent the consumer confusion that the jury determined was a likely result of infringement.

MySimon's attempt to rely on a laches defense to avoid an injunction [*58] is unavailing. The jury found that laches did not apply to SPG's claim for damages. The court must respect those findings and cannot independently decide those issues to reach a result on the claim for equitable relief that is directly inconsistent with the jury's verdict. See, *e.g., Hot Wax, Inc. v. S/S Car Care, 1999 U.S. Dist. LEXIS 16444,* at *23, *1999 WL 966094,* at *7 ("Here, it must be assumed that, consistent with the instructions, the jury found there was insufficient prejudice to support a laches defense as to the claim for defendant's profits. An equal or higher level of prejudice would have to be shown to support applying laches to the prospective remedy of injunctive relief."), citing *Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 824 n.3 (7th Cir. 1999)* (noting that, due to the continuous nature of trademark infringement, injunctive relief sometimes remains available to plaintiffs in trademark cases even though laches bars recovery of damages or wrongfully derived profits during the time prior to filing suit). The court has reviewed and upheld the jury's verdict that mySimon failed to prove laches under the Rule 59 standard. MySimon fares no better relying on laches to avoid [*59] prospective injunctive relief.

Accordingly, the court will enter a permanent injunction barring defendant mySimon, Inc. from using the "mySimon" name, the domain name www.mysimon.com, and the character named "Simon." Specifically, mySimon, Inc. shall:

(1) No later than the effective date of the injunction, cease and desist from offering its comparative shopping services through the web site linked to the domain name www.mysimon.com or to any other do-main name that contains any form of the word "Simon." However, the mandate of this paragraph is subject to a one year transition exception during which traffic to the www.mysimon.com domain name may be automatically and immediately redirected to defendant's new web site. The one year transition period is to be measured from the effective date of the injunction, which will be the 60th day after all appeals of this order are exhausted.

(2) Within 30 days after the transition exception in paragraph (1) has expired, transfer to SPG ownership and registration of the www.mysimon.com domain name and any other domain names owned by mySimon, Inc. that make use of the "Simon" mark. If SPG decides to use actively any of these domain [*60] names in its business within a year after the transfer of ownership and registration takes place, SPG must include a link to mySimon, Inc.'s new domain name on the web site until the year has expired. The link and an explanation that "Services formerly offered through www.mysimon.com are now available at [new domain name]" must be reasonably prominent and visible upon initial loading of the web page in standard browsers.

(3) No later than the effective date of the injunction, remove all references to "mySimon," the character name "Simon," or any other form of the "Simon" mark from all web pages owned or operated by defendant. The mandate of this paragraph is subject to a one year transition exception during which defendant may make use of the "mySimon" name on a new web site for the sole purpose of informing the public of its new name. The one year transition period is to be measured from the effective date of the injunction.

(4) No later than the effective date of the injunction, cease all forms of advertising that refer to the name "mySimon," the domain name www.mysimon.com, the character named "Simon," or any other form of the "Simon" mark. This provision has no transition [*61] period, but it shall not bar advertising during the sixty days before the effective date of the injunction

to inform the public that mySimon is changing its name.

(5) No later than the effective date of the injunction, request Internet search engines, as defined below, to sever any connection between the www.mysimon.com domain name and any form of the "Simon" mark, including "mySimon," so that use of any form of the "Simon" mark in a search will not return a link to the www.mysimon.com domain name or any other domain name or web site owned by mySimon, Inc. An Internet search engine, for purposes of this paragraph, includes any search engine or Internet search service with which mySimon, Inc. has registered or has entered into an agreement to list www.mysimon.com as a potential result of a search.

(6) No later than the effective date of the injunction, withdraw all applications for trademark protection pertaining to the "mySimon" name, the domain name www.mysimon.com, and the "Simon" character.

(7) No later than the effective date of the injunction, take whatever steps are necessary to change the name of its company so that it does not infringe on the "Simon" mark (to [*62] the extent that there still is a company known as mySimon, Inc. after the purchase by CNET).

The court assumes that mySimon will appeal the final judgment in this action. Upon filing a notice of appeal, the permanent injunction will be stayed pending appeal. There is no doubt that such an appeal will present substantial questions. If mySimon is required to change its name, that change will inflict irreparable harm on mySimon that could not be corrected if the judgment in favor of SPG were later set aside on appeal. However, to protect SPG's interests pending appeal, defendant is ordered to continue to place 2 percent of its gross revenue in an escrow account as a potential royalty for SPG in the same manner as has been required since the date of the jury's verdict.

The permanent injunction orders mySimon to forfeit and to assign to SPG the "www.mysimon.com" domain name and related domain names that defendant might own. That aspect of the injunction will allow SPG to begin to recover, beyond the interim royalty payments, some benefit from the similarity of the name to its own web site.

See, *e.g., PACCAR, Inc. v. TeleScan Technologies, L.L.C., 115 F. Supp. 2d 772, 780-81 (E.D. Mich. 2000)* [*63] (ordering forfeiture of infringing domain name as part of remedy for trademark violations); *Ford Motor Co. v. Ford Financial Solutions, Inc., 103 F. Supp. 2d 1126, 1129 (N.D. Iowa 2000)* (same).

As an alternative to SPG's proposed form of injunctive relief, mySimon contends that the terms of the injunction should allow it to continue offering its services through the "www.mysimon.com" domain name, but require it to include a disclaimer on the mySimon web site stating that mySimon is not associated with SPG. Such a disclaimer would not be an adequate remedy in this case.

First, as the Seventh Circuit has noted, disclaimers are often ignored by consumers. See *International Kennel Club, 846 F.2d at 1093* ("Especially where the infringement in issue is a verbatim copying of the plaintiff's name, we are convinced that plaintiff's reputation and goodwill should not be rendered forever dependent on the effectiveness of fineprint disclaimers often ignored by consumers.").

Second, without an injunction, the likelihood of confusion between SPG's marks and mySimon's marks is likely only to increase with time as each company continues to advertise and promote [*64] its services to consumers, especially assuming (as suggested by the evidence at trial) that SPG further expands its Internet presence targeted at the retail consumer and mySimon expands the services it offers to retail consumers.

Third, a disclaimer would not adequately address the possibility of initial interest confusion, whereby a consumer familiar with Simon malls might hear about mySimon and visit the mySimon web site believing that it is affiliated with SPG. See, *e.g., Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d at 464* ("Such confusion, which is actionable under the Lanham Act, occurs when a consumer is lured to a product by its similarity to a known mark, even though the consumer realizes the true identity and origin of the product before consummating a purchase."). For these reasons, the court is not satisfied that a disclaimer would be an effective method of notice to the public that the two companies' retail shopping services are unrelated. See *Ford Motor Co. v. Ford Financial Solutions, Inc., 103 F. Supp. 2d at 1128* ("Due to the nature of Internet use, [a] defendant's appropriation of [a] plaintiff's mark as a domain name and [*65] home page address cannot adequately be remedied by a disclaimer") (internal quotation omitted).

SPG also seeks injunctive relief on claims brought under the laws of Texas, Florida, and Georgia. The court sees no differences between the relief that would be appropriate under those state statutes and the relief the court will order under federal trademark law. In addition, the

court sees no basis for awarding relief under those statutes if SPG does not ultimately prevail on its federal trademark infringement claim. Under such circumstances, there is no need to address these state law claims further.

### E. *Damages for Violation of the Lanham Act*

The jury awarded two types of compensatory damages to SPG as a result of mySimon's violation of the Lanham Act. The first award was for defendant's "profits" attributable to the use of the infringing marks. The second award was for "corrective advertising." The issues raised by the post-verdict motions with respect to each category of damages are distinct, and the court considers them separately.

#### 1. *MySimon's "Profits"*

The court instructed the jury, pursuant to evidence on damages offered by SPG, that one measure of damages for infringement **[*66]** under federal trademark law was the amount of defendant's profits attributable to use of the infringing marks. Jury Inst. No. 41. The court also instructed the jury that it should assume, when determining compensatory damages, that mySimon would continue using the infringing marks indefinitely into the future. Jury Inst. No. 37. Based on these instructions and after finding infringement, the jury awarded $ 11.5 million in "defendant's profits" as compensatory damages.

The jury's $ 11.5 million award of "defendant's profits" is grounded in evidence presented through SPG's damages expert, Scott Phillips. Phillips testified that one way to measure damages in this case would be to estimate the value of mySimon's infringing marks by assigning a percentage of the total value of mySimon, Inc. to the infringing "Simon" marks. Trial Tr. IV at 468, 482. Phillips set the total value of the company at about $ 700 million -- a figure derived from the value of the stock that CNET, Inc. exchanged with the owners of mySimon's stock in order to acquire mySimon in February 2000 (before a widespread drop in the value of many Internet stocks). Trial Tr. IV at 481-82. Phillips then testified that the **[*67]** portion of the $ 700 million acquisition value attributable to the infringing marks could be determined by (1) totaling mySimon's actual advertising expenditures up to the date of the acquisition, or (2) using a modified version of a reasonable royalty calculation that considers certain tax consequences. Trial Tr. IV at 483-87. n12 Under both approaches, Phillips calculated, the portion of the acquisition value attributable to the infringing marks amounted to about $ 11.5 million. Trial Tr. IV at 484, 487.

n12 Phillips also calculated a reasonable royalty rate. Reasonable royalties are generally said to approximate the amount of money that the infringing party would have paid the owner for use

of the infringing marks if the two parties had actually engaged in a negotiation for payments. The expert's royalty calculation was broken down into past royalties (for the period of infringement through the date of the verdict) and future royalties (for mySimon's use of the infringing marks into the indefinite future assuming that no injunction would be entered). According to Phillips' testimony, past royalties amounted to $ 170,000 and future royalties, adjusted by a present value factor, amounted to $ 19.9 million. In each case, the estimate of royalties represented 2 percent of gross revenues (either historical or projected). Trial Tr. IV at 450-62.

SPG's expert presented the royalty measure of damages as an alternative to the "defendant's profits" measure of damages. Trial Tr. IV at 489. The two models were also presented as mutually exclusive alternatives in the jury instructions and on the verdict form. The jury chose to accept the defendant's $ 11.5 million profits calculation and, as a result, awarded no past or future royalties.

**[*68]**

Regrettably, this calculation was labeled as a calculation of "defendant's profits" attributable to the infringing marks. Trial Tr. IV at 442. The label is misleading because mySimon has not generated any operating profits at all -- let alone $ 11.5 million of profits that could be attributed to trademark infringement. In a loose sense, one might say that SPG's $ 11.5 million figure approximated the amount by which mySimon's *shareholders* "profited" from the company's use of the infringing "Simon" marks because $ 11.5 million is a very rough estimate of the value shareholders received as compensation for the infringing marks when they swapped mySimon stock for CNET stock. However, for those familiar with calculations of "defendant's profits" in trademark suits (generally based on calculations that begin with defendant's actual sales), the clarification that Phillips' "profits" figure represented a fraction of the total *value* of the company at the time of the CNET acquisition is significant.

Another critical clarification is that the $ 11.5 million "profits" figure assumed that no injunction would be entered. n13 In other words, when CNET acquired mySimon, it assumed that the **[*69]** company could use www.mysimon.com, the "Simon" character, and the other "Simon" marks into the indefinite future. As a result of this assumption, a substantial portion of what CNET paid for was the ability to use the "Simon" marks going forward. The significant point here is that SPG's $ 11.5 million figure is more similar to a reasonable royalty calculation than to what is traditionally thought of as a calculation of "defendant's profits" in trademark law.

2001 U.S. Dist. LEXIS 852, *

n13 When asked whether his calculation of defendant's "profits" was based on an assumption that mySimon would continue to use the "Simon" marks in the future, Phillips' answer was equivocal. See Trial Tr. IV at 515-16. However, the only reasonable conclusion from his testimony is that his calculations assumed use of the marks into perpetuity. First, he described his estimate of defendant's profits as an alternative to a reasonably royalty. Fully 99% of the estimated damages Phillips calculated under a reasonable royalty approach were for future royalties. Second, he clearly stated that his future royalties calculation assumed that mySimon would not lose its name. Third, one of the methods he used to calculate defendant's "profits" was essentially a modified version of a future royalties calculation. Fourth, there would be no conceivable basis for an award of "profits" greater than mySimon's cumulative *gross revenues* through the date of trial.

**[*70]**

Consistent with Phillips' testimony, the jury's award of $ 11.5 million in damages for "defendant's profits" was not broken down into separate pre-trial and post-trial amounts. This is significant because the entry of a permanent injunction against mySimon eliminates all future infringement and all future damages. SPG made a conscious decision to rely on a damages model that allows for no reasonable separation of pre-judgment and post-judgment damages. See Trial Tr. VI at 1186-87. SPG also conceded that if an injunction were to be entered, it would not seek future royalties or its proposed measure of mySimon's profits. See Trial Tr. VI at 1099-1100. Accordingly, the court's award of injunctive relief in favor of SPG eliminates the entire foundation for the jury's award of defendant's "profits." The court will vacate the award of $ 11.5 million as compensatory damages.

*2. Corrective Advertising*

Harmful confusion and damage to a plaintiff's reputation may persist among consumers even though a trademark defendant's infringement is put to an end through an injunction. An award of corrective advertising is intended to compensate a trademark owner for the amount it has spent, or will **[*71]** be required to spend in the future, to dispel harmful confusion caused by a defendant's infringement. See, e.g., *Otis Clapp & Son, Inc. v. Filmore Vitamin Co., 754 F.2d 738, 745 (7th Cir. 1985)* (noting district court's unchallenged reimbursement of plaintiff's expenses for the cost of a curative advertising campaign); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374-76 (10th Cir. 1977)*

(reducing jury award for plaintiff's future corrective advertising costs).

SPG's expert witness Phillips testified that an award of $ 5.3 million for corrective advertising would be reasonable in this case to allow SPG to correct any misrepresentations or confusion caused by mySimon's use of the infringing marks. Trial Tr. IV at 463, 466. The $ 5.3 million was about 25 percent of the $ 21.3 million that mySimon had spent on advertising and promotion from its inception through the date of trial. Trial Tr. IV at 466. Phillips told the jury this is a standard method for calculating prospective corrective advertising costs derived from the Tenth Circuit's decision in *Big O Tire.* Trial Tr. IV at 463. The basic theory, according to Phillips, **[*72]** is that it is reasonable to award the plaintiff a percentage of defendant's advertising and promotion expenditures because such expenditures are a rough measure of the injury caused by confusion in the marketplace. Trial Tr. IV at 464. n14

n14 Phillips got through his direct testimony on corrective advertising without an objection from mySimon. At the close of plaintiff's case, mySimon then moved to strike Phillips' testimony on corrective advertising. See Trial Tr. IV at 522-23.

In *Big O Tire* the defendant tire company had marketed tires under the plaintiff's established "Big Foot" marks. See *561 F.2d at 1367-68.* The Tenth Circuit found that defendant's national advertising campaign had "deeply penetrated the public consciousness" and had "effectively usurped" the plaintiff's "Big Foot" trademark. *Id. at 1375.* In addition, the plaintiff had not had the economic resources to conduct an advertising campaign before trial sufficient to counteract the defendant's $ 9.7 million **[*73]** "saturation" advertising. *Id.* Under these circumstances, the court held that the plaintiff was entitled to recover "a reasonable amount equivalent to that of a concurrent corrective advertising campaign." *Id.*

The jury in *Big O Tire* had awarded plaintiff $ 2.8 million in compensatory damages, which was roughly 25 percent of the amount defendant had expended to promote the infringing mark on a nationwide basis. *Id. at 1368, 1374.* The Tenth Circuit adjusted the jury's figure downward to $ 678,302 because the plaintiff's dealers were located in only fourteen states, but the court reasoned that, after this adjustment, the 25 percent guideline used in Federal Trade Commission enforcement actions for misleading advertising was an appropriate guideline for a corrective advertising award. *Id. at 1375-76.*

After Phillips completed his testimony, mySimon moved to strike his estimate of corrective advertising

damages because the estimate, based entirely on the *Big O Tire* "standard," was not reasonably tied to SPG's alleged injury. See Trial Tr. IV at 522, citing *Zazu Designs v. L'Oreal, S.A., 979 F.2d 499 (7th Cir. 1992)*. The **[*74]** court initially denied the motion to strike and said this issue could be addressed as needed in post-verdict motions. The court instructed the jury that it could award damages for corrective advertising if it found that SPG either had paid or would have to pay in the future for advertising to prevent, correct, or mitigate consumer confusion. Trial Tr. VI at 1203; Jury Inst. No. 42; see also *Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1157 (7th Cir. 1994)* ("Items alleged as . . . damages suffered by the plaintiff must, of course, have been caused by the infringement itself; in addition the amount must be provable, although some uncertainty in making this calculation is allowed.").

After finding mySimon liable on SPG's federal trademark claims, the jury awarded SPG $ 5.3 million in damages under the heading of "corrective advertising." MySimon now seeks a new trial under Rule 59, arguing (1) that SPG failed to make a showing that its mark was injured such that an award of $ 5.3 million would be compensatory in nature, and (2) that prospective corrective advertising should be available only to plaintiffs who were unable to pay for such advertising before trial. **[*75]**

The Seventh Circuit's decision in *Zazu Designs* shows that a plaintiff is not presumptively entitled to 25 percent of a defendant's advertising expenditures as damages for the cost of corrective advertising. Instead, the amount of money damages sought for corrective advertising must be shown to be related to an injury caused by defendant's infringing use of the marks. The plaintiff in *Zazu Designs* was a partnership that owned "Zazu Hair Designs," a hair salon in the *Chicago area. 979 F.2d at 501.* The partnership was preparing to sell shampoos and conditioners under the salon's trade name when the defendant began selling and advertising a new, national line of hair cosmetics under the "Zazu" name. The defendant's products were not successful and were pulled from the market before the partnership's claim for infringement reached trial. *Id. at 501-02.*

The district court in *Zazu Designs* awarded the plaintiff $ 1 million in corrective advertising costs which the plaintiff could use to resurrect the "Zazu" mark. The figure was a simple 20 percent of the $ 5 million defendant had spent advertising its "Zazu" products. *Id. at 506.* **[*76]** Reversing the district court, the Seventh Circuit found that the $ 1 million figure was "an arbitrary number," and it cautioned that using "a percentage of some number unrelated to the plaintiff's injury is an unacceptable way to estimate damages." *Id.* The court explained that to justify damages for corrective advertising, "a plaintiff must show that the confusion caused by the de-fendant's mark injured the plaintiff and that 'repair' of the old trademark, rather than adoption of a new one, is the least expensive way to proceed." The plaintiff had not yet advertised its shampoo products and had made only negligible sales. In addition, the plaintiff had not established that the defendant's sales had "injured it in the slightest." *Id. at 505.* Thus, the plaintiff in *Zazu Designs* had not established either element of its claim for corrective advertising costs. *Id. at 506.*

In this case, mySimon contends that SPG similarly failed to connect its expert's $ 5.3 million figure to a proven injury. Several key pieces of evidence support this argument.

First, SPG's branding campaign elevated consumer awareness of the "Simon" mark to higher, even unprecedented, **[*77]** levels during the period of infringement. This evidence precludes a finding that mySimon's infringing use had "effectively usurped" the mark -- a finding the Tenth Circuit had made in *Big O Tire.*

Second, SPG did not undertake any effort to protect its mark through corrective advertising through the date of the trial. SPG's most senior executives were clearly aware of the infringement and at least expressed concern about its potential effects at an early date. In addition, as a successful multibillion dollar owner and operator of more shopping malls than any other company in the United States, SPG has always had the resources to mount any corrective campaign it deemed wise. SPG's failure to undertake some form of curative advertising prior to trial is a strong indication that defendant's infringement did not cause the type of injury that corrective advertising could reasonably be expected to remedy. See *Zazu Designs, 979 F.2d at 507* (commenting that the lack of any corrective advertising expenditures suggested either that defendant's use of the "Zazu" mark did not injure the plaintiff or that it would have been cheaper for plaintiff simply to use a new name). n15 **[*78]**

n15 The court does not mean to suggest that SPG would find it cheaper to find a new name for itself. The first prong of the *Zazu Designs* reasoning, not the second, applies here.

Third, SPG's damages expert testified that his method of estimating damages was based on the standard adopted by the Tenth Circuit in *Big O Tire.* He was not aware of any particular corrective advertising that SPG had planned for the future. Trial Tr. IV at 508-09. Although he had been told that there were instances of confusion, he did not know how many there were. Trial Tr. IV at 510. Lacking specific knowledge as to the extent of actual confusion, it is clear that the expert could not have considered whether $ 5.3 million of unspecified advertising

would be an effective way to remedy that confusion. He simply applied the 25 percent figure from *Big O Tire*, assuming arbitrarily that mySimon's advertising budget was a fair indicator of the confusion in the marketplace. Thus, the expert testified that SPG should receive 25 percent **[*79]** of mySimon's advertising expenditures largely because that is what another plaintiff had once received in an entirely different factual setting with an entirely different, and proven, injury. This method of estimating damages amounts to using what the Seventh Circuit described in *Zazu Designs* as "a percentage of some number unrelated to the plaintiff's injury."

Fourth, there was no evidence of lost sales, only argument suggesting an inference that consumers who otherwise would have gone to a Simon mall have used mySimon instead. Nor did SPG present evidence that would connect the $ 5.3 million figure to any reputational harm. MySimon's infringing use might have deprived SPG of royalties it could have charged for use of its mark, but this type of injury is not remedied by "corrective advertising."

Thus, unless trademark plaintiffs are presumptively entitled as a matter of law to 25 percent of the defendant's advertising budget based solely on the presentation of some evidence of actual confusion -- a proposition not yet confirmed by any case in this circuit -- the $ 5.3 million figure proposed by SPG's expert and accepted by the jury in this case is not supported by sufficient **[*80]** evidence of an injury that would be remedied by corrective advertising in that amount. See *Badger Meter, Inc. v. Grinnell Corp., 13 F.3d at 1157* (any non-discretionary monetary award ought to be grounded in either an ascertainable loss of the plaintiff or a benefit accruing to the defendant on account of its infringement); *Otis Clapp & Son, 754 F.2d at 745* ("The plaintiff is held to a lower burden of proof in ascertaining the exact amount of damages . . . . However, the plaintiff may not recover if he fails to prove that the defendant's actions caused the claimed harm.").

Phillips' estimate of $ 5.3 million for corrective advertising is arbitrary and free from support in the evidence on this record. Nor did Phillips' testimony provide a basis for selecting any lower number. Accordingly, the court grants mySimon's motion for a new trial on the jury's award for corrective advertising. Having resolved mySimon's motion on its first argument, the court need not decide whether mySimon is correct that *Big O Tire* should be read as allowing prospective corrective advertising damages only when the plaintiff lacked the resources to conduct corrective advertising **[*81]** prior to trial. n16 SPG's unexplained failure to undertake any corrective advertising prior to trial is, as mySimon has argued, evidence that SPG's $ 5.3 million estimate of damages is so arbitrary as to be unreliable.

n16 A district court has concluded that prospective corrective advertising costs are available only to plaintiffs who were financially unable to conduct a curative advertising campaign before trial. See *MasterCard International, Inc. v. Arbel Corp., 1989 U.S. Dist. LEXIS 12433, 13 U.S.P.Q.2D (BNA) 1958 (S.D.N.Y. 1989)* (finding prospective corrective advertising damages limited to plaintiffs who lacked resources to mount corrective campaign). The Seventh Circuit has not addressed this question. The Ninth Circuit, however, has specifically rejected the position argued by mySimon. In *Adray v. Adry-Mart, Inc.*, the court wrote:

> We see no reason to so limit the availability of essentially compensatory damages. Prospective costs may be difficult to determine precisely and present a danger of overcompensation if they exceed the value of the mark; however, the burden of any uncertainty in the amount of damages should be borne by the wrongdoer and overcompensation can be avoided by appropriate limitation in the instructions.

*76 F.3d 984, 988-89 (9th Cir. 1995)* (citations omitted).

**[*82]**

To summarize with respect to compensatory damages: The court's issuance of a permanent injunction effectively removes the basis for the jury's award of $ 11.5 million in compensatory damages based on defendant's "profits." Faced with the choice of alternative damages theories presented by SPG itself, the jury rejected the royalties theory, which offered a basis for distinguishing between damages before trial and damages after trial. Because the $ 11.5 million figure does not offer a basis for such a distinction, the court vacates that award in its entirety and replaces it, in effect, with the permanent injunction. The award of $ 5.3 million for corrective advertising is arbitrary and not supported by the evidence. The court grants mySimon a new trial on that issue, but the court will enter final judgment promptly if SPG accepts within 21 days of this entry a remittitur of the $ 5.3 million figure to nominal damages of ten dollars.

II. *State Law Claims*

Case 1:05-cv-00349-GMS    Document 267    Filed 04/27/2007    Page 68 of 73

Page 21
2001 U.S. Dist. LEXIS 852, *

A. *Unfair Competition under Indiana Law*

On SPG's claim seeking damages under Indiana law for the tort of unfair competition, the court instructed the jury that SPG must prove each element of its federal trademark claim, **[*83]** plus the additional elements: (1) that mySimon intended to pass off, or to attempt to pass off, its Internet-based comparison shopping services as services offered by Simon Property Group, and (2) that mySimon and SPG competed directly against each other. See Jury Inst. No. 43. These elements were derived substantially from *Hammons Mobile Homes, Inc. v. Laser Mobile Home Transport, Inc., 501 N.E.2d 458, 462 (Ind. App. 1986)* ("In an action for unfair competition, damages are appropriate only when the defendant's conduct was deliberate and willful."); see also *Beacham v. Macmillan, Inc., 837 F. Supp. 970, 977 (S.D. Ind. 1993)* ("passing off" theory of unfair competition failed where plaintiff sold no goods to the public and did not compete with the defendant in the marketplace). MySimon seeks judgment as a matter of law or, in the alternative, a new trial on the jury's finding that SPG met its burden on each element of the Indiana unfair competition claim.

The evidence supporting the jury's verdict as to the defendant's intent and as to the degree of competition between the two companies has already been discussed in connection with the multi-factor **[*84]** tests that determine the existence of secondary meaning and likelihood of confusion under federal trademark law. SPG's evidence of intent focused heavily on the actions of mySimon founder Michael Yang and, allowing all reasonable inferences in SPG's favor, went beyond establishing the defendant's mere awareness of SPG and its business. Cf. *Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1044, 2000 U.S. App. LEXIS 33581, No. 00-3110, 2000 WL 1868325, at *4 (7th Cir. 2000)* (reversing preliminary injunction; defendant restaurant owners' admission that they had eaten at plaintiff's restaurant and had discussed the similarity of the two restaurants' names was not sufficient evidence of intent to deceive or infringe).

As for establishing that the two companies were competitors in the marketplace, both parties presented evidence as to the nature of their retail shopping services. The extent of competition here is a matter of degree that has not been quantified by either side. The jury apparently accepted SPG's argument that the two businesses sufficiently compete with one another due to the convergence between Internet and brick-and-mortar businesses and the possibility that **[*85]** a consumer might use mySimon's retail shopping services rather than visit an SPG-owned shopping mall. The evidence on these issues was far from onesided, but the jury's verdict on these issues was not unreasonable or against the manifest weight of the evidence. As a result, mySimon's Rule 50 and Rule 59 mo-tions concerning the jury's finding of liability on SPG's common law unfair competition claim are denied.

B. *Punitive Damages*

Because injunctive relief and compensatory damages were already available to SPG under the federal trademark claim, the primary benefit to SPG of proving the Indiana unfair competition claim was the possibility that the jury would award punitive damages. The court instructed the jury that it could award punitive damages if SPG proved its unfair competition claim and if SPG also proved by clear and convincing evidence that "mySimon acted maliciously, fraudulently, willfully or wantonly with conscious disregard for probable injury, or with gross negligence or oppressiveness that was not the result of a mistake of fact or law, honest error of judgment, overzealousness, mere negligence or other human failing." Jury Inst. No. 44; see also *Bud Wolf Chevrolet, Inc. v. Robertson, 519 N.E.2d 135, 137-38 (Ind. 1988)* **[*86]** (approving of similar jury instruction). MySimon has moved for judgment as a matter of law and in the alternative for a new trial on the jury's $ 10 million award of punitive damages.

Review of the punitive damages award under the Rule 50 and Rule 59 standards must take into account the heightened burden of proof that SPG faced under Indiana law. However, SPG was not required to present evidence that excluded every reasonable hypothesis of innocent conduct. See, e.g., *Budget Car Sales v. Stott, 662 N.E.2d 638, 639 (Ind. 1996)* (discussing review of punitive damages awards under state law standard similar to *Fed. R. Civ. P. 50*). In this case, a reasonable jury could have determined that Michael Yang, by incorporating the "Simon" mark into his company's name, Internet domain name, and advertising, willfully sought to capitalize on the "synergy" he had identified between SPG's retail shopping services and his Internet venture. A reasonable jury also could have relied on Andy Halliday's uncorroborated testimony that he told Michael Yang not to use the "Simon" name well before October 1998. From this evidence, the jury could have determined that Michael Yang went forward **[*87]** with a plan to capitalize on the "Simon" name with actual knowledge of SPG's objection and the possible harm it might cause to SPG's business interests. MySimon's motions under Rule 50 and Rule 59 as to the jury's finding of liability for punitive damages are denied.

As to the amount of punitive damages awarded by the jury, a substantial adjustment must be made under the terms of Indiana statutes. A punitive damages award under state law may not be more than the greater of (1) three times the amount of compensatory damages awarded in the action; or (2) fifty thousand dollars. *Ind. Code § 34-51-3-4*; see also *Executive Builders, Inc. v.*

*Trisler, 741 N.E.2d 351, 361, 2000 Ind. App. LEXIS 1985, No. 73 A01-0001-CV-30, 2000 WL 1782625,* at *9 (Ind. App. Dec. 6, 2000) (holding that § 34-51-3-4 applies to actions commenced on or after July 1, 1998). Subject to plaintiff's election of remittitur on damages for corrective advertising, compensatory damages currently stand at the nominal sum of $ 10. Under these circumstances, SPG is entitled to only $ 50,000 in punitive damages.

Indiana law also requires 75 percent of any punitive damages award to be paid to the state treasurer for deposit [*88] into the state's violent crime victims compensation fund. See Ind. Code. § 34-51-3-6. If SPG accepts the remittitur on corrective advertising damages, the court's final judgment will reflect these reductions and changes.

III. *Fees and Costs*

SPG also seeks an award of attorney's fees and expenses under the Lanham Act in the amount of $ 3,320,560.33. The Lanham Act provides: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." *15 U.S.C. § 1117(a).* A case can be "exceptional" for these purposes if the infringement was "malicious, fraudulent, deliberate, or willful." *BASF Corp. v. Old World Trading Co., 41 F.3d 1081, 1099 (7th Cir. 1994),* quoting *Roulo v. Russ Berrie & Co., 886 F.2d at 942.* For these purposes, the court treats the jury's verdict on punitive damages on the Indiana unfair competition claim as sufficient to support such an award.

Nevertheless, even if a case may be deemed "exceptional," the decision to award attorney's fees remains equitable in nature, calling upon the court to exercise its sound discretion. See *BASF Corp., 41 F.3d at 1099* ("A decision [*89] to award attorneys' fees under the Lanham Act is firmly committed to the district court's discretion"); *Otis Clapp & Son, 754 F.2d at 746* ("Section 1117 confers a wide scope of discretion on the district court in fashioning a remedy for a trademark infringement subject to the principles of equity."), citing *Maier Brewing Co. v. Fleischmann Distilling Corp., 390 F.2d 117, 121 (9th Cir. 1968),* and *Ramada Inns, Inc. v. Apple, 482 F. Supp. 753, 757-58 (D.S.C. 1980)* ("A successful plaintiff in a trademark infringement case is not always entitled to a monetary award in addition to injunctive relief, since any award for damages is subject to the principles of equity which give the court discretion based upon a wide range of considerations."). Accord, *Sovereign Order of St. John of Jerusalem, Inc. v. Grady, 119 F.3d 1236, 1244 (6th Cir. 1997)* (affirming denial of fees despite finding of intentional infringement; district court did not abuse discretion by finding that defendant did not act maliciously because his religious beliefs led him to believe he was entitled to use mark of ancient order of Crusaders); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 846-47 (11th Cir. 1983)* [*90] (affirming denial of attorneys' fees

where district court found that defendant intentionally copied plaintiff's successful mark to capitalize on plaintiff's reputation, but also that defendant's action was an honest attempt to lawfully copy the mark; "even if the court determines the case to be exceptional, the decision to award attorney fees is still within the court's discretion").

The court exercises its equitable discretion not to award attorneys' fees in this case. As a matter of equity, the court will issue a permanent injunction because, under the jury's verdict, such relief is necessary to protect the public as much as to protect the plaintiff. An award of attorneys' fees, however, would have at most only indirect benefits for the public. In addition, injunctive relief requiring mySimon to adopt a new name and re-establish itself on the Internet is more than sufficient to ensure that mySimon's infringement found by the jury was not profitable. Given the looming prospect of needing essentially to start over with consumer awareness of its services, mySimon surely would have been much better off if it had started with an entirely different name. If an award of attorneys' fees [*91] were made here, it would be solely for the benefit of plaintiff.

As a matter of equity, SPG's own neglect and delay played a central part in causing this case even to become necessary. The court recognizes that the jury rejected mySimon's laches defense, as discussed above, and there was certainly evidence that could have let the jury find that mySimon did not rely to its detriment on SPG's inaction, at least after October 1998. Nevertheless, this entire case could have been avoided if SPG's most senior executives had followed the timely advice they received from their own Andy Halliday in April 1998.

After talking to mySimon founder Michael Yang, and after receiving no assurance from Yang that mySimon would change its plans in response to Halliday's demand that mySimon change its name, Halliday reported directly to SPG's chief executive officer and others. On April 13, 1998, Halliday sent an e-mail to SPG's chief financial officer, chief inside attorney, chief outside attorney, and top executive dealing with Internet efforts. Halliday wrote: "I spoke to Michael Yang, who is chief of a startup company in Silicon Valley which will do a comparison search engine with integrated transaction [*92] closing capability called MySimon. *We should vigorously defend against the use of Simon for any online shopping service. We should mark, register, or whatever is necessary to preserve the name Simon for all electronic shopping uses.*" Trial Ex. 2004 (emphasis added). Halliday gave this advice in a new business context that everyone at SPG realized involved change at extraordinary speeds: the explosive growth in commercial use of the Internet in the late 1990s.

2001 U.S. Dist. LEXIS 852, *

After receiving Halliday's memo and learning of this supposedly dangerous threat to SPG's ability to expand its use of the Internet, SPG did nothing. The evidence shows no further action. The national launch of mySimon surely must have come as a rude shock to any SPG executives who were counting on Halliday's report that he had told Yang to change the name, but without, according to Halliday, extracting even an oral promise from Yang that he would do so.

Yet about three months after that national launch, according to unrebutted and unimpeached evidence from mySimon, in January or February 1999, SPG's Melanie Alshab encountered a mySimon representative at an Internet trade show. Alshab was in charge of SPG's Internet ventures. **[*93]** She had been involved in the initial exchange of e-mail with Michael Yang in April 1998. She had even received a copy of Halliday's e-mail of April 13, 1998, about the need to protect the Simon name on the Internet and to stop mySimon from using that name. The mySimon representative was wearing a name tag with "mySimon" on it, and he talked with Alshab about her earlier e-mails and telephone call with Michael Yang. Trial Tr. IV at 623-24. In that encounter she said nothing about mySimon's continued use of the name. *Id.* After the encounter she apparently did nothing about mySimon's continued use of the name. SPG's lack of response cannot be attributed to lack of information.

Moreover, as late as April 1999, SPG's chief executive officer and other senior executives evaluating Internet business strategies identified mySimon as a potential "first tier" partner of SPG, not as a target for an immediate lawsuit. See Trial Ex. 2119. SPG obviously knew about mySimon but apparently did not treat mySimon as an incorrigible infringer. Instead, SPG saw an opportunity.

This court's equitable judgment on the issue of attorneys' fees under § 1117 is not controlled by the jury's verdict on the **[*94]** laches defense on liability and the damages claims. The jury could have found no detrimental reliance by mySimon, and the standard for laches is more sharply defined than the equitable considerations that govern a fee award. The record here persuades the court that SPG acted unreasonably and negligently by failing to act much earlier than it did, at a time when litigation either could have been avoided entirely or could have been resolved far more quickly and cheaply.

Both testimony and supporting documentation show that mySimon's founders were considering internally a possible name change as late as September 1998 in order to best position the company. See Trial Ex. 287; Trial Tr. IV at 656, 662-64. Thus, if SPG had acted more promptly to address what it now claims were its immediate and substantial concerns about an Internet shopping service named mySimon, the most likely result would have been a

decision by mySimon to select a new name when that path would have been far less costly for everyone involved. Instead, the evidence shows, SPG watched, waited, and contemplated investment and even partnership. SPG chose to sue only after mySimon established itself as a significant player **[*95]** in comparison shopping services on the Internet. Equity acts to protect the public from the threat found by the jury, but equity need not reward further such strategic delay by SPG while the potential stakes and expenses of litigation mounted.

Also weighing against an award of attorneys' fees here is the lack of any evidence that SPG has actually suffered any substantial harm at this point. SPG has never attempted to prove any lost sales or actual damage to its goodwill. Since mySimon launched its business, plaintiff SPG's business has had banner years. Moreover, mySimon cannot be said to have profited in any material way from its use of the various "Simon" marks. By the time of trial, mySimon's gross revenues over the life of its business were about $ 8.5 million. During that time, SPG's own evidence showed, mySimon spent on advertising alone more than $ 21.3 million. The combination of lack of substantial harm and lack of profit tends to weigh against an attorneys' fee award here. n17

> n17 SPG has made much of CNET's acquisition of mySimon in a stock-for-stock exchange valued at about $ 700 million, just before much of the air went out of the Internet stock balloon. The acquisition does not show that mySimon, Inc., the only defendant in this case, is profitable at all, let alone that it profited from use of the "Simon" marks.

**[*96]**

Accordingly, the court exercises its discretion under *15 U.S.C. § 1117*(a) and denies an attorneys' fee award. This is not a case in which such an award is required by equity. Because the court is denying a fee award entirely, the court has not addressed a number of aspects of SPG's fee petition that inflate the requested amount well beyond what would be reasonable even if any award were appropriate. n18

> n18 These features include the use of an extraordinary number of billing timekeepers. During the trial itself, as many as four Jones Day partners, four associates, and two legal assistants billed time to the case on the same day, while only three attorneys (all partners) played any active role during the trial. Also, for example, Jones Day billed for attendance of three partners, two associates, and a legal assistant to attend one pretrial conference on

August 16, 2000. Another feature is the fact that time was charged at hourly rates well above those that would be reasonable in the Indianapolis market. Partners charged from $ 330 up to $ 490 per hour; associates charged from $ 150 up to $ 305 per hour; legal assistants charged from $ 95 up to $ 120 per hour. (Although the comparison is not legally relevant, it is interesting to note, in light of the billed rates for legal assistants, that experienced criminal defense attorneys, who handle litigation as complex as any the federal courts encounter, are reimbursed under the Criminal Justice Act at the rate of $ 75 per hour.) The fee request also includes sizable expenses for travel, some of it necessary because of the national scope of the case and witnesses, and some of it resulting only from SPG's decision to rely primarily on attorneys from other cities. In addition, the court has not tried to unravel the difficult problems posed by the fact that SPG lost on a number of its separate claims, despite its overall success in the district court on the central trademark infringement claim. See generally *United Phosphorus, Ltd. v. Midland Fumigant, Inc., 205 F.3d 1219, 1233-35 (10th Cir. 2000)* (affirming reduction in fees for time spent on non-Lanham Act claims; remanding for redetermination of prevailing market rates).

**[*97]**

Under *Fed. R. Civ. P. 54(d)(1)*, plaintiff SPG also seeks an award of costs in this matter in the amount of $ 187,759.14. As the prevailing party, SPG is entitled as a matter of course to an award of costs covered by *28 U.S.C. § 1920*. MySimon has not raised specific challenges to the cost petition, but the court has undertaken an initial review principally to be sure that the requested items are at least of the right types of expenses. Exhibit 3 to Mr. Murphy's affidavit shows that SPG has distinguished between "costs" and "expenses" for purposes of its petition. From the papers submitted, however, it is not possible to confirm whether the request for costs is limited to those costs properly recoverable under § 1920. Exhibit 3 cites specific Jones Day invoices for costs, but for all except the first invoice identified, the court could only guess which items are being treated as costs under § 1920 and which are being treated as the broader "expenses" that might be addressed as part of an attorneys' fee award, if at all.

Moreover, two-thirds of the costs sought are from third-party bills, without any more specific information. Those bills include as costs and **[*98]** expenses (in a way that the court cannot differentiate between the two categories) such obviously non-recoverable items as out-of-pocket expenses for jury consultants and expert witnesses, catered meals for "jurors" in a mock trial, courier services, and the $ 1500 per day SPG paid Mr. Halliday for his travel to Indianapolis to testify at trial. The court will not try on its own to reconstruct from the documentation which costs are properly recoverable under § 1920. SPG's petition for costs is denied without prejudice. SPG may submit an amended petition for costs, limited to properly recoverable items under *28 U.S.C. § 1920*, no later than fourteen days after entry of final judgment. See Local Rule 54.1.

*Conclusion*

This entry resolves all pending post-verdict motions in docket entries Nos. 246, 249, and 271. On the federal trademark claim, the jury was the trier of fact as to the central issues affecting liability, notwithstanding the court's own views of the evidence on those issues. MySimon's motions under Rule 50 and Rule 59 seeking review of the jury's verdict as to liability are denied. SPG's motion for injunctive relief is granted according **[*99]** to the terms stated in this entry, but the injunction will not issue until final judgment, and it will be stayed pending appeal subject to continued escrow of the amount SPG's expert testified would be a reasonable royalty. In addition, the entry of a permanent injunction causes the court to vacate in its entirety the jury's $ 11.5 million award of "defendant's profits" because the award was a measure of prospective damages and assumed that defendant would continue to use the infringing marks. MySimon's motion for a new trial on corrective advertising damages is granted subject to SPG's election of remittitur to nominal damages of ten dollars. MySimon's motions as to its laches defense are denied.

On SPG's Indiana unfair competition claim, the court denies mySimon's Rule 50 and Rule 59 motions asking the court to set aside the jury's finding of liability, including liability for punitive damages. Pursuant to *Ind. Code § 34-51-3-4*, the amount of punitive damages will be reduced to $ 50,000 if SPG accepts the remittitur on corrective advertising damages, and 75 percent shall be paid to the state. A decision on SPG's remaining state law claims for injunctive relief is not necessary **[*100]** in light of the finding of liability and the grant of a permanent injunction under the Lanham Act.

The court denies SPG's motion for costs and attorneys' fees in this action. However, the motion for costs is denied without prejudice, and SPG may submit a revised cost petition to the court no later than 14 days after the entry of final judgment. Finally, SPG shall file and serve written notice no later than 21 days from the date of this entry stating whether it accepts remittitur, in which case the court will promptly enter final judgment, or whether SPG prefers a new trial on the issue of corrective advertising, in which case the court will confer with counsel

2001 U.S. Dist. LEXIS 852, *

and try to find a suitable date for the new trial compatible with the court's overall calendar.

    So ordered.

Date: January 24, 2001

/s/

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on April 28, 2007, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

**BY HAND DELIVERY AND E-MAIL**

Jeffrey B. Bove, Esq.
Mary W. Bourke, Esq.
Mark E. Freeman, Esq.
Jaclyn Mason, Esq.
Donna Hallowell
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE  19899-2207
jbove@cblh.com, mbourke@cblh.com
mfreeman@cblh.com, jmason@cblh.com
dhallowell@cblh.com; cjeffers@cblh.com;
dhammond@cblh.com; mlambert@cblh.com

**BY EMAIL**

Dana K. Hammond, Esq.
M. Curt Lambert, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
Wilmington, DE  19899
jhammond@cblh.com; mlambert@cblh.com

Christopher E. Jeffers, Esq.
Connolly Bove Lodge & Hutz LLP
1990 M. Street, NW
Washington, DC 20036-3425
cjeffers@cblh.com

I hereby certify that on April 28, 2007 I have sent by E-mail and Federal Express

the foregoing document to the following non-registered participants:

Bradford J. Badke, Esq.
Gabrielle Ciuffreda, Esq.
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036-8704
bradford.badke@ropesgray.com; gabrielle.ciuffreda@ropesgray.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com