## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | ) ) ) | |
| Plaintiffs, | ) ) | C. A. No. 05-349-GMS |
| v. | ) ) | JURY TRIAL DEMANDED |
| BAXTER INTERNATIONAL INC. and BAXTER HEALTHCARE CORPORATION, | ) ) ) | **PUBLIC VERSION** |
| Defendants. | ) ) ) | |
| _____ | ) | |
| BAXTER HEALTHCARE CORPORATION, | ) ) | |
| Counterclaimant, | ) ) | |
| v. | ) ) | |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | ) ) ) | |
| Counterdefendants. | ) ) | |

## SUPPLEMENTAL DECLARATION OF ANNE M. ROGASKI IN SUPPORT OF DEFENDANT BAXTER INTERNATIONAL INC. AND DEFENDANT/COUNTERCLAIMANT BAXTER HEALTHCARE CORPORATION'S MOTIONS IN LIMINE

OF COUNSEL:

James G. Gilliland, Jr.
Susan M. Spaeth
Anne M. Rogaski
TOWNSEND and TOWNSEND and CREW LLP
379 Lytton Avenue
Palo Alto, CA 94301
(650) 326-2400

Dated: May 14, 2007
Public Version: May 17, 2007

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
E-mail: provner@potteranderson.com

*Attorneys for Defendant Baxter International Inc. and Defendant/Counterclaimant Baxter Healthcare Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | Civil Action No.: 05-349-GMS |
| Plaintiffs, | Jury Trial Demanded |
| v. | |
| BAXTER INTERNATIONAL INC. and BAXTER HEALTHCARE CORPORATION, | PUBLIC VERSION |
| Defendants. | |
| | |
| BAXTER HEALTHCARE CORPORATION, | |
| Counterclaimant, | |
| v. | |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | |
| Counterdefendants. | |

## SUPPLEMENTAL DECLARATION OF ANNE M. ROGASKI IN SUPPORT OF DEFENDANT BAXTER INTERNATIONAL INC. AND DEFENDANT/COUNTERCLAIMANT BAXTER HEALTHCARE CORPORATION'S MOTIONS *IN LIMINE*

I, Anne M. Rogaski, declare:

1.      I am a partner at the law firm of Townsend and Townsend and Crew LLP and one of the counsel of record for Defendant Baxter International Inc. and Defendant/Counterclaimant Baxter Healthcare Corporation (collectively "Baxter"). I make this declaration of my personal knowledge in support of Baxter's reply briefs regarding Baxter's motions *in limine*.

2.      A true and correct copy of *Kovoor v. Sch. Dist. of Philadelphia*, 93 Fed. Appx. 356 (3rd Cir. Feb. 26, 2004) is attached hereto as Exhibit 15.

3.     A true and correct copy of the order in *Telcordia Technologies, Inc. v. Lucent Technologies, Inc.*, Civil Action No. 04-875 GMS, issued by Judge Sleet on April 24, 2007 is attached hereto as Exhibit 16.

4.     A true and correct copy of Plaintiffs' Statement of Expert Witness Qualifications served on May 8, 2007 is attached hereto as Exhibit 17.

5.     True and correct copies of pages 219-224 of the highly confidential deposition transcript from the March 3, 2007 deposition of Jeffrey Ravetch are attached hereto as Exhibit 18.

6.     A true and correct copy of the Expert Report of Jeffrey V. Ravetch, M.D., Ph.D., in Rebuttal of the Report of Thomas Kindt, Ph.D. Pursuant to Federal Rule of Civil Procedure 26(a) is attached hereto as Exhibit 19.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this 14 day of May, 2007 at Palo Alto, California.


_____
Anne M. Rogaski


Public Version: May 17, 2007

2

# EXHIBIT 15



93 Fed.Appx. 356
93 Fed.Appx. 356, 187 Ed. Law Rep. 43
**(Cite as: 93 Fed.Appx. 356)**

Page 1

**H**
This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Thomas I. KOVOOR, Appellant,
v.
SCHOOL DISTRICT OF PHILADELPHIA.
**No. 03-1583.**

Submitted Pursuant to Third Circuit LAR 34.1(a) Feb. 9, 2004.
Decided Feb. 26, 2004.

**Background:** School district employee brought action against school district, alleging that he was denied promotions and was subject to hostile work environment on account of his race in violation of Title VII and § 1981. On school district's motion for summary judgment, the United States District Court for the Eastern District of Pennsylvania, Anita B. Brody, J., 211 F.Supp.2d 614, granted motion in part and denied motion in part. Employee appealed and requested a new trial.

**Holdings:** The Court of Appeals, Scirica, Chief Judge, held that:
(1) each instance of school district's denial of application for promotion triggered obligation to pursue his claims, and
(2) employee was not entitled to mixed motive jury instruction.
Affirmed.

West Headnotes

**[1] Civil Rights** 🔑1505(7)
78k1505(7) Most Cited Cases

**[1] Limitation of Actions** 🔑58(1)
241k58(1) Most Cited Cases

Each instance of school district's approximately annual denial of Indian employee's applications for promotion over course of several years triggered his obligation to pursue his claims under Title VII and § 1981 for failure to promote and hostile work environment based on racial discrimination, and could not together form basis for application of the continuing violation doctrine as to claims arising from conduct occurring outside the applicable limitations periods. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[2] Civil Rights** 🔑1438
78k1438 Most Cited Cases

**[2] Civil Rights** 🔑1556
78k1556 Most Cited Cases

Employee alleging he was denied promotions on account of his race in violation of Title VII and § 1981 was not entitled to mixed motive jury instruction, where there was no direct evidence linking discrimination with the failure to promote. 42 U.S.C.A. § 1981; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

*356 On Appeal from the United States District Court for the Eastern District of Pennsylvania. D.C. Civil Action No. 00-cv-05873. (Honorable Anita B. Brody).

Anser Ahmad, Harrisburg, PA, for Appellant.

Andrew M. Rosen, Office of General Counsel, Philadelphia, PA, for Appellee.

Before SCIRICA, Chief Judge, ROTH and McKEE, Circuit Judges.

OPINION OF THE COURT

SCIRICA, Chief Judge.

In this employment discrimination action, plaintiff Thomas Kovoor appeals a *357 grant of partial summary judgment in favor of defendant School District of Philadelphia. He also requests a new trial alleging erroneous rulings by the district court at trial. We will affirm.

I.

Kovoor began working for the school district as an Accounting Clerk in January 1985. Later that year, he

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

became a Financial Management Trainee. Kovoor alleges that during this time his supervisor, Herbert Schectman, harassed him on a daily basis, making disparaging comments and referring to Kovoor and African-American employees as "sons of slaves." Nonetheless, Kovoor was promoted to an Auditor I position in November 1986. Schectman, however, allegedly refused Kovoor a routine promotion to an Auditor II position in November 1987. In December 1987 Kovoor requested and received a transfer to the Pre-Audit section, where he worked under the supervision of Bonnie Rosen. He received a promotion from Auditor I to Auditor II in March 1988. In January 1989 Kovoor transferred to the Office of Categorical Finance working under the supervision of William Kozlowski. Six months later Kovoor returned to his former position of Auditor II under Rosen's supervision.

Kovoor applied for an Auditor III position in 1989 but allegedly was not permitted to take the required written and oral examinations because he had not completed the requisite number of accounting credits. He then applied for positions in the Transportation Department in 1990, 1991 and 1992. Kovoor rated second in the examination all three times, but in each case the school district awarded the position to the applicant who rated first. Kovoor again applied for a promotion in the transportation department in 1994 but was disqualified when he failed the written portion of the examination. Kozlowski allegedly called Kovoor "Swami" during the 1994 examination. Kovoor claims he never filed grievances for these promotion denials because he believed an objection would be futile.

In October 1995, the school district transferred Kovoor to the Categorical Finance Department under Kozlowski's supervision. Kovoor and Kozlowski played cards regularly during their lunch breaks, and Kozlowski allegedly referred to Kovoor as "Swami" and "Gunga Din" [FN1] during the card games. On July 1, 1996, Kovoor was laid off because of budget constraints. In November 1996 the school district rehired Kovoor in November 1996 in the position of School Operations Officer, a $12,000 pay cut from his previous position. In December 1999, the school district hired two other people for Budget Analyst II and III positions, but did not consider Kovoor for the positions. When Kovoor asked Kozlowski why he was not considered, Kozlowski allegedly told him it was because his "degree is from India." Kovoor continues to work for the school district.

FN1. "Gunga Din" is apparently the name of

an Indian servant in a movie based on a Rudyard Kipling novel.

On February 29, 2000, Kovoor filed a discrimination charge with the EEOC and on November 17, 2000 brought suit in federal court. Kovoor alleges the school district subjected him to a hostile work environment and denied him several promotions because of his nationality in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. ("Title VII") and 42 U.S.C. § 1981 (" § 1981"). The District Court granted the school district's *358 motion for summary judgment on Kovoor's hostile environment claim, but denied summary judgment on the failure to promote claim. A jury rendered a defense verdict finding the school district did not discriminate against Kovoor on the basis of his national origin.

Kovoor brings three claims on appeal: (1) the court erred in granting the school district's motion for partial summary judgment on the hostile work environment claim; (2) the court erred in failing to charge the jury with a mixed-motive instruction; and (3) the court erroneously limited Kovoor's evidence to post-1998 conduct.

II.

We have appellate jurisdiction under U.S.C. § 1291. Our review of the District Court's summary judgment award on the hostile work environment claim is plenary. *Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir.1999)*. We review jury instructions for abuse of discretion unless the instruction misstates the law, when our review is plenary. *Walden v. Georgia-Pacific Corp., 126 F.3d 506, 513 (3d Cir.1997)*. We review rulings to exclude evidence for abuse of discretion. *Walden, 126 F.3d at 517*.

III.

A.

Kovoor contends the District Court erred in granting summary judgment to the school district on his hostile work environment claim. To establish a hostile work environment claim in violation of Title VII, a plaintiff must prove that:

(1) he or she suffered intentional discrimination because of national origin; (2) the discrimination was "pervasive and regular;" (3) he or she was adversely affected by the discrimination; (4) the discrimination would adversely affect a reasonable person of the same national origin; and (5) that respondeat superior liability applies.

*Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990)*. Kovoor failed to satisfy the second prong, citing only one potentially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

93 Fed.Appx. 356                                                                 Page 3
93 Fed.Appx. 356, 187 Ed. Law Rep. 43
**(Cite as: 93 Fed.Appx. 356)**

discriminatory incident within the two-year statute of limitations period, [FN2] Kozlowski's alleged comment about an Indian degree.

> FN2. Pennsylvania law applies a two year statute of limitations to personal injury claims, and federal courts generally use this limitations period from the relevant state law for claims under § 1981. *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987); *Burgh v. Borough Council of Montrose,* 251 F.3d 465, 471 (3d Cir.2001). A Title VII claim must be filed within 300 days of the alleged discrimination where there has been a cross-filing with a state agency under state law. *See* 42 U.S.C. § 2000e-5(e)(1); *Burgh,* 251 F.3d at 472.

Kovoor urges application of the continuing violation theory, which might permit consideration of events that occurred outside the statute of limitations period. *See West v. Philadelphia Elec. Co.,* 45 F.3d 744, 754 (3d Cir.1995). To establish a claim under the continuing violation theory, a plaintiff must demonstrate: (1) at least one discriminatory act occurred within the filing period, and (2) the acts created a persistent, ongoing pattern. *West,* 45 F.3d at 754-55.

[1] Kovoor's continuing violation claim fails because he did not demonstrate that the comment was a pattern of an ongoing pattern of behavior. There was a five-year time gap between the "Indian degree" comment and Kozlowski's previous alleged discriminatory comments. No other event demonstrated racial animus. We will affirm summary judgment on the hostile work environment claim in favor of the school district.

**\*359 B.**

Kovoor contends he should have received a mixed motive jury instruction. The District Judge gave only a pretext charge. App. 1279-85. Unlike a pretext charge, a mixed motive charge shifts the burden of production and risk of nonpersuasion to the defendant. The defendant must then show that the adverse employment decision would have been made in the absence of retaliatory animus. *Walden,* 126 F.3d at 512-13. Strong "direct" evidence is required to show that "an illegitimate criterion was a substantial factor in the decision." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 276, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring).

[2] The District Judge explained at the charge conference that a mixed motive charge was inapplicable because there was no direct evidence linking discrimination with the failure to promote. App. 1279-85. We agree. The school district required all applicants seeking a promotion to a teaching position to hold a Bachelor's degree from a United States institution or an equivalent degree. The school district determined that Kovoor's degree from India was fifteen or sixteen credits short of an equivalent United States degree and for this reason refused to consider him for a promotion. Kovoor presents no evidence of retaliatory animus. Given this lack of evidence, the District Court properly refused to give a mixed motive jury instruction.

**C.**

Kovoor contends the District Court improperly limited the evidence he was allowed to present at trial to post-1998 conduct but allowed defendant to use pre-1998 evidence in its rebuttal. Kovoor's brief is devoid of any reference to the record to support this claim. [FN3] Furthermore, the District Court allowed Kovoor to present considerable pre-1998 evidence at trial. [FN4] This claim is meritless.

> FN3. On January 8, 2004, Kovoor submitted an motion to amend his brief to include instances where the District Court allegedly refused to allow Kovoor's pre-1998 evidence. Notwithstanding, he points to nothing in the record to support this claim.

> FN4. This includes testimony from Kovoor's supervisor Bonnie Rosen regarding the school district's failure to promote Kovoor in 1987; testimony by Kovoor regarding alleged discriminatory comments by Schectman in 1985-87 and Kozlowski in 1995-96, among other matters; and testimony of coworkers Levester Keitt, Mayer Krain and Tuyet Hoa Ost and supervisor Sheldon Jahss, all regarding events that took place before 1998.

**IV.**

For the foregoing reasons, we will affirm the judgment of the District Court.

93 Fed.Appx. 356, 187 Ed. Law Rep. 43

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-875 GMS |
| | ) | |
| LUCENT TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| TELCORDIA TECHNOLOGIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-876 GMS |
| | ) | |
| CISCO SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER**

## I.    INTRODUCTION

On March 30, 2007, the court conducted a pretrial conference in the above-captioned actions.

During the pretrial conference, the court heard brief oral argument on the parties' motions in limine

and reserved ruling on the following motions: (1) The defendants' motion to preclude Telcordia

Technologies, Inc. ("Telcordia") from presenting certain damages theories; (2) the defendants'

motion to preclude Telcordia from arguing that the invention of U.S. Patent No. Re. 36,633 (the

"'633 patent") was conceived before November 4, 1991, and from introducing uncorroborated

evidence of prior conception; (3) the defendants' motion to preclude Telcordia from introducing

evidence of Cisco Systems, Inc.'s ("Cisco") decision not to disclose advice of counsel and Lucent

Technology, Inc.'s ("Lucent") failure to seek legal advice; (4) the defendants' motion to preclude

Telcordia from introducing into evidence and/or relying upon at trial, the license and settlement agreements from *Bell Communications Research Inc. v. Fore Systems, Inc.*, 113 F. Supp. 2d 635 (D. Del. 2000) (the "*Fore* Case"); (5) Lucent's motion to preclude Telcordia from referring to the recent merger between Lucent and Alcatel S.A.; and (6) Telcordia's motion to preclude testimony of alleged inequitable conduct during prosecution of the '633 patent based upon the Gonzales article or private communications with France Telecom. Having considered the arguments raised in the parties' submissions (D.I. 302, 304, 309-315, 326, 327) and during the pretrial conference, the court will: (1) grant in part and deny in part the defendants' motion to preclude certain damages theories; (2) deny the defendants' motion regarding the introduction of uncorroborated evidence of prior conception; (3) grant in part and deny in part the defendants' motion regarding the advice of counsel; (4) grant the defendants' motion to exclude any reference to or reliance on the settlement and licensing agreements in the *Fore* Case; (5) grant Lucent's motion regarding the merger between Lucent and Alcatel S.A.; and (6) deny Telcordia's motion to preclude testimony regarding inequitable conduct during prosecution of the '633 patent. The court bases its rulings on the following reasons, among others.

## II.    DISCUSSION

### A.    The Defendants' Motion to Preclude Certain Damages Theories

The defendants contend that Telcordia should be precluded from seeking damages on revenue from products that do not infringe the '633 patent, which is directed to a synchronous residual time stamping ("SRTS") function. According to the defendants, their products, which they refer to as "boxes," can be outfitted with hundreds or thousands of different circuit cards, and the accused SRTS functionality resides on optional cards, which are priced, invoiced and sold separately

2

from the boxes into which they are inserted. Specifically, Cisco contends that it has sold only 3,109 SRTS cards and, as a result, a maximum of 3,109 of its boxes could potentially infringe. Cisco further contends that Telcordia seeks damages for over 200,000 of Cisco's boxes, including those that are not outfitted with SRTS-capable cards.

Likewise, Lucent contends that, although Telcordia seeks to offer a damages number based on all of Lucent's sales revenue for CBX boxes since April 2000, it never sold an SRTS-capable card to any customer for use with CBX and did not offer such a card until 2004. Lucent further contends that Telcordia seeks to offer a damages number based on all sales of its GX boxes since April 2000, even though only three customers bought an SRTS-capable card for those boxes, Lucent has not sold such a card since 2002, and the card was discontinued in 2004.

In sum, the defendants argue that Telcordia seeks damages for sales of their boxes to customers that never purchased any SRTS-capable cards, and who cannot possibly infringe the asserted claims. The defendants cite to *Golden Blount, Inc. v. Robert H. Peterson, Co.*, 438 F.3d 1354 (Fed. Cir. 2006) in arguing that Telcordia cannot recover for their sales of boxes, since there is no direct infringement associated with the those sales.

In response, Telcordia asserts that the defendants' motion in limine is a disguised and belated summary judgment motion on the issue of inducement and contributory infringement under 35 U.S.C. §§ 271(b), (c), and (f), which the court should not consider at this late date. As to the merits, Telcordia asserts that all of the accused products should be included in the damages base, because the defendants make and sell boxes that include components that are especially made or adapted for practicing the accused SRTS invention of the '633 patent. In other words, Telcordia argues that the defendants' manufacture and sale of the SRTS-capable boxes alone constitutes contributory

3

infringement. To support its position Telcordia relies on *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409 (Fed. Cir. 1996).

In *Stryker*, a lost profits case, the Federal Circuit held that the district court did not err when it awarded damages for the sales of implants that were sold with an infringing distal sleeve. 96 F.3d at 1416. The Federal Circuit specifically pointed out that over 16,000 sales of the implant did not result in the implant with a distal sleeve being implanted in a patient. *Id.* However, the court affirmed the district court's award based on how the implant systems were marketed and sold. *Id.* The court found that the implant and distal sleeve were marketed as a "total system." *Id.* That is, the sales agent would attempt to sell the entire system, implant and sleeve, to a surgeon. *Id.* The surgeons purchasing the systems would make the decision whether or not to use the distal sleeve in surgery. Therefore, the surgeon needed the entire system available during surgery and, because of this, "a responsible agent would make sure that the sleeves were available in the operating room for the surgeon." *Id.* at 1417. Based on these facts, the court held that the plaintiff was entitled to damages for every system sold, "because the compensable injury had already occurred – when the [system] was supplied to the surgeon instead of the [plaintiff's implant]." *Id.*

In *Golden Blount*, the Federal Circuit held that the district court should have excluded dealer returns of the infringing devices, because they did not represent instances of direct infringement. 438 F.3d at 1372-73. There, the devices sold by the defendant did not infringe until they were assembled in a certain configuration. *Id.* at 1360. Of the devices that the defendant sold, customers allegedly returned 802 before they were assembled into an infringing configuration. *Id.* at 1372. In concluding that the plaintiff could not recover for the 802 returned devices, the court noted, "it is hornbook law that '[l]iability for either active inducement of infringement or contributory

4

infringement is dependent upon the existence of direct infringement.'" *Id.* (citations omitted). The court then determined "there would be 802 fewer acts of direct infringement and [the defendant] would be liable for 802 fewer acts of contributory or inducing infringement," if the 802 devices were returned before they were assembled into an infringing configuration. *Id.* at 1373.

After having considered the submissions and arguments of the parties, the court concludes that *Golden Blount*, not *Stryker*, is more on point with the facts of the present case. Here, like *Golden Blount*, the defendants have sold devices, i.e. boxes, that are incapable themselves of performing the function that allegedly infringes the '633 patent. As such, direct infringement can exist only for the boxes sold with the SRTS-capable cards, or the SRTS-capable cards that the defendants sold to customers. Put another way, the devices or boxes sold without the SRTS-capable cards cannot directly infringe, even though they have been adapted for practicing the accused SRTS invention, because they cannot practice the invention without the SRTS-capable card. Accordingly, the court concludes that Telcordia can recover damages only for SRTS-capable cards sold by the defendants, and not for the total number of boxes the defendants sold.

The defendants also contend that Telcordia should be precluded from introducing evidence regarding Cisco's foreign sales of allegedly infringing products. Cisco argues that its foreign sales are irrelevant because Telcordia cannot connect them to an allegedly infringing domestic activity. Specifically, Cisco argues that Telcordia did not ask for foreign sales information during discovery, and that Telcordia's expert has merely doubled his damages figure to account for allegedly-infringing foreign sales.

Conversely, Telcordia argues, with citations to the record, that Cisco manufactures and tests the accused products in the United States, a statutory act of infringement. Telcordia further argues

5

that Cisco's representations regarding its failure to seek discovery on foreign sales are disingenuous, noting that Cisco produced its world-wide revenue figures for the products-in-suit, and that its Rule 30(b)(6) witness authenticated and explained those figures.

After having considered the parties' submissions and arguments, the court agrees with Telcordia that it has shown evidence of damages for foreign sales of allegedly infringing products. The court further concludes that Cisco has not shown (or even argued) any prejudice, much less undue prejudice, or jury confusion, that would result from allowing Telcordia to present evidence of foreign sales. As such, the court will permit Telcordia to introduce into evidence Cisco's foreign sales.[1]

## B.    The Defendants' Motion to Exclude Evidence of Prior Invention

In this motion, the defendants first contend that Telcordia should be precluded from arguing that the invention claims in the '633 patent was conceived before November 4, 1991. In its answering brief, and at the pretrial conference, Telcordia represented to the court that it "is not arguing that the invention claimed in the '633 patent . . . was conceived before November 4, 1991, and it is not attempting to introduce any evidence, let alone uncorroborated evidence that the claimed invention was conceived before that date." (D.I. 310, at 1; see D.I. 337, at 70:10-16.) Instead, Telcordia intends to present evidence of the work of Drs. Lau and Fleischer (the inventors of the '633 patent) that was completed prior to August 26, 1991, to demonstrate that the invention

---

[1] In making its ruling, the court notes that Cisco can effectively cross-examine Telcordia's expert in order to determine whether he has merely "doubled" Cicso's United States sales to arrive at a foreign sales damages number, and whether he has excluded Cisco's United States sales and/or foreign sales of non-infringing products from his analysis. If Telcordia's expert has in fact "doubled" the damages number or failed to remove non-infringing products from his analysis, Cisco can use these facts to its advantage in arguing to the jury.

of the '633 patent was not taken from someone else. Given Telcordia's representations, the court will deny this part of the defendants' motion as moot.

The defendants further argue, however, that Telcordia should be precluded from presenting any "uncorroborated inventor evidence" regarding an earlier conception date for the '633 patent, because it is legally improper. (D.I. 304 Ex. 2, at 1, 3.) Telcordia counters that the evidence it will present is corroborated and, as a result, the court should deny the defendants' motion. The primary dispute between the parties is whether a June 6, 1991 memorandum from Dr. Lau may properly be considered to demonstrate the inventors' possession of key ideas regarding the SRTS invention.

The Federal Circuit developed a rule requiring corroboration "where a party seeks to show conception through the oral testimony of an inventor," because the court was concerned that "inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (citations omitted). In order to determine sufficient corroboration, courts apply a "rule of reason" analysis and "examine[] all pertinent evidence to determine the credibility of the inventor's story." *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002). However, the Federal Circuit "does not require corroboration where a party seeks to prove conception through the use of physical exhibits." *Mahurkar*, 79 F.3d at 1577. When conception is being proven through physical exhibits, the concern that led to the development of the corroboration requirement no longer exists, because "[t]he trier of fact can conclude for itself what documents show, aided by testimony as to what the exhibit would mean to one skilled in the art." *Id.* at 1577-78.

Here, Telcordia has argued that it will use the June 6, 1991 memorandum from Dr. Lau to demonstrate that he possessed the key ideas of the invention of the '633 patent at the time of its writing. Thus, Telcordia is attempting to demonstrate an earlier conception date to rebut the defendants' invalidity claim through a physical exhibit, namely, the June 6, 1991 memorandum. Because the jury, aided by testimony as to what the memorandum would mean to one skilled in the art at the time, can determine for itself what the memorandum demonstrates, the court concludes that Telcordia is not precluded from presenting it as evidence. The court further concludes that any likelihood of jury confusion regarding the conception date of the '633 patent can be remedied by a proper limiting instruction. In other words, the court will permit Telcordia to present evidence on the June 6, 1991 memorandum, but will tell the jurors (through the use of a limiting instruction crafted by the parties) that they can consider the memorandum and accompanying testimony only as evidence to rebut the defendants' derivation of invention claim.

C.    **The Defendants' Motion to Exclude Evidence Regarding the Advice of Counsel**

The defendants argue that Telcordia should be precluded from introducing evidence of their decision not to disclose advice of counsel pertaining to the patents-in-suit, or to argue that the they did not properly seek legal counsel. Cisco specifically argues that Telcordia should not be permitted to introduce any evidence regarding its receipt and reliance on advice of counsel. Lucent specifically argues that Telcordia should not be permitted to introduce evidence regarding its failure to obtain advice of counsel. The court has distilled the parties' arguments into the following two considerations: (1) whether the jury may consider the fact that Cisco has obtained but not produced

8

any legal opinions or advice;[2] and (2) whether the jury may consider the fact that Lucent has not obtained any legal opinions or advice. Both parties rely on the Federal Circuit's decision in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corporation*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc), as well as subsequent decisions from the Federal Circuit and district courts.

In *Knorr-Bremse*, the Federal Circuit "resolve[d] . . . the question of whether adverse inferences of unfavorable opinions can be drawn [in a willful infringement analysis when a defendant has failed to obtain or produce a exculpatory opinion of counsel.]" *Knorr-Bremse*, 383 F.3d at 1347. As to that question, the court held that it is not appropriate for the trier of fact to draw an adverse inference and overruled precedent authorizing such an inference. *See id.* at 1344. The Federal Circuit, however, expressly declined to resolve the question of whether "the trier of fact, particularly a jury, can or should be told whether or not counsel was consulted (albeit without any inference as to the nature of the advice received) as part of the totality of the circumstances relevant to the question of willful infringement." *Id.* at 1347. Therefore, *Knorr-Bremse* left untouched the totality of the circumstances standard that the jury may consider in its willful infringement analysis.

Since that decision, the Federal Circuit and several district courts have addressed the issue left untouched by *Knorr-Bremse*. Generally, the cases seem to fall into two situations: (1) cases in which the defendant obtained an opinion of counsel, but has asserted the attorney-client privilege to withhold the opinion; and (2) cases in which the defendant has failed to seek or obtain an opinion

---

[2] During the pretrial conference, and in its briefing, Telcordia argued that Cisco had not obtained any opinions of counsel. (D.I. 337, at 87:1-88:3.) As expected, Cisco maintained that it had obtained legal advice regarding the patents-in-suit. To resolve the issue, the court ordered Cisco to produce for in camera review a sampling of documents that it would rely on as opinions of counsel. Cisco filed those documents on April 16, 2007. After having reviewed the documents, the court concludes that they constitute opinions of counsel received by Cisco in this litigation.

9

of counsel. In the latter situation, subsequent cases applying *Knorr-Bremse* have held that "[t]he

fact that no opinion of counsel on the issue of infringement was acquired by [the] defendant may be

considered by the trier of fact in its willful infringement analysis, but no inference may be drawn

to suggest that such an opinion, had it been acquired, would have been unfavorable to [the]

defendant." *IMX, Inc. v. LendingTree, LLC*, No. Civ. 03-1067-SLR, 2006 WL 38918, at *1 (D. Del.

Jan. 6, 2006); *see Engineered Products Co. v. Donaldson, Co., Inc.*, 147 F3ed. Appx. 979, 991 (Fed.

Cir. Aug. 31, 2005) (unpublished). This outcome makes sense, because one of the factors that the

jury must consider in its willfulness analysis is "whether the infringer, when he knew of the other's

patent protection, investigated the scope of the patent and formed a good-faith belief that it was

invalid or that it was not infringed." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).

Thus, permitting the plaintiff to tell the jury that the defendant did not obtain an opinion of counsel

may indicate to the jury that the defendant did not act properly. *See Third Wave Technol. v.*

*Stratagene Corp.*, 405 F. Supp. 2d 991, 1016-17 (W.D. Wis. 2005) (*Knorr-Bremse* "did not say that

it was improper for a jury to infer from [the] infringer's failure to consult counsel that the infringer

had no prior knowledge of its opponent's patents or that it had not acted properly in other respects.")


On the other hand, in the former situation, the Federal Circuit has stated that the threshold

showing a patentee must make in establishing willful infringement "cannot be satisfied merely by

proof that the accused is asserting the attorney-client privilege to withhold an opinion of counsel."

*Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1368 (Fed. Cir. 2006). This also

makes sense to the court, because it can envision only one inference that the jury will draw from

learning that the defendant has consulted counsel and obtained advice, but has chosen to assert the

attorney-client privilege: that the opinion received by the defendant was unfavorable. This is precisely the inference that would run afoul of the Federal Circuit's reasoned opinion in *Knorr-Bremse*, and an inference that this court will not permit the jury to draw. Given the foregoing discussion, the court will permit Telcordia tell the jury that Lucent did not seek legal counsel with respect to the '633 patent,[3] but prohibit Telcordia from introducing evidence of Cisco's decision not to disclose advice of counsel pertaining to the patents-in-suit. *See McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*, 434 F. Supp. 2d 810 (E.D. Cal. 2006) (distinguishing cases in which the defendant consulted counsel and received an opinion but chose to assert the attorney-client privilege from cases in which the defendant did not seek legal counsel). Therefore, the court will grant in part and deny in part the defendants' motion.

D.    **The Defendants' Motion to Exclude Evidence Regarding the License and Settlement Agreements Resulting from its Litigation of *Bell Communications Research Inc. v. Fore Systems, Inc.***

In this motion, the defendants ask the court to exclude evidence and argument from Telcordia regarding the license and settlement agreements in the *Fore* Case. The defendants rely on Rule 408 of the Federal Rules of Evidence. Rule 408 provides that a license agreement may be excluded from evidence "where it (1) was reached under a threat of litigation, (2) arose in a situation where litigation was threatened or probable, or (3) was negotiated against a backdrop of continuing litigation infringement." *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, No. C.A. 02-148 GMS,

---

[3] Lucent argues that Telcordia should be precluded from telling the jury that it did not seek legal counsel regarding the '633 patent because it had no notice of the '633 patent until Telcordia filed its amended complaint, nearly one year into the litigation. The court is not persuaded by this argument and finds that Lucent's notice of the '633 patent, or lack thereof, is not proper for a determination on a motion in limine, because it is a factual issue for the jury to decide after hearing the evidence presented.

2003 WL 22387038, at *2 (citations omitted). In determining whether the license agreement meets any of the above-stated requirements, the court must look at the context in which the agreement was reached. *Id.* (citing *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1572 (Fed. Cir. 1988)).

In the present case, the license and settlement agreements between BellCore and Fore Systems arose as a direct result of the settlement of the *Fore* Case. Thus, they fall squarely within the prohibition of Rule 408. More important, however, is the fact that the license and settlement agreements provide a license for 78 patents, only 3 of which are involved in the present lawsuit. Permitting Telcordia to put the agreements into evidence and rely on them has the potential to confuse or mislead the jurors, because they do not paint an accurate picture of the value of the patents at issue in the present litigation. In addition, the jurors may be tempted to speculate as to the reasons the agreements contain licenses for patents that are not at issue here – business reasons known to only the parties who are signatories to those agreements. Because the license and settlement agreements arose as a result of the settlement in the *Fore* Case, and because permitting the jurors to hear evidence and testimony regarding agreements that pertain to 75 patents not at issue in this lawsuit has the potential to mislead or confuse them, the court will not permit Telcordia to introduce or rely upon the license and settlement agreements.[4]

---

[4] Telcordia argues that, at a minimum, the license and settlement agreements are relevant and probative of the non-obviousness of the patents-in-suit. The court cannot agree with Telcordia, and questions its reliance on *WMS Gaming Inc. v. International Game Technology*, 184 F.3d 1339, 1360 (Fed. Cir. 1999). Here, Telcordia's agreements arose as a result of litigation. In *WMS Gaming*, the Federal Circuit did not state that the patentee's license agreements with competitors were entered into as a result of litigation, in concluding that they were "strong indicia" of non-obviousness. Because *WMS Gaming* does not stand for the proposition that all license agreements, no matter in what context they arise, are "strong indicia" of non-obviousness, the court places no weight on Telcordia's citation to and reliance on that

E.    **Lucent's Motion to Exclude any Reference to Its Merger with Alcatel S.A.**

Lucent contends that the court should not permit any reference to its merger with Alcatel

S.A. ("Alcatel"), because it is not relevant to the disputed issues, and because it is highly prejudicial

to Lucent. Specifically, Lucent contends that no Alcatel USA product has ever been in dispute here,

because Alcatel USA has received a stay of Telcordia's case against it, pursuant to its statutory right.

Lucent further contends that any reference to the merger would be misleading and confusing to the

jury.

After having considered the parties positions, the court agrees with Lucent and further finds

that Telcordia has not presented any reason for the court to allow the jury to hear that Lucent and

Alcatel have merged. Put another way, Telcordia has not demonstrated to the court that the Lucent

and Alcatel merger has any tendency of making any disputed fact more or less probable. First,

although a merger has occurred, Telcordia does not dispute that Lucent and Alcatel USA are

separate subsidiaries within the Alcatel-Lucent company.

In addition, while Telcordia maintains that the merger is relevant to Lucent's defense of

laches, the court is not persuaded, especially considering that the Alcatel-Lucent merger did not

occur until December 1, 2006 – more than two years after Telcordia filed this lawsuit. Laches is

defined as "the neglect or delay in bringing suit to remedy an alleged wrong, which taken together

with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an

equitable bar." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028-29 (Fed. Cir.

1992) (en banc). For a defense of laches, the defendant has the burden of proving that: (1) the

plaintiff delayed in filing suit for an unreasonable and inexcusable length of time after the plaintiff

_____

case.

13

knew or reasonably should have known of its claim against the defendant; and (2) the defendant suffered material prejudice or injury as a result of the plaintiff's delay. *Id.* at 1028. Neither of the above-stated factors that Lucent must prove to establish laches has any relevance to a merger with Alcatel that occurred after the initiation of this action. *See id.* at 1038 (explaining that courts must look for a change in the economic position of the alleged infringer *during* the period of delay) (emphasis added). Accordingly, the merger has no bearing on Lucent's laches defense.

Finally, Telcordia contends that the merger is relevant to the biases of witnesses from France Telecom that Lucent intends to call to support its case. Indeed, Telcordia contends that, at the outset of this litigation, France Telecom witnesses had biases in favor of Alcatel which, because of the merger, "directly translate[]" to Lucent. (D.I. 312, at 2.) Putting aside the fact that the allegedly biased witnesses are employees and former employees of France Telecom, a company that is not a party to this case, nor legally affiliated with any of the parties in this case, the court cannot fathom how any bias toward Alcatel during depositions that occurred *before* the merger between Alcatel and Lucent now "directly translates" to Lucent. Nor has Telcordia provided any explanation for this theory of translating bias, which the court finds untenable.

In sum, after having considered all arguments and submissions, the court concludes that any marginal probative value of the merger "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." Fed. R. Evid. 403. The court, therefore, will grant Lucent's motion.

14

F.    **Telcordia's Motion to Preclude Testimony of Alleged Inequitable Conduct During Prosecution of the '633 Patent**

Telcordia's motion in limine asks the court to preclude testimony relating to alleged inequitable conduct by the inventors of the '633 patent. The court, however, need not address the merits of this motion, because it has determined that the motion is not a motion in limine. Rather, it is a stealth motion for summary judgment, which this court does not permit to be raised during the pretrial conference of civil patent cases.[5] This is evidenced by the fact that Telcordia does not discuss anywhere in its motion how it will be prejudiced if the court permits the defendants to introduce testimony regarding the Gonzales article and communications with France Telecom. Instead, reading like a motion for summary judgment, the motion states that it is legally incorrect for the defendants to introduce testimony regarding this evidence. (D.I. 302, at 1.) Moreover, Telcordia made the following summary judgment argument with respect to the motion during the pretrial conference: "they [the defendants] are relying on two types of conduct where there is controlling Federal Circuit authority which says that type of conduct does not constitute inequitable conduct *as a matter of law*." (D.I. 337, at 96:22-25.) Further, the motion does not discuss the exclusion of evidence or argue that certain testimony should be excluded under the Rules of Evidence, but asserts that an entire claim should be precluded. In other words, the structure of the motion and language used by Telcordia demonstrate to the court that Telcordia is seeking summary

---

[5] The court's summary judgment process is one that is detailed and well-known to the parties – indeed it is part of their scheduling order. In accordance with the Scheduling Order (D.I. 22 ¶ 8; D.I. 83 ¶ 6) in the present case, the parties filed letter requests to submit motions for summary judgment, which the court then addressed during a teleconference. While Telcordia requested permission to move for summary judgment on seven different issues, it did not request to move for summary judgment on the inequitable conduct issue. Accordingly, it is too late in the day for Telcordia to request summary judgment on the inequitable conduct issue for the first time in a motion in limine.

judgment under the guise of a motion in limine. Given the foregoing and Telcordia's failure to comply with the court's process, the court will deny Telcordia's motion.

## III.    CONCLUSION

For the reasons stated in the court's discussion, IT IS HEREBY ORDERED that:

1.    The defendants' Motion in Limine Number 1 Re: Unsupported Damages Theories (D.I. 304 Ex. 1) is GRANTED in part and DENIED in part. The motion is granted with respect to the defendants' total boxes sold and denied with respect to Cisco's foreign sales.

2.    The defendants' Motion in Limine Number 2 Re: Uncorroborated Evidence of Conception (D.I. 304 Ex. 2) is DENIED.

3.    The defendants' Motion in Limine Number 3 Re: Advice of Counsel (D.I. 304 Ex. 3) is GRANTED in part and DENIED in part. The motion is GRANTED with respect to Cisco and DENIED with respect to Lucent.

4.    The defendants' Motion in Limine Number 4 Re: *Telcordia v. Fore Systems* License and Settlement Agreements (D.I. 304 Ex. 4) is GRANTED.

5.    Lucent's Motion in Limine Number 5 Re: References to the Alcatel-Lucent Merger (D.I. 304 Ex. 5B) is GRANTED.

6.    Telcordia's Motion in Limine Number 4 to Preclude Testimony on Alleged
Inequitable Conduct During Prosecution of the '633 Patent Based upon the Gonzales
Article or Private Communications with France Telecom (D.I. 302) is DENIED.


Dated: April 24, 2007                                  /s/ Gregory M. Sleet
                                                       UNITED STATES DISTRICT JUDGE


17

# EXHIBIT 17

**Schedule E**

**PLAINTIFFS' STATEMENT OF EXPERT WITNESS QUALIFICATIONS**

Plaintiffs intend to call the following expert witnesses at trial.

1.    **Jeffrey V. Ravetch, M.D., Ph.D.**

    a.    <u>Statement of Qualifications</u>

Dr. Ravetch currently holds positions as Theresa and Eugene M. Lang Professor
Head of the Leonard Wagner Laboratory of Molecular Genetics and Immunology at The
Rockefeller University in New York City, and Adjunct Professor, Department of
Microbiology and Immunology, Jefferson Medical College and Jefferson Cancer Institute
in Philadelphia. Prior to assuming his positions at The Rockefeller University in 1996,
Dr. Ravetch was a Member of the Memorial Sloan-Kettering Cancer Center and
Professor at the Cornell University Medical College. After receiving his Bachelor of
Science degree in Molecular Biophysics and Biochemistry, *cum laude*, from Yale
University in 1973, he entered a combined M.D.- Ph.D. program, earning his Ph.D. in
bacterial genetics from The Rockefeller University in 1978 and, in 1979, earning his
M.D. from Cornell University Medical College. Dr. Ravetch subsequently received
postdoctoral training at the National Institutes of Health. Since and during his training,
he has held positions and appointments at Memorial Hospital for Cancer and Allied
Diseases, Memorial Sloan-Kettering Cancer Center, Cornell University Medical College,
the National Institutes of Health, and Yale University.

Dr. Ravetch has directed a research laboratory in molecular genetics and
immunology since 1982, focusing on the structure, function and regulation of antibodies
and their receptors. He has investigated the mechanisms of antibody-mediated responses,

including the interaction of antibodies with complement components and cellular Fc receptors. He has investigated the mechanisms of IVIG protection *in vivo* and the biological basis for the anti-inflammatory activity of IVIG. Dr. Ravetch is the author of over 150 original articles and over thirty book chapters, review articles, and invited commentaries in the field of molecular immunology. He is a member of several scientific societies and serves on the editorial boards of both the *Journal of Experimental Medicine* and *International Immunology.* Dr. Ravetch is a frequent international lecturer at numerous universities, medical centers, and symposia throughout the world. He is also a member of several scientific advisory boards, including the Irvington Institute for Immunology and the Cancer Research Institute.

Dr. Ravetch has received numerous awards and honors for his research efforts in immunology including the Pew Scholar Award, the Burroughs-Wellcome Award, the National Institutes of Health Merit Award, the Lee C. Howley Award and the AAI Huang Award for Meritorious Career. In 2006, he was elected to the National Academy of Sciences of the United States in recognition of his seminal contributions to the field of antibody structure and function.

Dr. Ravetch is an expert in the fields of molecular biology and immunology, with particular focus on the structure, function and regulation of antibody molecules and their receptors, the Fc receptors. His work on antibodies began in 1979 with the successful cloning and characterization of the genes for the heavy chains of human antibodies and has continued over the next two and half decades on studies defining the cellular receptors for antibodies and their role in the biological responses elicited by antibodies. Over the course of his work, Dr. Ravetch has investigated the role of various IgG binding

2

molecules, such as molecules of the complement pathways and the Fc receptors, on the biological activities of antibodies and the mechanisms by which IVIG mediates its therapeutic activities in autoimmune diseases.

        b.    <u>Subject Matter of Testimony</u>

Dr. Ravetch will testify on the issues of infringement, both literally and under the doctrine of equivalents. In particular, Dr. Ravetch will testify that Baxter's Gammaguard Liquid manufacturing process falls within the scope of the asserted claims of the 191 patent. Dr. Ravetch's testimony will include testimony on scientific and technical issues concerning IGIV product and the plain and ordinary meaning of certain claim terms.

Dr. Ravetch will also testify on the issues of the validity and enforceability of the 191 patent. Dr. Ravetch will respond to any testimony provided by Baxter's experts on those topics. Dr. Ravetch's testimony is set forth in greater detail in his expert reports of January 10, 2007 and January 31, 2007 and his deposition of March 3 and 4, 2007.

3

2.    **Erwin W. Gelfand, M.D.**

    a.    <u>Statement of Qualifications</u>

Dr. Gelfand is the Chairman of the Department of Pediatrics at National Jewish

Center for Immunology and Respiratory Medicine in Denver, Colorado, and Professor of

Pediatrics and Microbiology and Immunology at University of Colorado Health Sciences

Center in Denver. Prior to assuming this position in 1987, Dr. Gelfand was Chief of the

Division of Immunology and Rheumatology at The Hospital for Sick Children in

Toronto, Canada, and Professor of Immunology and Pediatrics at the University of

Toronto.

Dr. Gelfand completed his undergraduate education at McGill University, earning

a Bachelor of Science degree in Physiologic Psychology with Honors in 1962, continuing

at McGill to earn an M.D. degree with Honors in 1966. He then completed an internship

at Montreal General Hospital, then a residency in Pediatrics at the Montreal Children's

Hospital and at the Children's Hospital Medical Center in Boston. From 1969 to 1971,

Dr. Gelfand completed a fellowship in Immunology at Harvard University and a Clinical

Fellowship in Immunology at Children's Hospital Medical Center in Boston. His work in

Boston focused on antibody interactions, and it was here that he participated in the

earliest clinical studies in the United States administering the first preparations of IVIG.

He also performed the first successful bone marrow transplants in infants suffering from

Severe Combined Immune Deficiency Disease.

Dr. Gelfand has maintained an independent laboratory career as a researcher and

as a clinical faculty member since 1972. From 1972 to 1987 at the Hospital for Sick

Children and the University of Toronto, where he progressed to Professor of Immunology

4

and Pediatrics and head of the Department of Immunology and Rheumatology, Dr.
Gelfand established the first pediatric bone marrow transplant center in Canada and the
first IVIG infusion center, where he initiated studies on the use of IVIG for treatment of a
number of autoimmune and inflammatory diseases. During this time, Dr. Gelfand also
initiated several clinical trials using different IVIG preparations. He first showed the
benefits of high dose IVIG in treating several diseases in adults and children. In the
infusion center, he also demonstrated the ability to infuse higher concentrations of IVIG,
as well as rapid infusion, without compromising patient safety. This immunodeficiency
program became a leading program in North America with patient referrals from all over
the United States and Canada.

In 1987, Dr. Gelfand assumed the chairmanship of the Department of Pediatrics at
the National Jewish Medical and Research Center in Denver and Professor of Pediatrics,
Microbiology, and Immunology at the University of Colorado Health Sciences Center.
Dr. Gelfand continued his research program at National Jewish, defining basic
mechanisms of action of IVIG and in introducing its use in treatment of novel indications
such as severe asthma. His research has been supported by continuous funding from the
National Institutes of Health, the United States Environmental Protection Agency, and
special awards from several foundations and pharmaceutical companies.

Dr. Gelfand has established an IVIG infusion center at National Jewish, which
likely sees more patients and carries out more infusions of IVIG than any other center in
the United States. He estimates that during the past thirty-five years, he has administered
more than 20,000 infusions of IVIG. For the past nine years and since the *U.S. News and*

5

*World Report* rankings began, National Jewish has been ranked the number one respiratory hospital in America.

Dr. Gelfand has published more than 650 papers, including original articles in peer-reviewed journals, book chapters, and solicited papers. His scholarly writings are widely recognized since he is ranked in the top one-half of one percent of most-cited immunologists. Dr. Gelfand frequently has been invited to speak at universities and major national and international symposia on immunology, immunodeficiency, and on clinical and research aspects of IVIG. As a teacher, he has supervised the training of more than seventy-five M.D. and Ph.D. students in Immunology. He has received numerous scholarships and awards. He has been Associate Editor of several major scientific journals, and regularly reviews for such eminent journals as *Nature*, *Nature Medicine*, *Science*, and *Journal of Immunology*. Dr. Gelfand serves on the scientific advisory boards of several companies including Atherogenics, LAB Pharma, Sanofi-Aventis, Schering, and Novartis.

Dr. Gelfand is an expert in the fields of immunology and allergy. He has established many of the parameters of care for patients with primary immunodeficiency disease, particularly defining dose-dependent effects of IVIG for treatment of infections, as well as identifying the unique susceptibility of these patients to certain microorganisms. In allergic diseases, Dr. Gelfand demonstrated the efficacy of IVIG where standard therapy such as corticosteroids had failed, and demonstrated the benefits of IVIG in reversing "steroid-resistance". His work in establishing an animal model for asthma has defined critical pathways that lead to lung immune/inflammatory responses.

For many years, Dr. Gelfand been listed among the 'Best Doctors in America" and in the "Top 2000 Doctors in America".

    b. <u>Subject Matter of Testimony</u>

   Dr. Gelfand will testify regarding background technology in this case pertaining to IGIV and anticomplement activity from a clinical perspective.  Dr. Gelfand will testify regarding the plain and ordinary meaning of the phrase "acceptable level suitable for intravenous administration" pertaining to anticomplement activity.  Dr. Gelfand will respond to any testimony provided by Baxter's experts on those topics.  Dr. Gelfand's testimony is set forth in greater detail in his expert report of January 10, 2007 and his deposition testimony of February 14, 2007.

3.    **Michael C. Carroll, Ph.D.**

   a.    <u>Statement of Qualifications</u>

   Dr. Carroll is Professor of Pediatrics and Pathology at Harvard Medical School
and Senior Investigator at the CBR Institute for Biomedical Research. Prior to this
position, which he has held since 1998, Dr. Carroll was an Associate Professor in
Pathology at Harvard Medical School; and, beginning in 1985, held the position of
Assistant Professor in Pediatrics and Biological Chemistry at Harvard Medical School
and Children's Hospital in Boston.

   Dr. Carroll completed a Bachelor of Business Administration at Texas Tech
University in 1968. His first training in Immunology was as a graduate student at
Southern Methodist University in Dallas, Texas where he received a Masters in Science
in 1975. Subsequently, he trained with Dr. J. Don Capra, an expert on the structure of
human immunoglobulin, as a Ph.D. student at the University of Texas Southwestern
Medical School in Dallas. During both his doctoral thesis research and his post-doctoral
training in Oxford, England with a Nobel Laureate, Dr. Carroll investigated the structure
and genetics of components of the complement system.

   Over the past twenty years, Dr. Carroll's laboratory research at Harvard has
focused on understanding the complement system and how it influences the adaptive
immune response and autoimmunity. Much of this work has involved construction and
characterization of strains of mice in which their complement or immunoglobulin genes
were altered. Given the importance of the interaction between complement and antibody

8

(immunoglobulin), his laboratory has been continuously focused toward understanding both human and mouse immunoglobulin and the cells that produce it.

During the past two decades at Harvard Medical School, Dr. Carroll has been actively involved in teaching both graduate and medical students, and has initiated and co-directed the basic immunology course for graduate students since 1996. In 2004, he was appointed by the Dean of the Medical School as the Director of the Graduate Program in Immunology in the Department of Arts and Sciences at Harvard University.

Dr. Carroll has published over 125 papers in peer-reviewed journals. In addition, he has written a number of review articles and book chapters on the topic of complement and the humoral immune response, and he has presented over 100 scientific talks as an invited lecturer at universities and scientific meetings. As an expert in the field of complement, and innate and adaptive immunity, Dr. Carroll has served on the editorial boards of the *Journal of Immunology*, including as Associate Editor and Section Editor, *Molecular Immunology*; and on the Board of Advisors of *The Journal of Experimental Medicine*. Dr. Carroll also serves on the Scientific Advisory Board of DecImmune Therapeutics in Boston and MedImmune in Gaithersburg, Maryland.

Dr. Carroll has received numerous fellowships and awards, including award of the American Arthritis Foundation Investigator Award and appointment as a Pew Scholar by the Pew Foundation.

Dr. Carroll's expertise is in the field of the complement system and how it interacts and influences adaptive immunity. Much of his work from his time as a doctoral student has resulted in the identification of complement system components and the location of their genes on chromosomes. In particular, his work resulted in the genetic

9

linking of defects in complement C4 genes and the human autoimmune disease, systemic lupus erythematosus, often referred to as "lupus."

Importantly, his earlier work has allowed him to develop models for human disease, especially for autoimmune disease such as lupus. One of the indications of lupus is failure to clear immune complexes. An outcome of this defect in humans with lupus is binding of complement C1q and activation of the complement system leading to severe inflammation and disease, a discovery that he and his laboratory at Harvard are continuing to research.

      b.    <u>Subject Matter of Testimony</u>

Dr. Carroll will testify regarding the anticomplement activity assays performed by his laboratory on in-process samples taken from Baxter's GAMMAGARD Liquid 10% manufacturing facility. Dr. Carroll will provide scientific testimony into the scientific principles underlying the two testing methodologies utilized. Dr. Carroll's testimony is set forth in greater detail in his expert report of January 10, 2007 and his deposition testimony of February 16, 2007.

4.    **Christopher J. Bokhart, CPA, CFE**

Mr. Bokhart is a Vice President of CRA International and has over twenty years of experience in intellectual property (IP) and business valuation. He received his B.S. in Management from Purdue University. He assists companies and counsel in transactional, strategy, litigation and financial reporting matters involving patents, trademarks, trade secrets, copyrights and business interests.

His expertise in such engagements has been applied in a broad array of manufacturing, services, and retail industries, for clients ranging from Fortune 500 companies to individuals, and governmental and non-profit entities. Through the application of accounting, finance, and economics techniques, Mr. Bokhart analyzes incremental revenues, costs, and profitability, as well as other issues including the determination of discount rates, cost of capital, and royalty rates. These projects often involve the use and interpretation of statistical analyses, financial modeling, comparable transactions, and market research.

Mr. Bokhart has provided significant testimony in federal, state and arbitration settings on subjects including the valuation of intellectual property, such as patents, trademarks, copyrights and trade secrets. In addition, he has often assisted in case evaluation and royalty audits in commercial disputes prior to potential litigation as well as post licensing royalty compliance.

In the transactional setting, he has advised companies on valuation and pricing issues in the context of acquisitions, joint ventures, bankruptcy, corporate restructuring, and investment holding companies. His background also includes experience in licensing, including the analysis of royalty rates.

In addition to his consulting experience, Mr. Bokhart has lectured on topics, including intellectual property valuation, lost profit and reasonable royalty damages determinations, licensing strategies, joint partnerships and strategic alliances, and international competition.

Mr. Bokhart co-founded Chicago-based IPC Group (a predecessor company of InteCap) in 1988. InteCap was acquired by CRA International in 2004. Prior to the founding of IPC Group, Mr. Bokhart was an Executive Consultant for Peterson & Company, a Chicago based firm who specialized in accounting, financial and economic consulting.

# EXHIBIT 18

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 19

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 17, 2007, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

**BY HAND DELIVERY AND E-MAIL**

Jeffrey B. Bove, Esq.
Mary W. Bourke, Esq.
Mark E. Freeman, Esq.
Jaclyn Mason, Esq.
Donna Hallowell
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
P. O. Box 2207
Wilmington, DE 19899-2207
jbove@cblh.com, mbourke@cblh.com
mfreeman@cblh.com, jmason@cblh.com
dhallowell@cblh.com; cjeffers@cblh.com;
dhammond@cblh.com; mlambert@cblh.com

**BY EMAIL**

Dana K. Hammond, Esq.
M. Curt Lambert, Esq.
Connolly Bove Lodge & Hutz LLP
1007 N. Orange Street
Wilmington, DE 19899
jhammond@cblh.com; mlambert@cblh.com

Christopher E. Jeffers, Esq.
Connolly Bove Lodge & Hutz LLP
1990 M. Street, NW
Washington, DC 20036-3425
cjeffers@cblh.com

I hereby certify that on May 17, 2007 I have sent by E-mail and Federal Express

the foregoing document to the following non-registered participants:

Bradford J. Badke, Esq.
Gabrielle Ciuffreda, Esq.
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
bradford.badke@ropesgray.com; gabrielle.ciuffreda@ropesgray.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com