# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

| | | |
|---|---|---|
| TALECRIS BIOTHERAPEUTICS, INC., | : | Civil Action |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BAXTER INTERNATIONAL INC. and BAXTER HEALTHCARE CORPORATION, | : | |
| | : | |
| Defendants. | : | No. 05-349-GMS |

- - -

| | |
|---|---|
| BAXTER HEALTHCARE CORPORATION, | : |
| | : |
| Counterclaimant, | : |
| | : |
| v. | : |
| | : |
| TALECRIS BIOTHERAPEUTICS, INC. and BAYER HEALTHCARE LLC, | : |
| | : |
| Counterdefendants. | : |

- - -

Wilmington, Delaware
Thursday, December, 2006
10:00 a.m.

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, U.S.D.C.J.

2

```
 1   APPEARANCES:

 2          JEFFREY B. BOVE, ESQ.,
            MARY W. BOURKE, ESQ.,
 3          MARK E. FREEMAN, ESQ., and
            JACLYN M. MASON, ESQ.
 4          Connolly Bove Lodge & Hutz LLP
                      -and-
 5          BRADFORD J. BADKE, ESQ.
            Ropes & Gray LLP
 6          (New York, N.Y.)

 7                        Counsel for Plaintiff and
                          Counterdefendants
 8
            PHILIP A. ROVNER, ESQ.
 9          Potter Anderson & Corroon LLP
                      -and-
10          SUSAN M. SPAETH, ESQ.,
            JAMES G. GILLILAND, JR., and
11          ANNE M. ROGASKI, ESQ.
            Townsend and Townsend & Crew
12          (Palo Alto, CA)

13                        Counsel for Defendants and
                          Counterclaimant
14

15                        -   -   -

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Please be seated,
 2    counsel.  Let's start off with a round of introductions from
 3    plaintiffs' table.
 4              MR. BOVE:  Good morning, Your Honor.  Jeff Bove
 5    from Connolly Bove representing plaintiffs Talecris and
 6    Bayer.  I have with me my partner, Mary Bourke, who will be
 7    also arguing today.  I have our colleague from Ropes & Gray,
 8    James Badke, counsel for Bayer, and my associate, Jaclyn
 9    Mason.
10              (Counsel say "Good morning.")
11              THE COURT:  Mr. Rovner.
12              MR. ROVNER:  Good morning, Your Honor.  Phil
13    Rovner from Potter Anderson on behalf of the defendants'
14    Baxter International and Baxter Healthcare.  With me, all
15    from the firm of Townsend and Townsend and Crew, are Susan
16    Spaeth, Anne Rogaski, and Jim Gilliland.
17              THE COURT:  I take it counsel got the order that
18    I issued yesterday.
19              MR. BOVE:  Yes, Your Honor.
20              THE COURT:  Any questions or concerns?
21              MR. BOVE:  No, Your Honor.
22              Good morning, Your Honor.  Just by way of
23    introduction in terms of the format for the argument today,
24    what plaintiffs would like to propose is a very brief -- I
25    underscore brief -- technology tutorial to set up the
```

1    context and to aid everyone.   Then we would propose, and we

2    think this is the most efficient way -- we only have

3    essentially one claim -- a limited number of terms, that we

4    would present our arguments, once we have the floor, we

5    would present our arguments, then allow Baxter to present

6    its arguments, and we would propose to reserve just a brief

7    time, if we may.

8           We really feel that, best-made plans, we can

9    accomplish this in about a half-hour with our opening

10   arguments and try to get through it.   I say best-made plans.

11   I think that would be the most efficient way to proceed.

12           THE COURT:   Sounds like it to me.   Opposition?

13           MS. SPAETH:   That sounds fine, Your Honor.

14           MR. BOVE:   Your Honor, by way again of

15   introduction, and just so the record is clear, the claims at

16   issue in this lawsuit presently are Claims 1, Claims 7

17   through 12, and Claims 15 through 20.   However, only Claim

18   1, at least as far as plaintiffs are concerned, is pertinent

19   to today's discussion.

20           With that, Your Honor, we also thought it might

21   be helpful to provide the Court and Your Honor's staff with

22   a copy of the patent that we tried to enlarge as best we

23   can.   These things are hard to read at times.   We did apply

24   the actual Joint Appendix numbers to it so it would conform

25   to what is in the record.

5

1        And also I would like to hand up, with Your

2   Honor's permission, a copy of our PowerPoint presentation.

3        THE COURT:  Great.  Thank you, Mr. Bove.

4        MR. BOVE:  Your Honor, as I also indicated, Ms.

5   Bourke and I are going to split the argument, if that is

6   acceptable to the Court, by dividing some terms.

7        THE COURT:  Perfectly fine.

8        MR. BOVE:  With that, I can simply say briefly

9   that it is plaintiffs' position that Claim 1 should be

10  construed in accordance essentially with its plain and clear

11  meaning.

12       And, Your Honor, what we did, because we thought

13  a picture was worth a thousand words, we wrote Claim 1 to

14  indicate the construction that Baxter would propose through

15  its claim construction arguments.

16       If we could see that.

17       It is not coming out so well.  But it is in the

18  PowerPoint presentation.

19       THE COURT:  Does that consist of two binders or

20  one, gentlemen?

21       MR. BOVE:  Your Honor, I gave multiple copies.

22  Just one.

23       I will let us get right to it and turn the

24  presentation over to Ms. Bourke with respect to the first

25  term.

1          THE COURT:  Great.  Are you going to incorporate

2    the tutorial into your discussion?

3          MS. BOURKE:  Yes.  I will start with the

4    tutorial, Your Honor.  It should only be about five minutes,

5    hopefully.

6          If we could have the first slide.

7          What I would like to do is first start with a

8    brief description of what the invention is.  Although it

9    often looks complex, it is relatively simple technology.

10   The claim language is not complicated.  There are not many

11   technical terms, with the exception of one, perhaps.  And

12   then I would like to just go into some of the terms you will

13   hear throughout the morning and explain them to you so that

14   hopefully we are all on the same page.

15         With that, Claim 1, which is the claim that we

16   will be addressing this morning, is a claim for a method for

17   producing critical life-saving antibody drugs.  It is a

18   multi-step process, which includes -- can we go back to the

19   other slide.  So it's a multi-step process to make these

20   drugs.  But the claim at issue is directed to two steps of

21   the process.  The first is the S/D treatment step, that

22   stands for solvent/detergent treatment step, which is a

23   viral inactivation step, which, according to the claim,

24   leads to an elevation in anticomplement activity, which I

25   will address a little bit later.

1        Then there is a series of additional processing

2    steps, and it ends with a low pH hold incubation step, which

3    then lowers the anticomplement activity.

4        For now, just understand, anticomplement

5    activity is bad.  You don't want it.  You don't want to

6    inject patients with a drug that has elevated anticomplement

7    activity.

8        With that, let's go to some of the terms that

9    you will hear throughout the morning.

10        Immune serum globulin.  Immune serum globulin is

11    a solution of antibodies, derived from blood plasma, given

12    to patients, primarily to supplement defective or

13    insufficient immune systems.  The term you will likely hear

14    this morning is IGIV.  IGIV stands for intravenously

15    injectable immune serum globulin.  What we have here are

16    drugs that are going to be injected into the patient.

17        And what is an antibody?  An antibody is

18    generally a Y-shaped protein, as you can see, that is

19    involved in immune reactions.  It binds to antigens, which

20    are pathogens, or foreign invaders to the system, like

21    bacteria and virus, and generally antibody binding activates

22    the immune system.

23        So basically, what you have here are the

24    solution of antibodies, which are given to people with

25    defective immune systems.  They either don't have enough

1    antibodies or they have antibodies that are damaged or

2    defective in some way, so you need to supplement the immune

3    system.

4                 How are these things made?

5                 You basically start out with collecting blood or

6    plasma.  Plasma is the liquid portion of blood with the

7    cells and the other solid material spun out, from multiple

8    donors.

9                 Then you go through a plasma fractionation step.

10   Why do you do that?  Plasma contains a lot of proteins from

11   which you can make multiple drugs, Factor 8 being one, which

12   is a drug that is used to treat hemophiliacs.  IGIV is

13   another one.  Albumin is another one.  So you fractionate

14   this plasma to get the desired protein that you want.

15                Then you go into your downstream processing

16   steps.  And you have virus inactivation or removal steps,

17   generally, you have at least two.  Then you go into

18   purification of the proteins.  That's generally done with

19   column chromatography.

20                Then you go to formulation, sterilization, you

21   fill it into these vials, then you put it on a low hold

22   incubation, under defined conditions, temperature and time.

23                So all of the steps of this process will impact

24   the final product.

25                But what this patent is all about is a virus

1    inactivation -- if we can go back.  What this patent is all

2    about is a virus inactivation step, the S/D treatment step,

3    and the low pH hold step.

4              So what is anticomplement activity?  What I said

5    before is, it's bad.  It is the ability of an antibody to

6    bind complement.  What is complement?  Complement are immune

7    proteins activated by binding to antibodies which are

8    involved in the inactivation of invading pathogens.

9              There are two ways that you can activate

10   complement.

11             If we can have the next slide, please.

12             There is normal complement activation, where you

13   have antibody binding antigens -- the little green triangle

14   is your antigen -- and complement binding antibody, which

15   leads to a desirable immune response.  Then you have what we

16   characterize as abnormal complement activation, where you

17   have complement binding antibody leading to an undesirable

18   immune response.

19             Historically, these undesirable immune responses

20   have been associated with elevated ACA.  And what

21   physiological symptoms happen within the patient when they

22   have elevated ACA?  You get flu-like symptoms, chills,

23   fever, stuff like that.  The more severe reactions are

24   hypertension or anaphylaxis, which can actually lead to

25   death.

1          So elevated ACA is bad.

2          What is this invention all about?  This

3   invention is about a solution of antibodies which start out

4   to be normal.  Then they are subjected to an S/D treatment

5   step.  That S/D treatment step damages the antibody, which

6   then binds to complement and leads to an elevated

7   anticomplement activity, which then is subjected to a low pH

8   hold step, which returns the antibody to normal.

9          So, in sum, we have Claim 1, Step (a),

10  solvent/detergent treatment, leads to elevated

11  anticomplement activity, further process step Claim 1, Step

12  (b), low pH hold lowers the anticomplement activity.

13         With that, let's just jump right into claim

14  construction, if that is all right with Your Honor.

15         THE COURT:  That is fine.

16         MS. BOURKE:  The first term that has to be

17  construed and that shows up on the proposed claim

18  construction chart is "any virus activity."  It is

19  plaintiffs' position that no construction is necessary.  It

20  should be given its ordinary meaning.  Its defendants'

21  position that any means all.  And plaintiffs say the

22  intrinsic evidence establishes that any cannot equal all.

23         Let's go back to Claim 1 and look at what Claim

24  1 says.  Claim 1 says, A method of treating a solution of

25  antibodies that may have virus activity, the method

1    comprising, (a), contacting the solution with a

2    trialkylphosphate -- that is the solvent, Your Honor -- and

3    a detergent under conditions sufficient to substantially

4    reduce any virus activity.

5            So what are those conditions that are sufficient

6    to substantially reduce any virus activity?  Those are the

7    solvent/detergent treatment conditions.

8            If you go to the patent, at Column 1, Lines 49

9    to 53, it describes that solvent/detergent treatment.  This

10   is a prior art method.  It was acknowledged in prosecution

11   that this was a method that was in the prior art.  It's

12   described in the patent to Neurath, U.S. Patent 4,540,573.

13   And if you look at Column 1 -- I actually start at 45 and go

14   to about 53.  It says U.S. Patent No. 4,540,573, to Neurath,

15   et al., which is incorporated herein by reference, describes

16   a viral inactivation process using a trialkylphosphate and

17   detergent process, hereinafter the solvent/detergent process

18   or S/D process.

19           That solvent/detergent method has gained

20   acceptance as being efficacious in the inactivation of

21   lipid-enveloped viruses with limited adverse effects on

22   biological activity or blood profile.

23           So it was well-known in the art that what the

24   S/D treatment was inactivating was lipid-enveloped viruses.

25   Just to put that in context, there are also non-lipid-

1    enveloped viruses that typically are not inactivated by that

2    S/D treatment process.

3              If you go further into the summary of the

4    invention, which actually describes the invention, it

5    says -- and this is at Column 2, Lines 25 through 30 -- The

6    invention is a method for producing an intravenously

7    injectable immune serum globulin (IGIV) preparation with low

8    anticomplement activity which has been chemically treated to

9    render it substantially free of lipid-enveloped viruses.

10    Substantially free, not all.

11              THE COURT:  Enveloped, envelope, is there a

12    difference?  When I read the word, I think of the term

13    enveloped meaning involved.  Is there a difference?  You

14    pronounce it "envelope."  Is that a term of art?

15              MS. BOURKE:  There is a lipid layer that

16    surrounds the virus.  What the solvent/detergent treatment

17    does is it inactivates the virus by breaking into that

18    lipid-enveloped outer surface.

19              THE COURT:  Okay.  I think we are on the same

20    page.

21              MS. BOURKE:  Further, on the summary of the

22    invention, at Lines 43 to 45, it says, ...the viral

23    inactivation step in a model system results in a substantial

24    reduction, at least four logs, in the titer of the

25    lipid-enveloped viruses.

1          Again, it is not saying all.  It is saying
2     substantial reduction.
3          Quite frankly, all of this intrinsic evidence
4     was cited by the defendants in their opening brief at Page
5     6.  The defendants well know that the solvent/detergent
6     treatment does not and cannot, is not likely to reduce all
7     viruses.  In fact, if you look at defendants' brief, at Page
8     6, they state, quote, "To maximize the viral safety of
9     purified antibodies, multiple steps can be utilized to
10    remove or inactivate viruses."
11         Again at Page 8, "In addition to the steps set
12    forth above, manufacturers often employ other downstream
13    processing steps that further purify particular types of
14    antibodies or further inactivate or remove viruses, to the
15    extent they remain after other processing steps."
16         So any does not equal all, as set forth in the
17    intrinsic evidence, the specification.  And defendants
18    well-know that one skilled in the art would not understand
19    the S/D treatment process to inactivate all viruses.
20         Let me just finish with saying that our proposed
21    construction of that term is any virus activity that is
22    substantially reduced by the conditions of Step (a), that
23    being the solvent/detergent treatment conditions.
24         With that, I will turn the floor over to my
25    colleague, Mr. Bove.

1          THE COURT:  All right.  Thank you.

2          MR. BOVE:  Your Honor, I am going to now address

3     what are claim terms, and I am referring to the claim chart

4     for ease of reference, Terms Nos. 2, 3 and 4.  The parties

5     are debating -- and I am not going to repeat the briefs --

6     what is the appropriate term to construe.  I am going to

7     address all of them at one time and just wanted to make that

8     clear.

9          The term I am going to address is "under

10    conditions sufficient to substantially reduce any virus

11    activity and resulting in an increased level of ACA."

12          As Ms. Bourke explained, Claim 1 as a whole is

13    directed to the use of a solvent, trialkylphosphate, and a

14    detergent.  Baxter's position is that the claim must be

15    limited to a single detergent, cholate, and to be performed

16    under a condition which is a pH at 7.0.

17          Talecris' position is that the words should be

18    construed according to their plain meaning.  Indeed, if we

19    can flip to the next slide, with respect to the conditions,

20    which is the predicate for this term, Ms. Bourke just

21    explained those conditions, the solvent/detergent

22    conditions.  With respect to the rest of this phrase, it is

23    our position that the word resulting, the word increased,

24    and the word level mean exactly what they say.  There is no

25    need to go beyond the plain meaning of these words, Your

1    Honor.

2              It is not a complicated claim term.  And we

3    believe that the presumption of ordinary meaning here

4    governs.

5              Your Honor, to further exemplify our position,

6    if we look at Dependent Claims 19 and 20, you can see in

7    Claim 19 that the detergents that are listed in this

8    dependent claim are polysorbate 80, which is called tween,

9    and sodium cholate.  So we know right away that we have a

10   dependent claim which includes polysorbate 80, tween, and

11   cholate.  Therefore, under Section 112, the dependent claims

12   are presumed to be narrower in scope than independent Claim

13   1.  It would not be proper to therefore limit Claim 1 to

14   only cholate, because then Claim 1 would be narrower than

15   dependent Claim 19.  Again, I am following the order of

16   Phillips, the canons of construction.

17              Looking next to the dependent claims.

18              The same thing with respect to the pH, Your

19   Honor.  Claim 20 expresses a pH range in Step (a).  Step

20   (a), again, is the solvent/detergent step.  The range is a

21   pH of between 3.5 and 6.  Claim 1 cannot properly be limited

22   to a pH of 7, consistent with the principles of claim

23   construction, or it would be narrower than dependent Claim

24   20.

25              That's the intrinsic evidence.

1          The intrinsic evidence fully exemplifies a range

2     of detergents, Your Honor, cholate, tween, and others.  And

3     just for the record, I don't mean to reprint these, Your

4     Honor has these, these are the intrinsic evidence examples,

5     no need to repeat it at this point.

6          Your Honor, our next point of argument is that

7     Baxter's construction actually reads a preferred embodiment

8     out of the claim.  And we know under the Pfizer v. Teva case

9     cited in our briefs that a claim construction that excludes

10    a preferred embodiment is rarely correct.

11         Your Honor, I am just going to zip right to the

12    intrinsic evidence, at JA-146.  This is at Line 4 through

13    31.  There, the specification talks about a pH in the S/D

14    step of preferably less than pH 5.8.  Baxter's construction

15    of 7.0 would exclude a preference.  It therefore should not

16    be adopted.

17         Very quickly, Baxter seeks to vary the plain

18    meaning.  To do so, it must show a clear and unequivocal

19    expression of disavowal, an expression of manifest exclusion

20    of a restriction in the intrinsic evidence.

21         What Baxter does, Your Honor, is it attempts to

22    read a word into the claim in order to characterize the

23    increase in ACA.  It attempts to read the word unacceptable

24    into Claim 1, and argues that the increase in ACA must be to

25    an unacceptable level.

1    Reading a word into a claim is a tall order.

2    Phillips so indicates, and the Federal Circuit has so

3    indicated, and the Supreme Court has indicated in the

4    McCarty case at 160 U.S., at Page 116, an eloquent quote,

5    "If we once begin to include elements not mentioned in the

6    claim, we should never know where to stop."

7    That is the Supreme Court.  That is an old case,

8    1895.

9    That is basically what Baxter is urging the

10   Court to do, to read a term in.  There is no predicate in

11   the intrinsic evidence to do so.

12   Your Honor, what they do is, Baxter argues that

13   first we should read in unacceptable, and then we should

14   look at the examples and preferences in Column 5 for what is

15   characterized an injust exemplification as to what would be

16   acceptable, and then they say from that, you then know what

17   is unacceptable, and then that should be read into the

18   claim.  Of course, the intrinsic evidence refutes this

19   completely.  And we have cited this in our brief.  We have

20   cited the data in Table 7.  We have cited the data in Table

21   1.  You simply cannot read the word acceptable in,

22   consistent with the intrinsic evidence.

23   In summary, on this term, the claim itself, the

24   dependent claim, the intrinsic evidence, and the canons of

25   construction, confirm that plain meaning is the correct

1    construction and that Baxter's construction should be

2    rejected.

3                THE COURT:  Thank you, Mr. Bove.

4                MR. BOVE:  I still have more.  We will keep

5    going here.

6                I will now go to Claim Term No. 6, which is the

7    term -- and I am taking it slightly out of order.  I am

8    going to do 5 after 6, and I think it will become apparent

9    why, to keep this thing moving.

10               The term is "then incubating the solution of

11   Step (a)."

12               Your Honor, Baxter says that there can be no

13   intervening process steps between Step (a) and Step (b).

14   This is wrong.  It's wrong for three reasons, at least.

15   Number one, this is a comprising claim.  Claim 1 begins with

16   the word comprising.  Comprising is an open-ended term.  The

17   MPEP, for example, and even the plain meaning of the word,

18   it means including, containing.  It is not a term of

19   exclusion.

20               Step (a) and Step (b) are not the exclusive

21   steps.  What Baxter tries to do is to make them such and

22   says that you cannot allow any additional processing steps

23   to occur between Step (a) and Step (b).  The word comprising

24   totally defeats that argument.

25               But there is more, the intrinsic evidence.  The

1    intrinsic evidence at JA-146 and 147, and this is from

2    Column 4, Line 66 to Column 5, Line 44, describes processing

3    steps between (a) and (b).

4           Finally, Your Honor, if there were any doubt,

5    Ms. Bourke's slide was very instructive, processing steps

6    are how these products are made.  They occur between (a) and

7    (b) for a variety of reasons set forth in that slide.

8    Baxter in its brief, at Page 8, acknowledges this.  They set

9    it out as well.

10          In short, then, incubating the solution of Step

11   (a) does not exclude intervening processing steps between

12   Step (a) and Step (b).

13          Your Honor, I am next going to go to related

14   claim Term No. 5.  This is in Step (b).  This is the term

15   the "increased anticomplement activity of the solution."

16          And I can simply say, first, they argue the same

17   arguments that I have just addressed with respect to Claim

18   Term No. 6.  I am not going to repeat them.  But what is

19   different is one point, the word "the solution," the term

20   "the solution."  What is the solution within that term in

21   Step (b)?

22          If Your Honor follows the argument about

23   comprising and follows the argument that indeed the claim

24   presupposes there will be intervening steps between Step (a)

25   and Step (b) in order to make this medicine, then

1    necessarily the solution in Step (b) has to be the solution
2    that is incubated.  It can't be anything else.  It doesn't
3    mean, as Baxter argues, the solution from Step (a), period,
4    without any intervening processing steps.
5            Your Honor, that is all I have to say on those
6    three claim terms.
7            I am going to invite Ms. Bourke back up to the
8    podium.
9            THE COURT:  Okay.  Thank you, Mr. Bove.
10           Ms. Bourke.
11           MS. BOURKE:  Two terms left and we are done.
12           Anticomplement activity.  That is the technical
13   term to which I referred before.  That terms is defined
14   expressly in the patent at Column 1, Lines 19 through 22.
15   What does anticomplement activity mean?  The ability of
16   antibodies to combine, complement.  It's that simple.
17           In fact, Baxter, in their opening brief, when
18   they were describing the technology, described it the same
19   way:  "Very generally, the anticomplement activity of the
20   solution is a measure by a particular ACA assay of the
21   ability of the solution to bind complement proteins and
22   thereby initiate these enzymatic cascades in the absence of
23   antigen."
24           Anticomplement activity means the ability of
25   antibodies to bind and complement.  It is a scientific term.

1    There are many, many ways to measure anticomplement

2    activity.  There are hemolytic assays, there are complement

3    binding assays, there are complement activation assays.

4    These are all well-known to those skilled in the art at the

5    time the application was filed.

6              In fact, the prior art that is asserted by

7    Baxter actually describes some of these additional assays.

8    The assay reference is at Rogaski declaration Exhibit 4, and

9    the prior art reference is at Rogaski Declaration Exhibit

10    14.  Both those prior art references describe C4A generating

11    activity assays.  Those are the complement activation

12    assays.  They are not a hemolytic assay.

13              So there are many ways to measure anticomplement

14    activity.

15              Baxter attempts to import three limitations into

16    the claim for this term.  First, they import the particular

17    unit of measure, the CH-50.  They import a specific type of

18    assay, a hemolytic assay.  And they import a specific type

19    of hemolytic assay, that used to generate data in the '191

20    patent.

21              As Mr. Bove pointed out in his argument, once

22    you begin to read limitations into a claim, you never know

23    when to stop.  It is improper to import limitations into a

24    claim for a general descriptive term.

25              Claim 1 specifies neither units nor measurement

1    techniques.  It just describes an elevation of

2    anticomplement activity and a lowering of anticomplement

3    activity.  One skilled in the art would know what kind of

4    assays could be used to measure that.

5                THE COURT:  I am curious as to plaintiffs' view,

6    ACA is really a measure as opposed to, let's say, the

7    quality, ability of antibodies to complement.  Right?

8                MS. BOURKE:  I am not so certain I understand

9    Your Honor's question.

10               THE COURT:  It is a way to measure?  ACA, in

11   fact, is a measure?

12               MS. BOURKE:  I am not so sure I agree with that.

13   I think it's the ability of antibodies to bind complement.

14   It is a scientific event.  And what we have in Claim 1 is a

15   qualitative assessment of anticomplement activity going up

16   and anticomplement activity going down.

17               THE COURT:  A qualitative assessment.  So we are

18   measuring.

19               MS. BOURKE:  You are measuring by different

20   techniques.  But there is no specific measuring technique --

21               THE COURT:  I am not suggesting there is or that

22   the defendant is correct or not.  I am just wondering what

23   plaintiffs' view would be of adding the following words to

24   what you propose, and that is, the measure of the ability of

25   antibodies to bind anticomplement?

1          MS. BOURKE:  I am not quite following Your

2  Honor.

3          THE COURT:  It's plain enough to me as a

4  layperson.

5          MS. BOURKE:  I think it would be okay if you are

6  saying, in front of the ability to bind, antibodies to bind

7  complement.

8          THE COURT:  Yes, because, after all, what we are

9  trying to do is instruct a jury as to the meaning of the

10  terms.  That is my focus, in addition to or not worrying

11  about what the Federal Circuit is going to do with my claim

12  construction.  I am worried about the jury.  That is why I

13  ask the question I ask.

14          MS. BOURKE:  I don't think it would be entirely

15  wrong to put the term measured in front of it.

16          THE COURT:  I don't want to just not be entirely

17  right.  I want to know if it is helpful, quite frankly, your

18  view as to its impact.

19          MS. BOURKE:  So long as you don't import a

20  particular unit of measure or a particular measurement --

21          THE COURT:  I understand that.

22          MS. BOURKE:  -- technique.  That is my only

23  concern.

24          THE COURT:  Okay.

25          MS. BOURKE:  Let me just make certain Your Honor

1    understands.  Anticomplement activity is a biological

2    phenomenon which you can measure multiple different ways.

3            THE COURT:  Let me see if you disagree with this

4    statement.  It appears, allaying concerns or not that you

5    might have, this is in defendants' opening claim

6    construction brief at Page 9.  It is in the middle

7    paragraph.  The defendant writes:

8            "Very generally, the ACA of the solution is a

9    measure (by a particular ACA assay)" -- I note you disagree

10   with their proposal as to the importation of these

11   limitations.  They go on to say -- "of the ability of a

12   solution to bind complement proteins" -- and I will skip the

13   parenthetic -- "in the absence of an antigen.

14           MS. BOURKE:  I don't have a problem with that.

15   But just so we are on the same page, it is a biological

16   phenomenon.  It is just like from here to there, I can

17   measure that length in a lot of different ways.  I can use

18   meters, I can use feet.  But it's a length.

19           THE COURT:  Okay.

20           MS. BOURKE:  All right.

21           Last claim term, "acceptable level suitable for

22   intravenous administration."  It is our position that that

23   term needs no construction.  What does it mean?  What is an

24   acceptable level?  An acceptable level is that which is

25   suitable for intravenous administration.  That kind of

1    language is not uncommon in claim terms.  In fact, recently

2    in this district there was a decision construing

3    physiologically acceptable for, in the context of

4    intravenously administrable drugs.  That is Pharmacia v.

5    Sicor, if you want the cite it is 447 F.Supp. 2d 363.  That

6    was this year.

7           The intrinsic evidence supports that.  The

8    intrinsic evidence at Column 5, Lines 51 to 54 states, quite

9    clearly, why there is no strict rule for determining when

10   the ACA level is low enough to be an acceptable level

11   suitable for IV administration.  IGIV preparation should

12   have ACA levels as low as possible.  ACA levels are tied to

13   adverse reactions.  Any clinician will know what is

14   acceptable for IV administration.  There are no numerical

15   limits in the FDA regulations, because it is all determined

16   on a product-by-product basis.  We will have evidence at

17   trial from clinicians talking exactly about this term.

18          And with that, unless Your Honor has any further

19   questions, I will turn it over to --

20          THE COURT:  No, I don't.

21          MS. BOURKE:  -- the defendants to my left.

22          THE COURT:  Ms. Spaeth.

23          MS. SPAETH:  Good morning, Your Honor.

24          Your Honor, if I may take a minute to switch the

25   electronics.

1              THE COURT:  No problem.

2              MS. SPAETH:  We also have a presentation.  May

3    we please hand Your Honor up some material?

4              THE COURT:  Please do.  Pass it up to Ms. Walker

5    there.

6              You have the floor.

7              MS. SPAETH:  Thank you, Your Honor.

8              While plaintiffs refer to Phillips, they

9    actually do not follow the teachings of Phillips.  I don't

10   think we heard plaintiffs mention the prosecution history

11   once.  The claims have to be construed in light of the claim

12   language, the specification, the prosecution history, and in

13   fact they have to be construed in terms of how a person of

14   ordinary skill in the art would understand the claims at the

15   time of the invention.

16             Here, we believe that a proper Phillips

17   construction gives you Baxter's construction.

18             Plaintiffs' analysis is improper for several

19   reasons.  First, they improperly pick and choose among the

20   intrinsic evidence.  We heard them talk about ACA being low

21   enough, but they haven't put any context with that.  They

22   certainly haven't put the context with that, that is,

23   throughout the specification and the prosecution history.

24             They also purport to say, to talk about an

25   ordinary meaning.  But what they have really done is they

1    have used a dictionary definition, because they haven't put

2    the ordinary meaning in terms of how one of ordinary skill

3    in the art at the time the invention was made, they haven't

4    said it in that context.  They haven't even told us what

5    they propose the person of ordinary skill in the art to be.

6    Instead, they have converted it to a dictionary definition.

7    But they are quite right, of course, they don't use the word

8    dictionary definition, because that has been clearly

9    disavowed by Phillips.

10           What we would like to do is spend a few minutes

11   on Claim 1 and the basis of the claim, just touch on a few

12   points in the specification and file history, and then go to

13   a few particular claim terms.

14           THE COURT:  That is fine.

15           MS. SPAETH:  Claim 1 is the only independent

16   claim.  It is on the slide.  But in order for me to keep

17   going, I thought at the same time we had it on the slide I

18   could put it on a blowup so I could keep the slide together.

19           THE COURT:  I have it right in front of me.

20           MS. SPAETH:  Your Honor, may I approach the

21   board?

22           THE COURT:  You may.

23           MS. SPAETH:  As plaintiff said, the claim is

24   directed to a method of treating a solution of antibodies

25   and includes a solvent/detergent step and a low pH

1  incubation step.  The solvent/detergent step, you will see,

2  requires that the solvent/detergent results in an increased

3  level of ACA but that increased level must be to an

4  unacceptable level.

5          Now, as Ms. Bourke spoke, the solvent/detergent

6  step was well-known.  She cited this section of the file

7  wrapper, she cited Neurath.  If you look at this section

8  right here, you see that Neurath talks about, described a

9  viral inactivation process using trialkylphosphate and

10  detergents and that that method, the solvent/detergent

11  method, has gained acceptance as being efficacious in the

12  application of lipid-enveloped viruses.

13          Now let's look at this claim, their claim,

14  contacting the solution with a trialkylphosphate and a

15  detergent under conditions sufficient to substantially

16  reduce antivirus activity.  This phrase right here, at least

17  in this claim to here (indicating), looks very much like the

18  prior art.

19          They have also admitted that the Talecris

20  process is prior art.

21          They talk about the Tenold patent here also in

22  Column 1.  They say, Tenold reported a method of preparing

23  an immune serum globulin with low ACA.  Which could be

24  administered by intravenous injection.  Going to their claim

25  now, we see Step (b) talks about an incubation step under

1    conditions such that the increased ACA of the solution is

2    reduced to an acceptable level suitable for IV

3    administration.

4              Very similar language to that which they admit

5    is prior art by Tenold.

6              So given that, the scope of the invention here

7    is actually quite narrow.  The alleged invention demands

8    that both the solvent/detergent step increase ACA to

9    unacceptable levels followed immediately by a pH step that

10   decreases ACA to acceptable levels.  Plaintiffs now dispute

11   this interpretation, that the increase has to be

12   unacceptable.  But a logical reading of Claim 1, which we

13   will go through, gives that interpretation.  That is what

14   Bayer set forth in their specification, as we will see in a

15   minute, and that is what Bayer argued to get this patent

16   allowed to the examiner.

17             They talk about low and they say, it just has to

18   be low enough for IV administration.  But actually, in their

19   specification, they go beyond that.  You would see here, in

20   Column 2 now, here is where they talk about what they found:

21   We have found that using the S/D process -- it begins at

22   Line of 6 -- using the S/D process to treat ISG

23   preparations, especially those formulated according to the

24   Tenold '608 patent, results in a product with an acceptable

25   viral inactivation but unacceptably high levels of ACA.

1            This is not high or low.  It is unacceptably

2   high ACA.  They have said, this is what they have found from

3   the solvent/detergent step.  That is the only thing new that

4   they claim to have discovered by a solvent/detergent step.

5            Similar language is in Column 9.  Column 9 of

6   the patent, beginning, at Line 38, says, it's right under

7   Table 7, Taken together, the above result suggests that ISG

8   products which have been subjected to a solvent/detergent

9   viral inactivation process resulting in an undesirable ACA

10  increase can be made suitable for IV administration by

11  incorporating an additional incubation step under the

12  conditions described here to reduce ACA to an acceptable

13  level.

14           So this provides some of the context from the

15  specification.  They completely ignore the prosecution

16  history.  However, during the prosecution of this patent,

17  they had to make arguments that involve the term acceptable

18  level as well as the term increased level of anticomplement

19  activity in order for the claim term to be allowed.  They

20  completely ignore those here.

21           Your Honor, I would like now to talk about three

22  claim terms in particular, if I might, and to walk through

23  the evidence.

24           THE COURT:  Yes.

25           MS. SPAETH:  We believe there are three claim

1    terms critical and potentially case-determinative in here.

2    Just so we keep track of them, the first claim I am going to

3    talk about is increased level of anticomplement activity.

4    That is right here at the end of Step (a).  Then we are

5    going to talk about acceptable levels suitable for IV

6    administration, and that is here at the end of Step (b).

7    Then I would like to also address the then incubating the

8    solution of Step (a).  We don't mean to give up our other

9    constructions at all.  We just mean to try to focus today's

10   construction.

11          I am prepared to answer questions, I hope I am

12   prepared to answer any questions the Court may have by any

13   of the other claim terms.

14          Increased level of anticomplement activity here

15   is the last phrase of Step (a).  And in light of the

16   argument, and the claim language, we propose that the

17   construction means that this solvent/detergent step results

18   in that gets increased, the anticomplement activity, from a

19   level acceptable for administration to unacceptable.  That

20   is that this solvent/detergent step ends up with an

21   unacceptable level of ACA, not just any level, not just any

22   increased level, but somehow, it has to be an unacceptable

23   level, as the plaintiffs have defined it.

24          This construction is compelled by the language

25   of the claim.  We see the claim term here, but of course,

32

1  remember, with the art that this step is generally known and

2  an incubation step is generally known, we will see in the

3  specification and in the prosecution history that the

4  purpose of Step (b), this incubation step, was to incubate

5  the solution such that the increased anticomplement activity

6  of the solution is reduced to an acceptable level suitable

7  for IV administration.

8      For Step (b) to have meaning, the increased

9  level in Step (a) must be to an unacceptable level so that

10  Step (b) has the opportunity to decrease it to an acceptable

11  level.  Step (b) would have no purpose if it was going from

12  acceptable to acceptable.  In order for Step (b) to have

13  meaning, it has to go from unacceptable to acceptable.

14      Thus, the increased level here in Step (a) must

15  be to an unacceptable level.

16      Now, this is supported by the specification as

17  well.  We saw here at Claim 2 that they found that when they

18  used the S/D treatment, it resulted in a product with an

19  acceptable level of viral inactivation but unacceptably high

20  ACA.  I just also read a portion of Column 9, which I am not

21  going to re-read.  At Column 9, that is where you saw that

22  the solvent/detergent step resulted in an undesirable ACA.

23  And now if you look at Column 10, they speak at Line 24, It

24  would be desirable to produce substantially virus-free IGIV.

25  That means, we like to use the S/D step, but following prior

1    art, it results in a product with an unacceptable level of

2    ACA.

3              So not just any increase.  How are we going to

4    measure an increase?  It has to be an increase to an

5    unacceptable measure of ACA.  Plaintiffs would like us to

6    believe that it could be any increase.  Low, low is better.

7    The lower, the better.  But what's low compared to?

8              Well, continuing here in Column 2 -- sorry to

9    jump around -- they first talk about how the prior art

10   results in unacceptably high levels of ACA.  They go on and

11   they say elevated levels were always detected at the sterile

12   bulk stage, always detected.

13             They also had elevated levels.

14             What did they mean by that?  Did they mean it

15   went from 25 to 26?  No, that's not what they meant.

16             They were talking about, this is in the context

17   of unacceptably high ACA, a few lines down, beginning at

18   Line, I am not sure if it's 14 or 15, Preparations of ISG

19   with high ACA levels are not suitable for IV injection but

20   instead you have to inject it intramuscularly.

21             So this is not low compared to I want it to be

22   as low as possible.  This is low as compared to high.  And

23   high is unacceptable and undesirable, as they stated over

24   and over in their specification.

25             The prosecution history now also demands

1    Baxter's construction.  All of the claims were initially

2    rejected in the first office action.  There is not too much

3    special with that.  But faced with those objections, Bayer

4    made certain arguments to overcome the objections.  One of

5    the arguments Bayer made was it added the word increased.

6    This word increased wasn't original.  It was not in the

7    first claim.  It added the word increased in order to get

8    the claim allowed.

9            Now, on Slide 18, we see Bayer's response as it

10   was adding this word increase.  It argued the origin of the

11   invention is the discovery by applicant that using the

12   trialkylphosphate detergent viral inactivation method of

13   Neurath for immunoglobulin preparation resulted in a

14   surprising -- that is the hook of their whole invention -- a

15   surprising but undesirable increase in ACA.

16           What is undesirable?  Undesirable means it is

17   not suitable for IV administration.  This increase is now a

18   requirement in Step (a) of the claimed methods.  It is a

19   requirement that it increase, and the increase here is

20   described as an undesirable increase, not just a few points

21   here and there.

22           They go on in their argument, in Step (b), The

23   invention requires that the product of Step (a) be incubated

24   under conditions sufficient to bring about a decrease in ACA

25   to an acceptable level.

1    That is where I started with this term, you see,

2    that the purpose of Step (b) requires that the increased ACA

3    be decreased to an acceptable level.  For the entire claim

4    to have meaning, the increased ACA in Step (a) must be to an

5    unacceptable level.

6    The examiner actually didn't buy that argument,

7    yet.  The examiner kept rejecting the claims, so much so

8    that they had to appeal to the Board of Patent Appeals at

9    the Patent Office.

10    In their appeal brief, they further say, If

11    there is no such increase, that is, the increase in ACA due

12    to the solvent/detergent step, If there is no such increase,

13    then Step (b) of the invention, and the invention itself, is

14    not even needed.

15    They are clearly defining the invention as

16    seeing this solvent/detergent problem that has raised, they

17    say, to unacceptable levels, such that they have to have an

18    incubation step to lower the ACA to an acceptable level.

19    It is those arguments that they made to the

20    Patent Office, and that is how they got this claim issued.

21    Now, they don't talk specifically today, but

22    they referred to it generally, that their data just shows

23    raised.  Not all the data, not all the data shows that it's

24    raised to an unacceptable level.

25    Now let's look at the figure.  Originally, the

1    figure is the second page of the patent, and in your copy

2    that they gave you or you already had from the file, you

3    will note that your figure looks like this.  It has three

4    bars.  But the figure as originally filed didn't have this

5    bar.  It only had these two bars.

6            THE COURT:  For your record, you mean the middle

7    and the bar to the far right.

8            MS. SPAETH:  Thank you, yes.  For the record.

9            It had the incubation bar, the middle bar, where

10   the anticomplement activity level is at 60.  And it had the

11   width incubation bar, the bar to the far right, with an

12   anticomplement level that looks about 23, give or take.

13           Now, if we look to the patent, the patent

14   describes Figure 1.  In this brief description of the

15   figure, in Column 2, after the background and summary of the

16   invention, they briefly describe the figure.  They show,

17   they say, Fig. 1, which is the only figure, Fig.  1 shows a

18   comparison of the typical average observed ACA levels of

19   five percent IGIV solutions treated according to the S/D

20   process and with or without followup incubation of the

21   present invention.

22           So they say that this is the average data, and

23   this is after the solvent/detergent with incubation, after

24   the solvent/detergent without incubation.

25           Now, they actually don't point to any particular

1    average data, like you can't find the number 60 anywhere in

2    the patent.  But if you average the numbers, if you go to

3    Table 7, which I don't think we need to do for this

4    discussion, but if you go to Table 7, you can see that the

5    average ofA1, A2, A3 and A4 at the zero numbers is 60.  You

6    can find the average if you do a little math.  But they

7    don't actually tell you an average.  They just say, this is

8    an average.  But they have told the examiner what an

9    acceptable level of ACA is regarding five percent.  You will

10   see in a minute that that acceptable level at five percent

11   is 45.

12             During the prosecution, they had to argue hard

13   to get this claim allowed.  And as part of their argument,

14   they revised the figure to now add a new bar, the leftmost

15   bar, that they labeled Control Tenold.  And it has a bar

16   with an AC activity of 25.  They talk about the control

17   being the standard, the so-called standard, from which to

18   measure any increase in ACA.  That is how they talk about it

19   in the file history.

20             Now, when you look at the claims, they make

21   sense against this figure, now that we have seen from

22   putting together the file history.

23             The control bar provides this so-called standard

24   that this is -- this did not have an S/D step.  No S/D.  So

25   without S/D, they did their processing, and they measured

1    the ACA and they got 25.  Then they rely on this figure

2    throughout the prosecution history, saying, then they added

3    S/D, and when they added S/D they got these high ACA

4    numbers, and the average of a certain set of those ACA

5    numbers was above that acceptable for administration.  So

6    this is with S/D, but before incubation.

7              So you see, it shows an increase of above that

8    which is acceptable.

9              Then, they say, but, then they added the

10   incubation step and the ACA went down and now it was

11   acceptable again.

12             Plaintiffs can now not be held to the arguments

13   that they made during the prosecution history.

14             THE COURT:  Did you misspeak?  You meant

15   plaintiff should be held?

16             MS. SPAETH:  Yes.  Thank you, sorry, Your Honor.

17   I appreciate that.

18             Plaintiffs cannot ignore the prosecution

19   history, that they must be held to it.  Thank you.

20             And actually, if you look at sections of their

21   brief, they agree with us.  We have three quotes here on the

22   board.  They admit that Dr. Alonso surprisingly discovered

23   that S/D-treated IGIV failed to meet release specifications

24   because the ACA had elevated and was too high.

25             Guess what the release specification is?  45

1    (indicating).

2             The S/D process results in ISG preparations with

3    acceptable viral inactivation but with unacceptably high

4    levels of ACA.  That's from their brief.  And then, using a

5    final incubation step would surprisingly lower ACA to an

6    acceptable level suitable for IV administration.

7             We believe that the claims, the specification,

8    the file wrapper, as well as their own statements, make it

9    clear that Baxter's claim construction should be adopted by

10   the Court because it is proper.

11            The second term I would like to talk about is

12   acceptable level suitable for IV administration.

13            Acceptable doesn't sound like a very complicated

14   word.  But when you are talking about ACA, everything is

15   complicated, unfortunately.  It is very complex, because it

16   is not simply measuring the -- ACA is not like measuring the

17   length from the podium to the jury box.  Everything we think

18   about ACA is more complicated.  We understand from Your

19   Honor's order that you don't wish us to talk about our

20   general position on indefiniteness, so we will skip that.

21            THE COURT:  Not at this time.

22            MS. SPAETH:  We will go to our alternate

23   construction that we provided to the Court.

24            We believe that for acceptable levels suitable

25   for IV administration to be understood by a person of

1   ordinary skill in the art at the time the invention was

2   made, 1995, that a defined numeric level is necessary.  But

3   the defined numeric level doesn't tell the whole story.  You

4   have to have the numeric level as well as an identification

5   of the assay used.

6           Without reference to both the numerical level

7   and the identification of the assay, acceptable level

8   suitable for IV administration lacks meaning to a person of

9   ordinary skill in the art.

10          They might not -- they certainly know they don't

11  want to kill anybody.  But the claim is not discussing let's

12  have an ACA level just low enough not to kill anybody.

13          So we are now back to Claim 1 and we are talking

14  about the last phrase of the claim in Step (b), intrinsic

15  evidence is required to look at what acceptable level means.

16  And it's pretty clear from that, the numerical limitation,

17  that is.  In the specification, at Column 5, Your Honor,

18  Column 5, the paragraph that starts at Line 56, first you

19  see the sentence that says, The figure depicts the typical

20  average reduction of ACA observed in five percent solutions

21  following S/D treatment.

22          So remember that figure that I said.  That's the

23  only figure.  And we are again talking about acceptable, or

24  the reduction.  And here is where we see the acceptable

25  level 45 that I drew on that figure.

1    For a five percent ISG formulation, the

2    acceptable level suitable for intravenous administration,

3    preferably, would be less than about 45 CH-50 units per

4    milliliter and more preferably less than about 30 CH-50

5    units per milliliter.  For a ten percent ISG formulation,

6    the acceptable level suitable for intravenous administration

7    preferably would be less than about 60 CH-50 units per

8    milliliter, and more preferably less than about 45 CH-50

9    units per milliliter.

10    That 45 line comes straight here from the

11    specification itself.

12    Now, keeping with the numeric portion that's

13    necessary for the claim, we can look at the file history.

14    Not only did the examiner initially reject the

15    increased level as indefinite, she also rejected the claim

16    acceptable level as indefinite.  And, in fact, in the

17    prosecution history, she said, The metes and bounds of what

18    is defined by an acceptable level cannot be determined.

19    That was her first office action after the case

20    was filed.

21    Now, Bayer's response, that same May 1996

22    response, they also argued what an acceptable level should

23    be.  Bayer argued the acceptable level of ACA generally

24    depends on IGIV concentration.  And examples for five and

25    ten percent solutions are described in the second full

1    paragraph of Page 9. That's Page 9 as filed.

2          I am not going to re-read the second paragraph

3    of Page 9, which, Your Honor, what I just read from Column

4    5, beginning at Line 56, this is the second paragraph of

5    Page 9.

6          Now, in their brief, they cite the prior

7    paragraph and say, oh, they were only concerned about

8    lowering ACA. And they cite to this, the preparation should

9    have ACA levels as low as possible. That is not what they

10    argued to the Patent Office to get this claim allowed.

11          The Patent Office said, acceptable level is

12    indefinite. It is ambiguous. And in order to get over that

13    hurdle, they did not say look. They said five percent means

14    45. Ten percent means 60. This is the section of the

15    patent that they relied on to get this claim issued.

16          And the examiner withdrew her objection based on

17    that argument. The very next office action, she withdraws

18    her objection to indefiniteness regarding acceptable level.

19    She says, Further, it was argued that an acceptable level is

20    not vague because it depends on the concentration of IGIV.

21    The latter argument is found to be persuasive, and the

22    rejection based on an acceptable level suitable for

23    intravenous administration is withdrawn based on the

24    definition of an acceptable level found in the specification

25    at Page 9.

1    For the claim to be allowed, the numerical

2    definition was a must to the examiner. Bayer set forth what

3    was an acceptable level for five and ten percent solutions

4    in the specification at Column 5. It argued that section of

5    the specification at Column 5. It gave the numeric input to

6    the examiner. It made that argument for the patentability

7    of the claims. And their argument was accepted by the

8    examiner in 1996.

9    They cannot now run from their earlier

10   statements and positions. This numeric information must

11   inform the meaning of acceptable level in this case.

12   Indeed, a person of ordinary skill in the art

13   reading the patent would look there and they would look at

14   that section of Column 5 and see the language, an acceptable

15   level means 45, not a five percent solution. Somebody of

16   ordinary skill in the art would plainly know how to read

17   that, except they are still missing the identification of

18   the assay.

19   Now, I think it was Ms. Bourke, but if I missed

20   who said what term, I hope counsel will forgive me, they

21   talk about how prior art assays and I think they disclose

22   other ways of measuring bad things happening in the

23   complement system. We suggest that other prior art is

24   necessary to understand where a person of ordinary skill in

25   the art is coming from and how somebody would look at the

44

1    numbers that, that section of Column 5, and look at the

2    claims in figuring out what is an acceptable level.

3            This is a table from a Bayer paper published in

4    1989.  And this table is from that paper.  It measures AC

5    activity under two methods, Method 1 and Method 2.

6            Let's first read the bottom bar.  With Method 1,

7    an acceptable level is considered to be below 25 units.  So

8    Method 1, some assay, has an acceptable level at 25 units,

9    while Method 2 has an acceptable level of below 20 units.

10           They at Bayer looked at ten lots.  And they did

11   the Method 1 assay and the Method 2 assay.  And the Method 1

12   assay, which has an acceptable level of 25, all of the ten

13   lots passed the Method 1 assay.  All of the ACA levels were

14   found acceptable.  They were all less than 25 units.

15           Under Method 2, which had a different

16   acceptability level, had a 20-unit acceptability level,

17   look, all of them failed.

18           So depending on which assay you used and the

19   limits of that assay, each assay has its own limits, you

20   would either think you had a lot that was acceptable or a

21   lot that was unacceptable.

22           In addition, they don't even correlate between

23   the two.

24           So let's look at the first lot with Method 1.

25   It has an AC of 11.9.  The second lot has a higher ACA,

1     12.8. But look at Method 2. The first lot has 25.3 and the

2     second lot has a lower ACA under the other assay. So it's

3     not that they all go up or down together. It's not like you

4     can say Method 1, say I multiply by 2.4 and I get the

5     Method 2 method. No, they are not correlated.

6          You see Lot No. 3 has the same level as the

7     first lot under Method 1. But under Method 2 the assay

8     gives a value in between the value given for Lots 1 and 2.

9          So you see, Your Honor, not only is acceptable

10    defined for each particular assay, but assays do not

11    correlate among themselves and you don't know what is

12    acceptable unless you know the assay. The assay determines

13    acceptability along with the numeric values.

14         That is how we came to our construction, Your

15    Honor. Our construction requires a defined numerical level

16    and the identification of the assay used to obtain the ACA

17    value, because that is what a person of ordinary skill in

18    the art would need to know in order to judge whether he or

19    she infringed the claim.

20         THE COURT: I will wait until you finish.

21         MS. SPAETH: One last claim term: then

22    incubating the solution of Step (a).

23         Baxter's proposed construction is, then

24    incubating the solution of Step (a) is right here at the

25    beginning of Step (b). And we propose that the construction

1  be incubating the solvent/detergent treated solution

2  resulting from Step (a) without any additional processing

3  steps between Steps (a) and (b). They have just about the

4  opposite construction, Incubating a solution originating

5  from Step (a) under these certain conditions wherein

6  additional steps may be performed prior to said incubating.

7          Now, their first complaint against our

8  construction is that we are ignoring the word comprising.

9  Baxter does not ignore the word comprising. And I am here

10  telling you how we are not.

11          They are right that, in general, comprising is

12  open-ended. But comprising, just because you have

13  comprising in the preamble doesn't mean that you can ignore

14  the other parts to the claim.

15          What they are asking the Court to do is to

16  ignore them and ignore the solution of Step (a).

17          Here is what I mean by that.

18          A patent attorney can write a patent, can write

19  a claim that says, a method of treating a solution of

20  antibodies wherein you have an S/D step and you have an

21  incubation step, without regard to which comes first or the

22  immediacy between them. That is a very open-ended claim.

23  You just have an S/D step and an incubation step. This

24  doesn't say that. This has the word then in there, so they

25  could have written the claim, you have an S/D step followed

1   by or then you have an incubation step, so that the order of

2   the processing steps, first an S/D step, then an incubation

3   step, is required by the claim.  That is what this then

4   provides.

5            Here they didn't do that.  They went further.

6   They said, then incubating the solution of Step (a).  It's

7   that language that's limiting whether or not they get

8   intervening steps.

9            Now, this comprising still has meaning.  It may

10  not be the only steps in a process.  They might actually

11  fractionate first.  They might remove the solvent/detergent

12  immediately after incubation.  They might formulate it here.

13  Just because at Bayer in their operations and Talecris have

14  the incubation step last doesn't mean you have to do it that

15  way.  They chose to use these words, the solution of Step

16  (a).  They did not have to do it that way.

17           These are the words that limit, and we are not

18  discounting comprising.  Lots of other things can still

19  happen in the process.  It just can't happen between Steps

20  (a) and (b).

21           We have a graphic that hopefully can help

22  illustrate our point.

23           If you look at the three beakers in the top row,

24  Your Honor, we suggest that these three beakers represent

25  Claim 1 as properly construed.  You first have the solution,

1    it's clear, in the clear solution in the graphic.  And then

2    you do Step (a).  Step (a) is the solvent/detergent step,

3    and it results in unacceptable ACA.  That is reflected by a

4    blue solution.  Then you incubate that step, then you

5    incubate that solution, the solution of Step (a), and when

6    you incubate it in Step (b), now you have acceptable ACA.

7             So the solvent/detergent treatment did something

8    funky and it increased the ACA to unacceptable levels, and

9    now the incubation step is reducing the ACA to acceptable

10   levels.  That is what Claim 1 reads.

11            Bayer would have you believe that additional

12   steps can be between Steps (a) and (b).  However, if there

13   are additional steps -- let's say there is now a Step X.

14   What if Step X makes the solution acceptable for IV

15   administration?  In that instance, Step (b) is unnecessary.

16   That is not the flow of Claim 1.  Under their construction,

17   they leave open that this Step X can affect ACA, and if Step

18   X makes it acceptable, they are outside the scope of Claim

19   1.

20            Now, Your Honor, they knew how to write a claim

21   differently.  In Europe, they added removing the

22   solvent/detergent in between their first step, their S/D

23   step, and their incubation step.  They knew how to write a

24   claim differently.  They chose not to do so in the U.S.

25            Moreover, this isn't just a side point.  They

1    say here:  removing trialkylphosphate and detergent from the

2    second antibody solution to produce a third antibody

3    solution.

4              So they are saying that the removal of S/D is

5    changing the quality of the solution.  And they have given a

6    new number, the third antibody solution.

7              If they wanted to write the claim differently,

8    they knew how to do so.

9              They chose instead to say, then incubating the

10   solution of Step (a).

11             Your Honor, I am happy to take any questions or

12   to talk about any other claim terms that you might --

13             THE COURT:  I have a specific question to your

14   argument, the defendants' argument.  Then I would like to

15   have a discussion with both parties about the person of

16   ordinary skill in the art.  I want to talk about that a

17   little bit and get your views as to the role, because you

18   both referred to the person of ordinary skill I think

19   appropriately.  I think as directed by the Federal Circuit,

20   starting with the claims, or at least starting with the

21   claims and moving right onto Phillips, which directs trial

22   courts I think to begin our task of interpreting claims with

23   the language of the claim words and to try to divine the

24   meaning of the words from the point of view of the person of

25   ordinary skill.

1          Is that a fair statement, sort of a hornbook

2    statement of claim construction at the beginning?

3          MS. SPAETH:  Yes.

4          THE COURT:  Yet it seems that perhaps, at least

5    one party, I am not sure, maybe both of you would view -- I

6    don't think the Federal Circuit views it differently -- that

7    the Court needs to understand that term, what that means,

8    what that person of ordinary skill in the art, what the

9    definition is for any given dispute.

10         Does that put the Court in the position of

11   considering, and appropriately it would be in my view

12   extrinsic evidence, where the parties are perhaps not in

13   agreement as to the meaning?  Because it is written, I think

14   it has been written in this case, or suggested at least, in

15   this case -- I will give the plaintiff a chance to comment

16   on this -- that I would be in a position, I would put myself

17   in a position of considering extrinsic evidence.

18         I don't mean to go on.

19         MS. SPAETH:  Your Honor, I believe what Phillips

20   contemplates when advising what the level of skill in the

21   art is is along the lines of the background:  Where is the

22   state of the art?  What would somebody know about the state

23   of the art as of September 1995 in this case?

24         THE COURT:  And I share that, right.  I left

25   that out.  That is fine.  That is important.

1          MS. SPAETH:  What I meant to say is that this

2    state of the art, the background technology, can inform the

3    Court, that the Court has a tough job.  You have to put

4    yourself back in time and you have to know what one of

5    ordinary skill in the art would know.  And that means that

6    you are able to look at the background of the technology and

7    the state of the art at the time.  And with that sitting

8    there, we believe you can still construe the claims just

9    with the intrinsic evidence.  But you must take into account

10   the state of the art, the background technology, where the

11   level of ordinary skill person would be sitting in order to

12   then look at the intrinsic evidence and construe the claims.

13         THE COURT:  I need to understand each party's

14   view then of what the level of skill was at the time of the

15   invention.  Is that correct?

16         MS. SPAETH:  I believe, Your Honor.

17         THE COURT:  Does that put me in the land of

18   extrinsic evidence?

19         MS. SPAETH:  I do not believe so.  I believe

20   that is part of what was required by Phillips.

21         THE COURT:  What is Baxter's view as to the

22   person of ordinary skill of the art?

23         MS. SPAETH:  It is in our opening brief, Your

24   Honor, at Pages 18 and 19.  And we believe that a person of

25   ordinary skill in the art would be a process chemist or a

1    biochemist or an immunologist, someone in this general

2    field, with either a Bachelor's degree or a Master's degree,

3    and we list several things, like chemistry, biology,

4    biochemistry, immunology or related field.  Those general

5    types of fields.  And several years of experience in one or

6    more of the following.  The purification of blood proteins,

7    how you go from blood plasma to the intermediates, or viral

8    inactivation or removing viruses when everybody knows that

9    is important and that was of utmost importance, as you might

10   appreciate, in the eighties and nineties.

11          They would have had in 1995 some exposure or

12   experience with solvent/detergent treatment and low pH

13   incubation, if they met the virus removal part of the prong,

14   and/or ACA anticomplement system, including how to measure

15   and lower ACA, or the equivalent.

16          So the general field, we do not believe it has

17   to be a Ph.D.  We do not believe it has to be the world's

18   leading expert on any particular one of these.  But somebody

19   who is generally working in the field.

20          THE COURT:  It doesn't have to be one of

21   exceptional skill, but ordinary skill.

22          MS. SPAETH:  Correct.

23          THE COURT:  Let me ask you this:  You point out,

24   I think it's Column 5, the patent discloses certain

25   specifics in the assay.  I guess my question is, absent that

1    disclosure, could plaintiff have enabled independent Claim

2    1?

3              MS. SPAETH:  We believe it would not have passed

4    the written description test, Your Honor, because it was

5    found to be indefinite until they pointed to this section of

6    their specification.

7              So without the numeric values, they failed the

8    written description.  Without the assay identification.

9    They would fail the written description and the enablement

10   prong, yes.

11             THE COURT:  One of the concerns that I have

12   about a number of Baxter's arguments is, it would seem to me

13   that it might place the Court in a position, I am not sure,

14   of limiting the claims by the preferred embodiment or the

15   disclosures in the specification.  Do you want to address

16   that?

17             MS. SPAETH:  Sure, Your Honor.  I know that it

18   is a concern of plaintiffs that we suggest that claims must

19   be limited, for instance, to cholate and pH 7 rather than

20   including tween or any other detergent or pH 5.8.

21             First, on the cholate, while they say they have

22   this tween example in Table 1, if you read the full

23   specification, it becomes clear that Table 1 is only talking

24   about raising ACA with an S/D step.  It doesn't talk about

25   the second half, which it is needed for their claim, which

1    is the lowering of the ACA with an incubation step.  There

2    is no tween data for Step (b) of their claim.  Thus, there

3    is actually no tween data to the full scope of the claim.

4            So we believe that we are right for many

5    reasons, including extrinsic evidence, you don't want us to

6    talk about, but even with the intrinsic evidence.

7            THE COURT:  I concede, by the way, that

8    sometimes when I have these arguments it seems rather

9    artificial for me to say what I think the Court has told us

10   to do, and that is, only in certain circumstances consider

11   extrinsic evidence.  And I rather avoid and have been

12   comfortable staying within those parameters because I have

13   entertained arguments, not knowingly perhaps, but where we

14   have injected summary judgment considerations into my

15   Markman process.  And it is somewhat seductive, actually.

16   But I am not sure that it really results in a correct

17   approach to claim construction.

18           That is just my views.

19           I don't want you to feel like I have got my head

20   in the sand on this.  It's not that you have to feel that

21   you are going to blow up if you step on extrinsic evidence

22   terms.

23           MS. SPAETH:  We will generally stay away from

24   it.

25           So on the tween issue itself, there is no data

1   in the patent about tween vis-a-vis the entire claim.  So we

2   feel pretty confident that there is no support for the

3   entire scope of the claim vis-a-vis tween, which leaves us

4   with cholate.  There is no other detergent discussed besides

5   cholate for both Steps (a) and (b).

6           Then on the pH 7 and the pH 5.8, Table 1 and

7   then Tables 3 and 5 are all with pH 7.  And when you look at

8   the ACA value, boy, those go right up there.  They zoom up

9   there.  They apparently go off the chart of the assay.  When

10  it says greater than a hundred, Your Honor, I think it means

11  the assay can't tell you the number.  It's top of the chart,

12  so to speak.

13          So pH 7, all the ACA numbers go above.  And then

14  they work to bring it down through a low pH incubation.  But

15  if you look at the data to pH 5.8, you see that they are not

16  all off the chart.  You see 43, 31 and 44.  Those are all

17  five percent solutions.  Of course, they are all less than

18  45.  So when you look at how they had to argue acceptable,

19  and you read the whole specification, you see, this is

20  acceptable, and at least 43, 31 and 44 are acceptable at day

21  zero, before any incubation, since it is before any

22  incubation, it is outside the scope of the claim.  Again,

23  you don't need to lower it.

24          For a ten-percent solution, this figure doesn't

25  apply, because this is a five-percent figure, for a

ten-percent solution, acceptable was 60.

So at day zero, they have 49 and 53. Those are all already acceptable levels suitable for IV administration.

They do say lowest possible, lowest possible. And we admit in the spec they do also talk about wanting it low as possible. But that is what the examiner had a problem with when the examiner looked at the term acceptable level, and it didn't make clear that numeric value, she said it's indefinite.

So just because we have this number that is more than twice this, and this number, which is about three times that, just because we have outliers, we do not believe that a person of ordinary skill in the art would look at those outlyers and say, oh, 5.8 doesn't work. We think a person of ordinary skill in the art would say, yep, 5.8 does it.

They say, well, if we limit, when they talk about their preferred embodiment and they refer to Column 4, Your Honor, they were talking about the reference in the patent to the preferred embodiment for viral inactivation. They say that a lower -- that pH 5.8, maybe 5.6, with cholate gives better viral inactivation. And so their complaint to us is that we are cutting out the preferred embodiment.

Your Honor, I can't hold back. Their data does

1    not support pH 5.8.  It simply does not.  What is claimed is

2    something that increases ACA to unacceptable and then

3    decreases it to acceptable.  If there is data that is

4    already acceptable, there is no meaning to Step (b).  It's

5    clear from all their arguments that that step had to reduce

6    it to an acceptable level.

7                    THE COURT:  Okay.  Thank you.

8                    Why don't we take a short break, and then come

9    back and I will hear plaintiffs' rebuttal.

10                   (Recess taken.)

11                   THE COURT:  Mr. Bove.

12                   MR. BOVE:  Thank you, Your Honor.

13                   Let me first indicate the approach I would

14   suggest for rebuttal, so we are organized here.  I am going

15   to take the terms essentially that I took in the opening.

16   Ms. Bourke will take her terms as I follow.

17                   THE COURT:  That is fine.  But I do want to ask

18   you first -- and your colleague can also weigh in here -- I

19   do want to direct Bayer's attention to its brief, where you

20   write at Page 7, opening, "The starting point" -- talking

21   about claim construction, after you cite, I think it's after

22   you cite Vitronics -- "is the words of the claims which are

23   presumed to Bayer their ordinary and customary meaning as

24   understood by a person of ordinary skill in the art at the

25   time of the invention.  Phillips.

1          Then at Page 17 of your answering brief, you

2     write the following, in Paragraph 7:  Defendants attempt to

3     characterize and obtain a finding as to the person of

4     ordinary skill in the art, citation to the brief.  First,

5     they offer support neither for their description of the

6     skilled artisan nor the art in which the person is skilled.

7     Secondly, there is no extrinsic evidence before this Court,

8     parenthetic, even the need to establish the person of

9     ordinary skill in the art presupposes the need to interpret

10    extrinsic evidence), nor is there an affidavit of any

11    expert.

12          I am a little confused as to Bayer's position on

13    how this Court should approach its job and the task of claim

14    construction.

15          MR. BOVE:  Your Honor, if I may respond.

16          Number one, the position of actually both

17    parties, I believe, is that the claim terms may be

18    addressed, in Bayer's case, Talecris' case, based on the

19    plain meaning of the terms, ergo, no evidence of the level

20    of skill in the art was introduced.  Baxter's position is

21    similar in the sense that no evidence of the level of skill

22    in the art is introduced.

23          Ergo, the Court's dilemma -- well, if the Court

24    requires a level of skill in the art to address this, then,

25    as I understand Your Honor's question, what does the Court

1    do.  Let me at least make it clear what Talecris' position

2    is.  We have not sought to introduce any extrinsic evidence

3    on this point, as the briefs indicate.

4              Your Honor, a patent, as the Court is

5    well-aware, does not need to teach what one skilled in the

6    art knows.  So we first want to look at, well, what is the

7    basic teaching of the patent.  This is, as my colleague on

8    the other side said, very complex technology in one sense.

9    In another sense, if you are a Ph.D., it is not very

10   complex.

11             So it is Talecris' position that one skilled in

12   the art would certainly need to be a Ph.D.  They would need

13   to have background in designing purification and

14   manufacturing processes.  After all, that is what we are

15   talking about here in this patent.  However, teams that go

16   and perform this work also do contain clinicians, medical

17   doctors.  Indeed, that's exactly how I think both parties

18   have designed their processes.  You have to have clinical

19   end points, as Ms. Bourke will address with respect to the

20   second one.

21             You have to have a person knowledgeable about

22   complement assays at a Ph.D level and also viral activation.

23   Our position for the record would be a Ph.D. of one or more

24   of those types of technical backgrounds.

25             What Baxter posits, as best I understand, is a

1    much lower level of skill, basically a line technician

2    looking for a protocol to follow with numbers in the claim.

3    That is not what the patent is directed to.  The claim

4    basically says, this is the teaching, this is the direction

5    you go in, and you will be able to get the details for your

6    particular process.

7              THE COURT:  So it's Talecris' and Bayer's

8    position -- Bayer can speak for itself -- that this is not

9    the time, Markman is really not the time that the Court has

10   to engage the resolution of that dispute.  That's really

11   more for a fact-finder potentially down the road.

12             MR. BOVE:  Yes, Your Honor.

13             Your Honor, switching back into the other

14   arguments.  Let me first say, Column 5 in the patent at

15   JA-47 in Line 51, I think Ms. Bourke will get back to this,

16   Column 5 at JA-47 in Line 51 states, there is no strict rule

17   for determining whether ACA level is low enough to be

18   acceptable.  That is just an important predicate for what I

19   am about to say.  Baxter's reply brief at Page 10 states, I

20   will just read it, It is only the ACA levels in the final

21   solution ... that must be acceptable.

22             We will start with that as a background.  Let me

23   then go to specific rebuttal about the increase and the

24   decrease.

25             First of all, the prior art -- I am going to

1    address the prosecution history briefly.  The prior art did

2    not necessitate an increase in ACA to any given level.

3    Indeed, the thrust of the prosection history was that, in

4    fact, the prior art did not show an increase after the S/D

5    step.  That was the problem.  And this patent provided the

6    solution to it.

7         So there was nothing in the prior art requiring

8    an elevation to any given level.

9         Secondly, the amendments.  The amendments did

10   not address any level of increase.  What happened was, the

11   word given was in the claim.  And the examiner said, no,

12   that is not good enough.  I don't know what it means.

13        They added the words given increased.  The

14   examiner said, no, not yet.  So then they deleted the word

15   given and it ended up as an increase.  This is in Step (a).

16        The standard, and this is what the applicant

17   said, not what the examiner said, that the applicant, which

18   is the key, the operative words, Salazar says the Court

19   doesn't rely on what the examiner says.  We cited Salazar in

20   our reply brief, the standard which cured the indefiniteness

21   rejection was the standard of the starting material before

22   the process.  That was it.  It starts at a level, it

23   elevates, and then it is reduced.

24        That was the basis for the applicant's position.

25        So we have no prior art, and actually it is very

1    simple.  It starts, that's the starting level.  And,

2    indeed -- let me see if I can give you the page cite for

3    that.  It's not really apparent, I don't want to take more

4    time.  It is JA-98.  That should be helpful to the Court.

5          So no prior art -- the amendments were not

6    necessitated such that the level had to increase to any

7    particular numerical point, and then to be reduced to any

8    particular point, except Ms. Bourke's acceptable.

9          Next point.  Baxter's intrinsic evidence.  Your

10   Honor, I started with Column 5.  There is no fixed line for

11   acceptability.  The intrinsic evidence simply states that it

12   rises, and remember Column 5 says any elevation is bad, as

13   Ms. Bourke started off.  Therefore, unacceptably high is

14   really any elevation you want to try to eliminate.  One

15   skilled in the art that we just referred to would want to

16   avoid this and bring it back down so that the human can

17   consume it through IV.

18         All of these references to undesirable,

19   unacceptable, none indicate criticality to a numeric point.

20   None suggest that they should be read into the claim at all.

21   They are simply descriptions, some descriptions of the prior

22   art, undesirably higher levels of ACA.  Descriptions of the

23   examples in the patent, unacceptably high.

24         There is no invitation to one reading Claim 1 to

25   read in the word unacceptable.  And we submit that the case

1    law would counsel otherwise.

2            The figure.  JA90, JA98 and JA134, just for the

3    record, the figure was characterized by the patentee as

4    illustrative, an example, not a formal drawing.  That's it.

5    To me, that is the end of the discussion on the figure.

6    They are trying to import examples, illustrations, over and

7    over into the claims.

8            Table 7 and the preferences, I am not going to

9    take the time to go through this now, but there are stated

10   numeric preferences, examples, as indeed a patentee should

11   put in a patent, to help someone understand what they are

12   teaching.

13           The Court well-knows, preferences examples are

14   not read into the claim absent some clear direction to do

15   so, which is not here because Column 5 says that there is no

16   strict rule for doing this.

17           If you compare Table 7, the numbers, with the

18   preferences, you will see that the Table 7 data in many

19   instances after S/D are below the preference levels for

20   acceptable.  It just refutes their argument completely.  I

21   will not waste time now to say whether 43 is below 45.  I

22   invite the Court to take a look at that.  I thought it was

23   very helpful.

24           Let me shift now to then incubating the solution

25   of Step (a), if I may.

1          First of all, no law is cited to support the

2    proposition that there must be a particular order of

3    processing steps in Claim 1, and, indeed, the word then

4    suggests simply that you perform Step (b) after you perform

5    Step (a).  It doesn't mean immediately after.  It just says

6    you perform Step (a), then you perform Step (b).

7          Indeed, the intrinsic evidence, which I referred

8    to in my opening, and their own brief, and Ms. Burke's

9    demonstrative -- and there is no dispute about this -- all

10   of this contemplates intervening processing steps between

11   (a) and (b).  There is no dispute about this.

12         Your Honor, just for the record, one other point

13   of fact in the intrinsic evidence.  The patent refers to

14   sterile bulk, the solution of Step (a) has been sterilized

15   and Step (b) is performed.  And the record cites for that,

16   which presuppose intervening processing steps, are JA-149 at

17   Column 9, Line 12, and Column 10, Line 9.  That is further

18   support for the intrinsic evidence, which I believe is

19   overwhelming in any event.

20         As to the foreign prosecution, this is Pfizer v.

21   Ranbaxy.  And we have cited to that that case.  We are off

22   into I don't know what country.  But it is not relevant to

23   this discussion today.

24         With that, I am going to turn the podium over to

25   Ms. Bourke.

1               THE COURT:  Thank you, Mr. Bove.

2               MS. BOURKE:  Acceptable level suitable for IV

3    administration.  First, I want to address the prosecution

4    history argument that defendants made.  If Your Honor wants

5    to refer to Page 26 and 27 of their PowerPoint presentation,

6    that's what I am really addressing.

7               THE COURT:  Okay.

8               MS. BOURKE:  Their argument is wrong for three

9    reasons.  I will refer the Court to Salazar v. Procter &

10   Gamble, 414 F.3d 1342, a Federal Circuit decision, 2005.  It

11   is cited in our briefs.  And the holding for which it is

12   cited is, Examiners' unilateral statements do not constitute

13   clear and unambiguous disavowal of claim scope and an

14   applicant's silence is not an acquiescence to the examiner's

15   characterization.

16               So whatever the examiner did or said on Page 27

17   is completely irrelevant to the construction.

18               Number two, the applicant's statements on Page

19   26 were not a clear and unambiguous disavowal of claim

20   scope.  Applicant simply said look to Column 5, Lines 57

21   through 64, and here are some examples, the examples.  The

22   examiner never required the applicant to amend its claims to

23   put in any numerical limitations to overcome the rejection.

24               And who knows what the examiner thought, and

25   it's not relevant, but clearly, she was referred to examples

 1    and was satisfied and withdrew the indefiniteness rejection.

 2              Let's turn to their argument that we should read

 3    in these 45 and 60 CH-50 numbers as the acceptable levels.

 4    To me, that is just back-dooring the argument that they made

 5    for anticomplement activity which they did not address at

 6    the hearing here.  But again, they are reading in a

 7    particular unit of measure.  They are reading in a

 8    particular assay, hemolytic assay.  And they are reading in

 9    a particular assay, that assay that was used to define those

10    numerical limits in the patent.  They even admit that these

11    assays have inherent variability.  That issue I don't think

12    is quite properly before the Court.  Maybe in an

13    indefiniteness motion, but not on claim construction.

14              Quite frankly, that is exactly the reason why

15    this Court should not read in any numerical levels to the

16    term acceptable level for -- acceptable level suitable for

17    IV administration.

18              Those numbers were developed by Bayer when it

19    was developing its product and its process.  But those

20    numbers cannot be universally applied to every product and

21    every process that falls within these claims.

22              Acceptable level suitable for administration is

23    a clinical term.  It depends on the clinical experience with

24    that product and that process.  If you look to Column 1 of

25    the patent at Lines 15 through 20, it states, Early

1    pharmaceutical preparations of immuno serum globulins could

2    not be administered intravenously due to unacceptably high

3    incidence of adverse reactions.  That is what they are

4    talking about, the clinical events that occur from having

5    elevated anticomplement activity.  We will have experts come

6    in at trial and explain for the jury what those exactly are.

7                But the claim term is clear on its face.  It

8    means what it says.  Acceptable level is that which is

9    suitable for IV administration.

10                THE COURT:  Thank you, Ms. Bourke.  All right.

11   Okay.

12                Counsel, the Court appreciates the presentations

13   and the briefing and will endeavor to issue its ruling by

14   the end of 30 days.

15                I am aware that there are at least, I think, two

16   outstanding motions.  I didn't notify you that I wanted to

17   hear argument.  Quite frankly, I haven't read the briefs

18   yet.  I am essentially, I think, aware of what the issues

19   are, what the issue in the motion to amend is, I think, the

20   request by Baxter to include the defense of inequitable

21   conduct, plaintiff resists that effort because I think you

22   assert that the evidentiary support for that was improperly

23   disclosed.

24                Am I misstating?

25                MR. BOVE:  Your Honor, if I may.

1              THE COURT:  Is that too simplistic?  Do you want

2     to talk about that in a minute?

3              MR. BOVE:  It is a futility argument.

4              THE COURT:  It is a futility argument.

5              MR. BOVE:  Along with some prejudice combined.

6     And I think the briefs are very clear on this, so that the

7     Court will be able to get right to the point.

8              THE COURT:  All right.

9              MR. BOVE:  Basically, we don't know who they are

10    accusing of doing what.  And the discovery is over and this

11    is many, many, many months after the --

12             THE COURT:  So we are past the cutoff of fact

13    discovery.

14             MR. BOVE:  We are long past the cutoff for fact

15    discovery.

16             THE COURT:  When was the motion filed?

17             MR. BOVE:  The motion was filed --

18             MR. GILLILAND:  Your Honor, the motion was filed

19    on November 1st.

20             THE COURT:  Remind me of the fact discovery

21    cutoff, counsel.

22             MR. BOVE:  September 29th, Your Honor.

23             MR. GILLILAND:  So the date for amending

24    pleadings without leave of the Court was in early May.  The

25    production of documents and the depositions occurred after

1    that time.  The discovery concluded at the end of September.

2    We then filed our motion immediately thereafter.

3                 THE COURT:  How close are we to the pretrial

4    order due date?

5                 MR. GILLILAND:  Trial is not until July of 2007.

6                 MS. MASON:  The first draft of the pretrial

7    order is due at the end of April.

8                 THE COURT:  Then there is the motion which is

9    perhaps a little more prickly, to disqualify.  Is there

10   anything that either side wants to say about that while you

11   have me?

12                MR. BOVE:  Your Honor, briefly.

13                THE COURT:  Again, I haven't read the briefs.

14                MR. BOVE:  I am going to direct the Court to the

15   briefs.

16                THE COURT:  Okay.  Anything from Baxter on this?

17                MR. GILLILAND:  Merely this, Your Honor:  that

18   the only company that Townsend ever represented was Miles,

19   Inc.  That was 15 years ago.  Miles, Inc. evidently became

20   Bayer Corporation.  In the briefs, it is represented that

21   Bayer Corporation has brought this motion to disqualify.

22   That is not true.  If the Court looks carefully at the

23   motion that was filed, it was filed by the plaintiffs.  The

24   plaintiffs are Talecris Therapeutics and Bayer Healthcare,

25   LLC.  Neither of those companies ever was a client of

1    Townsend.

2              THE COURT:  Okay.  Do you want to say something?

3              MR. BOVE:  Just briefly.

4              These points are addressed in the papers.

5              THE COURT:  Is there anything else that we need

6    to address today while we are here?  Everything is running

7    along otherwise smoothly.

8              All right.  Counsel, have a good holiday.  Merry

9    Christmas.

10             (Counsel respond "Thank you.")

11             (Court recessed at 12:11 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25