# APPENDIX

LEXSEE 2002 U.S. DIST. LEXIS 13205



Caution
As of: Jul 08, 2007

### R. JOHN HOLZSCHUH, Plaintiff, v. UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.

### CIVIL ACTION NO. 02-1035

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

*2002 U.S. Dist. LEXIS 13205*

**July 17, 2002, Decided**
**July 18, 2002, Filed**

**DISPOSITION:**     Court entered judgment in favor of the Plaintiff.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff claimant brought suit against defendant plan administrator to collect benefits under an insurance plan pursuant to § 502(a)(1)(b), *29 U.S.C.S. 1132(a)(1)(B)* of the Employee Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001 et seq.* The administrator moved for summary judgment.

**OVERVIEW:** Because the administrator both funded and administered the benefit plan, the administrator had a conflict of interest and heightened scrutiny was required. The administrator reversed its initial decision to award the claimant benefits on the ground that the medical records established that the claimant was not precluded from full time sedentary capacity. The court disagreed with the administrator's findings because the claimant's disability claim was supported by objective evidence such as MRI and CT reports, doctors' observations, and x-rays, which documented multiple level changes in the claimant's cervical and lumbar spines, showing degenerative disc disease disabled the claimant and that

fibromyalgia was a secondary condition contributing to the disability. Furthermore, the administrator's use of nurses and non-treating/examining physicians to deny the claim after sustaining it for over a year was suspect. In addition, under the plan, the claimant was not required to provide new objective medical data to demonstrate a deterioration of his condition. Consequently, the court found that the administrator arbitrarily and capriciously denied the claim for benefits.

**OUTCOME:** The court denied the administrator's motion for summary judgment. The court sua sponte granted summary judgment for the claimant.

**COUNSEL:** [*1] For R. JOHN HOLZSCHUH, PLAINTIFF: JAMES N. GROSS, JAMES N. GROSS, ESQUIRE, PHILA, PA USA.

For UNUM LIFE INSURANCE COMPANY OF AMERICA, DEFENDANT: E. THOMAS HENEFER, STEVENS AND LEE, READING, PA USA. KIRK L. WOLGEMUTH, READING, PA USA.

**JUDGES:** Clarence C. Newcomer, S.J.

**OPINION BY:** Clarence C. Newcomer

2002 U.S. Dist. LEXIS 13205, *1

## OPINION

Newcomer, S.J.

July 17, 2002

This is an action to collect benefits under an insurance plan pursuant to the Employee Retirement Income Security Act ("ERISA") section 502(a)(1)(b), *29 U.S.C. 1132(a)(1)(B)*. [1] Defendant's motion for summary judgment, Plaintiff's response and Defendant's reply are now before the Court.

> 1  Section 502 provides that:
>
>> A civil action may be brought--
>>
>>> (1) by a participant or beneficiary--
>>>
>>>> (B) to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

*29 U.S.C. 1132(a)(1)(B).*

## I. BACKGROUND

[*2] Plaintiff, R. John Holzschuh ("Plaintiff"), resides in Chadds Ford, Pennsylvania and is a former employee of Forgent Corporation, formerly known as VTELL Corporation ("VTELL"). Defendant, UNUM Life Insurance Company of America ("UNUM" or "Defendant"), provided a long-term disability policy (the "Policy") to VTELL at all relevant times.

As a result of certain injuries, including cervical and lumbar pain, fibromyalgia, [2] and psychological illness, UNUM paid Plaintiff long term disability benefits from March 10, 1999 until October 2000. At that time, UNUM terminated Plaintiff's benefits after it found that Plaintiff's back condition was not disabling and his fibromyalgia

and psychiatric illness were covered by a 12 month limitation contained in the Policy. After UNUM discontinued Plaintiff's benefits, Plaintiff sought benefits from UNUM through an appeal process, but UNUM ultimately denied Plaintiff benefits in a March 13, 2001 letter.

> 2  The term firbromyalgia refers generally to pain in fibromuscular tissue. *Cini v. Paul Revere Life Ins. Co., 50 F. Supp. 2d 419, 420 n.1 (E.D.Pa. 1999).*

### [*3] A. *The Policy*

When defining total disability, the Policy states that:

> [An individual] is disabled when UNUM determines that:
>
>> - you are limited from performing the material and substantial duties of your regular occupation due to sickness or injury; and
>>
>> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>>
>> After 24 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience. [3]

(*Defendant's App.* at 700).

> 3    Plaintiff did not receive 24 months of payments.

Additionally, the Policy explains that "when making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (*Defendant's App.* at 694).

For certain types of disabilities, the [*4] Policy limits benefits to a 12 month period:

> Disabilities, due to sickness or injury, which are primarily based on self-reported

2002 U.S. Dist. LEXIS 13205, *4

symptoms, and disabilities due to mental illness have a limited pay period up to 12 months. . .

SELF-REPORTED SYMPTOMS means the manifestations of your condition which you tell your doctor, that are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. . .

MENTAL ILLNESS means a psychiatric or psychological condition regardless of cause such as schizophrenia, depression, manic depressive or bipolar illness, anxiety, personality disorders and/or adjustment disorders or other conditions. These conditions are usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment.

(*Defendant's App.* at 709-10).

**B. *Plaintiff's Claim and UNUM's Review***

When Plaintiff applied for benefits, he claimed that he was disabled as of December 9, 1998. Plaintiff further stated that his "occupation" was a "purchasing manager". (*Defendant's App.* at 664). A later vocational review indicated that [*5] the purchasing manager position is classified as sedentary. The review also said that the duties of purchasing manager occasionally involved lifting, but was primarily a seated position. The duties further allowed for alternatively sitting and standing. (*Defendant's App.* at 629-31).

Along with Plaintiff's application, Plaintiff's physician, Dr. Lawrence Schmitzer, submitted an Attending Physician Statement ("APS") which stated that Plaintiff suffered from "severe cervical and lumbar pain." (*Defendant's App.* at 666) The APS further stated that Plaintiff should not lift and pull, and should not sit or stand for prolonged periods. (*Defendant's App.* at 667).

On April 16, 1999, Defendant reviewed Plaintiff's then available medical records and concluded that "CT and MRI studies well document multiple level changes in the cervical and lumbar spines." (*Defendant's App.* at 655). Defendant further concluded that Plaintiff's

restrictions and limitations were reasonable and appropriate for 12 months based upon the APS and diagnostics and that "surgery may give a more favorable long term outcome." *Id.* Accordingly, Defendant approved Plaintiff's request for disability benefits [*6] in an April 20, 1999 letter, and began paying benefits effective March 9, 1999. (*Defendant's App.* at 643). However, that letter also indicated that Defendant would request periodic medical evidence and vocational information from Plaintiff to support his claim for continued disability benefits. [4] (*Defendant's App.* at 643).

4 Also on April 20, 1999, Defendant learned that Plaintiff may be suffering from fibromyalgia, and that Plaintiff was receiving treatment from a rheumatologist, Dr. Getzoff, who had diagnosed him with fibromyalgia.

After UNUM approved Plaintiff's claim, it continued to monitor his condition by requesting and reviewing additional medical records. For example, in June 1999, UNUM received Dr. Parvis Kambin's March 23, 1999 report. When reporting on his review of the x-rays and imaging studies, Dr. Kambin stated that he did not see "a clear disc herniation in the cervical or lumbar spine which would be responsible for [Plaintiff's] signs and symptoms." (*Defendant's App.* at 610).

[*7] However, UNUM also received a March 15, 1999 report from Dr. Hilibrand, an Assistant Professor of Orthopedic Surgery at Thomas Jefferson University. In that report, Dr. Hilibrand found a "small residual disc on the right side at C5-6 in combination with a spur which does narrow the right neural foramen at C5-6 but does not cause spinal cord compression." (*Defendant's App.* at 609). He further found that "the lumbar study is negative except for some degenerative changes, and the remainder of the cervical study is also basically normal. Of note, there is a little bit of deformity in the right side of the spinal cord at the C5-6 level. . ." *Id.*

In addition, Defendant received a March 11, 1999 report from Dr. Louis Pearlstein which found that Plaintiff had "cervical and lumbosacral radiculopathies." (*Defendant's App.* at 604). However, he also concluded that "these would not explain his paresthesias [5] from the elbows down and knees down." *Id.*

5 Defined as: abnormal sensation, as of burning, pricking, etc. on the skin. WEBSTER'S NEW WORLD DICTIONARY 1063 (College ed.

1968).

[*8] In his June 1999 APS, Dr. Schmitzer again concluded that Plaintiff should not do anything that requires prolonged sitting or standing. Accordingly, Dr. Schmitzer stated that in an 8 hour work day, Plaintiff could sit for 4 hours, stand for 4 hours, walk for 1 hour, drive for 30-45 minutes, and perform 1 hour of sedentary activity, [6] but would need a break every 30 minutes. (*Defendant's App.* at 599-601). Later, in September 1999, Dr. Schmitzer submitted an additional APS which indicated that Plaintiff suffered from severe lower back and neck pain, and that his objective findings were "CT - mylogram." (*Defendant's App.* at 562). It further indicated that fibromyalgia was a secondary condition contributing to Plaintiff's disability. He also concluded that in an 8 hour workday, Plaintiff could sit for 3 hours, stand for 1 or 2 hours, and could perform sedentary activity for 3 hours a day. (*Defendant's App.* at 564).

> 6    The APS defines sedentary as: "10 lbs. maximum    lifting    or    carrying    articles. Walking/standing on occasion. Sitting 6/8 hours." (*Defendant's App.* at 601)

[*9] Then, UNUM received a November 15, 1999 MRI which concluded that "a tiny central disc herniation is again seen at C4-5, and there are degenerative changes at the other levels. This has not significantly changed as compared to the prior study." (*Defendant's App.* at 519).

In December 1999, UNUM requested records from Dr. Barry Getzoff, Plaintiff's rheumatologist, and Defendant received those records in late December 1999 or early January 2000. Among those records was an April 1999 treatment report where Dr. Getzoff found that "[Plaintiff's] complaint of chronic pain is out of proportion to the findings on the x-rays." (*Defendant's App.* at 498). However, Dr. Getzoff did state that Plaintiff's "workup has shown that he had a CT of his cervical spine and a myelogram showing disc bulges and spondylitic [7] disc herniation at C5 and C6." (*Defendant's App.* at 497). Dr. Getzoff also commented that "I do think he may be depressed." (*Defendant's App.* at 498). Later, on November 29, 1999, Dr. Getzoff stated that Plaintiff is "still complaining of the same back and neck discomfort also, which is a combination of his fibromyalgia and his radicular symptoms." (*Defendant's App.* [*10] *at 503*).

> 7    *Defined as: "Relating to spondylitis." STEDMANS MEDICAL DICTIONARY (27th ed.*

*2000). Spondylitis is defined as: "inflammation of one or more of the vertebrae." Id.*

*In January of 2000, and again in February 2000, an UNUM nurse named Thabi M. Mathebula requested more information from Dr. Getzoff. Dr. Getzoff supplied additional records that indicated that Plaintiff had been undergoing psychiatric treatment. He also supplied physical therapy records that noted that Plaintiff had experienced some improvement in his cervical and lumbar spine. On March 23, 2000, Dr. Getzoff responded to questions Ms. Mathebula asked him in January and February 2000. In those responses, Dr. Getzoff stated that Plaintiff could not perform sedentary duties because of fibromyalgia. (Defendant's App. at 358). However, Dr. Getzoff did not indicate any other cause for the disability.*

After again receiving updated information on July 5, 2000, an UNUM nurse reviewed those records, including a new APS from Dr. Schmitzer. The [*11] nurse concluded that his prescribed restrictions and limitations may be excessive, but that additional records were needed before that could be decided. (*Defendant's App.* at 319). UNUM received additional records, including an MRI report that indicated that Plaintiff suffered from mild disc degeneration, but that Plaintiff did not suffer from disc herniation. (*Defendant's App.* at 306).

After UNUM received these records, Kay O'Reilly, an UNUM registered nurse, reviewed all of the medical records in UNUM's file pertaining to Plaintiff. She then issued a report which was reviewed and approved by Dr. Kanovsky, one of UNUM's physicians. Based upon this review, UNUM decided that the objective findings regarding Plaintiff's cervical and lumbar problems would not preclude sedentary work. Instead, UNUM concluded that Plaintiff's restrictions and limitations were based only on self reported conditions and subjective complaints. Further, UNUM noted that Plaintiff had not submitted records of a psychiatric condition that appeared in Plaintiff's records. (*Defendant's App.* at 285-86). Accordingly, UNUM wrote to Plaintiff on October 11, 2000, and asked him to provide evidence of a physical [*12] disability by November 13, 2000. (*Defendant's App.* at 280-82).

In early November, Dr. Getzoff spoke to an UNUM doctor named Dr. Gritton. Based on that discussion, Dr. Gritton understood that Dr. Getzoff believed that Plaintiff had full time sedentary capacity. However, Defendant concedes that Dr. Getzoff may dispute this interpretation

2002 U.S. Dist. LEXIS 13205, *12

of the discussion. Indeed, UNUM's records indicate that Dr. Getzoff may not have felt that "he was heard" and that a person he spoke to at UNUM was, according to Dr. Getzoff, "rude" and "pushy." (*Defendant's App.* at 265).

Then, on November 13, 2000, UNUM received MRI reports from Plaintiff. They revealed small disc herniations at C3-4 and C5-6, and a small bulge at L4-5. (*Defendant's App.* at 261-63). The next day, UNUM received Plaintiff's psychiatric treatment records dating back to 1998 for depression and anxiety. (*Defendant's App.* at 259).

On November 29, 2000, UNUM received x-rays of Plaintiff's cervical, thoracic and lumbar spines from September 2000. As to these x-rays, Dr. Getzoff explained that they "show some mild cervical disc changes at C5-6. Otherwise these are normal." (*Defendant's App.* at 208). On November 2, 2000, Dr. [*13] Getzoff noted that Plaintiff "has chronic pain consistent with myofascial and fibromyalgia type pain." (*Defendant's App.* at 206). Nevertheless, in a November 20, 2000 letter to UNUM, Dr. Getzoff explained that Plaintiff was under his care for both fibromyalgia and degenerative disc disease in the cervical and lumbar spine. (*Defendant's App.* at 205). Dr. Getzoff further concluded that Plaintiff could not return to work, and that he was disabled due to both the fibromyalgia and degenerative disc disease. *Id.* Also included with the November 29, 2000 submissions was a November 28, 2000 letter from Dr. Javed Mohsenian confirming that Plaintiff was undergoing treatment for bipolar disorder and depression. (*Defendant's App.* at 204).

After another review of Plaintiff's file on December 11, 2000 an UNUM nurse found, and Dr. Gritton agreed, that the existence of a psychiatric disability was not substantiated and concluded that "no objective findings preclude [Plaintiff] from F/T [full time] sedentary capacity in regards to musculoskeletal issues." (*Defendant's App.* at 186).

The next day, UNUM received a report from Dr. Schmitzer. Dr. Schmitzer concluded that Plaintiff [*14] was totally disabled based upon "significant neck and back pain, as well as inappropriate jerky movements of his extremities, coupled with significant MRI findings of the cervical and lumbar spine as well as the diagnosis of fibromyalgia." (*Defendant's App.* at 192).

After receiving Dr. Schmitzer's report, UNUM's

nurse reviewed it and concluded that the MRI findings were not significant enough to warrant total incapacity, and Dr. Gritton agreed. (*Defendant's App.* at 184).

### C. UNUM's Decision to Deny Further Benefits and Plaintiff's Appeal

UNUM denied Plaintiff's claim for continued benefits in a January 2, 2001 letter explaining that the medical records did not support a finding of disability. (*Defendant's App.* at 174-177). Plaintiff sent UNUM a letter appealing its decision, but UNUM denied Plaintiff's appeal in a March 13, 2001 letter. (*Defendant's App.* at 81-82). In that letter, UNUM once again concluded that Plaintiff's disability was covered by the Policy's self-reported symptoms limitation. *Id.*

With these facts as background, the Court turns to Defendant's Motion for Summary Judgment.

## II. DISCUSSION

Summary judgment is appropriate [*15] "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

### A. Scope of Judicial Review

When a federal court decides whether an administrator wrongfully denied disability benefits to a claimant, and the disability plan grants the administrator discretionary authority to determine eligibility benefits, or to construe terms of the plan, that review is limited as federal courts may only decide whether the denial was arbitrary or capricious. *Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).* Thus, in those cases, the district court may overturn a decision of an administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)* (quoting *Adamo v. Anchor Hocking Corp., 720 F. Supp. 491, 500 (WD.Pa. 1989).*

On the other hand, when an administrator operates under [*16] a conflict of interest, the Court must weigh that conflict as a factor in determining whether the administrator has abused its discretion. *Firestone Tire*

*and Rubber Co. v. Bruch, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 109 S. Ct. 948 (1989).* The Third Circuit has held that a conflict of interest exists when an insurance company both funds and administers a plan, and courts must apply a heightened form of arbitrary and capricious review. *Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 387 (3d Cir. 2000).* In *Pinto,* the Third Circuit held that review under such a heightened standard should be made using a "sliding scale," in which the intensity of review increases proportionately with the intensity of the conflict of interest. *Pinto, 214 F.3d at 393.*

Here, there is no dispute that Defendant had discretionary authority under the Policy, nor do the parties dispute that Defendant both funded and administered the Policy. They do dispute what standard of review the Court should apply, and whether Defendant wrongfully denied Plaintiff's benefits.

Because Defendant has a conflict of interest, there is no question that heightened scrutiny [*17] is required here. *See Pinto, 214 F.3d at 392* ("heightened scrutiny is required when an insurance company is both plan administrator and funder"). However, the Court must decide where this case falls on *Pinto's* sliding scale. When applying the heightened form of the arbitrary and capricious standard, courts should be deferential, but not absolutely deferential, and "'the greater the evidence of conflict on the part of the administrator, the less deferential [the] abuse of discretion standard.'" *Id.* (quoting *Vega v. National Life Ins. Services, Inc., 188 F.3d 287, 297 (5th Cir. 1999).* Thus, evidence of a significant conflict of interest places a case at the far end of the sliding scale where the court reviews the administrator's decision with a "high degree of skepticism." *Pinto, 214 F.3d at 395.*

Evidence of procedural anomalies warrants application of more weight to the conflict along the sliding scale under the "heightened" abuse of discretion standard. For example, in *Pinto,* the Court of Appeals for the Third Circuit found various procedural anomalies, such as when the insurance company reversed its initial decision [*18] to award benefits and ignored a staff worker's recommendation to reinstate benefits. *Pinto, 214 F.3d at 393-94.*

In this case, the Court finds that it should view Defendant's decision to deny Plaintiff's claim with significant skepticism. First, like the Defendant in *Pinto,* UNUM reversed its initial decision to award Plaintiff

benefits, although the *Pinto* Court did so without receiving additional medical information, whereas UNUM did receive such information. However, when Defendant reviewed those records, it concluded that "no objective findings preclude [Plaintiff] from F/T [full time] sedentary capacity in regards to musculoskeletal issues." (*Defendant's App.* at 186). This is simply wrong. As discussed at length above, Plaintiff's disability claim was supported by objective evidence such as MRI and CT reports, Plaintiff's doctors' observations, and x-rays. UNUM even admitted that such evidence existed when, on April 16, 1999, Defendant reviewed Plaintiff's then available medical records and concluded that "CT and MRI studies well document multiple level changes in [Plaintiff's] cervical and lumbar spines." (*Defendant's App.* at 655). The administrative [*19] record's evidence of Plaintiff's disability certainly contains more than "no objective findings."

Other procedural anomalies exist here. After UNUM issued its October 11, 2000 letter, three of Plaintiff's physicians submitted reports. For example, in the November 20, 2000 letter to UNUM, Dr. Getzoff concluded that Plaintiff could not return to work, and that he was disabled due to both the fibromyalgia and degenerative disc disease. (*Defendant's App.* at 205). UNUM dismissed Dr. Getzoff's report without confronting it squarely, and denied Plaintiff's claim on January 2, 2001.

Also very troubling to this Court, is Defendants' use of nurses and non-treating/examining physicians to deny Plaintiff's claim after sustaining it for over a year. This court and others have found that use of non-treating physicians in this way is suspect. *See Cohen v. Standard Insurance Company, 155 F. Supp. 2d 346, 352 (E.D.Pa. 2001); Palmer v. University Med. Group, 994 F. Supp. 1221, 1235 (D.Or. 1998); see also Regula v. Delta Family-Care Disability Survivorship Plan, 266 F.3d 1130, 1147 (9th Cir. 2001)* (noting that failure to give special weight to [*20] a treating physician's opinion is evidence of conflict). On November 30, 2000, Dr. Schmitzer reported to UNUM that Plaintiff was totally disabled due to "significant neck and back pain, as well as inappropriate jerky movements of his extremities, coupled with significant MRI findings of the cervical and lumbar spine as well as the diagnosis of fibromyalgia." (*Defendant's App.* at 192). He further found that Plaintiff suffered from small disc herniation at C3-4, narrowing of both neural foramina, [8] small right paramedian disc

2002 U.S. Dist. LEXIS 13205, *20

herniation at C5-6, narrowing of the right neural foramen, and central disc bulge at C4-5. (*Defendant's App.* at 191). He also stated that a lumbar MRI "showed early degenerative disease with a small central disc bulge at L4-5", and that "his examination revealed cervical and trapezius spasm, as well as lumbar spasm and tenderness with restriction of motion in all areas." *Id.*

> 8    Foramina is defined as: "an aperture or perforation through a bone or a membranous structure."    STEDMANS    MEDICAL DICTIONARY (27th ed. 2000).

[*21] After only reviewing Dr. Schmitzer's letter, and not Plaintiff himself, an UNUM nurse concluded that Dr. Schmitzer's letter "does not provide any new objective medical data to substantiate a deterioration of clmnt's [sic] condition to warrant permanent disability." It is difficult to accept the nurse's conclusion because UNUM never examined Plaintiff. Further, under the Policy, Plaintiff is not required to provide "new objective medical data" to demonstrate a "deterioration" of his condition. Thus, rejecting Dr. Schmitzer's conclusions on these grounds was arbitrary.

The record reveals more evidence of procedural anomalies and that Defendant's conflict improperly influenced its decision, but the evidence the Court has reviewed above warrants a standard of review that does not afford substantial deference to UNUM's decision to deny Plaintiff's claim for benefits.

**B.    *Review of UNUM's Decision Under a Heightened Arbitrary and Capricious Standard***

The parties dispute whether, under the Policy, Plaintiff is "limited from performing the material and substantial duties of your regular occupation due to sickness or injury" and is therefore disabled. (*Defendant's App.* [*22] *at 700).* Plaintiff's regular occupation under the Policy was a "purchasing manager". (*Defendant's App.* at 664). As explained earlier, that position is classified as sedentary and occasionally involved lifting, but was primarily a seated position allowing for alternatively sitting and standing. However, Dr. Schmitzer concluded that Plaintiff could only sit for 4 hours out of an 8 hour work day, and perform only 1 hour of sedentary work in June 1999. Then, in September 1999, Dr. Schmitzer concluded that Plaintiff could sit for 3 hours, and perform 3 hours of sedentary work. Further, throughout the claim process, Dr. Schmitzer maintained

that Plaintiff was disabled. As highlighted above, on November 20, 2000, Dr. Schmitzer concluded that Plaintiff was totally disabled based upon "significant neck and back pain, as well as inappropriate jerky movements of his extremities, coupled with significant MRI findings of the cervical and lumbar spine as well as the diagnosis of fibromyalgia." (*Defendant's App.* at 192).

Similarly, after treating him throughout the claim process, Dr. Getzoff stated on November 20, 2000 that "in reviewing the most recent studies and examining him, I find [*23] that he is still disabled and unable to return to work at this time" because of his "fibromyalgia and degenerative disc disease in the cervical and lumbar spine." (*Defendant's App.* at 205).

Despite the unwavering conclusions of Plaintiff's treating physicians, UNUM's nurses and reviewing doctors repeatedly referred only to those parts of Plaintiff's medical records that were adverse to Plaintiff's claim when justifying the denial of Plaintiff's claim. For example, in a January 16, 2001 letter to Plaintiff, UNUM wrote that in his April 12, 1999 evaluation of Plaintiff's condition, Dr. Getzoff noted that Plaintiff did not "appear to be chronically ill", that Plaintiff had a "fairly good range of motion of [his] neck without pain or loss of range of motion" and that "'the patient's complaint of chronic pain is out of proportion to the findings on the x-rays.'" (*Defendant's App.* at 147). However, in that letter UNUM ignores Dr. Getzoff's statement that Plaintiff's "workup has shown that he had a CT of his cervical spine and a myelogram showing disc bulges and spondylitic disc herniation at C5 and C6." (*Defendant's App.* at 497). But more importantly, UNUM ignores Dr. Getzoff's [*24] November 20, 2000 conclusion that Plaintiff is totally disabled. Thus, even though Dr. Getzoff may have made some findings in April 1999 that could be construed as adverse to Plaintiff's claim, his ultimate conclusion was that Plaintiff is disabled. Other courts have overturned adverse benefits decisions based upon such selective reading of medical records. *E.g., Davies v. Paul Revere Life Ins. Co., 147 F. Supp. 2d 347, 361* (M.D.Pa., 2001); *Rosenthal v. Long-Term Disability Plan of Epstein, Becker & Green, P.C., 1999 U.S. Dist. LEXIS 21443,* No. CIV-98-4246, 1999 WL 1567863 at *13 (C.D.Cal. Dec. 21, 1999).

The record further reveals that UNUM acted more like Plaintiff's adversary than an impartial judge of his claim for benefits. Courts have admonished such

behavior, and have considered such behavior as grounds for overturning a benefits decision. *E.g., Davies, 147 F. Supp. 2d at 360; Rosenthal, 1999 U.S. Dist. LEXIS 21443, 1999 WL 1567863,* at *14. Not only did UNUM selectively read the medical records, it offered conclusory findings in the face of objective medical evidence and well reasoned opinions by Plaintiff's treating doctors. For example, and as discussed [*25] earlier, UNUM's finding that "no objective findings preclude [Plaintiff] from F/T [full time] sedentary capacity in regards to musculoskeletal issues" (*Defendant's App.* at 186) is without basis. Plaintiff's disability claim was supported by objective evidence such as MRI and CT reports, Plaintiff's doctors' observations, and x-rays. Likewise, after reviewing Plaintiff's file on December 11, 2000, an UNUM nurse found in a report, and Dr. Gritton agreed, that Plaintiff's medical records "do not substantiate a sudden deterioration of clmnt's [sic] condition." (*Defendant's App.* at 186). However, that report fails to explain the reasoning supporting that conclusion, and the Policy does not require that Plaintiff "substantiate a sudden deterioration" of his condition. The Third Circuit has held that it is arbitrary and capricious for an administrator to require a claimant to satisfy conditions that are not part of a policy. *E.g., Mitchell v. Eastman Kodak Co., 113 F.3d 433, 442 (3d Cir. 1997)* (finding it arbitrary and capricious to require the claimant to submit clinical evidence of the etiology of his allegedly disabling symptoms when the Plan did not impose [*26] such a requirement); *cf. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1997)* (administrator's discretionary interpretation of plan "may not controvert the plain language of the [plan] document").

The Court has fully reviewed the administrative record, and giving UNUM's decision limited deference, finds that Defendant arbitrarily and capriciously denied Plaintiff's claim for benefits. Indeed, objective medical evidence supports his claim that degenerative disc disease disabled the Plaintiff, and the record further indicates that fibromyalgia was a secondary condition contributing to the disability. [9] Further, because the Court finds that the administrative record is complete, UNUM reached an arbitrary and capricious result, and that the evidence points only to a finding of disability, the Court will enter judgment in favor of the Plaintiff. [10] *See Cohen, 155 F. Supp. 2d at 355* (entering judgment for the Plaintiff); *Davies, 147 F. Supp. 2d at 360* (same); *Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1327-28 (11th Cir. 2001).*

[9] Defendant argues that Plaintiff's claim of disability is based solely on self-reported symptoms, and therefore that UNUM was only required to pay Plaintiff disability benefits for 12 months. However, as discussed throughout today's opinion, Plaintiff's claim of disability is also supported by objective medical evidence. To the extent Defendant argues that Plaintiff's claims of psychiatric illness and fibromyalgia are insufficient alone to find Plaintiff disabled, the Court need not address that issue. The record indicates that Plaintiff is disabled because of degenerative disc disease and that fibromyalgia is merely a secondary condition contributing to Plaintiff's disability. *E.g.,* (*Defendant's App.* at 186).

[*27]

[10] A district court may grant summary judgment in favor of a non-movant where it believes that the movant has had adequate notice of grounds for that judgment, and where there is clear support for such judgment. *See, e.g., Banks v. Lackawanna County Comm'rs, 931 F. Supp. 359, 363 n.7 (M.D.Pa. 1996); Peiffer v. Lebanon School Dist., 673 F. Supp. 147, 152 (M.D.Pa. 1987), affirmed, 848 F.2d 44 (3d Cir. 1988);* 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2720 at 29-35 (1983). Here, the parties have been given ample opportunity to present evidence and argument on the issue of summary judgment. Although the Plaintiff argues that there are issues of material fact here, Plaintiff points to evidence outside the administrative record to support that argument. As Defendant correctly argues, the Court may not consider such evidence. *See Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997).* Moreover, the Defendant concedes that "summary judgment is appropriate because there is no genuine issue of material fact." (*Defendant's brief in support of its Motion for Summary Judgment,* at 15). In this case, the record is complete, the parties may not supplement it, and the only competent evidence in this matter, namely the opinions of Plaintiff's treating physicians, requires a finding of disability.

[*28] An appropriate order will follow.

Clarence C. Newcomer, S.J.

2002 U.S. Dist. LEXIS 13205, *28

***ORDER***

AND NOW, this **17th** day of July, 2002, the Court hereby ORDERS as follows:

1. Defendant's Motion for Summary Judgment is DENIED.

2. Summary Judgment is GRANTED in favor of the Plaintiff. The Court will enter its judgment after the parties comply with the procedure in paragraph 3.

3. The parties shall make every effort to stipulate to a proposed Order awarding Plaintiff relief that conforms to the Court's opinion accompanying this Order, and submit said proposed Order by Tuesday, July 23, 2002. If the parties cannot so stipulate, the parties shall submit proposed Orders and a brief not to exceed three (3) pages addressing the propriety of their proposed Orders by Tuesday, July 23, 2002. The conference presently scheduled for July 23, 2002 is hereby CONTINUED pending final resolution of this matter.

AND IT IS SO ORDERED.

Clarence C. Newcomer, S.J.

Westlaw.

154 Fed.Appx. 903
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
**(Cite as: 154 Fed.Appx. 903)**

**H**
Fisher-Price, Inc. v. Graco Children's Products, Inc.
C.A.Fed.,2005.
This case was not selected for publication in the
Federal Reporter.NOTE: Pursuant to Fed.Cir.R.
47.6, this order is not citable as precedent. It is
public record.Please use FIND to look at the
applicable circuit court rule before citing this
opinion. Federal Circuit Rule 47.6. (FIND CTAF
Rule 47.6.)
United States Court of Appeals,Federal Circuit.
FISHER-PRICE, INC, Plaintiff-Appellant,
v.
GRACO CHILDREN'S PRODUCTS, INC. and
Newell Rubbermaid, Inc., Defendants-Appellees.
No. 05-1258.

Nov. 4, 2005.

**Background:** Patentee of collapsible infant swing
brought infringement action against competitor.
The United States District Court for the Eastern
District of Pennsylvania, 2005 WL 408040,Fullam,
J., held two claims invalid by reason of
indefiniteness and dismissed the suit. Patentee
appealed.

**Holdings:** The Court of Appeals, Schall, Circuit
Judge, held that:

(1) the limitation "upper seating surface" was not
indefinite;

(2) the limitation "reconfigurable swing area" was
not indefinite; and

(3) shield limitation was not indefinite.

Reversed and remanded.
West Headnotes
**[1] Patents 291 ☞101(6)**

291 Patents
   291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(6) k. Ambiguity, Uncertainty or

Indefiniteness. Most Cited Cases
The limitation "upper seating surface" of claim in
patent for collapsible infant swing was not
indefinite, so as to render the patent invalid, even if
it was not mentioned in the specification, since the
technology involved in the invention was not
complex and the words used in the limitation had
well-known meanings. 35 U.S.C.A. § 112.

**[2] Patents 291 ☞101(6)**

291 Patents
   291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(6) k. Ambiguity, Uncertainty or
Indefiniteness. Most Cited Cases
Since claim language regarding "reconfigurable
swing area" in patent for collapsible infant swing
was unambiguous, clerical error in drawing of
swing did not render the limitation "reconfigurable
swing area" indefinite, so as to render the patent
invalid. 35 U.S.C.A. § 112.

**[3] Patents 291 ☞101(6)**

291 Patents
   291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(6) k. Ambiguity, Uncertainty or
Indefiniteness. Most Cited Cases
Shield limitation in patent for collapsible infant
swing was not indefinite, so as to render the patent
invalid, even if conflict existed within the
specification, since unambiguous claim language
resolved the conflict. 35 U.S.C.A. § 112.

**[4] Patents 291 ☞101(6)**

291 Patents
   291IV Applications and Proceedings Thereon
    291k101 Claims
      291k101(6) k. Ambiguity, Uncertainty or
Indefiniteness. Most Cited Cases
Shield limitation in patent for collapsible infant
swing was not indefinite, so as to render the patent
invalid, since antecedent basis for term "said

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 Fed.Appx. 903                                    Page 2
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
**(Cite as: 154 Fed.Appx. 903)**

seating area" was present by implication. 35 U.S.C.A. § 112.

**Patents 291 ⚖329328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
6,520,862. Valid.

Before MAYER, SCHALL, and LINN, Circuit Judges.

DECISION

SCHALL, Circuit Judge.

**\*\*1** Fisher-Price, Inc. ("Fisher-Price") appeals from the final decision of the United States District Court for the Eastern District of Pennsylvania (i) holding claims 6 and 7 of United States Patent No. 6,520,862 (the " '862 patent") invalid by reason of indefiniteness and (ii) dismissing Fisher-Price's suit

against Graco Children's Products, Inc. ("Graco") and Newell Rubbermaid, Inc. ("Newell") for infringement of claims 6 and 7. *Fisher-Price, Inc. v. Graco Children's Prods., Inc.,* No. 03-5405, 2005 WL 408040, at \*1 (E.D.Pa.2005) (*"Summary Judgment"*). Because we conclude that the district court erred in its determination that claims 6 and 7 are indefinite, we *reverse* and *remand.*

DISCUSSION

I.

Fisher-Price is the owner of the '862 patent. The patent is directed to a collapsible infant swing having two configurations: a deployed configuration and a storage configuration. Figure 6 of the patent depicts an embodiment of the claimed invention.



Figure 6 shows a collapsible infant swing (100) with a shield (400) coupled to a seat (190). The seat has a removable cover (180) that defines a seating surface between support posts (210). '862 patent, col. 3, II. 8-9, col. 3, II. 29-30. The support posts are connected to a base (150), which pivots around a pivot point (510), while a cross member (300) is coupled between the upper ends of the support posts. '862 patent, col. 2, II. 20-26, col. 2, II. 39-40, col. 4, I. 37. Figure 6 also shows a positioning

member (500) and a swing arm (252). '862 patent, col. 3, II. 2-3, col. 4, I. 36. Claim 6 of the '862 patent recites:

An infant swing comprising:

an upward extending frame support post;

**\*905** a swing arm pivotally coupled to an upper end of said frame support post and extending in a downward direction from said upper end of said frame support post;

a seat coupled to said swing arm and having an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

upper seating surface;
said swing arm and said frame support post
defining a reconfigurable swing area therebetween;
a shield coupled to said seat and extending
upwardly from said seat and disposed between said
reconfigurable swing area and said seating area.

'862 patent, col. 6, ll. 30-43. Claim 7 depends from
claim 6. It claims the infant swing of claim 6
"wherein said shield is formed of open mesh fabric.
" '862 patent, col. 6, ll. 44-45.

## II.

Graco is a manufacturer of children's products,
including infant swings. Newell is Graco's
corporate parent. Fisher-Price sued Graco and
Newell for infringement of claims 6 and 7 of the
'862 patent. Upon doing so, it sought a preliminary
injunction, which was denied by the district court.
*Fisher-Price, Inc. v. Graco Children's Prods., Inc.,*
No. 03-5405, 2003 WL 22797891, at *2 (E.D.Pa.
Nov. 19, 2003). Subsequently, the district court
held a *Markman* hearing, after which it found
several limitations of the claims at issue indefinite.
*Fisher-Price, Inc. v. Graco Children's Prods., Inc.,*
No. 03-5405, 2004 WL 1320901, at *1-2 (E.D.Pa.
June 15, 2004) ("*Claim Construction*").
Accordingly, the court granted summary judgment
of invalidity in favor of Graco and Newell and
dismissed Fisher-Price's suit. *Summary Judgment* at
*1. Fisher-Price now appeals. We have jurisdiction
pursuant to 28 U.S.C. § 1295(a)(1).

## III.

**2** The definiteness requirement originates from
35 U.S.C. § 112 ¶ 2. The statute provides that "[t]he
specification shall conclude with one or more
claims particularly pointing out and distinctly
claiming the subject matter which the applicant
regards as his invention." 35 U.S.C. § 112 ¶ 2. If a
claim fails to satisfy the definiteness requirement, it
is invalid. *Bancorp Servs., L.L.C. v. Hartford Life
Ins. Co.,* 359 F.3d 1367, 1371 (Fed.Cir.2004). "In
ruling on a claim of patent indefiniteness, a court
must determine whether those skilled in the art
would understand what is claimed when the claim

is read in light of the specification." *Id.; Exxon
Research and Eng'g Co. v. United States,* 265 F.3d
1371, 1375 (Fed.Cir.2001). "A claim is indefinite if
its legal scope is not clear enough that a person of
ordinary skill in the art could determine whether a
particular composition infringes or not." *Geneva
Pharm., Inc. v. Glaxosmithkline PLC,* 349 F.3d
1373, 1384 (Fed.Cir.2003); *accord Exxon
Research,* 265 F.3d at 1375.

The *Exxon Research* court explained that a claim
will not be invalidated for indefiniteness without a
severe defect.
[W]e have not held that a claim is indefinite merely
because it poses a difficult issue of claim
construction. We engage in claim construction
every day, and cases frequently present close
questions.... We have not insisted that claims be
plain on their face in order to avoid condemnation
for indefiniteness; rather, what we have asked is
that the claims be amenable to construction,
however difficult that task may be. If a claim is
*insolubly ambiguous,* and no narrowing
construction can properly be adopted, we have held
the claim indefinite. If the meaning of the claim is
discernible, even though the task may be
formidable and the conclusion may be **906** one
over which reasonable persons will disagree, we
have held the claim sufficiently clear to avoid
invalidity on indefiniteness grounds.

265 F.3d at 1375 (citing *Modine Mfg. Co. v. United
States Int'l Trade Comm'n,* 75 F.3d 1545, 1557
(Fed.Cir.1996) (emphasis added) (rejecting
indefiniteness argument after claim construction;
and stating that "when claims are amenable to more
than one construction, they should when reasonably
possible be interpreted to preserve their validity.")).
We declared in *Exxon Research* that "[b]y finding
claims indefinite only if reasonable efforts at claim
construction prove futile, we accord respect to the
statutory presumption of patent validity, and we
protect the inventive contribution of patentees, even
when the drafting of their patents has been less than
ideal." *Id.* (internal citations omitted).

"A determination that a patent claim is invalid for

154 Fed.Appx. 903                                                      Page 4
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
(Cite as: 154 Fed.Appx. 903)

failure to meet the definiteness requirement of 35 U.S.C. § 112, ¶ 2 is a conclusion 'that is drawn from the court's performance of its duty as the construer of patent claims and therefore, like claim construction, is a question of law' as to which we exercise plenary review." *Bancorp Servs.,* 359 F.3d at 1371 (quoting *Atmel Corp. v. Info. Storage Devices, Inc.,* 198 F.3d 1374, 1378 (Fed.Cir.1999)); *accord Exxon Research,* 265 F.3d at 1376 ("A decision holding a patent invalid for indefiniteness presents a question of law, which we review de novo.... We therefore reject Exxon's argument that the issue of indefiniteness turns on an underlying factual dispute that should not have been resolved as a matter of law on summary judgment.").

IV.

**\*3** The district court ruled that the following limitations of claim 6 of the '862 patent are indefinite:
a seat coupled to said swing arm and having an upper seating surface;
said swing arm and said frame support post defining a reconfigurable swing area therebetween;
a shield coupled to said seat and extending upwardly from said seat and disposed between said reconfigurable swing area and said seating area.

'862 patent, col. 6, ll. 36-42. On appeal, Fisher-Price argues that the court erred in its rulings with respect to each of these limitations. We address each limitation in turn.

A. *"[A] seat coupled to said swing arm and having an upper seating surface"*

The district court stated:
"[A] seat coupled to said swing arm and having an upper seating surface" is indefinite. The meaning of "upper seating surface" is unclear. Fisher-Price defines the "upper seating surface" as the entire top surface of the seat (and concomitantly defining at the hearing the lower seating surface as the underside of the swing). Fisher-Price's definition would apply to every seat, but the patent distinguishes the swing as having an upper seating surface, thus implying that not every seat would

have an "upper seating surface."

*Claim Construction* at \*1.

Fisher-Price argues that the district court erred because the limitation "upper seating surface" is not insolubly ambiguous. Fisher-Price contends that the limitation is susceptible to two possible constructions. According to Fisher-Price, the correct construction is the one it urged in the district court. Under that construction, the "upper seating surface" is "[t]he top surface of the seat on which the child rests, including the portion substantially adjacent the child's head and the portion \*907 substantially adjacent the child's feet." An alternative construction, Fisher-Price urges, is the one suggested by the district court during the *Markman* hearing. Under that construction, "upper" in "upper seating surface" refers only to some subset of points that define the "seating surface," such as the portion of the seating surface located near the infant's head or torso rather than the infant's legs and bottom.

Graco responds that the district court did not err in its ruling that the limitation "upper seating surface" is indefinite. Graco points out that neither "seating surface" nor "upper seating surface" is mentioned in the specification of the '862 patent, and like the district court, it maintains that because of the "inherent differentiation" between "upper" and "lower" seating surface, the limitation is insolubly ambiguous.

[1] The district court erred in finding the limitation "upper seating surface" indefinite. The technology involved in the invention of the '862 patent is not complex; it is readily understood by both the expert and the layperson. Moreover, as Fisher-Price notes, the words used in the limitation are simple, with well-known ordinary meanings. Under these circumstances, we think the limitation "upper seating surface" can be construed without great difficulty, even if, as Graco points out, it is not mentioned in the specification. Indeed, not surprisingly, two very plausible constructions already have emerged. Finally, as far as the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 Fed.Appx. 903                                                                                    Page 5
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
**(Cite as: 154 Fed.Appx. 903)**

indefiniteness analysis is concerned, we think the district court's concern about differentiating between upper and lower seating surfaces is misplaced. In our view, whether "the patent distinguishes the swing as having an upper seating surface, thus implying that not every seat would have an upper seating surface," *Claim Construction* at *1, is a consideration not relevant to determining whether the limitation is so unclear that "a person of ordinary skill in the art could [not] determine whether the [accused device] infringes or not." *Geneva Pharm.*, 349 F.3d at 1384.

B. *"[S]aid swing arm and said frame support post defining a reconfigurable swing area therebetween"*

**\*\*4** The district court stated:



**\*908** Applying the claim language, the "reconfigurable swing area" is the area between the swing arm (252) and the frame support post (210). As the distance between the swing arm and the frame support post decreases, the swing area "A" decreases. In this way, an infant's limbs get pinched by being in a region that is eliminated by the boundaries of the region collapsing. Thus, "A" in Figure 7 identifies the wrong region.

Graco argues that Figure 7 possesses an error so severe that one skilled in the art would not know what region is being defined. Fisher-Price acknowledges the error in Figure 7, but argues that this does not justify a holding of indefiniteness because claim construction still is possible.

[2] We agree with Fisher-Price. The clerical error in Figure 7 is not fatal because the claim language is unambiguous. It clearly defines the

"[S]aid swing arm and said frame support post defining a reconfigurable swing area therebetween" is indefinite. As Fisher-Price itself acknowledged, one of the drawings (Figure 7) is inaccurate. A person skilled in the art reviewing the patent as a whole, including the drawing, could not determine the "reconfigurable swing area."

*Claim Construction* at *2 (internal citations omitted). The inaccuracy of Figure 7 appears to be the district court's sole stated reason for declaring this limitation indefinite. The "reconfigurable swing area" is represented by "A" in Figures 5-7 shown below. '862 patent, col. 3, II. 34-36.

"reconfigurable swing area" as the area between the swing arm and the frame support post.[FN1] Moreover, the Detailed Description states, "The space between each support post 210 and corresponding swing arm 250 is a wedge-shaped swing area A that varies with the position of the swing arms 250." '862 patent, col. 3, II. 33-35. In short, despite the error in Figure 7, one skilled in the art would know that the "reconfigurable swing area" is the region in which an infant's limb can be pinched, which must be the region between the swing arm and the frame support post. The limitation "reconfigurable swing area" is not indefinite.

FN1. "[S]aid swing arm and said frame support post defining a reconfigurable swing area therebetween ...."'862 patent, col. 6, II. 38-39.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 Fed.Appx. 903
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
(Cite as: 154 Fed.Appx. 903)

C. "[A] shield coupled to said seat and extending
upwardly from said seat and disposed between said
reconfigurable swing area and said seating area."

The district court found two parts of this claim
limitation indefinite. The court first stated:
"[A] shield coupled to said seat and extending
upwardly from said seat" is indefinite. It is unclear
whether the shield is to be coupled with the seat
itself, the (undefined) "seating area", or the padded
seat cover (if that is what is meant by "upper
seating surface.")

Claim Construction at *2.

In challenging the ruling of the district court,
Fisher-Price states: "Nothing in the English
language prevents an object that is located
'between' elements A and B also to be 'coupled to'
... either A or B." Fisher-Price further states that
"[t]he claim says nothing about where on the seat
the coupling must occur.... [T]he law does not
require patent claims to specify the exact location
of components." Graco's primary contention is that
the first part of the shield limitation is indefinite
because neither the claim nor the specification say
where the shield is to be coupled to the seat. In
making this argument, Graco points to what it says
is a conflict within the specification. The
specification states that the shield can be integrally
coupled "with the seat," while later stating that the
shield is preferably coupled in taut configuration
"between swing arms 250 and seat 190" to prevent
the shield from deforming. '862 patent, col 3, ll.
44-49. Graco urges that the specification is
inconsistent as to whether the shield is coupled
"with" the seat or "between" the seat and the swing
arms.

**909 **5 [3] Again, we agree with Fisher-Price.
Even if it could be said that a conflict exists within
the specification, it is resolved by the unambiguous
claim language, which teaches "a shield coupled to
said seat." Given the clarity of the claim language,
we are confident that insofar as the first part of the
shield limitation is concerned, reasonable efforts at
claim construction would not prove futile. See

Exxon Research, 265 F.3d at 1375.

As far as the second part of the shield limitation is
concerned, the district court stated:
"[A]nd disposed between said reconfigurable swing
area and said seating area" is indefinite. Seating
area is nowhere defined in the patent. Fisher-Price's
attempts to define the "upper seating surface" as the
entire padded area and the "lower seating surface"
as the underside of the swing was unconvincing and
against the ordinary meaning of the terms.

Claim Construction at *2. The district court thus
found the second part of the shield limitation
indefinite because the term "said seating area"
lacked an antecedent basis. Fisher-Price argues that
the district court erred. It contends that "upper
seating surface" is the antecedent basis for "said
seating area."[FN2] Graco responds that allowing
"upper seating surface" to serve as the antecedent
basis for "said seating area" essentially equates the
terms, which Graco argues is impermissible. See
Ethicon Endo-Surgery Inc. v. United States
Surgical Corp., 93 F.3d 1572, 1579 (Fed.Cir.1996)
(stating that if the two claim terms at issue
"described a single element, one would expect the
claim to consistently refer to this element as either
[one or the other of the two terms], but not both,
especially not within the same clause").

   FN2. The '862 patent claims:
   [A] seat coupled to said swing arm and
   having an *upper seating surface;*
   said swing arm and said frame support post
   defining a reconfigurable swing area
   therebetween;
   a shield coupled to said seat and extending
   upwardly from said seat and disposed
   between said reconfigurable swing area
   and *said seating area.*
   '862 patent, col 3. ll. 36-42 (emphasis
   added).

[4] A claim is not invalid for indefiniteness if its
antecedent basis is present by implication. Cross
Med. Prods., Inc. v. Medtronic Sofamor Danek,
Inc., 424 F.3d 1293, 1319 (Fed.Cir.2005) (citing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

154 Fed.Appx. 903
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)
**(Cite as: 154 Fed.Appx. 903)**

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.,* 810 F.2d
1113, 1116 (Fed.Cir.1987)). It is our conclusion
that, in this case, "upper seating surface" is by
implication the antecedent basis for "seating area."
On that basis, we hold that the second half of the
shield limitation of claim 6 is not indefinite.

For the foregoing reasons, the decision of the
district court holding the asserted claims of the '862
patent indefinite and dismissing Fisher-Price's suit
is reversed. The case is remanded to the district
court for it to construe the asserted claims and to
thereafter adjudicate Fisher-Prices' claim of
infringement.

C.A.Fed.,2005.
Fisher-Price, Inc. v. Graco Children's Products, Inc.
154 Fed.Appx. 903, 2005 WL 2899289 (C.A.Fed.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))
(Cite as: Slip Copy)

**H**

MicroStrategy Inc. v. Business Objects Americas
C.A.Fed. (Del.),2007.
Only the Westlaw citation is currently
available.This case was not selected for publication
in the Federal Reporter.Not for Publication in
West's Federal Reportertl See Fed. Rule of
Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan.
1, 2007. See also Federal Circuit Rule 32.1 and
Federal Circuit Local Rule 32.1. (Find CTAF Rule
32.1)
United States Court of Appeals,Federal Circuit.
MICROSTRATEGY INCORPORATED, Plaintiff-
Appellant,
v.
BUSINESS OBJECTS AMERICAS (Successor by
merger to Crystal Decisions, Inc.), Defendant-
Appellee.
**No. 2006-1320.**

June 25, 2007.

Appealed from United States District Court for the
District of Delaware, Kent A. Jordan, Judge.

William F. Lee, Wilmer Cutler Pickering Hale and
Dorr LLP, of Boston, Massachusetts, argued for
plaintiff-appellant. With him on the brief were
Joseph J. Mueller and Pratik A. Shah. Of counsel
on the brief was William G. McElwain, of
Washington, DC. Of counsel were Joseph P.
Lavelle and Peter E. Moll, Howrey LLP, of
Washington, DC.
Daniel J. Furniss, Townsend and Townsend and
Crew LLP, of Palo Alto, California, argued for
defendant-appellee. With him on the brief were
Joseph A. Greco, Gary H. Ritchey, and Thomas F.
Fitzpatrick. Of counsel on the brief were Josy W.
Ingersoll, and John W. Shaw, Young Conaway
Stargatt & Taylor LLP, of Wilmington, DE.

Before MAYER, Circuit Judge, CLEVENGER,
Senior Circuit Judge, and PROST, Circuit Judge.
PROST, Circuit Judge.

*1 MicroStrategy Inc. ("MicroStrategy") appeals a
decision by the United States District Court for the
District of Delaware granting summary judgment of
noninfringement of claims 1, 2, 8, and 21 of U.S.
Patent No. 6,279,033 ("the 033 patent") by
Business Objects Americas ("Business Objects"),
and summary judgment of invalidity of claims 1, 2,
4-6, 9, 10, and 13 of U.S. Patent No. 6,658,432
("the 432 patent") and claims 1, 4, 7, 8, 11, and 18
of U.S. Patent No. 6,567,796 ("the 796 patent").
*MicroStrategy Inc. v.. Bus. Objects Ams.,* 410
F.Supp.2d 348, 351 (D.Del.2006). Because the
district court's grants of summary judgment were
correct, we affirm.

I. BACKGROUND

On December 13, 2003, MicroStrategy sued Crystal
Decisions, Inc., which was acquired by Business
Objects one day later, for infringement of the 033,
432, and 796 patents. These patents relate to
business intelligence software that retrieves,
organizes, and analyzes data stored in large
databases to assist users making business decisions.
As such, this software is sometimes referred to as a
"decision support system." In particular
embodiments, decision support systems may be
implemented through network-based user interfaces
that allow a user to submit a request for a particular
report through a web browser. 033 patent, col. 3, ll.
30-31; 432 patent, col. 1, ll. 61-64. The resulting
report may then be directed to the web browser
and/or other devices such as fax machines, pagers,
telephones, and electronic mail. 796 patent, col. 5,
ll. 54-63. "One type of decision support system is
known as an on-line analytical processing system
('OLAP')." 033 patent, col. 1, ll. 49-50; 432 patent,
col. 1, ll. 20-22; 796 patent, col. 1, ll. 59-60. The
three patents-in-suit are generally directed to
systems and methods for improving the operation
of such systems.

After construing the disputed claim terms, the
district court granted summary judgment that
Business Objects did not infringe claims 7, 8, and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))
**(Cite as: Slip Copy)**

Page 2

21 of the 033 patent. *MicroStrategy,* 410 F.Supp.2d at 361. The district court also granted summary judgment that claims 6, 9, 10, and 13 of the 432 patent were indefinite under 35 U.S.C. § 112, ¶ 2. Lastly, the district court granted summary judgment that claims 1, 2, 4, and 5 of the 796 patent and claims 1, 4, 7, 8, 11, and 18 of the 796 patent were invalid under 35 U.S.C. § 102(b). *Id.* at 363-65.

MicroStrategy appeals the grant of summary judgment of noninfringement of claim 7 of the 033 patent, and the grants of summary judgment of invalidity of claims 1, 2, 4-6, 9, 10, and 13 of the 432 patent and claims 1, 4, 7, 8, 11, and 18 of the 796 patent. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## II. DISCUSSION

### A. Standard of Review

This court reviews a district court's grant of summary judgment without deference, applying the same standard as the district court and drawing all reasonable inferences in favor of the nonmovant. *Perricone v. Medicis Pharm. Corp.,* 432 F.3d 1368, 1372 (Fed.Cir.2005). Claim construction and indefiniteness are questions of law that we review de novo. *Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.,* 336 F.3d 1308, 1318 (Fed.Cir.2003). Anticipation, on the other hand, is a question of fact that we review for clear error. *See Medichem, S.A. v. Rolabo, S.L.,* 353 F.3d 928, 933 (Fed.Cir.2003).

### B. Noninfringement of Claims 7 and 8 of the 033 Patent

**\*2** On appeal, MicroStrategy argues that the district court misconstrued claim 7 of the 033 patent, and that, therefore, the district court's infringement analysis of claim 7 was incorrect.

Claim 7 recites:
A network-based system for enabling users connected via a network user interface over the network to an OLAP system to asynchronously submit requests for reports to be processed by an OLAP system, the network-based system comprising:
report receiving means for receiving a request from an instance of the network user interface for the OLAP system to process a report;
storage means for storing a report entry for reports that have been requested, including reports requested by other users and reports that are being processed;
report control means for adding a request by that user to the report entry of a particular report in the report list if the report requested by the user is substantially the same as that particular report contained in the report list so that a report is processed once and a result from the report is provided to each user making a request for that report; and
on-line analytical processing means for generating requested reports.

In construing the claim, the district court held that the preamble, particularly the term "asynchronously," was a limitation. *MicroStrategy,* 410 F.Supp.2d at 358. The district court then construed the asynchronously submitted requests referred to in the preamble to be the requests that the report control means checks against the list of previously submitted requests for substantial similarity. *Id.* On appeal, MicroStrategy does not disagree that the term "asynchronously" is a limitation of the claim; however, it contends that the district court erred in construing the "report control means" to operate in response to asynchronously submitted requests. MicroStrategy argues that the preamble of claim 7 only requires that the system enable users to asynchronously submit requests, and that this does not foreclose the system from also enabling users to synchronously submit requests. In other words, MicroStrategy contends that the requests referred to in the body of claim 7 need not be the asynchronously submitted requests referred to in the preamble. Instead, MicroStrategy contends that the requests referred to in the body could be synchronously submitted and unrelated to the asynchronously submitted requests mentioned in the preamble.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 3
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))
(Cite as: Slip Copy)

In support, MicroStrategy cites claims 17 and 21 of the 033 patent, which recite "method[s] of asynchronously processing requests for reports to processed by an OLAP system." According to MicroStrategy, the difference in claim language between claim 7 and claims 17 and 21 indicates the patentee did not intend to limit claim 7 to asynchronously submitted requests. This argument, however, is unpersuasive.

The Summary of the Invention of the 033 patent clearly states that one "object of the invention is to provide a system and method enabling users to asynchronously request reports in a multi-user networked OLAP system that compares *each* request with all requests already processed or being processed by the system to avoid duplicative processing of requests." 033 patent, col. 4, ll. 16-21 (emphasis added). Similarly, figures 1 and 2 of the 033 patent Ilustrate the comparison of the newly submitted request to previously submitted requests as part of the asynchronous operation of the OLAP. Lastly, during reexamination of the 033 patent, MicroStrategy stated that "[e]ach independent claim [including claim 7] recites a feature that specifies asynchronous operation," not merely asynchronous capability.

**\*3** In light of these statements and disclosures, which inextricably link the comparison of new requests against previously submitted requests with the asynchronous submission of requests to the OLAP, the district court did not err when it construed the requests handled by the report control means to be the asynchronously submitted requests mentioned in the preamble of the claim. The district court's grant of summary judgment of noninfringement was, therefore, not erroneous.

### C. Indefiniteness of Claims 6, 9, 10, and 13 of the 432 Patent

MicroStrategy also appeals the district court's grant of summary judgment that claims 6, 9, 10, and 13 of the 432 patent were indefinite and, therefore, invalid under 35 U.S.C. § 112, ¶ 2. According to the district court, the claims were indefinite since

the word "using" in the phrase "the client system using and transmitting the retrieved information to the at least one web server" lacked an object, and there was more than one plausible way to correct the error (i.e., by adding an object or deleting the phrase "using and"). MicroStrategy contends this was error, and that the district court should have instead construed "the retrieved information" to be the object of both "using" and "transmitting."

In determining that the claims were indefinite, the district court relied on *Novo Industries, L.P. v. Micro Molds Corp.,* 350 F.3d 1348, 1354 (Fed.Cir.2003), in which we held that a court can only correct an error in a patent if "(1) the correction is not subject to reasonable debate based on the consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims."

MicroStrategy does not dispute that the inclusion of the phrase "using and" in the claims was erroneous, nor does MicroStrategy dispute that there is more than one plausible way to correct this error. MicroStrategy does, however, dispute that this renders the claims indefinite. According to MicroStrategy, even with the error uncorrected, the claims are not "insolubly ambiguous" and are, therefore, subject to construction and not indefinite.

In making this argument, MicroStrategy relies on *Bancorp Services, L.L.C. v. Hartford Life Insurance Co.* in which we stated:
[I]f [a] claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness. That is, if the meaning of the claim is discernible, "even though ... the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." ... "[C]lose questions of indefiniteness in litigation involving issued patents are properly resolved in favor of the patentee."

359 F.3d 1367, 1371 (Fed.Cir.2005) (citations omitted). However, the argument MicroStrategy advances, i.e., construing "the retrieved

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                   Page 4
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))
(Cite as: Slip Copy)

ormation" to be the object of "using," is the same as one of the corrections considered and correctly rejected by the district court. MicroStrategy's argument does no more than identify a second way to cope with an otherwise indefinite claim term. To credit MicroStrategy's argument would eviscerate our holding in *Novo Industries*. We decline to do so. Simply put, MicroStrategy cannot make an end run around *Novo Industries*.

\*4 Moreover, even if we were to adopt MicroStrategy's proposed construction and construe "the retrieved information" as the object of "using," the claims would still be indefinite. Although MicroStrategy asserts that "using" and "transmitting" mean the same thing, our case law instructs that different claim terms are presumed to have different meanings. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed.Cir.2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed.Cir.2006) ( "[T]he use of two terms in a claim requires that they connote different meanings...."). Here, there is no evidence that the terms have the same meaning. Therefore, "using the retrieved information" must be presumed to mean something other than "transmitting the retrieved information." However, without some information in the patent or its prosecution history about the way in which the retrieved information is being used, or for what purpose it is being used, we are unable to discern what that meaning is. Accordingly, even if we were to construe "the retrieved information" to be the object of "using," claims 6, 9, 10, and 13 of the 432 patent would still be indefinite. As such, the district court's grant of summary judgment of invalidity of these claims was not in error.

D. Anticipation of Claims 1, 2, 4, and 5 of the 432 Patent and Claims 1, 4, 7, 8, 11, and 18 of the 796 Patent

MicroStrategy also appeals the district court's grant of summary judgment that claims 1, 2, 4, and 5 of the 432 patent and claims 1, 4, 7, 8, 11, and 18 of the 796 patent were invalid under 35 U.S.C. § 102. According to MicroStrategy, the prior art "references" relied upon by the district court were not single prior art references and, therefore, cannot be anticipatory under 35 U.S.C. § 102. MicroStrategy, however, did not raise this issue before the district court. Instead, trial counsel for MicroStrategy merely included the perfunctory statement that in order "[t]o prove that a patent claim is anticipated by the prior art, a single prior art reference must contain, either explicitly or inherently, all of the elements of the claim." (citing *EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1350 (Fed.Cir.2001)). The recitation of the applicable law, however, does not prevent the waiver of an argument unless that recitation is accompanied by an explanation of how the law applies to the facts of the particular case. Not only did MicroStrategy fail to provide such an explanation, but it also failed to challenge Business Objects' statement that the manuals relied upon "constitute a single prior art disclosure." Accordingly, MicroStrategy's argument that the prior art manuals are not single references for the purposes of 35 U.S.C. § 102 was waived.

\*5 Nonetheless, MicroStrategy contends that there are still genuine issues of fact regarding claims 4 and 5 of the 432 patent and claims 4, 11, and 18 of the 796 patent. We, however, reject each of these contentions. Simply put, MicroStrategy failed to raise any issues of material fact regarding claims 4 and 5 of the 432 patent and claims 4, 11, and 18 of the 796 patent before the district court. As such, the district court's grant of summary judgment of invalidity of those claims was not erroneous.

### III. CONCLUSION

Because the district court correctly granted summary judgment that claims 7, 8, and 21 of the 033 patent were not infringed by Business Objects and that claims 1, 2, 4-6, 9, 10, and 13 of the 432 patent and claims 1, 4, 7, 8, 11, and 18 of the 796 patent were invalid, we affirm.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))
**(Cite as: Slip Copy)**

C.A.Fed. (Del.),2007.
MicroStrategy Inc. v. Business Objects Americas
Slip Copy, 2007 WL 1842701 (C.A.Fed. (Del.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy

Slip Copy, 2006 WL 3694622 (D.Del.)

**(Cite as: Slip Copy)**

Page 1

**H**

Block Drug Company, Inc. v. Sedona laboratories, Inc.

D.Del.,2006.

Only the Westlaw citation is currently available.

United States District Court,D. Delaware.

BLOCK DRUG COMPANY, INC., Plaintiff,

v.

SEDONA LABORATORIES, INC., and Nutri-Health Supplements, LLC d/b/a Sedona Laboratories, Defendants.

**No. Civ.A.06 350 KAJ.**

Dec. 14, 2006.

Steven J. Balick, John G. Day, Tiffany Geyer Lydon, Ashby & Geddes, Wilmington, DE, for Plaintiff.

John W. Shaw, Karen Elizabeth Keller, Young, Conaway, Stargatt & Taylor, David S. Eagle, Patrick Andrew Costello, Klehr, Harrison, Harvey, Branzburg & Ellers, Wilmington, DE, Chad H. Conelly, pro hac vice, David B. Goldstein, pro hac vice, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

### I. INTRODUCTION AND BACKGROUND

**\*1** This is a patent infringement case filed by plaintiff, Block Drug Company, Inc., ("Block") against defendants, Sedona Laboratories, Inc., and Nutri-Health Supplements, LLC d/b/a Sedona Laboratories ("NHS"). Before me is a Motion to Reconsider (Docket Item ["D.I."] 39; the "Motion") filed by NHS pursuant to Federal Rule of Civil Procedure 54(b) and 59(e). NHS's Motion comes in response to my November 2, 2006 Order (D.I.33) denying NHS's motion to dismiss or, alternatively, to transfer venue. In open court, I determined that 28 U.S.C. § 1391(c) was the proper venue statute to apply in this case, thereby making this court an appropriate venue if it had personal jurisdiction over NHS. (D.I. 32 at 24.) *See North Am. Philips Corp. v. Am. Vending Sales, Inc.,* 35 F.3d 1576,

1577 n. 1 (Fed.Cir.1994) ("The venue issue is subsumed in the personal jurisdiction issue. Venue lies ipso facto if we hold ... that the district court has personal jurisdiction ....") (citing *VE Holding Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574, 1584 (Fed.Cir.1990), *cert. denied,* 499 U.S. 922, 111 S.Ct. 1315, 113 L.Ed.2d 248 (1991)). I further determined that this court had personal jurisdiction over NHS pursuant to Delaware's long-arm statute, 10 Del. C. § 3104(c), because NHS knowingly sent its products into Delaware through a contractual relationship it had with another company, and NHS sought to comply with Delaware labeling laws, thus tailoring its product so it could operate lawfully in Delaware. (D.I. 32 at 24-27.) In addition, I determined that NHS did not carry its burden of showing that Block's rational choice of this court for a forum should be overturned for what would amount to no more than the convenience of NHS. (*Id.* at 27-28.) NHS now asks me to reconsider my order denying its request to transfer this action to the U.S. Court for the District of Arizona. (D.I. 40 at 3-4.) It asserts that transfer of this action is appropriate pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and in the interest of justice. (*Id.* at 4-19.) For the reasons that follow, I will deny NHS's Motion.

### II. STANDARD OF REVIEW

Motions for reconsideration should be granted sparingly. *TI Group Auto. Sys., (N. Am.), Inc. v. VDO N. Am., L.L.C.,* No. C.A.00-432-GMS, 2002 WL 87472, at \*1 (D.Del. Jan.22, 2002). The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). A motion for reconsideration may be granted if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court issues its order; or (3) the need to correct a clear

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3694622 (D.Del.)
**(Cite as: Slip Copy)**

error of law or fact or to prevent manifest injustice. *Max's Seafood Café v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999). A motion for reconsideration is not properly grounded on a request that a court rethink a decision already made. *Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa.1993). Motions for reargument or reconsideration may not be used "as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990). Reargument, however, "may be appropriate where 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." ' *Id.* at 1241 (quoting *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101 (E.D.Va.1983)).

### III. DISCUSSION

**\*2** NHS does not argue that there has been an intervening change in the controlling law, or that there is newly discovered evidence that was not available to it at the time of judgment. Rather, it contends that there is a need to correct a clear error of law or fact or to prevent manifest injustice. (D.I. 40 at 2.) NHS asserts that under the factors identified in *Jumara v. State Farm Insurance. Co.,* 55 F.3d 873, 879-80 (3d Cir.1995) (identifying six private interests and six public interests that courts have considered in ruling on § 1404(a) motions), the balance of convenience and fairness considerations weigh in favor of transferring this case to the U.S. Court for the District of Arizona. (D.I. 40 at 8-17.)

The U.S. Supreme Court explained in *Stewart Organization Inc. v. Ricoh Corp.,* 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988), that section 1404(a) vested district courts with broad discretion to determine whether convenience and fairness considerations weigh in favor of transfer. *Id.* at 30-31; *see also Jumara,* 55 F.3d at 883. In making my determination that a transfer was not appropriate, I stated that I had considered the

appropriate factors and had concluded that NHS did not carry its burden of showing that plaintiff's choice of forum should be overturned. (D.I. 32 at 27-28.) To win a motion of reconsideration, it is not enough for NHS to argue that the balance of convenience weighs in favor of transfer; rather, NHS must demonstrate that I made a clear error of law or fact, or that manifest injustice resulted from my decision. NHS argues in substantial detail that the "balance of conveniences" tips in favor of transfer, because the lawsuit has a limited connection to Delaware, it is more convenient and less expensive for NHS to litigate in Arizona, and it would be more convenient for its witnesses to litigate in Arizona. (D.I. 40 at 8-14.) It also argues that there are several public interest factors that favor transfer. (*Id.* at 14-17.) While some of these factors may indeed weigh in favor of transfer, NHS has not met its high burden of showing that I made a clear error of law or fact, or that there is manifest injustice.

Moreover, it is not appropriate for parties to make a motion of reconsideration to relitigate matters that have already been determined. *Glendon,* 836 F.Supp. at 1122; *Dale and Selby Superette & Deli v. U.S. Dept. of Agric.,* 838 F.Supp. 1346, 1347-48 (D.Minn.1993) (citing *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986); *Brambles,* 735 F.Supp. at 1240. I did not misunderstand the arguments of NHS, or make a decision outside the adversarial issues presented to me by the parties. It is, therefore, not appropriate for NHS to present arguments that it could have made previously, when it first brought its motion to transfer venue.

### IV. CONCLUSION

Accordingly, IT IS HEREBY ORDERED that NHS's Motion for Reconsideration (D.I.39) is DENIED.

D.Del.,2006.
Block Drug Company, Inc. v. Sedona laboratories, Inc.
Slip Copy, 2006 WL 3694622 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.